# Exhibit 41



# Financial Crime Compliance Principles for Securities Custody and Settlement

**27 August, 2015**

# Table of Contents

**Preamble**     **2**

**1.  Introduction**     **3**

**2.  Securities Custody and Settlement**     **4**

**3.  Compliance Principles for Securities Custodians**     **7**
    A)  Governance and Control     7
    B)  Due Diligence     7
    C)  Third Party Client Business     9

**Appendix:  Definition of Beneficial Owner as Referenced
in Footnotes 3 and 4**     **14**

## Preamble

Compliance has become a major focus for financial services. Recent trends affecting the industry include:

- Regulators have increased their attention and focus on sanctions enforcement and counter-terrorism measures. Recent enforcement actions highlighted differing expectations between the industry and the authorities.
- Concerns about the lack of transparency in securities holding chains have led regulators to adopt new standards that depart from traditional guidance.
- The development of compliance monitoring practices in securities settlement will lead to significant operational friction if not accompanied by appropriate cross-industry standards.

ISSA believes that the securities custody and settlement industry must now reassess and enhance the financial crime compliance framework within the cross-border intermediated securities supply chain.

# 1. Introduction

The International Securities Services Association (ISSA) has agreed to the Financial Crime Compliance Principles (Principles) in order to provide global guidance on the establishment and maintenance of Cross-Border Securities Custody relationships.

The international system under which securities are safekept and settled intermediates many institutions, transforming ownership interests multiple times. The system brings enormous benefits to the global economy through significant scale benefits resulting in low transactional costs and a high degree of securities mobility. These Principles aim to provide guidance to securities custodians ("Custodian(s)" [1]) on how best to manage the risks that arise from the layers of intermediation between securities issuers and ultimate beneficial owners.

Whilst these Principles are not intended to address the risks associated with domestic custody accounts, domestic market participants and their supervisors may nonetheless be guided by the Principles. ISSA believes that adherence to these Principles will further enhance effective risk management and enable institutions to exercise sound business judgement with respect to their customers and the underlying clients for whom their customers act. The Principles aim to protect the global securities custody and settlement infrastructure and its participants from criminal activity.

The Principles are intended to cover certain conduct risks in general including measures to counter money laundering, terrorist financing, market abuse, corruption, fraud and the evasion of sanctions. In particular, the Principles provide market participants with practical guidance on the question of transparency of ownership and control in intermediated securities custody arrangements. The Principles are designed to be consistent with the objective of affording the investor the highest degree of protection but are not themselves intended to provide guidance on that question.

---

[1] A professional securities custodian («Custodian») may be defined as a regulated financial institution providing securities custody / safekeeping accounts, securities settlement and related services to its clients (typically institutional, collective and private investors, investment managers, and broker dealers) and to other financial institutions.

3

## 2.  Securities Custody and Settlement

Under the IOSCO *Principles on Client Identification and Beneficial Ownership for the Securities Industry* of 2004, correspondent banks may undertake simplified or reduced due diligence on their equivalently regulated financial institution customers in order to rely on the customers' programs to identify clients and ultimate beneficial owners. These Principles provide guidance to Custodians on the appropriate due diligence measures to fulfil this recommendation.

These Principles are addressed to Custodians and their institutional account holders ("Account Holders"), which are defined as the regulated financial institutions that act as their customers[2].

A Custodian provides its customers with a number of securities services, among them: securities safekeeping services, the processing and execution of securities settlement instructions, the settlement of trades cleared by a central counterparty and the related management of margins, the processing of payment obligations arising from clearing and settlement, funds distribution as well as related asset services.

Those services may be for the customer's own account and / or for the account of the customer's clients (hereafter referred to as "Client of the Account Holder" or "Client") representing a range of beneficial owners[3]. The Clients of the Account Holder may be individuals, legal entities or even other financial institutions.

---

[2] Account Holders in the context of the Principles are regulated financial institutions holding accounts directly with the Custodian.  The term expressly excludes the notion of direct end investor records at the level of the CSD which is the arrangement in place in some markets and which are sometimes called "accounts".

[3] For the purposes of these Principles, beneficial ownership is defined in accordance with the EU Fourth Money Laundering Directive (Directive [EU] 2015/849 of 20 May 2015, OJL 141/73 5 June 2015). It is especially relevant that this definition of beneficial ownership relates both to the entitlement to the proceeds of an asset (that we will refer to in these Principles as "Assets Beneficial Owners") and to the control over the disposition of the asset (hereafter referred to as "Entity Beneficial Owners"), see Appendix A.



FIG 1 – FCCP naming convention for stakeholders of the securities custody chain

In the context of these Principles, Custodians include but are not limited to banks acting as global custodians and sub-custodians, fund distributors, trustees/depositary banks, brokers, prime brokers, International Central Securities Depositories and Central Securities Depositories, to the extent that cross-border operations are involved.

Custodians are used by their customers for the safekeeping of proprietary and third party interests in securities, the settlement and clearing of securities trades and ancillary services including corporate action processing, securities lending and collateral management.

The Principles:

- Focus on the Custodian's relationship with its Account Holders, including other Custodians;

- Address cross-border relationships which are defined as relationships in which the Account Holder is foreign or which concern the deposit of foreign or international securities;

- Address relationships maintained with regulated financial institutions even if Custodians may decide to extend these Principles to all the relationships they maintain for other types of customers.

A Custodian will only be entitled to exercise its rights as foreseen in Principles C1 to C17 below towards its own Account Holder if there is a clear jurisdictional link between the jurisdictions under which the securities involved are related and the jurisdiction evoked by the Custodian and the Account Holder.

5

For example, a Custodian will only be able to rely on the obligations imposed in jurisdiction A if:

- The Custodian or the Account Holder falls subject to jurisdiction A;

- The securities at stake (i) have been issued under the law of jurisdiction A, (ii) are deposited in jurisdiction A, (iii) have been traded in jurisdiction A or (iv) are denominated, traded or settled in the currency of jurisdiction A;

- The issuer of the securities at stake falls subject to jurisdiction A.

In these cases the requirements of jurisdiction A may be applied by the Custodian to the Account Holder or to the latter's Clients.

6

# 3. Compliance Principles for Securities Custodians

## A) Governance and Control

Custodians shall define policies and procedures which detail how the Custodian will ensure compliance with these Principles.

Custodians shall organise appropriate compliance and control functions that are specifically tailored to the demands of safekeeping, clearing, settling and administering securities. The control functions should independently review new customer relationships and should provide for an independent, periodic review of the Custodian's business relationships.

## B) Due Diligence

All Account Holders of the Custodian shall be subjected to appropriate due diligence that will seek to satisfy the Custodian that it is comfortable conducting business with a particular Account Holder, in the light of that Account Holder's risk profile and the nature of the business relationship that it will have with the Custodian.

It may be appropriate for a Custodian to consider that an Account Holder is subject to a Financial Action Task Force ("FATF") – compliant regulatory environment or its equivalent. The Custodian should not rely solely on the Account Holder's regulatory status but should, as appropriate, take into account other information through the due diligence process.

The Custodian's policies and procedures shall require that the information on the Account Holder is reviewed and updated on a periodic basis. A relevant conduct-risk event (such as a suspicious transaction, a material regulatory investigation or enforcement or related adverse media) that results in a material change in the risk profile of the Account Holder shall prompt a risk review of the relationship.

The Custodian shall follow regulatory requirements and its policies and procedures to detect and investigate unusual or suspicious activity and report any such activity as required by applicable law. The policies and procedures include appropriate monitoring of the Account Holder's activity, incorporating due diligence results such as customer risk rating and other factors considered meaningful in the assessment of risks related to the provision of securities custody and settlement services.

In conducting due diligence on its Account Holders, the Custodian might consider the elements set out below to address specific risk indicators:

### B1) The Account Holder's Ownership and Management Structures

Relevant risk considerations include the domicile and reputation of the Entity Beneficial Owners[4] and the transparency of the ownership structure and whether it is publicly held and its shares are traded on an exchange in a jurisdiction that the FATF recognises as compliant with global standards.

The structure and experience of Executive Management and those managing the business directed towards the Custodian in the intermediation of securities should also be considered.

The presence of any politically exposed persons (PEPs) in the Executive Management or ownership structure is also an important consideration.

For all significant controlling interests, the ultimate Entity Beneficial Owners, (of the Account Holder as an entity), sources of wealth and background, including their reputation in the market place (particularly as may be related to any negative or adverse AML matters) as well as recent material ownership changes shall also be ascertained to the extent available through inquiry or public sources.

### B2) The Account Holder's Geographic Risk

Certain jurisdictions are internationally recognised as having weaker anti-money laundering standards and regulatory supervision, presenting greater risk for crime, corruption, terrorist financing or posing elevated risk of evading sanctions. On the other hand, other jurisdictions with more robust regulatory environments represent lower risks.

The supervisory regime must be considered, particularly where the regime is considered to be deficient in its application of global financial crime standards.

Custodians shall review announcements of regulatory and enforcement authorities[5] in order to evaluate the degree of risk presented by the jurisdiction in which the Account Holder is based, the jurisdiction in which its ultimate parent is headquartered, and jurisdictions of the Clients of the Account Holder.

### B3) The Account Holder's Business Franchise

The types of financial products and services the Account Holder offers to its own clients, as well as the type of markets served, influence the risk profile.

The Custodian should seek to obtain information about which products and which segments within the Account Holder's business franchise are supported by the

---

[4] For the sake of those Principles, we will call:
- the natural person(s) who ultimately owns (shareholders) or controls (Directors, executive committee members) an entity the "Entity Beneficial Owner";
- the natural person(s) on whose behalf or under whose ultimate control a transaction is being conducted the "Assets Beneficial Owner".

[5] These include, in particular, the FATF, the EU Council and US Treasury.

8

account(s) with the Custodian and, where relevant, which of its business divisions, branches, subsidiaries and affiliates are involved in distributing securities-related offerings. Involvement in certain business segments and providing certain products or services generally recognised as being vulnerable to money laundering, terrorist financing, market abuse, corruption, fraud and the evasion of sanctions may present additional risks.

### B4) The Account Holder's Anti-Money Laundering and Compliance Controls

The Custodian should inform itself about the Account Holder's anti-money laundering program in the context of its products, customer base and jurisdiction.

Where there is evidence of adverse reputational risk, regulatory enforcement action or failures in financial crime compliance, the Custodian should seek to obtain information about any consequent changes in the Account Holder's Executive Management and of any remedial action taken in respect of the Account Holder's AML controls and its compliance program.

## C) Third Party Client Business

Securities custody intermediates the ownership interests not only of the Account Holder but, in many cases, of the Clients of the Account Holder. Securities are primarily a record of entitlement. Consequently, control methodologies in securities services must focus on asset holdings and not just on the execution of transactions by asset owners.

In dealing with Custody accounts established for the purpose of safekeeping and transacting in securities interests ultimately owed to third party clients, the Custodian shall apply the Principles set out below. In order to ensure that the Custodian can meet its obligations and fulfil the objectives of its compliance policies, it should communicate its requirements to its Account Holders and obtain representations and undertakings relating to them contractually.

9

**Policy and Standards**

1. It is the responsibility of the Custodian to communicate to its Account Holders any relevant Know Your Customer ("KYC") standards and other compliance and risk-based requirements that it expects them to follow.

2. It is the responsibility of the Account Holder to comply with those standards and requirements.

3. Where the Account Holder has clients who themselves accept deposits of third party client securities, it is the responsibility of the Account Holder to notify those clients that by holding securities cross-border they will be subject to the requirements of the jurisdictions in which the securities entitlements are held, including the standards of the relevant Custodian(s).

4. It is the responsibility of the Account Holder to sub-deposit securities with the Custodian only when the Assets Beneficial Owners have been subjected to satisfactory due diligence. If the Assets Beneficial Owners of the securities are not themselves directly clients of the Account Holder, then it is the responsibility of the Account Holder to ensure that its direct Clients have undertaken the appropriate level of due diligence. On a risk-led basis, the Custodian should be entitled to verify that its due diligence standards have been met. Third party agents or reports may be relied upon for this purpose.

**Account Holder's Assets – Segregated versus Omnibus Accounts**

5. The Custodian must ensure that all accounts are designated by the Account Holder as intended for the deposit of proprietary or client interests in securities. Accounts designated as client accounts must be sub-classified as either segregated, holding securities for one single Client of the Account Holder or omnibus, commingling securities belonging to or held for several Clients of the Account Holder.

**Segregated Client Accounts**

6. Non-proprietary segregated accounts may be held only by Account Holders authorized to accept client assets and monies that have adequate compliance and control functions fulfilling the demands of safekeeping client assets. In the limited case of third countries that do not regulate safekeeping, the Custodian should ensure that the Account Holder has established appropriate policies and procedures to ensure that assets are suitable for the underlying investors.

7. When an Account Holder opens a segregated account for a third party with the Custodian, the account must be associated with the name of that third party.

8. In addition to the provision of paragraph 7 above, the Account Holder must declare to the Custodian the Assets Beneficial Ownership of the assets deposited on a segregated Account Holder's account. An exception to this is when the segregated Account Holder's account is maintained on behalf of an underlying Client itself depositing securities with the Account Holder on an omnibus basis. In such a case the Custodian should apply, to the Account Holder, the Principles that govern the maintenance of omnibus client accounts (paragraph 9 and following).

**Omnibus Client Accounts**

9. Omnibus client accounts commingling securities held for several Clients of the Account Holder may be opened and maintained only by those Account Holders that:

    - Are regulated and authorized to accept client assets and monies;

    - Have compliance and control functions reasonably designed to ensure compliance with client asset protection rules or, in the limited case of third countries that do not regulate safekeeping, have policies and procedures in place to ensure that assets are suitable for the underlying investors;

    - Represent that they have applied any specific requirements communicated by the Custodian to the business of the Clients of the Account Holder whose securities are sub-deposited with the Custodian and can demonstrate that reasonable steps are taken to verify compliance;

    - Screen transactions and holdings against lists of designated persons under sanctions and other relevant programs consistent with any requirements communicated by the Custodian.

10. In case the Account Holder opens an omnibus client account with the Custodian, it must disclose to the Custodian the geography, segments and products which the omnibus client account supports.

11. In considering whether to open an omnibus client account for an Account Holder, the Custodian should evaluate the risk factors present, including the reputation and jurisdiction of the Account Holder, the geographies,

segments and products that the account is intended to support and the nature of the Account Holder's activity.

12. The Account Holder must inform the Custodian promptly of any intention to materially change its use of the omnibus client account[6]. The Custodian reserves the right to decline the use of the omnibus client account to support any new business activity of the Account Holder.

13. The Custodian has the right to conduct activities to verify its Account Holder's compliance with its requirements including requesting that the Assets Beneficial Ownership of assets deposited on omnibus client accounts be disclosed to the Custodian via an agreed operational procedure based on predicated risk factors (i.e. red flags).

    The beneficial ownership of assets deposited on omnibus client accounts shall be disclosed to the Custodian in case of an enquiry by a regulatory authority, judicial authority or the issuer of those assets provided there is sufficient legal basis (as determined by the Custodian) to justify the request.

14. In the case of an omnibus client account where Clients of the Account Holder have themselves deposited securities in this account on an omnibus basis, the Custodian should:

    - Require its Account Holder to apply the standards to its Clients that the Custodian requires;

    - Be entitled to require that its Account Holder is in a position to identify the Assets Beneficial Owners of the assets deposited and to disclose those identities in accordance with Principle 17;

    - Require that its Account Holder performs due diligence to ensure that its Clients meet the requirements of Principles 9 – 16.

15. The Account Holder which has opened an omnibus client account with the Custodian must ensure that it has an appropriate level of visibility over the business of its branches, subsidiaries, business divisions and affiliates that are entitled to also use this omnibus account.

16. The Custodian should undertake periodic reviews on a risk basis of its Account Holders which have opened an omnibus client account to ensure that these requirements are continuously observed.

---

[6] A material change means an intention to use the account for a purpose significantly at variance with current representations and undertakings given by the Account Holder to the Custodian.

12

## Disclosure of Buyers and Sellers

17. The Custodian should be entitled to require its Account Holder to disclose the identities of the ultimate buyer and / or seller of a security in response to a specific request predicated on risk factors (i.e. red flags) within a reasonable period. Where the Client of the Account Holder is itself an intermediary, the Custodian should be required to ask its Account Holder to have its Client(s) disclose the identities of the ultimate buyer, seller and / or other related parties and to communicate the data to the Custodian within a reasonable period of time.

## Management of Conflict of Laws

Account Holders may be subject to local legal or regulatory requirements that make compliance with the above Principles unlawful without appropriate consents or at all. If compliance with any Principle can be made lawful if the appropriate consents are provided, the Account Holder shall use reasonable endeavors to obtain such consents. The Account Holder shall inform the Custodian (a) whether it has Clients who have not granted such waivers or consents and (b) of any circumstances in which a contractual waiver would be ineffective to remove the legal impediment to compliance with the Principles.

******

## Appendix A: Definition of Beneficial Owner as Referenced in Footnotes 3 and 4

The definition of the notion of "Beneficial Owner" is to be found in different regulatory documents, and amongst others:

(1) **EU Fourth Money Laundering Directive 2015/849 (20 May 2015)**

(6) 'beneficial owner' means any natural person(s) who ultimately owns or controls the customer and/or the natural person(s) on whose behalf a transaction or activity is being conducted and includes at least:
(a) in the case of corporate entities:
(i) the natural person(s) who ultimately owns or controls a legal entity through direct or indirect ownership of a sufficient percentage of the shares or voting rights or ownership interest in that entity, including through bearer shareholdings, or through control via other means, other than a company listed on a regulated market that is subject to disclosure requirements consistent with Union law or subject to equivalent international standards which ensure adequate transparency of ownership information.
A shareholding of 25 % plus one share or an ownership interest of more than 25 % in the customer held by a natural person shall be an indication of direct ownership. A shareholding of 25 % plus one share or an ownership interest of more than 25 % in the customer held by a corporate entity, which is under the control of a natural person(s), or by multiple corporate entities, which are under the control of the same natural person(s), shall be an indication of indirect ownership. This applies without prejudice to the right of Member States to decide that a lower percentage may be an indication of ownership or control. Control through other means may be determined, inter alia, in accordance with the criteria in Article 22(1) to (5) of Directive 2013/34/EU of the European Parliament and of the Council (29);
(ii) if, after having exhausted all possible means and provided there are no grounds for suspicion, no person under point (i) is identified, or if there is any doubt that the person(s) identified are the beneficial owner(s), the natural person(s) who hold the position of senior managing official(s), the obliged entities shall keep records of the actions taken in order to identify the beneficial ownership under point (i) and this point;

(b) in the case of trusts:
(i) the settlor;
(ii) the trustee(s);
(iii) the protector, if any;
(iv) the beneficiaries, or where the individuals benefiting from the legal arrangement or entity have yet to be determined, the class of persons in whose main interest the legal arrangement or entity is set up or operates;
(v) any other natural person exercising ultimate control over the trust by means of direct or indirect ownership or by other means;

14

(c) in the case of legal entities such as foundations, and legal arrangements similar to trusts, the natural person(s) holding equivalent or similar positions to those referred to in point (b).

**(2) US Treasury Department, FinCEN, proposal for public comment on requirement for financial institutions (banks, broker-dealers, etc.) at account opening to identify beneficial owner:**

Beneficial Owner means each of the following:

(1) Each individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25% or more of the equity interests of a legal entity customer *[maximum of four persons]*;

(2) A single individual [only one required to be identified] *with significant* responsibility to control, manage, or direct a legal entity customer, including

(i) An executive officer or senior manager (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer); or

(ii) Any other individual who regularly performs similar functions.

[Exceptions to requirements to identify beneficial owner, for customers who are: banks, broker-dealers and other supervised securities participants, investment companies, exchanges, etc.]

For the sake of those Principles, we will call:

- the natural person(s) who ultimately owns (shareholders) or controls (Directors, executive committee members) an entity the "Entity Beneficial Owner");
- the natural person(s) on whose behalf a transaction is being conducted the "Assets Beneficial Owner".