# Exhibit 2

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
2                  CASE NO.  18-MD-2865 (LAK)

3

4    _____
                                            )
5    IN RE:                                 )
                                            )
6    CUSTOMS AND TAX ADMINISTRATION OF      )
     THE KINGDOM OF DENMARK                 )
7    (SKATTEFORVALTNINGEN) TAX REFUND       )
     SCHEME LITIGATION                      )
8                                           )
     _____)
9

10

11

12                  C O N F I D E N T I A L

13

14

15    REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

16                      EXAMINATION OF

17                      BRUCE DUBINSKY

18

19               DATE: March 29, 2022

20

21

22

23

24

25           REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

1

2

3

4

5

6                TRANSCRIPT of the videotaped deposition

7      of the expert witness, called for Oral Examination

8      in the above-captioned matter, said deposition being

9      taken by and before MICHAEL FRIEDMAN, a Notary

10     Public and Certified Court Reporter of the State of

11     New Jersey, via WEBEX, ALL PARTIES REMOTE, on March

12     29, 2022, commencing at approximately 9:04 in the

13     morning.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1     A P P E A R A N C E S :

 2

       HUGHES, HUBBARD & REED
 3     One Battery Park Plaza
       New York, NY 10004
 4     BY:   NEIL OXFORD, ESQ.
             BILL MAGUIRE, ESQ.
 5           MARC A. WEINSTEIN, ESQ.
             CAROLYN HARBUS, ESQ.
 6           JAMES HENSELER, ESQ.
             JOHN MCGOEY, ESQ.
 7           VALERIE CAHAN, ESQ.
             ERIN PAMUKCU, ESQ.
 8           VICTOR SANDOVAL, ESQ.
             MAUREEN HOWLEY, ESQ.
 9           GREGORY FARRELL, ESQ.
             ELIZABETH ZHOU, ESQ.
10           DEBBIE PLACID, ESQ.
             SIOBHAN D'ANGELO, ESQ.
11           JUSTIN TAYLOR, ESQ.
             ERIC EBDRUP, ESQ.
12           Via VTC
       Attorneys for SKAT
13

14     HANAMIRIAN LAW FIRM
       40 E. Main Street
15     Moorestown, NJ 08057
       BY:   JOHN M. HANAMIRIAN, ESQ.
16           ELZA GRIGORYAN
             Via VTC
17     Attorneys for Acorn Capital

18     THE MOORE TAX LAW GROUP
       11 Broadway
19     New York, NY 10004
       BY:   ZHANNA ZIERING, ESQ.
20           AARON ESMAN, ESQ.
             Via VTC
21     Attorneys for Kenning and Klugman

22     KAPLAN RICE
       142 West 57th Street
23     New York, NY 10019
       BY:   Y. KATIE WANG, ESQ.
24           MICHELLE RICE, ESQ.
             Via VTC
25     Attorneys for Albedo, et al
```

```
 1      A P P E A R A N C E S :

 2

        KOSTELANETZ & FINK
 3      250 Greenwich Street
        New York, NY  10007
 4      BY:    NICHOLAS H. BAHNSEN, ESQ.
               BRYAN C. SKARLATOS, ESQ.
 5             CAROLINE CIRAOLO, ESQ.
               ERIC SMITH, ESQ.
 6             DANIEL DAVIDSON, ESQ.
               SHARON L. MCCARTHY, ESQ.
 7             JULIET L. FINK, ESQ.
               Via VTC
 8      Attorneys for Azalea, et al

 9

        K&L GATES
10      One Lincoln Street
        Boston, MA  02111
11      BY:    JOHN GAVIN, ESQ.
               BRANDON DILLMAN, ESQ.
12             DAVID FINE, ESQ.
               JOHN BLESSINGTON, ESQ.
13             ANNA E. L'HOMMEDIEU, ESQ.
               Via VTC
14      Attorneys for Alexander Jamie Mitchell, et al

15

16      GUSRAE, KAPLAN & NUSBAUM
        120 Wall Street
17      New York, NY  10005
        BY:    KARI PARKS, ESQ.
18             MARTIN H. KAPLAN, ESQ.
               Via VTC
19      Attorneys for Goldstein

20

21

22

23

24

25
```

```
 1      A P P E A R A N C E S:

 2

        WILMER HALE
 3      7 World Trade Center - 250 Greenwich Street
        New York, NY  10007
 4      BY:   ALAN SCHOENFELD, ESQ.
              MICHAEL BONGIORNO, ESQ.
 5            JULIA PILCER LICHTENSTEIN, ESQ.
              RACHEL CRAFT, ESQ.
 6            ANDREW DULBERG, ESQ.
              BRITTANY LLEWELLYN, ESQ.
 7            Via VTC
        Attorneys for Avanix, et al
 8

 9

10      BINDER & SCHWARTZ
        366 Madison Avenue
11      New York, NY  10017
        BY:   NEIL S. BINDER, ESQ.
12            GREGORY C. PRUDEN, ESQ.
              WENDY H. SCHWARTZ, ESQ.
13            M. TOMAS MURPHY, ESQ.
              Via VTC
14      ATTORNEYS for ED&F Man

15

        DEWEY, PEGNO & KRAMARSKY
16      777 Third Avenue
        New York, NY  10017
17      BY:   SEAN MULLEN, ESQ.
              DAVID PEGNO, ESQ.
18            THOMAS E.L. DEWEY, ESQ.
              Via VTC
19      Attorneys for Michael Ben-Jacob

20

        WILLIAMS & CONNOLLY
21      725 12th STREET, NW
        Washington, DC  20005
22      BY:   AMY B. MCKINLAY, ESQ.
              STEPHEN D. ANDREWS, ESQ.
23            Via VTC
        Attorneys for Sander Gerber Pension Plan
24

25
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 6

```
 1      A P P E A R A N C E S :

 2

 3      KATTEN
        575 Madison Avenue
 4      New York, NY  10022
        BY:   DAVID GOLDBERG, ESQ.
 5            MICHAEL ROSENAFT, ESQ.
              Via VTC
 6      Attorneys for Klugman

 7

 8      SEWARD & KISSEL
        One Battery Park Plaza
        New York, NY  10004
 9      BY:   SHREY SHARMA, ESQ.
              THOMAS R. HOOPER, ESQ.
10            MARK J. HYLAND, ESQ.
              Via VTC
11      Attorneys for Bernard Tew

12

13      LAW OFFICES OF SHELDON S. TOLL
        2000 Town Center
        Southfield, MI  48075
14      BY:   SHELDON S. TOLL, ESQ.
              Via VTC
15      Attorneys for Hoffmeister

16

17      MORVILLO, ABROMOWITZ, GRAND, IASON & ANELLO
        565 5th Avenue
        New York, NY  10017
18      BY:   RICHARD WEINBERG, ESQ.
        Attorneys for Clove Pension Plan, Mill River
19      Pension Plan, Traden Investment Pension Plan

20

21

22

23

24

25
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1    A P P E A R A N C E S :

 2    MOORE TAX LAW GROUP
      2205 West Armitage Avenue
 3    Chicago, IL  60607
      BY:  ZHANNA ZIERING, ESQ.
 4    Attorneys for Klugman

 5

 6    POULOS LOPICCOLO
      311 W. 43rd Street
 7    New York, NY  10036
      BY:   DANIELLA DACUNZO-DALIA, ESQ.
 8          JOSEPH LOPICCOLO, ESQ.
      Attorneys for Lehman, et al

 9

10    ALSO PRESENT:  JOSE RIVERA, Videographer

11                   ROBERT KLUGMAN

12                   HELENE SCHWIERING

13                   DANIEL ALDRICH

14                   ROGER WARIN

15                   ZACHARY SCHREIBER

16                   DANIELLA DALLA

17                   CHRISTIAN B□LOW

18                   ANTHONY ALMEIDA

19                   AC EGHOLM

20

21

22                   *  *  *  *  *

23

24

25
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 8

```
 1                    I N D E X

 2   WITNESS NAME                           PAGE

 3   BRUCE DUBINSKY

 4   Examination By:

 5            By Mr. Bongiorno                13

 6            By Mr. LoPiccolo               191

 7
                      *  *  *  *  *
 8

 9                  E X H I B I T S

10   Exhibit NO.                            PAGE

11   Exhibit 5200-5203     Dubinsky initial   20
                           report, rebuttal
12                         report, reply report,
                           revised list of prior
13                         testimony

14   Exhibit 5209          Dubinsky declaration  51

15   Exhibit 5210          WH_MDL 96977 - 96986  62

16   Exhibit 5211          WH_MDL 265119 - 265129 64

17   Exhibit 5225          Investor publication  86

18   Exhibit 5227          SEC report, 10/14/21  96

19   Exhibit 5217          MPSKAT 75372 - 75374  102

20   Exhibit 5218          MPSKAT 88402 - 88403  110

21   Exhibit 5219          MPSKAT 182365 - 182367 119

22   Exhibit 5220          FGC Securities document 128

23   Exhibit 5221          SEC investor bulletin  130

24   Exhibit 5222          WH_MDL 32533 - 32543   148

25
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
1                    E X H I B I T S
                       (CONTINUED)
2

3    Exhibit NO.                                PAGE

4    Exhibit 5223      London Stock Exchange    175
                       rules
5
     Exhibit 5224      Investor.gov document    182
6
     Exhibit 5228      Determination of         186
7                      beneficial owner

8    Exhibit 5229      Elysium 5315871          192

9

10

11                    *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1                    - - -

 2              Deposition Support Index

 3                    - - -

 4

 5   Direction to Witness Not to Answer

 6   Page  Line     Page  Line     Page  Line

 7   None

 8

 9   Request for Production of Documents

10   Page  Line    Page  Line     Page  Line

11   None

12

13   Stipulations

14   Page  Line     Page  Line     Page  Line

15   None

16

17   Questions Marked

18   Page  Line     Page  Line     Page  Line

19   None

20

21

22

23

24

25
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
1              THE COURT REPORTER:  My name is

2      Michael Friedman, a Certified Shorthand

3      Reporter.   This deposition is being held

4      via videoconferencing equipment.

5          The witness and reporter are not in

6      the same room.   The witness will be

7      sworn or affirmed in remotely pursuant

8      to agreement of all parties.   The

9      parties stipulate that the testimony is

10     being given as if the witness was sworn

11     in person.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 12

```
 1           THE VIDEOGRAPHER:  We are now on
 2      record.   This is the remote
 3      video-recorded deposition of Bruce
 4      Dubinsky.
 5           Today is Tuesday, March 29, 2022.
 6      The time is now 9:04 a.m. in the Eastern
 7      time zone.
 8           We're here in the matter of In Re,
 9      Customs and Tax Administration of the
10      Kingdom of Denmark Et Al.  All counsel
11      have been noted on record.
12           My name is Jose Rivera, remote
13      video technician on behalf of Gregory
14      Edwards LLC.  At this time, will the
15      reporter, Michael Friedman, on behalf of
16      Gregory Edwards LLC, please swear in the
17      witness.
18
19
20
21
22
23
24
25
```

```
 1     B R U C E   D U B I N S K Y,

 2              called as a witness, having been first

 3     duly sworn according to law, testifies as follows:

 4

 5

 6

 7     EXAMINATION BY MR. BONGIORNO:

 8         Q    Good morning, Mr. Dubinsky.

 9              Can you hear me okay?

10         A    I can, Mr. Bongiorno, yeah.

11              Good morning.

12         Q    Okay.  As you know, my name is Mike

13     Bongiorno and I represent Mr. Richard

14     Markowitz, Ms. Jocelyn Markowitz, and various

15     pension plans in this action, and I'll be

16     asking you questions today.

17              I know that you've given your

18     deposition before, Mr. Dubinsky.

19              Have you ever done so remotely like

20     we're doing it today?

21         A    I have, yes.

22         Q    Okay.  So, obviously, you know

23     since we're not in the same room, then it's

24     going to be even more difficult than it is

25     when we're -- when we are in the same room
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1   not to talk over each other, but we'll do our

2   best, and, you know, we'll try to avoid that.

3   It's inevitable at times but we'll do our

4   best.

5           And I'm sure you know this, but if

6   you have trouble understanding one of my

7   questions, either because of its content or,

8   obviously, because you can't hear me for

9   whatever reason, just say so before

10  answering.

11          Okay?

12      A   I will do that, yes.

13      Q   Okay.  And you know this, too, but

14  just to remind you, if you need a break, let

15  the court reporter know, let me know, and

16  we'll take a break as long as there's no

17  question pending, unless there's some

18  specific reason to do that.  And I'll try to

19  take a break every hour, a little over an

20  hour or so anyway.

21          Do you have a document binder in

22  front of you that was provided to you this

23  morning?

24      A   I do, yes.

25      Q   Okay.  Did you bring any other

```
 1    documents with you today?

 2         A    I did not.

 3         Q    Okay.  And where are you physically

 4    located today for this deposition?

 5         A    At the offices of Hughes Hubbard

 6    down in New York City, lower Manhattan.

 7         Q    And did you prepare for your

 8    deposition today?

 9         A    Yes, I have.

10         Q    Okay.  What did you do to prepare?

11         A    I reviewed my reports that I issued

12    in this case.  There were three reports that

13    I've issued in this case.

14              I reviewed documents related to

15    those reports.  I reviewed the reports of

16    Dr. Carr.  Dr. Carr had issued, I believe,

17    three reports in this case, and that's

18    basically going through documents in that

19    regard.

20         Q    What types of documents did you go

21    through?

22         A    I went back through things like --

23              MR. WEINSTEIN:  Let me just -- I'll

24         object on privileged grounds.  You can

25         give general categories of documents,
```

1          but I just caution you to not get into

2          specifics.  To the extent that any

3          review was done with or at the direction

4          of counsel.

5          A    So, in general, just looking at my

6    report, the footnotes where I footnote

7    reference certain documents in general.  That

8    might have been trade confirmations, things

9    related to the matter in the case.

10         Q    Did you review any deposition

11   transcripts in order to prepare for today?

12         A    I don't recall if I went back

13   through any of the deposition transcripts.

14   Again, I may have, but nothing is jumping out

15   in particular.

16              There were transcripts that were --

17         Q    Did you --

18         A    There were transcripts listed in my

19   report.  Those would have the ones if I went

20   back to those that I looked at.

21         Q    What about -- you know who Mr. Wade

22   is.

23              Correct?

24         A    Yes, generally.  I've never met the

25   man, but I know the name.

1     Q     You know he's an expert in this

2    case, has been designated as an expert in

3    this case?

4     A     That's my understanding.

5     Q     Okay.  Have you seen his deposition

6    transcript?

7     A     I have not.

8     Q     Okay.  When were you first

9    contacted about this case?

10    A     I believe it was April 2021, last

11    year.

12    Q     What has your total compensation

13    been so far for this engagement?

14    A     I believe the fees that have been

15    billed to date are about $1.5 million.

16    Q     Is anyone else working with you on

17    this matter?

18    A     Yes, I do have associates that are

19    working with me on this matter.

20    Q     Who?

21    A     There are basically three main

22    associates working with me on this matter; a

23    gentleman named John Emperiali, Rachel

24    Altman, and Caitlyn Thomas.

25    Q     Okay.  Can you tell me what they

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    have done in this matter?

2         A    All three of them had different

3    roles, working under my direction and

4    supervision, to go through documents, to

5    review materials in the case, to gather

6    information for me, and assist me just like

7    they would on any case.

8         Q    So are these folks who work with

9    you regularly?

10        A    They are.  So just to clarify, I

11   had left my company, basically gone on senior

12   status from my prior company, which was

13   called Duff & Phelps, it's now known as

14   Kroll.

15             And so I'd gone on senior status

16   last year on April 1st, basically retired,

17   and I set up my own consulting company called

18   Dubinsky Consulting LLC and I have an

19   arrangement back with Kroll where I can

20   utilize the staff that used to work for me at

21   the firm on cases if I need assistance.

22        Q    And are the three people that you

23   just mentioned, are they employees of Kroll?

24        A    They are, yes.

25        Q    And they are folks that you worked

```
 1    with when you were at that company?

 2         A    Correct.

 3         Q    And you continue to work with them

 4    now that you've established your own entity.

 5              Is that right?

 6         A    Correct.

 7         Q    In connection with this assignment,

 8    did you ask to interview anyone at SKAT?

 9         A    I did not.

10         Q    Okay.  Have you ever spoken to

11    anyone at SKAT?

12         A    No, I have not.

13         Q    Did you review any notes of any

14    interviews that anybody else conducted with

15    anyone at SKAT?

16         A    No, I have not.

17         Q    And you mentioned that you reviewed

18    deposition transcripts.

19              Are all the deposition transcripts

20    that you reviewed listed in your reports?

21         A    That's correct, yes.

22         Q    Okay.  I want to mark, from your

23    notebook in front of you, your reports and

24    your list of prior testimony.

25              MR. BONGIORNO:  I'd ask that they
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
1          be marked -- Tab 5200 is your initial

2          report as revised.  5201 will be your

3          rebuttal report.  5202 will be your

4          reply report, and 5203 will be your

5          revised list of prior testimony.

6              (Whereupon the above mentioned was

7          marked for Identification.)

8       A   Okay.  I see those.

9       Q   Okay.  And have you reviewed --

10             MR. WEINSTEIN:  I'm sorry,

11      Mr. Bongiorno.  If we could just make

12      clear that the reports as marked do not

13      have the attachments to them.  Is that

14      correct?  At least the copies we were

15      provided don't.  So I just want to make

16      sure what's been marked is clear, that

17      it's the reports but not the

18      attachments.

19             MR. BONGIORNO:  Okay.

20             MR. WEINSTEIN:  Is that right?  Are

21      we on the same page?

22             MR. BONGIORNO:  Yes.

23             MR. WEINSTEIN:  Okay.

24      Q   And Mr. Dubinsky, I believe you

25   said you reviewed these reports, your three
```

```
 1     reports again to prepare for the deposition.

 2             Is that right?

 3       A     That's correct.

 4       Q     Okay.  When you reviewed them in

 5     preparation for this deposition, did you

 6     identify anything that was inaccurate in the

 7     reports?

 8       A     No, I did not.

 9       Q     So there isn't anything in those

10     reports that you want to correct today.

11             Is that right?

12       A     That is correct.  There's nothing

13     that has come to my attention that would be

14     incorrect.

15       Q     Are you working on any -- anything

16     additional with regard to this case at the

17     present time?

18       A     No, I'm not.

19       Q     Do you have any additional opinions

20     beyond those contained in your reports on

21     which you plan to testify in this matter?

22       A     No.  I would say this.  The

23     opinions, the basis for my opinions are set

24     forth in the three reports; the initial

25     report, the rebuttal report, and my reply
```

```
 1    report.

 2              To the extent there are —— I know

 3    Mr. Carr —— or Dr. Carr's deposition is

 4    coming up.  To the extent that he may say

 5    something or bring up new ideas or opinions,

 6    that I'll reserve the right to comment on

 7    those.

 8              But sitting here today, I'm not

 9    aware of anything that would be additional.

10      Q    Okay.  And you said you reviewed

11    Dr. Carr's three reports.

12              Correct?

13      A    Correct.

14      Q    Okay.  And I believe you have those

15    in your binder in front of you as well.  At

16    Tab 5100 is Carr's initial report.  5101 is

17    his rebuttal report, and 5102 is his reply

18    report.

19              Do you have those in front of you?

20      A    I do, yes.

21      Q    Okay.

22              MR. BONGIORNO:  They were marked as

23         Carr's deposition —— I'm sorry.  Carr's

24         deposition, that hasn't happened yet.

25              They were marked at Wade's
```

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

Page 23

1          deposition.

2          Q      Prior to this litigation, had you

3     ever heard of Dr. Carr?

4          A      No, I have not.

5          Q      Would you agree, having reviewed

6     his credentials and his reports, that he's

7     well-qualified in the areas of accounting?

8               MR. WEINSTEIN:  Objection to form.

9          A      Again, I'm not here to opine on his

10    credentials.  He has his credentials, I think

11    they'll speak for themselves.

12              But generally, he has accounting

13    credentials and I'll leave it at that.

14         Q      What about financial economics?  Do

15    you have a view as to whether or not he's

16    qualified in that area?

17              MR. WEINSTEIN:  Objection to form.

18         A      No, I think that's -- you're asking

19    for a legal conclusion.  The judge would have

20    to determine that in this case.

21              He does have some experience in

22    that area, so I would leave it at that.

23         Q      You don't have any reason to doubt

24    his expertise in those fields, though, do

25    you?

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 24

```
 1              MR. WEINSTEIN:  Objection to form.

 2         A    Again, I'm not here to comment on

 3    his expertise in any one field.

 4         Q    You've been designated as an expert

 5    over a hundred times.

 6              Is that right?

 7         A    That's correct.

 8         Q    Okay.  And you've testified over 75

 9    times.

10              Is that right?

11         A    I think at trial, I think it's

12    about 80 times now, and deposition more than

13    that, yes.  But many times.

14         Q    When is the last time you testified

15    in a deposition?

16         A    In a deposition?  I would have to

17    go back and look.  The last trial was a

18    couple weeks ago in the Southern District

19    here in New York.

20         Q    And what case was that?

21         A    That was the -- it was a Madoff

22    related case.  The trustee was suing a

23    company called RAR, I believe.  I'd have to

24    look.

25              I think it was RAR Entrepreneurial
```

1    Fund Limited.

2        Q    And in many of the cases that

3    you've testified in, those were about alleged

4    fraud.

5            Right?

6        A    I've testified in quite a few cases

7    about fraud or alleged fraud or related

8    issues.  I've also testified on cases on

9    damages, commercial damages, valuation

10   issues, accounting issues, and a variety of

11   other SEC topics, investment advisory topics.

12           So it was quite a wide range of

13   expertise.

14       Q    But many of them were about fraud,

15   weren't they?

16       A    Yes.  Many of the cases have been

17   about fraud, yes.

18       Q    And in those cases, in many of

19   them, you found that there was fraud.

20           Correct?

21       A    Well, I'd have to go back.  I don't

22   think that I've concluded in court that

23   someone committed fraud.

24           That's a legal finding.  That would

25   be up to the tryer of fact.  I think what --

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

Page 26

1    I've either testified about either red flags

2    of fraud, indicia of fraud, fictitious nature

3    of transactions.

4          I think the ultimate findings, I

5    mean, committing fraud, is a legal finding.

6      Q    Okay.  So you don't have any

7    opinion as to whether or not there was any

8    fraud in this case, I take it.

9          Right?

10     A    Again.  I'm not opining on legal

11   issues.  I think the judge or jury in this

12   case would have to opine on that.

13         That's why I haven't opined on the

14   guilt of any person or party in that regard.

15     Q    Okay.  I'm not asking about guilt

16   or innocence, sir.  It's not a criminal case.

17         I'm asking whether or not you have

18   an opinion in this case as to whether there

19   was any fraud?

20     A    Again, I think that's a legal

21   finding.  I think my report speaks for

22   itself.

23         I concluded that there were

24   fictitious transactions, that stock didn't

25   exist, dividends weren't paid.  But I think

```
1    the ultimate conclusion of whether there was

2    fraud will be up to the judge or jury in this

3    case.

4        Q    Okay.  I understand your report

5    speaks for itself, sir, but this is a

6    deposition so I'm going to be asking you

7    questions about your report.

8             Okay?  You understand that, right?

9        A    Yes.

10       Q    Okay.  And you just said a moment

11   ago that you're not reaching any legal

12   conclusions.  You're not an attorney.

13            Right?

14       A    That's correct.  I'm not.

15       Q    Are you offering any opinion in

16   this case about whether the plans were the

17   beneficial owners of the dividends?

18            MR. WEINSTEIN:  Objection to form.

19       A    Again, I think that's asking for a

20   legal conclusion, and I'm not issuing that

21   legal conclusion.

22       Q    Okay.  And so you're not offering

23   any opinion, either about whether the plans

24   were the beneficial owner of dividends under

25   Danish tax law.
```

1          Right?

2          MR. WEINSTEIN:  Objection, form.

3      A    Again, I'm not opining anything as

4  to Danish tax law.  I'm not a Danish tax law

5  expert and not being offered as one.

6      Q    You're not an expert on what it

7  means to be the beneficial owner of dividends

8  under Danish tax law.

9          Right?

10     A    I would agree with you.

11     Q    Okay.  And you're not offering any

12  opinion about legal ownership under Danish

13  law.

14         Right?

15     A    I would agree with you.  That would

16  call for a legal conclusion.

17     Q    And similarly, you're not offering

18  an opinion about legal ownership under U.S.

19  law, then.

20         Right?

21     A    I would agree with you again.  That

22  would call for a legal opinion.

23         I'm not a lawyer.

24     Q    Okay.  And you're not offering an

25  opinion about the intent of the defendants in

1     this case, are you?

2          A    No, I'm not.

3          Q    And you're also not offering an

4     opinion about whether SKAT reasonably relied

5     on the reclaim applications at issue in the

6     case.

7               Right?

8          A    That is correct.  I am not.

9          Q    Okay.  Mr. Dubinsky, have you ever

10    worked as a trader?

11         A    I have not worked as a trader, no.

12         Q    So you don't have any experience in

13    trading Danish securities.

14              Is that a fair statement?

15         A    I would agree with you, yes.

16         Q    Have you ever engaged in dividend

17    arbitrage trading?

18         A    I have not.

19         Q    Do you have any experience in

20    arranging structured transactions?

21              MR. WEINSTEIN:  Objection to form.

22         A    I have not.  I'm just trying to

23    think.

24              I have not been involved in

25    arranging structured transactions.

1        Q    You're not an expert in trade

2    clearing, are you?

3        A    I wouldn't consider myself an

4    expert in trade clearing.  I have some

5    experience in looking at that aside from this

6    case, but I wouldn't consider myself an

7    expert in trade clearing.

8        Q    What about trade settlement?  Do

9    you consider yourself an expert in trade

10   settlement?

11       A    Again, I have some experience in

12   that area aside from this case, but I

13   wouldn't hold myself out as an expert in

14   that.

15       Q    Have you ever worked at a financial

16   firm that was a member of the New York stock

17   exchange?

18       A    I don't believe so, no.

19       Q    Have you ever worked at a firm that

20   was a member of the London stock exchange?

21       A    No.

22       Q    Have you ever worked at a firm that

23   was regulated by FINRA?

24       A    Yes.

25       Q    What firm was that?

```
 1        A     Several firms.  One was Bridgewater
 2   Financial Associates.  One was called SOL,
 3   S-O-L, Capital, and one was Duff & Phelps.
 4   It was a predecessor to Kroll.
 5        Q     What was the second one you
 6   mentioned?
 7        A     SOL Capital, S-O-L Capital.
 8        Q     What did you do at Bridgewater?
 9        A     I was a registered investment
10   advisor representative for Bridgewater and so
11   I had high net worth clients that I did
12   investment advisory services for, and
13   arranged their portfolios in investments.
14        Q     When did you work at Bridgewater?
15        A     That would have been late '90s,
16   early 2000s, in that time period.
17        Q     What did you do at SOL Capital?
18        A     Same thing.  I had -- this was
19   during the time I had an accounting practice.
20   I have a CPA and I had high net worth
21   individual clients.
22              And I got licensed as an IRA rep
23   and SOL was an investment advisor registered
24   with FINRA, regulated with FINRA, and I did
25   the same thing.  I advised high net worth
```

```
1    individual clients and pension plans,

2    retirement plans on investments.

3         Q    And at Duff & Phelps, you did this

4    type of work that you do now.

5              Is that right?

6         A    No, I did not.  So when I joined

7    Duff & Phelps, I let my license lapse at that

8    point because I was not doing that work

9    anymore.

10             And just to maintain the

11   registration requirements was too much red

12   tape.  So I let the license lapse at that

13   point.

14        Q    So what did you do at Duff &

15   Phelps?

16        A    I was a managing director at Duff &

17   Phelps in their disputes and investigation

18   practice, and so I handled everything from

19   investigations to commercial disputes, expert

20   witness work.

21             That was my role at Duff & Phelps.

22        Q    Okay.  And in this matter, you were

23   retained to do a forensic accounting of the

24   cash flows of the tax refund payments paid

25   out by SKAT.
```

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

```
 1              Is that right?

 2       A    Among other things, yes, that was

 3   part of what I was asked to do.

 4       Q    Okay.  And your forensic accounting

 5   was of the payments that allegedly went to

 6   Solo clients.

 7              Right?

 8       A    That portion of the work was, yes,

 9   looking at the refund claim payments paid by

10   SKAT and the money flow from those payments,

11   where did the money go.

12       Q    You did not do a forensic

13   accounting of SKAT, did you?

14       A    No, I did not.

15       Q    Okay.  You did not do a forensic

16   accounting to assess whether the withholding

17   tax associated with the refund claims in this

18   case was actually paid to SKAT.

19              Right?

20       A    No, I did not.

21       Q    Did you develop a view of whether

22   SKAT collected dividend withholding tax from

23   any of the sellers in the trades associated

24   with this case?

25              MR. WEINSTEIN:  Objection to form.
```

```
 1        A    I'm not sure what you mean, did I
 2   develop a view.  It's just my basic
 3   understanding that an issuer, when it pays a
 4   dividend in Denmark, would submit the
 5   withholding directly to SKAT.
 6             That was my understanding.
 7        Q    But you didn't develop a view as to
 8   whether SKAT collected dividend withholding
 9   tax from any of the sellers in the trades in
10   this case?
11             MR. WEINSTEIN:  Objection to form.
12        A    Which sellers are you talking
13   about?  I'm confused.
14        Q    You're aware that -- well, you
15   analyzed various transactions associated with
16   the opinions that you gave in this case.
17             Right?
18        A    Correct.
19        Q    And those transactions involved
20   numerous parties.
21             Correct?
22        A    Yes.
23        Q    And some of those parties were
24   sellers.
25             Right?
```

```
 1              MR. WEINSTEIN:  Objection to form.
 2       A    Well, again, if you could be more
 3   specific as to which ones you're talking
 4   about?
 5       Q    You don't know what I mean when I
 6   talk about sellers in a transaction in this
 7   case?
 8              MR. WEINSTEIN:  Objection to form.
 9       Q    You're unable to think of any?
10       A    Again, I just want to make sure
11   we're on the same page.  If you give me a
12   specific, then I can answer your question.
13       Q    You can't think of the name of a
14   single seller in a single transaction in this
15   case?
16              MR. WEINSTEIN:  Objection to form.
17       A    Well, again, I'm not here to go
18   back and forth.
19              Are you talking about the purported
20   short sellers?  Is that what you're asking?
21              I'm just trying to get
22   clarification, Michael.
23       Q    Sure.  Short sellers, folks who
24   sold to the pension plans?
25              MR. WEINSTEIN:  Objection to form.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 36

```
 1        A     So what I would say is -- and maybe
 2   we can agree for the deposition -- but when
 3   you talk about sellers, I'm going to talk
 4   about purported sellers.  And yes, so for
 5   instance, DDC Cayman would be a purported
 6   short seller.
 7             So that's how I would define that.
 8        Q     Okay.  That's fine.  And my
 9   question to you is whether -- we'll use DDC
10   Cayman -- did you develop a view as to
11   whether SKAT collected dividend withholding
12   tax from DDC Cayman?
13             MR. WEINSTEIN:  Objection to form.
14        A     My view would be that withholding
15   tax was paid -- should have been paid by the
16   issuer of the Danish security directly to
17   SKAT as withholding tax, and it wouldn't have
18   come directly from DDC Cayman in that regard.
19             So that would be my view, if that's
20   what you're asking.
21        Q     Okay.  Did you look to see how much
22   any of these issuers paid to SKAT in dividend
23   withholding tax?
24        A     No, I didn't.  Let me just clarify
25   and see if I understand the question.
```

```
 1              For instance, like Novo Nordisk,
 2    are you asking if I went back to see how much
 3    money Novo Nordisk, for a certain dividend
 4    that was declared by that company, by that
 5    issuer, paid to SKAT on a particular date?
 6              Is that what you're asking?
 7       Q    That's my question, yes.
 8              Did you look to see how much any of
 9    these issuers paid in dividend withholding
10    tax?
11              MR. WEINSTEIN:  Objection to form.
12       A    No, I did not.
13       Q    So you don't know either way how
14    much any of these issuers paid in withholding
15    tax in connection with any of the dividends.
16              Is that right?
17              MR. WEINSTEIN:  Objection.
18       A    That is correct.  To SKAT.
19       Q    In working on your reports, you
20    reviewed documents that you understood came
21    from Solo Capital.
22              Right?
23       A    Correct.
24       Q    Okay.  And you understand that
25    Solo Capital is not a party to this
```

```
 1    litigation?

 2         A    That's my understanding to this

 3    particular litigation, yes.

 4         Q    Okay.  You had access to a set of

 5    documents that came from an entity called

 6    Elysium Global.

 7              Right?

 8         A    Yes.

 9         Q    Okay.  And do you have any

10    understanding of what those documents

11    represent?

12         A    I think in general, my

13    understanding was those were documents that

14    Solo had maintained that was part of a Solo

15    umbrella of companies.  So there were a lot

16    of different documents in that database.

17              But they were business records

18    related to Solo and various entities under

19    Solo's control.

20         Q    Okay.  Why don't you open up your

21    report, your initial report, which is

22    Exhibit 5200.

23         A    Okay.

24         Q    And I want you to go to Footnote 5

25    on a Page 8.
```

```
 1              Okay?

 2      A    Okay.

 3      Q    I'm going to read the last couple

 4  of sentences of that footnote.

 5              "Further, I have been informed that

 6  a hard drive potentially containing Solo

 7  Capital and/or related entities' documents

 8  has been found, but is encrypted and cannot

 9  be accessed.  I do not believe that these

10  facts impact the conclusions of this report

11  and reserve the right to supplement this

12  report if/when more documents become

13  available."

14              Do you see that?

15      A    I do see that, yes.

16      Q    Did I read that correctly?

17      A    You did.  That was half of the

18  footnote, but that portion you did read

19  correctly.

20      Q    After you submitted your reports,

21  did you receive any additional Solo

22  documents?

23      A    Not that I recall, no.

24      Q    Based on the statement in this

25  footnote, is it fair to say that there are
```

1    documents from Solo Capital that you did not

2    review?

3        A    Yes, that's correct.  I mean, the

4    encrypted drive, as I said down there.  And

5    then there was a -- at the beginning of that

6    footnote it also talks about -- I think

7    there's a privilege review that was ongoing

8    and that those documents had not been

9    produced yet.

10       Q    And you don't know what's in the

11   documents on the encrypted hard drive.

12           Right?

13       A    That is correct.

14       Q    There could be anything on that

15   hard drive.

16           Right?

17       A    Theoretically, yes.

18       Q    You don't have any idea if that

19   hard drive contains Solo records reflecting

20   holdings of shares in Danish companies.

21           Right?

22       A    Not having access to it, I don't

23   know what's on there, but I wouldn't expect

24   to see shares of Danish companies

25   being -- the documents on that encrypted

1    drive when I haven't seen them anywhere else.

2    In the voluminous amount of records that have

3    been produced in this case, it wouldn't make

4    sense to me.

5              But again, I don't know what's on

6    there.  I can't get into that encrypted

7    drive.

8              I don't think anybody can.

9         Q    Okay.  So because you haven't seen

10   them anywhere else, you assume they're not on

11   this encrypted hard drive either.

12             Is that an assumption you made?

13        A    That's an assumption that I've

14   made, that there was a voluminous amount of

15   records made available to me.  There were --

16   when you look at those records in conjunction

17   with the information that came from the

18   supposed sub-custodians, from J.P. Morgan,

19   SEB and Sofgen, there's nothing that would

20   lead me to believe that there would be

21   documents from -- that would show holdings of

22   Danish securities that relate to the Solo

23   transactions on that encrypted drive.

24        Q    If the hard drive contained records

25   of holdings in Danish securities at

1    Solo Capital, would that affect your

2    conclusions?

3              MR. WEINSTEIN:  Objection to form.

4        A    Well, if there are documents from

5    sub-custodians, knowing that the Danish

6    securities were actually held in custodial --

7    you know, in custody, then sure, that would

8    affect my opinion.

9              But I don't see how that's

10   possible.  And sub-custodians that were

11   identified by Mr. Shah and Solo lawyers at

12   Reed Smith indicated that they didn't have

13   any holdings relating to these transactions.

14             So I don't know beyond that what

15   could be on that hard drive.

16       Q    You don't know if that hard drive

17   contains evidence of additional

18   sub-custodians that Solo used for Danish

19   securities, do you?

20             MR. WEINSTEIN:  Objection, asked

21        and answered.

22       A    Well, again, I mean, it's -- that's

23   kind of obvious.  If I can't get into the

24   hard drive, I don't know what's on there.

25             But I would think that Mr. Shah, in

1    the U.K. proceedings, would have had every

2    reason to identify proper sub-custodians

3    holding these shares because he was being

4    accused that these transactions were

5    fraudulent or didn't properly exist.  That

6    hasn't -- you know, he identified what he

7    identified.

8            So I don't know -- again, I don't

9    know what's on that hard drive, but there's

10   nothing to lead me to believe that in the

11   evidence I have seen in this case that there

12   would be anything of such nature on that hard

13   drive.

14       Q    So you're relying in part on what

15   Mr. Shah said in order to develop your view

16   in that regard?

17           Is that a fair statement?

18       A    I think that's a fair statement in

19   part.  Mr. Shah, Reed Smith had indicated

20   when they responded to the FCA's

21   investigation that Sofgen was the custodian

22   during the relevant period when they were

23   referencing on their letter what the relevant

24   period was.

25           So I think it's the totality of the

1    information.  I would have thought that --

2    that in all of the other documents that were

3    made available, there would have been some

4    mention of other sub-custodians that would

5    lead me to believe, you know, if there was,

6    that maybe something was on that hard drive,

7    and there's nothing that's come to my

8    attention in that regard.

9        Q    Do you know how much information is

10   contained on the hard drive?

11       A    No.  Again, I don't have custody of

12   the hard drive.  And I don't know what's on

13   the hard drive.

14             I think I've answered that several

15   times.

16             (Whereupon a discussion was held

17   off the record.)

18       Q    Mr. Dubinsky, I wasn't asking you

19   in that question if you knew what was on the

20   hard drive.  The question was if you knew how

21   much information was on the hard drive.

22             Do you know how much information is

23   on the hard drive?

24             MR. WEINSTEIN:  Objection to form.

25       A    I do not.

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

Page 45

```
 1        Q    I didn't hear the answer.  I'm
 2   sorry.
 3        A    I said I do not.
 4        Q    Okay.  Mr. Dubinsky, did you
 5   develop an opinion as to whether or not the
 6   trades that you reviewed in this case were
 7   fake?
 8        A    Yes, I did.
 9        Q    And your opinion is that they were
10   fake.
11             Right?
12        A    That they were fictitious, that
13   there was no stock backing up the trades.
14             MR. BONGIORNO:  I'm sorry.  His
15        video and sound are both breaking up
16        quite a bit on my end.  I don't know if
17        they are for anybody else?
18             THE VIDEOGRAPHER:  Stand by.  The
19        time is 9:39 a.m. and we're going off
20        the record.
21             (Brief recess taken.)
22             THE VIDEOGRAPHER:  Stand by.  The
23        time is 9:42 a.m. and we're back on
24        record.
25        Q    Okay.  Right before the break,
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    Mr. Dubinsky, I asked you -- just to level, I

2    had asked you if you developed an opinion

3    that the trades were fake, and your answer

4    was that they were fictitious, there was no

5    stock backing up the trades.

6           In your experience, do trades that

7    never happen get reported to stock exchanges?

8       A    Trades that never happened?  That's

9    kind of a weird question.  I'm not sure how

10   to answer that.

11          So are you -- maybe re-ask the

12   question.  I don't know how to interpret

13   that.

14      Q    Sure.  Okay.  Well, you used the

15   phrase or the word "fictitious," so I'll use

16   your word, okay?

17          Is it -- in your experience, do

18   fictitious trades get reported to stock

19   exchanges?

20          MR. WEINSTEIN:  Objection to form.

21      A    Well, I guess -- are you asking me

22   if somebody creates a fictitious transaction,

23   would they report that to a stock exchange?

24          Is that what you're asking me?

25      Q    I'm asking you whether or not -- in

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1    your experience, whether or not fictitious

 2    trades get reported to stock exchanges?

 3              MR. WEINSTEIN:  Objection to form.

 4        A    Again, I don't know how to answer

 5    the question, Mr. Bongiorno.  If you're

 6    asking me if somebody creates a fake

 7    transaction, does that get reported to a

 8    stock exchange, it may or may not.

 9              I don't know.

10        Q    Have you ever seen what you viewed

11    as a fictitious transaction get reported to a

12    stock exchange?

13              MR. WEINSTEIN:  Objection to form.

14        A    I believe in the -- and I'd have to

15    go back, but I believe in the work that I did

16    on the Madoff case, Mr. Madoff was reporting

17    to NASDAQ trades that had not happened just

18    in terms of volume.

19              But beyond that, no, I haven't seen

20    that.

21        Q    You said "in terms of volume."

22              What do you mean by that?

23        A    Yes.  And again, I'd have to go

24    back, but I think when I was going through

25    the records, there were reports that Madoff
```

```
 1    was filing with NASDAQ as to the volume of

 2    trading -- trades that he was doing, but

 3    there was nothing backing those trades up.

 4         Q    What about -- I'm not asking about

 5    volume of trades.  I'm asking about specific

 6    trades.

 7              Did you -- in your experience, have

 8    you ever seen specific trades that were

 9    fictitious reported to stock exchanges?

10              MR. WEINSTEIN:  Objection to form.

11         A    Again, I haven't.  I haven't seen

12    that.  I haven't specifically looked for that

13    in any of the investigations I've been

14    involved in.

15         Q    Did you look in this case to see

16    whether or not any of these trades that you

17    claim are fictitious were reported to stock

18    exchanges?

19              MR. WEINSTEIN:  Objection to form.

20         A    I did not.

21         Q    So you don't know either way

22    whether or not the trades that you claim are

23    fictitious in this case were reported to any

24    stock exchange.

25              Is that a fair statement?
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1        A    I don't know one way or the other.

 2    I didn't see -- in going through the

 3    documents, I didn't see any information that

 4    I recall where these trades were being

 5    reported.

 6             I think these were all OTC trades,

 7    so they were off-exchange trades.

 8        Q    Does it matter?

 9        A    I don't recall seeing any documents

10    that --

11        Q    I apologize for interrupting you.

12    Sorry.  Your sound broke up on my end and I

13    thought you were done.

14             But I can see from the realtime the

15    rest of your answer.

16        A    Right.  I was just going to -- did

17    it come through, the rest of the answer?

18        Q    I can see it on my screen, but I

19    can't hear it and I can't see you saying it.

20             MR. BONGIORNO:  I think we should

21        probably take a break because this is

22        starting to get a little bit more

23        challenging as we go forward.

24             THE VIDEOGRAPHER:  Stand by.  The

25        time is 9:46 a.m. and we're going off
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 50

```
 1          the record.
 2                  (Brief recess taken.)
 3                  THE VIDEOGRAPHER:  Stand by.  The
 4          time is 9:56 a.m. and we're back on
 5          record.
 6          Q    Mr. Dubinsky, you mentioned before
 7      that you testified as an expert witness in
 8      various cases related to Madoff.
 9                  Right?
10          A    Correct.
11          Q    You did a forensic accounting of
12      the Bernard L. Madoff investment securities.
13                  Correct?
14          A    Correct.
15          Q    And you concluded that Madoff
16      engaged in fictitious trading.
17                  Correct?
18          A    Correct.
19          Q    And this morning in your report
20      you've suggested some similarities between
21      this case and the Madoff case.
22                  Right?
23          A    That's correct.
24          Q    Okay.  And in fact, you say that
25      "like the Madoff case, the fact that there
```

```
 1    are trading documents that reflects trades is

 2    not proof that the transactions here were

 3    real."

 4            Right?

 5      A    That is correct.

 6      Q    Why don't you turn to Tab 5209 of

 7    your binder?  We can mark that as the next

 8    exhibit.

 9            MR. BONGIORNO:  Mark 5209.

10            (Whereupon the above mentioned was

11         marked for Identification.)

12      Q    Do you have that in front of you?

13      A    Yes, I do.

14      Q    Okay.  And that document, I hope,

15    is a declaration you submitted in litigation

16    in the Southern District of New York

17    bankruptcy court related to the Madoff case?

18      A    Correct.

19      Q    Before we go on, I think you might

20    want to tip the camera just a little bit.

21    You're not nearly as -- there you go.  Good.

22    Thank you.

23            Now, if you turn to the fifth page

24    of Exhibit 5209, there's -- it's your expert

25    report that you submitted in that case.
```

```
 1              Right?

 2      A    Yes, that's correct.  It was one of

 3    the earlier reports, yes.

 4      Q    Okay.  In the course of preparing

 5    that report, you looked at a lot of the

 6    Madoff records.

 7              Correct?

 8      A    Correct.  Among other things, but

 9    yes.

10      Q    And you found that Madoff generated

11    fake records to look like records from the

12    DTC.

13              Right?

14      A    Correct.

15      Q    DTC is the Depository Trust

16    Company.

17              Right?

18      A    That's correct.

19      Q    And one of the ways that you

20    determined that was to look at metadata.

21              Right?

22      A    Correct.

23      Q    Let's turn to Page 71 of this

24    expert report, which is Exhibit 5209, and

25    look at Paragraph 175.
```

```
 1              Okay?

 2       A    Okay.  I have that.

 3       Q    Okay.  And I want to point you to

 4  the sentence that says, "The metadata

 5  contained within these documents show that

 6  the documents were created after the supposed

 7  date of the screen lookup inquiry, as

 8  depicted in the text within those documents."

 9              Do you see that?

10       A    I do see that, yes.

11       Q    Okay.  And let's turn over to

12  Pages 72 and 73 of Exhibit 209 where you

13  discuss that the metadata of these DTC

14  reports show that they were created several

15  days after the date noted in the report.

16              Okay?

17       A    Okay.

18       Q    And I'll just read a part of 178.

19              "The metadata shows this document

20  was actually created on December 19, 2006 at

21  11:16:00 a.m., 20 days after the date which

22  appears in the text of the document."

23              Do you see that?

24       A    I do see that, yes.

25       Q    And this information led you to
```

1    conclude that these trades did not occur.

2         Correct?

3    A    This was one piece of information

4    among many, many things that I've looked at

5    in many analysis.  But this was one piece of

6    information that led me to conclude that the

7    trades did not occur.

8    Q    Okay.  In this case, the case that

9    we're here for today, did you review any

10   metadata of Solo's documents?

11   A    There was some metadata that I did

12   review.  There was -- I think it was called

13   "End Of Day Trading Spreadsheets" and I

14   recall looking at the metadata in some of

15   those Excel native documents that were

16   produced.

17        And some of that indicated the

18   individual that prepared those was somebody

19   at Solo.  I'm drawing a blank on the guy's

20   name right now, but I recall looking at

21   several of the native documents for that.

22   Q    Did you look at any metadata of

23   broker documents?

24   A    Not that I recall, no.

25   Q    How about from interdealer brokers?

1    Did you review any metadata from any

2    interdealer brokers?

3        A    No.

4        Q    You don't offer any opinion in this

5    case that's based on any of the metadata that

6    you saw, do you?

7        A    No.

8        Q    There wasn't anything in the

9    metadata that you just mentioned that you saw

10    that would indicate that the documents were

11    created after the trades they appear to

12    reflect, is there?

13        A    Well, the documents that I was

14    referring to were capturing information that

15    appear to be historical.  I was looking at it

16    just to see if the -- if those documents were

17    prepared contemporaneously with the business

18    records of Solo.

19            And the metadata, as I recall, did

20    show that -- who the author was and the date

21    those were created in the 2013 and '14 and

22    '15 time frame.

23            But beyond that I didn't look for

24    anything else.

25        Q    Okay.  And so my question to you is

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

Page 56

1    whether any of the metadata in this case that

2    you've seen indicates that the trades, that

3    they were created after the fact.

4            In other words, they were meant to

5    reflect something that occurred previously,

6    like you found in the Madoff case?

7            MR. WEINSTEIN:  Objection to form.

8        A    Your voice dropped off.  I couldn't

9    hear the end of the question, if you can

10   repeat it.

11       Q    I said, "like you found in the

12   Madoff case?"

13       A    No, right before that you said

14   something I couldn't hear.  Maybe just repeat

15   the whole question or someone can read it

16   back and —

17       Q    I can just start over.

18            My question to you, and I'll

19   rephrase the question, is whether or not you

20   found any metadata in this case that, like

21   you found in the Madoff case, indicated to

22   you that the documents were created after the

23   date which appears in the text of the

24   document?

25            MR. WEINSTEIN:  Objection to form.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 57

```
 1        A    Well, the spreadsheet that I looked

 2    at or the end of day spreadsheets had

 3    historical information on there.  So the date

 4    I think that was in the metadata would

 5    indicate when it was updated.  So that would

 6    have been updated after the purported trades

 7    occurred.

 8             But nothing like what

 9    you're -- what you asked me.  There's nothing

10    like what I found when we were just talking

11    about the Madoff case where the DTC documents

12    were created, made to appear that they were

13    created on a certain date, when, in fact,

14    they were created afterwards.

15        Q    Okay.  Mr. Dubinsky, in your report

16    you discuss several groups of pension plans,

17    and you defined two of those groups as the

18    Argre plans and the Kaye Scholer plans.

19             Do you recall Shah?

20        A    Yes.  Let me just get to the

21    report.

22             Are we done with that other

23    exhibit?

24        Q    Yeah.  You can go to your opening

25    report at -- which is Exhibit 5200, and I'll
```

```
 1    direct you from there.

 2             But that's the report I'm going to

 3    be referencing.

 4        A    Okay.   Thank you.

 5        Q    And I'll be going to Paragraph 22

 6    on Page 13, but if there's something else you

 7    want to look at to respond to that last

 8    question, feel free.

 9        A    What was the last question?

10        Q    It was whether or not you recall

11    referring to two groups of pension plans in

12    your report as "the Argre plan" and "the

13    Kaye Scholer" -- "Argre plans" and "the

14    Kaye Scholer plans?"

15        A    Those were two of the groups.  I

16    think there were two other groups I referred

17    to as well, "the Lehman plans" and "the Zeta

18    plans."

19             But yes, on Page 12 of my report,

20    Paragraph 20 through 23, I reference "the

21    Argre plans," and then "the Kaye Scholer

22    plans" as Paragraph 24 through 27.

23        Q    Okay.   And I'm going to point you

24    to Paragraph 22 now, which I think you just

25    said you have in front of you.  I'm going to
```

```
 1      read to you the second sentence.

 2              "In each partnership agreement, the

 3      plan undertook all the Solo trades in its

 4      name as an undisclosed agent or nominee for

 5      the partnership and transferred almost all of

 6      the proceeds that SKAT paid the plan, meta

 7      fees to Solo and others, to entities

 8      controlled by the Argre principals."

 9              Did I read that correctly?

10      A    Yes.

11      Q    Okay.  You refer to an "undisclosed

12      agent or nominee for the partnership."

13              Do you see that?

14      A    Yes.

15      Q    Is that a legal conclusion, sir?

16      A    No, it's not.

17      Q    On what basis are you qualified to

18      say that "the plans undertook all the Solo

19      trades in its name as an undisclosed agent or

20      nominee for the partnership?"

21      A    If I recall, the -- there were

22      partnership agreements.  And in the

23      partnership agreements, there was a section

24      towards the back, if I recall properly, that

25      indicated the plans would act as nominee or
```

1    could act as nominee for the purported

2    trades.

3            So I think that's where I was

4    getting that from.

5        Q    So you reviewed the partnership

6    plans?

7        A    The partnership agreement?  Is that

8    what you're asking?

9        Q    Yes, sir.  Partnership agreement.

10       A    Yes.

11       Q    And it's on the basis of your

12   review of those partnership agreements that

13   you determined that "the plans undertook all

14   Solo trades in its name as an undisclosed

15   agent or nominee?"

16       A    I believe that was the basis of

17   that statement, yes.

18       Q    And in Paragraph 27, you say

19   something similar.  I'm going to point you to

20   that now.

21       A    Yes, I see that.

22       Q    Similar to the -- and I'm reading

23   from Paragraph 27 of your opening report,

24   which is Exhibit 5200 -- "Similar to the

25   Argre partnership arrangements, in each of

```
 1    the 26 partnerships, the plan undertook all
 2    Solo trades in its name as an undisclosed
 3    agent or nominee for the partnership, and
 4    transferred almost all of the proceeds that
 5    SKAT paid to the plan, meta fees to Solo
 6    Capital and others, to two of the three
 7    trusts."
 8            Do you see that?
 9        A    Yes, I see that.
10        Q    And that's in reference to what you
11    call "the Kaye Scholer plans."
12            Right?
13        A    Correct.
14        Q    Okay.  And you said you read the
15    Argre plan partnership agreements?
16        A    Yes.  And -- as well as the
17    Kaye Scholer plan partnership agreements.
18            Yes, that's correct.
19        Q    Did you review any of the schedules
20    to the partnership agreements?
21        A    Yes.  So I would have reviewed the
22    schedules that were attached.  There were
23    many I recall that weren't filled out, if my
24    memory serves me.
25            But if you have one, I'm happy to
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 62

1    look at it.

2         Q    We will.

3              Are you familiar with the

4    provisions of these agreements regarding the

5    quote-unquote "custody of securities?"

6         A    I would have to go back and look at

7    the clause that you're talking about.

8         Q    You don't recall as you sit here

9    today?

10        A    Not off the top of my head, no.

11        Q    Let's look at Tab 5210 of your

12   binder.

13             MR. BONGIORNO:  I'd like to mark

14        that as the next exhibit, 5210.

15             (Whereupon the above mentioned was

16        marked for Identification.)

17        Q    Do you have that one in front of

18   you?

19        A    I do.

20        Q    Okay.  Have you seen this before?

21        A    I don't know if I put eyes on this

22   particular one.  I've seen ones that are

23   similar to this.

24             I may have.

25        Q    So the -- this document looks

1    familiar to you even though you may not have

2    seen this specific one?

3            Is that fair?

4        A    It's fair.  I think most of the

5    partnership agreements that I saw were cookie

6    cutters of each other, so it does look

7    familiar.

8        Q    Okay.  Delvian was an Argre plan.

9            Right?

10       A    I'd have to go look from my report.

11   I categorized them by groups.

12           I don't recall.

13       Q    Okay.  I mentioned a moment ago

14   custody of securities.  I'll point you to

15   that section now so you can see it.

16           It's Section 12 on Page 4 of this

17   exhibit, 5210.

18           Can you read that section to

19   yourself, sir?

20       A    Okay.

21           (Witness reviewing.)

22           Okay.

23       Q    Okay.  Now I want to focus your

24   attention on the bottom of that section after

25   the last semicolon, "and provided further,

1    however, that the partnerships shall have no

2    claim of a nominee arrangement with respect

3    to any property of a partner unless such

4    property is so set forth on Schedule A."

5           Do you see that?

6    A    I do see that, yes.

7    Q    And when you reviewed these

8    agreements, did you review the Schedule A?

9    A    Yes.

10   Q    Now let's turn to the last page of

11   the document, which is Schedule A.

12   A    Okay.

13   Q    This doesn't list any Solo account.

14        Right?

15   A    It does not.

16   Q    It's blank.

17        Correct?

18   A    Correct.

19   Q    Okay.  Let's go -- let's mark the

20   next exhibit, 5211, which is at Tab 5211 in

21   your binder.

22           MR. BONGIORNO:  Mark 5211.

23           (Whereupon the above mentioned was

24        marked for Identification.)

25   Q    Do you have that in front of you?

```
 1        A     I do.

 2        Q     Is it the general partnership

 3   agreement of Roadcraft Technologies General

 4   Partnership?

 5              Is that what you have in front of

 6   you, Mr. Dubinsky?

 7        A     Yes.

 8        Q     Okay.  And that -- we'll have that

 9   marked as 5211, okay?

10              And again, can you turn to

11   Section 12 on Page 4 of the document?

12        A     Okay.  I see that.

13        Q     This is the "Custody of Securities"

14   section again.

15              Right?

16        A     Yes.

17        Q     And it -- like the last one we

18   looked at, Section 12 on Page 4 of

19   Exhibit 5211 says, at the end after the

20   semicolon, "and provided further, however,

21   that the partnership shall have no claim of

22   nominee arrangement with respect to any

23   property of a partner unless such property is

24   so set forth on Schedule A."

25              Correct?
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 66

1      A    Correct.

2      Q    So this has the same language as

3    the Delvian agreement we just looked at.

4           Right?

5      A    Correct.

6      Q    And let's look at the last page of

7    this document.

8      A    Okay.

9      Q    You have that in front of you?

10     A    I do.

11     Q    And this shows that the Roadcraft

12   Technologies account at Wells Fargo Bank was

13   designated as property held as nominee.

14          Correct?

15     A    Correct.

16     Q    This does not list any account at

17   one of the Solo custodians, does it?

18     A    It does not.

19     Q    Okay.  Mr. Dubinsky, you say you

20   reviewed records related to 2,559 trades

21   conducted through Solo custodians.

22          Right?

23     A    Correct.

24     Q    And I can -- okay.  I was going to

25   offer to point you to your report.

```
 1              But you recall that, I take it?

 2       A    Yes.

 3       Q    Okay.  Those trades involved shares

 4   in Danish companies.

 5              Right?

 6       A    They were —— I classified those as

 7   purported transactions and purported shares

 8   of Danish companies.  That would be the way

 9   that I would classify them.

10       Q    Okay.  In your report, you reviewed

11   such trades in shares of Carlsberg.

12              Right?

13       A    Correct.

14       Q    And also such trades in Novo

15   Nordisk.

16              Correct?

17       A    Yes.

18       Q    And also you reviewed such trades

19   in AP Moeller-Maersk.

20              Right?

21       A    Correct.

22       Q    Okay.  And those are real

23   companies.

24              Right?

25       A    That is correct, yes.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 68

```
 1      Q    Carlsberg is a beer company.

 2           Right?

 3      A    Correct.

 4      Q    Novo Nordisk is a pharmaceutical

 5   company.

 6           Correct?

 7      A    That's correct.

 8      Q    And AP Moeller-Maersk is a shipping

 9   company.

10           Right?

11      A    That's correct.

12      Q    Most shares in Denmark are

13   dematerialized.

14           Correct?

15      A    That's my understanding, yes.

16      Q    And that means that no one is

17   holding paper stock certificates.

18           Right?

19      A    That's correct.

20      Q    Dematerialized share holdings are

21   reflected in electronic book entries.

22           Correct?

23           MR. WEINSTEIN:  Objection to form.

24      A    At a custodial -- or at the issuer,

25   they would be maintained electronically, and
```

```
 1    at a custodian that actually holds custody of

 2    them, yes.

 3         Q    Let's go to your opening report,

 4    which is Exhibit 5200 at Page 39.

 5              Do you have that in front of you?

 6         A    I do.

 7         Q    Okay.  And I'm going to point you

 8    to Paragraph Roman Numeral 6, Opinion

 9    Number 1.

10              Do you see that?

11         A    I do.

12         Q    And this is the one in all caps and

13    bolded.

14              "There is no evidence that the

15    plans ever owned actual shares of Danish

16    securities from their Solo trades or received

17    actual dividends issued by the Danish

18    companies whose stock was purportedly used in

19    the Solo trades."

20              Do you see that?

21         A    Yes.

22         Q    Ownership is a legal concept, isn't

23    it?

24         A    I think it certainly -- well, it's

25    an accounting and legal concept.  But from
```

```
 1    the standpoint of in the ultimate

 2    determination who had legal title, yes, that

 3    would be a legal determination.

 4         Q    And that's not a determination that

 5    you're qualified to make.

 6              Right?

 7         A    Again, I'm not a lawyer.  I was

 8    doing a forensic accounting investigation to

 9    determine whether there was evidence that

10    these shares actually existed, and that's

11    what I was discussing.

12         Q    Okay.  But this doesn't -- this

13    opinion doesn't talk about whether the shares

14    actually existed.

15              It talks about ownership, doesn't

16    it?

17              MR. WEINSTEIN:  Objection to form.

18         A    Well, the heading says what it

19    says.  But as you go through the report, the

20    basis for the opinion is that I saw no

21    evidence to support that the shares actually

22    existed.

23              And therefore, if the shares didn't

24    exist, certainly from a forensic accounting

25    standpoint, the plans couldn't have owned
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1    them.
 2         Q    You say if the shares didn't exist,
 3    the plan -- the plans couldn't have owned
 4    them.
 5              Is -- again, I ask you:  Is that a
 6    legal opinion?
 7         A    No, I think that's a forensic
 8    accounting opinion, I think the genesis
 9    being, after doing a forensic investigation
10    and looking for evidence of the actual shares
11    existing at either -- ultimately at a
12    custodian that Solo used as a sub-custodian,
13    and the fact that those shares didn't exist,
14    I concluded that therefore, the plans could
15    not have owned them.  And I think that's a
16    forensic accounting conclusion.
17              Ultimately, the judge or jury --
18    well, the judge would have to make a
19    determination from a legal standpoint if
20    there's something different than that, if
21    there was legal ownership or not.
22              I'm not issuing a legal opinion.
23         Q    So the forensic -- so a forensic
24    accountant is qualified to determine
25    ownership?
```

1              Is that your testimony?

2              MR. WEINSTEIN:  Objection to form.

3       A    I think certainly from the

4    standpoint of looking at the substance of a

5    transaction and trying to determine if the

6    substance was, were there shares, did the

7    plans actually own those, yes, I think I'm

8    qualified and it is within the purview of a

9    forensic accounting investigation.

10             I think the judge will make a

11   determination -- if there's a different legal

12   meaning, then that would be up to the judge

13   to make.

14      Q    So is that ownership under U.S.

15   principles of ownership?

16             MR. WEINSTEIN:  Objection to form.

17      A    Again, I'm not issuing a legal

18   opinion or not, or I'm not issuing a legal

19   opinion.

20             What I'm saying is I'm looking from

21   an accounting perspective, what do I see.  Do

22   the plans -- and they're U.S. based pension

23   plans -- did they own the shares, did the

24   shares exist.

25             And I concluded the shares did

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    not -- there was no evidence that the shares

2    existed.  And therefore, the dividends

3    weren't -- couldn't have existed, weren't

4    paid, and that was my conclusion.

5        Q    I'm asking you regarding your

6    statement regarding ownership, sir.  And I'm

7    asking you whether it was under U.S.

8    principles of ownership.

9            What is your answer to that

10   question?

11       A    Again, I think you're asking for a

12   legal conclusion and I'm not here to give you

13   a legal opinion on -- I'm here to tell you

14   what I did and under what basis that I

15   opined.

16       Q    So the concept of ownership in your

17   Opinion Number 1, you're not willing to tell

18   me under what principle you're giving that

19   opinion, whether it's U.S., EU, Danish, or

20   whatever?

21           MR. WEINSTEIN:  Objection to form,

22       asked and answered.

23       A    Again, I'm not here to issue a

24   legal opinion.  I think that would call for a

25   legal opinion.

```
 1        Q    You would agree, wouldn't you, the

 2   customer can have a long position in a stock

 3   without shares being held in their

 4   custodian's account.

 5             Right?

 6             MR. WEINSTEIN:  Objection to form.

 7        A    Can you repeat the question again?

 8        Q    Sure.  You would agree that a

 9   customer can have a long position in a stock

10   without shares being held in their

11   custodian's account.

12             Right?

13             MR. WEINSTEIN:  Objection to form.

14        A    If -- I guess one example could be

15   if they actually had the paper certificates,

16   then they could be -- they'd be long and they

17   don't have to have them in a custodial

18   account.

19             That would be an example.

20        Q    I'm asking in the context of

21   dematerialized shares, sir, so let's put

22   aside paper stock certificates, which I think

23   most of the world has for a long time now.

24             A customer can have a long position

25   in stock without there being any record of
```

CONFIDENTIAL
Bruce Dubinsky – March 29, 2022

1    the shares being held in the accounts of a

2    central securities depository.

3           Right?

4           MR. WEINSTEIN:  Objection to form.

5      A    Again, I'm not sure I understand

6    the question.

7      Q    What don't you understand?

8      A    The question that you just asked

9    me.  You said --

10      Q    Do you understand anything about

11    it?

12      A    Well, you asked, "Could somebody

13    have a long position in stock and the central

14    securities depository doesn't have record of

15    that?"

16           Is that what you're asking?

17      Q    That's the question I just asked,

18    yes.

19           MR. WEINSTEIN:  Objection to form.

20      A    I don't know.  I mean, maybe you're

21    asking -- are you asking -- it sounds like

22    you're asking a legal, you know, opinion.  I

23    don't have a legal opinion on that and I'm

24    struggling to figure out how that could be.

25      Q    Are you familiar with situations

```
 1    where one can own shares without a custodian

 2    or sub-custodian having any shares?

 3              MR. WEINSTEIN:  Objection to form.

 4         A    Again, not that I'm aware of in

 5    your -- maybe you can add some facts to the

 6    hypothetical to make it clearer for me.

 7              But in general, I don't know how

 8    that could be.

 9         Q    You can't think of any circumstance

10    under which that could happen as you sit here

11    today without me providing you with a

12    hypothetical.

13              Is that your testimony?

14              MR. WEINSTEIN:  Objection to form.

15         A    Again, nothing's coming top of

16    mind.

17         Q    Let me ask you about another word

18    you used in this opinion.

19              You say, "The plans never owned

20    actual shares."

21              Do you see that?

22         A    Yes.

23         Q    Okay.  Is "actual shares" a

24    technical term?

25         A    No.
```

```
 1        Q    Is it a legal term?

 2        A    No.  It's a term that I penned

 3   there just to indicate the existence of the

 4   actual Danish securities.  That's what I was

 5   referencing.

 6             So it's not a technical term.

 7        Q    Okay.  Most shares in Denmark exist

 8   in electronic book entry form.

 9             Right?

10        A    Correct.

11        Q    Book entries would show long or

12   short positions.

13             Is that right?

14        A    Book entries at a broker?

15             Is that what you're asking?

16        Q    Sure.

17        A    There could be records of the

18   broker showing long and short positions,

19   correct.

20        Q    Let's go to Heading A on Page 40 of

21   your report.  This is Exhibit 5200 still.

22        A    Yes.

23        Q    There you say, "The sub-custodians

24   identified by Solo Capital confirmed that

25   they did not hold any shares of Danish
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 78

```
1    securities on behalf of the Solo custodians
2    during the relevant period."
3        A    Yes.
4        Q    Do you see that?
5        A    Yes.
6        Q    You don't say anything here about
7    whether anyone owned any shares.
8             Right?
9        A    In that statement, I don't say
10   anything about that specifically.
11       Q    Do you say anything about it
12   generally?
13       A    No.  You were just reading
14   sub-point A, and it says what it says.  "The
15   sub-custodians identified by Solo Capital
16   confirmed that they did not hold any shares
17   of Danish securities on behalf of the Solo
18   custodians during the relevant period."
19       Q    Okay.  With some interruption,
20   we've been going for about an hour and a
21   half.
22             Why don't we take a break?
23       A    Okay.
24             THE VIDEOGRAPHER:  Stand by.  The
25        time is 10:28 a.m. and we're going off
```

CONFIDENTIAL
Bruce Dubinsky – March 29, 2022

Page 79

1          the record.

2                    (Brief recess taken.)

3                    THE VIDEOGRAPHER:  Stand by.  The

4          time is 10:45 a.m. and we're back on

5          record.

6          Q     Okay.  Can you hear me all right,

7     Mr. Dubinsky?

8          A     Yes.  Much better, thank you.

9          Q     Okay.  Let me try to set out a

10    simple hypothetical for you, okay?

11                    Let's say I call my stock broker

12    today and I asked to buy a hundred shares of

13    Apple.  If I purchase those shares today and

14    Apple stock goes down ten dollars per share

15    tomorrow, I will suffer a loss in value of

16    those shares.

17                    Right?

18         A     Assuming the trade is settled and

19    cleared, yes.

20         Q     Well, the trade isn't going to

21    settle and clear today, is it?

22         A     No, but inherent in the trading

23    process there has to be settlement in

24    clearance.  So when you say you made a trade,

25    inherent in that is, at some point, whether

```
 1    it's a T plus 2 or 3 trading cycle, whatever

 2    the trading cycle is, depending on what

 3    jurisdiction, once the settlement occurs and

 4    you have ownership of that stock, yeah, if

 5    you turned around and sold it at that point,

 6    you'd have an economic loss or gain.

 7         Q    But I'm buying the shares today.

 8    The stock's going down ten dollars and that's

 9    all happening before the trade settles.

10              Right?

11         A    Yes.  The price movement would

12    occur before the trade settles, yes.

13         Q    And you would agree with me that I

14    suffer the loss, the ten-dollar loss.

15              Right?

16         A    Well, again, there's a -- there's

17    an unrealized loss at that point, but the

18    stock has to settle.  You can't just have a

19    trade that hangs in thin air without

20    settlement.  You have to get the stock at

21    some point.

22              And then, depending on what the

23    economics are at that point, you'd conclude

24    the trade.

25         Q    So if I don't pay for the shares,
```

1    and the trade never settles, who is

2    responsible for that ten-dollar loss?

3              MR. WEINSTEIN:  Objection, calls

4         for a legal conclusion.

5         A    Yeah, I think you're asking for me

6    to issue a legal conclusion on who would be

7    liable for a trade.  You know, there's a lot

8    of facts that could go into that, so it's

9    hard to answer.

10        Q    Okay.  So you can't answer that

11   question.

12             Right?

13        A    I think you'd need to take the

14   hypothetical and give me some more facts.

15        Q    What other facts do you need?

16        A    Does the stock exist?  Was there

17   stock that was going to settle?  Was it just

18   a broken trade that is -- the trade is never

19   fixed?

20             I mean, there are a lot of

21   different hypotheticals.

22        Q    Okay.  So let's say I call today,

23   on Tuesday, to buy the shares of Apple and

24   the trade is going to settle on Thursday.

25             But let's say I decide later today

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 82

```
1    to sell those same shares.  I can sell those
2    shares even though the trade hasn't settled
3    yet.
4              Right?
5              MR. WEINSTEIN:  Objection.
6        A    Again, my understanding is you
7    could place a trade to sell them, but you
8    have to go through the first settlement
9    before you can settle on the sale.  So you'd
10   need to have the settlement on the buy side,
11   and then go to settlement on the sell side.
12             You can't just do it in thin air.
13       Q    Oh, so you're saying that I can't
14   buy and sell Apple on the same day?
15             MR. WEINSTEIN:  Objection,
16        misstates his testimony.
17       A    That's not what I said.
18       Q    It was a question.
19             MR. WEINSTEIN:  The question was --
20       Q    Can you buy and sell Apple on the
21   same day?
22       A    You could place a trade for a buy
23   order and a sell order on the same day, yes.
24       Q    And when you buy the shares, are
25   you the owner of the shares?
```

```
 1              MR. WEINSTEIN:  Objection, calls

 2         for a legal conclusion, vague.  Again,

 3         you know, I think you're --

 4              MR. BONGIORNO:  I think you could

 5         just object without giving a speech,

 6         please.

 7              MR. WEINSTEIN:  Did you hear the

 8         objections of your side the other day?

 9         Lengthy speeches and bases.  But when

10         you call for a legal conclusion, I'm

11         going to make that objection.

12      A    Again, I think you're asking me for

13   a legal conclusion on who owned -- who owns

14   the shares.  But assuming a trade is placed

15   and settlement is to occur and the stock is

16   actually delivered -- cleared, delivered, and

17   settled, then you would own the stock, the

18   stock is there.  You own it.

19      Q    But if you buy and sell on the same

20   day, it doesn't -- the buy doesn't clear,

21   does it?

22              MR. WEINSTEIN:  Objection, form.

23      A    Again, the buy -- you can place the

24   orders on the same day, but there has to be a

25   settlement and clearance process for the two
```

```
 1    legs of that trade.

 2         Q    But they can net settle, can't

 3    they?

 4              MR. WEINSTEIN:  Objection to form.

 5         A    In what scenario?

 6         Q    In the scenario I just gave where I

 7    buy a hundred shares of Apple today, and then

 8    I sell later today?

 9              MR. WEINSTEIN:  Objection to form.

10         A    If the -- if you're trading

11    through -- my understanding is if you're

12    trading through the same sub-custodian and

13    both the buyer and seller or custodian or

14    sub-custodian and both the buyer and seller

15    have accounts there when the settlement

16    occurs, there could be a net settlement

17    because the stock is already at the

18    custodian.  The stock exists.

19              So in that hypothetical, I would

20    agree that type of net settlement could

21    occur.

22         Q    So your testimony is, if I buy and

23    later sell a hundred shares of Apple on the

24    same day through my broker, they can't net

25    settle unless the broker is long those
```

```
 1    shares?

 2            Is that your testimony?

 3            MR. WEINSTEIN:  Objection to form.

 4        A   No.  I'm saying that the

 5    shares -- either the broker has a market in

 6    those shares and has an inventory.  But you

 7    posed if you bought and sold, and the -- and

 8    the broker is acting as an agent for that

 9    sale, not a principal, then, in that

10    hypothetical, I believe they can net settle

11    if both the buyer and seller were at the same

12    institution and the shares were already

13    either at the custodian at the institution or

14    the sub-custodian.

15            That's my understanding.

16        Q   So your view is if the shares are

17    not already at the custodian or

18    sub-custodian, and I buy and sell on the same

19    day, that the custodian has to go out and

20    find those shares even though I bought and

21    sold them the same day?

22        A   My -- it's -- again, I'm not -- I

23    think there's other people dealing with

24    trading, trading experts in this case.

25    That's not, you know, my area or my opinion.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 86

```
 1            But my general understanding is,
 2    yes, to net settle, you would have to have
 3    the shares at the same custodian or the
 4    shares were being borrowed and brought into
 5    that custodian and already sourced.
 6            But that's my general
 7    understanding.  I'm not an expert on net
 8    settlement.
 9        Q    Okay.  Let's look at Tab 5225 of
10    your binder.
11            MR. BONGIORNO:  We'll mark this as
12        Exhibit 5225.
13            (Whereupon the above mentioned was
14        marked for Identification.)
15        Q    It's a document entitled "SEC
16    Investor Publications, Day Trading:  Your
17    Dollars at Risk."
18            Do you have that?
19        A    It doesn't say "SEC."  Mine just
20    says "Investor Publications, Day Trading:
21    Your Dollars at Risk."
22        Q    Okay.  We're looking at the same
23    document, and we're at tab -- Exhibit 5225.
24            At the top of the page, I want to
25    read to you the first sentence.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1              "Day traders rapidly buy and sell

 2     stocks throughout the day in the hope that

 3     their stocks will continue climbing or

 4     falling in value for the seconds to minutes

 5     they own the stock, allowing them to lock in

 6     quick profits."

 7              Did I read that correctly?

 8       A    Yes.

 9       Q    And does this document suggest to

10     you that traders can both buy and sell the

11     same stock on the same trading day?

12       A    Yes, that's what it says.

13       Q    And it says the traders can do this

14     rapidly throughout the day.

15              Correct?

16       A    Correct.

17       Q    And if the traders buy and sell

18     rapidly, they nonetheless own a stock on the

19     trade, even if for seconds to minutes.

20              Right?

21              MR. WEINSTEIN:  Objection to form.

22       A    Well, again, I haven't read this

23     whole document and I don't -- I mean, it

24     says -- it says what it says.

25              I don't know what they mean by "own
```

1    the stock" in regards to this.  I haven't

2    read this whole document.

3              I assume --

4        Q    But it doesn't say?

5        A    Well, I assume they mean the trades

6    settle.  I assume they mean they're going to

7    settle.  You can't have a trade that doesn't

8    settle.

9              But it doesn't -- let me just see

10   if it says anything else about that here.

11             (Witness reviewing.)

12       Q    Okay.

13       A    (Witness reviewing.)

14             Yeah, it doesn't get into much

15   detail.

16       Q    It doesn't say anything about

17   settlement.

18             Right?

19       A    No.  It's a two-page document from

20   2005.  It doesn't really get into the

21   mechanics of the trade.

22       Q    The document doesn't say that a day

23   trader must confirm that its broker or

24   custodian holds the shares that the investor

25   is purchasing.

```
 1              Right?
 2       A    It doesn't -- well, let me -- let's
 3   just see.
 4              (Witness reviewing.)
 5              No, it's just -- it's just saying
 6   that day trading firms must register with the
 7   SEC in the states.  No, it doesn't -- it
 8   doesn't say specifically anything about
 9   confirming with the broker.
10       Q    But it does use the word "own."
11              Right?
12       A    Yes.
13       Q    The same word you used in one of
14   your opinions that we looked at earlier?
15       A    Yes.
16       Q    And you'd agree with me that short
17   selling is very common.
18              Right?
19       A    I would agree that short selling
20   happens in the market.
21       Q    You wouldn't agree with me that
22   it's common, though?
23       A    Well, in relative to what, short
24   sell?  I will agree that short selling occurs
25   and it happens.
```

```
 1              But again, relative to what?  You

 2    know, on a given day, a month, it happens.

 3    Short selling occurs.

 4       Q    And that's when an investor sells

 5    shares that it does not have with an intent

 6    to buy the shares at a later date.

 7              Right?

 8       A    Well, I'm not sure I agree with

 9    that definition, specifically.

10              It's -- are you talking about a

11    naked short where the shares haven't been

12    sourced yet?

13       Q    What's your definition of a "short

14    sale?"

15       A    Well, you asked me the question.

16    I'm just trying to get you to clarify the

17    question so I can answer it.

18       Q    Okay.  Now I'm asking you another

19    question.

20              What is your definition of a "short

21    sale?"

22       A    A "short sale" is usually a sale

23    where the shares have been sourced, you don't

24    have the shares yet, and then you're going to

25    cover -- when the delivery and settlement has
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 91

1      to occur, you're going to cover your short.

2          Q    So when someone sells short, they

3      don't necessarily have a long position, and

4      so they don't have any shares at the time of

5      the short sale.

6               Right?

7          A    They wouldn't have a -- they may

8      have a long position, and may choose to go

9      short against the box.  But they're -- if

10     they don't have a long position, then that

11     short position can't be a naked short as far

12     as I understand it.

13              It has to be -- the shares have

14     to -- you have to have a source to get the

15     shares through a loan or some other

16     arrangement to have those shares at some

17     point.

18         Q    Okay.  So you would agree with me

19     that the result of a short sale is that the

20     market can have investors that have economic

21     exposure to a higher number of shares than

22     the amount issued by the issuer.

23              Right?

24              MR. WEINSTEIN:  Objection to form.

25         A    I guess that's possible.  I don't

1    think that's very common.

2        Q    Well, the number of total

3    outstanding long positions can reach over a

4    hundred percent of the total outstanding

5    shares issued by the company, right, as a

6    result of short sales?

7            MR. WEINSTEIN:  Objection to form.

8        A    In long positions, trades that have

9    not settled yet?  Is that what you mean?

10           There can only be -- I mean, once

11   the trade settles, there can only be the

12   stock the issuer has.  It can't be -- you

13   can't trade more stock than the issuer has

14   actually issued.

15       Q    Well, someone can be long in a

16   stock as a result of purchasing from a short

17   seller.

18           Right?

19       A    If it hasn't gone to settlement?

20   Is that what you're saying?

21           Again, once it goes to settlement,

22   the shares are there.  So the shares in the

23   system -- if I'm Exxon, and I've got

24   10 million authorized and issued shares,

25   that's how many shares are authorized and

1    issued.

2            And that's what -- ultimately, at

3    the end of the day, that's what's traded.

4        Q    Right.  But a short seller can

5    borrow shares to sell, right?

6            Isn't that what happens?

7        A    Yeah, but they have to borrow real

8    shares.  They can't borrow shares out of thin

9    air.

10           So somebody has to own those shares

11   and be long in the shares.  And those are

12   shares of the original issuer that are issued

13   in outstanding shares.

14       Q    Right.  But the short seller is

15   borrowing them from someone who's long, and

16   selling them to someone else who's then long

17   as well.

18           Right?

19           MR. WEINSTEIN:  Objection to form.

20       A    That's during the -- you're -- so

21   you're -- I think what you're asking is

22   presettlement?  If somebody just places an

23   order and a trade before it settles, if I

24   understand you correctly?  Is that what

25   you're asking me?

1          Because once it settles, there's a

2     settlement.

3          Q    Eventually, sure.  I'm asking you

4     about the moment when somebody purchases from

5     a short seller who has borrowed from someone

6     else who is long.

7          Both the lender of those shares and

8     the buyer of those shares that were sold

9     short, they're both long at that point in

10    time, are they not?

11         MR. WEINSTEIN:  Objection to form.

12         A    Well, I think in theory they're

13    long.  But settlement has to occur.  So in

14    your -- I think the hypothetical is an

15    incomplete hypothetical.

16         You have to say, at the point it

17    settles, not everybody is going to be long.

18    The shares actually transferred at that

19    point.

20         Q    So you don't know whether or not

21    it's possible for short interests to cause

22    there to be long positions that are over a

23    hundred percent of the outstanding shares?

24         MR. WEINSTEIN:  Objection, asked

25        and answered.

```
 1        A    Yeah, I think there could be.  I
 2   don't think it's very common.
 3            And again, I think it would be at
 4   that moment before settlement occurs when the
 5   trades are placed.
 6        Q    Well, it's not a moment, is it,
 7   sir, for settlement to occur?  It's not a
 8   moment, it's days, isn't it?
 9        A    No.  I said the moment the trades
10   are placed, but until settlement occurs.
11   Yes, there's several days in that -- in that
12   time frame, yes.
13        Q    You said it would be at that moment
14   before settlement occurs.
15            And my question to you is:  It's
16   not just a moment before settlement occurs,
17   it's days before settlement occurs.
18            Right?
19            MR. WEINSTEIN:  Objection to form.
20        A    Again, assuming the shares exist
21   and settlement will happen, yes, it's T plus,
22   depending on the jurisdiction, whatever the
23   settlement is.
24        Q    Okay.  Let's go to -- let's go to
25   Dr. Carr's report.  Actually, we won't go to
```

```
 1    his report.

 2              We'll go to something his report

 3    cites, which is in Tab 5227 of your binder.

 4              MR. BONGIORNO:  We can mark that as

 5         Exhibit 5227.

 6              (Whereupon the above mentioned was

 7         marked for Identification.)

 8         Q    Do you have in front of you a

 9    document that -- with the SEC seal on the

10    front dated October 14th of last year?

11         A    Yes.

12         Q    Okay.  Have you seen this document

13    before?

14         A    No, I have not.

15         Q    Sorry?  I didn't hear you.

16         A    I'm sorry.  No, I have not.

17         Q    Well, I can represent to you this

18    was cited in Dr. Carr's report.  If you look

19    at the Table of Contents, you can see that it

20    discusses "GameStop."

21         A    Yes, I see that.

22         Q    Okay.  If you go to Page 21 of the

23    report, you see where it says, "Some

24    institutional accounts had significant short

25    interests in GME" -- which is
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    GameStop -- "prior to January 2021."

2         Are you with me?

3    A    Right underneath the charts?  Is

4    that where you're reading?

5    Q    Exactly.

6    A    Yeah, I see that.

7    Q    Okay.  And do you see the next

8    sentence, which starts, "GME, GameStop, short

9    interest, as a percentage of float in January

10   of 2021, reached 122.97 percent."

11        Do you see that?

12   A    Yes.

13   Q    Do you understand that to mean that

14   the percentage of short -- that the amount of

15   short interests in GameStop was more than the

16   entire float of GameStop?

17        MR. WEINSTEIN:  Objection to form.

18        He said he's never seen this document

19        before.

20   A    Again, I haven't seen the document,

21   I haven't read through it.  I mean, it says

22   what it says, so I don't know how they're

23   defining things and what the background is to

24   this.

25   Q    Okay.  So you can't -- you can't

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 98

1    agree with me that this sentence says that

2    the interests -- "the short interests in

3    GameStop, as a percentage of float, reached

4    122.97 percent?"

5           You're not willing to agree to

6    that?

7           MR. WEINSTEIN:  Objection.  He did

8       agree to your first question.  Your next

9       question was a different one.

10   A    You asked me, did you -- I think

11   you --

12          MR. BONGIORNO:  Do you want to

13      answer it for him, Marc, or do you want

14      him to answer it?

15          MR. WEINSTEIN:  He actually did

16      answer it once, if you want to go back

17      on your realtime.  And then you asked a

18      different question.

19          MR. BONGIORNO:  I thought you said

20      it was a different question.

21          MR. WEINSTEIN:  Why don't you just

22      ask a question now?

23          MR. BONGIORNO:  I did.

24          MR. WEINSTEIN:  And what's the

25      question on the table?

1      Q    You can't agree with me that the

2   sentence says that "the interest -- short

3   interest in GameStop, as a percentage of

4   float, reached 122.97 percent?"

5          You're not willing to agree to

6   that?

7          MR. WEINSTEIN:  Objection to form.

8      A    I agree that you read it correctly.

9      Q    And you don't understand what that

10  sentence means?

11     A    Again, I haven't read through the

12  report you're putting in front of me.  This

13  is the first time I've seen it.

14         It's 20 -- let's see how many

15  pages -- no, it's 44 pages.  So no, I'm not

16  going to agree to anything in this until I

17  have time to read the entire report and

18  digest it and see if I understand it.

19         So you can read whatever you would

20  like from it, I can tell you that you read it

21  correctly if that's what you want.

22         But that's as far as I can go.

23     Q    Okay.  You would agree with me,

24  sir, that an investor can have -- can obtain

25  economic exposure to an underlying stock from

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

Page 100

1    means other than purchasing the stock.

2            Right?

3            MR. WEINSTEIN:  Objection to form.

4        A    I'm not sure what you mean, if

5    you —

6        Q    Well, an investor can obtain

7    economic exposure to a stock through a

8    derivative.

9            Right?

10       A    I'm sorry.  I didn't hear the end

11   of that.

12           Through what?

13       Q    Sorry.  I'll do it again.  Sorry

14   about that.

15           An investor can obtain economic

16   exposure to a stock through a derivative.

17           Right?

18       A    I think in the general

19   hypothetical, it could be — it's possible,

20   yes.

21       Q    And an investor can obtain economic

22   exposure to a stock through an option.

23           Right?

24       A    In general, that's correct.

25       Q    And an investor can obtain economic

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 101

```
 1   exposure to a stock through a futures

 2   contract.

 3            Right?

 4       A    In general, that's correct.

 5       Q    And an investor can obtain economic

 6   exposure to a stock through a forward

 7   contract.

 8            Right?

 9       A    In general, that's correct.

10       Q    And an investor can obtain economic

11   exposure to a stock through a notional

12   principal contract.

13            Right?

14            MR. WEINSTEIN:  Objection to form.

15       A    Again, depending on the terms of

16   that contract, it's possible, yes.

17       Q    And you're aware that the pension

18   plans entered into flex futures contracts.

19            Right?

20            MR. WEINSTEIN:  Objection to form.

21       A    There was trades that Solo made

22   that I saw on behalf of the pension plans,

23   some of them, at certain times, for flex

24   futures.

25       Q    And you further agree that those
```

```
 1   contracts were actually executed on an

 2   exchange and were real.

 3           Right?

 4           MR. WEINSTEIN:  Objection to form.

 5       A   Again, I think that there was

 6   evidence that those futures were executed.  I

 7   think the ones we're referring to were at

 8   J.P. Morgan in the earlier period -- you

 9   know, earlier periods.

10           But yes, my understanding, those

11   were exchange traded futures.

12       Q   And they were real.

13           Right?

14       A   There were -- as I recall, there

15   were offsetting legs that Solo was placing.

16   But yes, those actually were real

17   transactions, the actual flex future that I

18   saw.

19       Q   Okay.  Let's go to Tab 5217 in your

20   binder.

21           MR. BONGIORNO:  Which we'll mark as

22       Exhibit 5217.

23           (Whereupon the above mentioned was

24       marked for Identification.)

25       A   5317 or 5217?
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 103

```
 1        Q    I meant 5217.

 2        A    I think you said "53," but I've got

 3    5217.

 4        Q    All right.  It's already 11:00.  If

 5    that's the first one I got wrong, I'm doing

 6    great, trust me.

 7             Do you have that in front of you,

 8    sir?

 9        A    I do, yes.

10        Q    Okay.  Is it an e-mail from

11    Execution@FGC Securities to Adam@Bernina P?

12             Is that what it is?

13        A    Yes.

14        Q    If you look further down the page

15    on the cover e-mail, this relates to a

16    transaction done by the Bernina Pension Plan

17    in shares of Carlsberg stock?

18             MR. WEINSTEIN:  Objection to form.

19        A    The purported purchase, yes.

20        Q    Right.  No, I understand that's

21    your position, and you know, if you -- you

22    don't need to say "purported," but feel free.

23             But I think we understand each

24    other in that regard.

25        A    Okay.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1        Q    I want you to turn to the page to

2    the attachment behind the blue sheet.  Okay?

3    This is -- we're still in Exhibit 5217.

4              I want you to look at Bates

5    number 75373.

6        A    Okay.  I see that.

7        Q    It's a document entitled "Equity

8    Futures Confirmation."

9              Correct?

10       A    Yes.

11       Q    And it shows the terms and

12   conditions of an equity futures transaction.

13             Correct?

14       A    Yes.

15       Q    It's a single stock future in

16   "CARLB" which I believe is Carlsberg.

17             Correct?

18       A    Yes.

19       Q    You see where it says "BClear flex

20   F-U-T-S?"

21       A    Yes.

22       Q    This is an example of one of the

23   futures that you stated in your report were

24   actually executed on an exchange and were

25   real.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 105

```
1              Right?

2       A    That is correct, yes.

3       Q    Okay.  Let's turn to the following

4    page ending in Bates number 75374.  Again,

5    we're still in Exhibit 5217.

6              Do you have that in front of you?

7       A    Yes.

8       Q    This is a "Cash Equity

9    Confirmation."

10             Right?

11      A    Yes.

12      Q    And this is attached to the same

13   e-mail.

14             Right?

15      A    It's consecutive Bates numbers.  I

16   guess that's how it was produced.

17             So I'm assuming it was attached to

18   the e-mail.

19      Q    Okay.  It's also a confirmation

20   from FGC.

21             Right?

22      A    Yes.

23      Q    And this one is for a cash equity

24   transaction.

25             Right?
```

```
 1        A    Correct.

 2        Q    And in your report, you say that

 3   the plans never actually purchased these

 4   shares because you say you did not locate any

 5   evidence of share holdings.

 6             Right?

 7        A    Correct.

 8        Q    Looking at these confirmations from

 9   FGC, the first one I showed you, you say that

10   shows a real transaction.

11             Right?

12        A    Correct.

13        Q    And the second one, according to

14   you, shows a fake transaction.

15             Right?

16        A    Correct.  Fictitious or fake, yes.

17        Q    Okay.  Both are issued by FGC.

18             Right?

19        A    Correct.

20        Q    Both are titled "Confirmation."

21             Right?

22        A    Both have the word "confirmation"

23   in them, correct.

24        Q    If I'm an investor who received

25   this e-mail with these confirmations, is
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    there any way to know by looking at these

2    documents that the first page I showed you is

3    about a real transaction, and the second page

4    is about what you claim is a fictitious

5    trade?

6            MR. WEINSTEIN:  Objection to form.

7        A    Again, I don't know what -- you

8    said, "Would the purchaser that received

9    these know?"

10            Is that -- was that the preface to

11    your question?

12        Q    "The investor," yes.

13        A    So again, I don't know what the

14    investor would be thinking or not.  I'm not

15    testifying -- I'm not here to testify about

16    what someone knew or didn't know in that

17    regard.

18        Q    Let's go back to the first page

19    that shows the futures confirmation.

20            Okay?

21        A    Okay.

22        Q    This shows a futures price of DKK,

23    Danish kroner, 583.4300.

24            Right?

25        A    Correct.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1        Q    And this future was cleared through

2   J.P. Morgan.

3             Correct?

4        A    It doesn't say on here, but my

5   recollection is they were cleared through

6   J.P. Morgan.  There were actual J.P. Morgan

7   documents that showed that they cleared.

8        Q    And the name of the exchange is

9   something called Euronext.

10            Correct?

11       A    Correct.

12       Q    Are you aware of whether Solo

13  Capital was able to clear this trade?

14       A    Whether Solo Capital, through

15  J.P. Morgan acting as their sub-custodian?

16            Is that what you're asking?

17       Q    Yes.

18       A    Yes, it was my understanding that

19  trade -- those trades cleared.

20       Q    And --

21       A    To be clear on the record, the flex

22  futures.

23       Q    Right.  You're referring to this

24  page we've been looking at for the past

25  minute or two that says "Equity Futures

```
 1    Confirmation" at the top.

 2              Right?

 3         A    Correct.  Bates stamp ending in

 4    373.

 5         Q    And Solo Capital was not a member

 6    of BClear.

 7              Right?

 8         A    That was my understanding, correct.

 9         Q    Do you know if J.P. Morgan was a

10    member of BClear?

11         A    Sitting here today, I don't know

12    specifically one way or the other.

13         Q    You didn't look into that in

14    connection with your work here?

15         A    I don't recall looking into it.  I

16    recall seeing the statement from J.P. Morgan

17    where these trades actually occurred as

18    sub-custodian.

19         Q    It wasn't important for you to

20    understand why Solo used J.P. Morgan for

21    these services?

22         A    No, not necessarily, no.  My

23    understanding is they were using J.P. Morgan

24    because Solo couldn't clear certain

25    transactions.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1           That was my general understanding.

2    But I didn't investigate that further.

3        Q    And they couldn't do so because

4    they didn't have a BClear membership?

5           Is that your understanding?

6        A    I don't know whether it was because

7    of that or whether they just weren't

8    registered properly or had the authority to

9    do so.  But they needed -- my understanding

10   was they needed a sub-custodian to -- like

11   J.P. Morgan to handle this for them.

12       Q    Okay.  Let's keep that tab handy

13   and we'll go over to -- but we'll go over to

14   5218.

15           MR. BONGIORNO:  Let's mark as the

16       next exhibit what is at Tab 5218.

17           (Whereupon the above mentioned was

18       marked for Identification.)

19       Q    This is an e-mail from FGC to the

20   Bernina plan dated August 21st of 2013.

21           Do you have that in front of you?

22       A    Yes.

23       Q    Okay.  Do you recall whether or not

24   you've seen this one before?

25       A    It's possible.  I don't recall

```
 1    specifically this document, but it looks

 2    familiar.

 3         Q    Okay.  Flip behind the blue sheet.

 4    There's an attachment of an "Equity Futures

 5    Confirmation."

 6              Do you see that?

 7         A    Yes, I see that.

 8         Q    It's for the purchase of 6,000

 9    futures contracts in Carlsberg.

10              Do you see that?

11         A    I do see that, yes.

12         Q    And the price of the futures

13    contract listed here is Danish kroner,

14    561.4700.

15              Right?

16         A    Correct.

17         Q    And if you turn back to the futures

18    confirm at 5217, that was confirmation for

19    the sale of 6,000 futures contracts in

20    Carlsberg.

21              Right?

22         A    Yes.  The one on Bates ending 75373

23    was for a sell, and this was for a buy,

24    Bates 8403.

25         Q    Right.  And the sell was for Danish
```

```
 1    kroner, 583.4300.

 2            Right?

 3       A    Yes.

 4       Q    So if we take the price of the

 5    futures purchase at Exhibit 5218 and the

 6    price of the futures sale at Exhibit 5217,

 7    that's the difference between 561.4700 and

 8    583.4300.

 9            Right?

10       A    Correct.

11       Q    So Bernina would have made a profit

12    of Danish kroner -- I'll do the math for

13    you -- 21.96 per share on this combination of

14    sale and later purchase.

15            Right?

16       A    That's correct, yes.

17       Q    And each contract was for 100

18    shares.

19            Right?

20       A    Yes.  The multiplier is a hundred.

21       Q    Okay.  Mr. Dubinsky, in your

22    opening report, you give several reasons why,

23    in your view, the pension plan trades were

24    not real.

25            Right?
```

```
 1      A    Yes.

 2      Q    And one of those reasons you say is

 3   that Solo Capital prearranged all of the

 4   transactions.

 5           Right?

 6      A    Yes.

 7      Q    If we go to your opening report at

 8   Page 78, Paragraph 205?

 9      A    Yes.

10      Q    Are you with me?

11      A    Yes.

12      Q    Okay.  Second sentence of Paragraph

13   205 of your report, "Specifically,

14   Solo Capital selected the particular stock or

15   security that was purportedly going to be

16   traded, the allocation of shares to each

17   plan, and the information related to which

18   broker and other counterparties would be used

19   for the hedging in stock loan transaction."

20           Do you see that?

21      A    Yes.

22      Q    So as you say, Solo selected the

23   stocks and securities before the plans

24   traded, and the brokers and counterparties

25   that those plans could use for the hedging
```

```
 1    transactions that the plans would do.

 2            Right?

 3       A    That's what I stated there, yes.

 4       Q    Okay.  But you say in your reply

 5    report that the futures contracts traded by

 6    the plans, one category of hedging

 7    transactions, those were real.

 8            Right?

 9       A    Correct.  Those actually occurred,

10    yes.

11       Q    Even though they were prearranged

12    by Solo.

13            Right?

14       A    That's correct, yes.

15       Q    Let's look further down on this

16    Page 78, Paragraph 207.  I think it goes on

17    to the next page.  I want to read the last

18    sentence there.

19            "Further, the fact that 34 plans in

20    this example were participating in one

21    transaction -- in this one transaction also

22    shows that the transactions were not custom

23    tailored to each plan based on their own risk

24    profile, investment strategy, or time

25    horizon, but rather, these transactions were
```

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

Page 115

1    simply carved up and doled out to each plan

2    by Solo Capital."

3            Do you see that?

4        A    Yes.  You read that correctly.

5        Q    The same can be said of the futures

6    trades.

7            Right?

8            MR. WEINSTEIN:  Objection to form.

9        A    I would have to go back and look

10   and see if, on the spreadsheets I was talking

11   about, the futures were allocated that way.

12   Sitting here today, I don't recall.

13           But they're all part —

14   nonetheless, the futures were all part of the

15   transaction that was — that Solo was

16   attempting to effectuate.

17       Q    Well, all 34 plans used the hedging

18   trade as part of their overall transaction.

19           Right?

20       A    Let me just see.  One second here.

21           (Witness reviewing.)

22           No.  I think this series was using

23   the forwards, not the futures when we're

24   looking at the example that I gave.  So

25   that's why I think the ones with the futures,

CONFIDENTIAL
Bruce Dubinsky – March 29, 2022

Page 116

1    which were earlier, which were traded at

2    J.P. Morgan, I'd have to go back and see if

3    those were carved up on a spreadsheet like I

4    was describing here.

5         Q    Okay.  You're not sure whether or

6    not each of the plans engaged in a futures

7    transaction as a hedge as part of the overall

8    transaction, sir?

9         A    No, that wasn't my testimony.  But

10   you're asking a different question.

11        Q    Okay.

12        A    I was answering --

13        Q    Sorry.  What is --

14        A    I was answering your earlier

15   question and I said your earlier transactions

16   that used futures for it was part of the

17   chain here that I was describing where it was

18   carved up.  That's what we were talking about

19   and that's the questions that you were asking

20   on.

21             These series where it says were

22   simply carved up were dealing with the

23   forwards.  So these were later, later trades.

24        Q    Okay.  Let's talk about the

25   forwards, then.

1          You also excluded forwards

2    contracts from your review in your opening

3    report.

4          Right?

5      A    No, I didn't exclude them from my

6    review.  I footnoted those in the report that

7    I was not opining on those.

8          Because, again, the investigation

9    that I was trying to conduct, that I did

10   conduct, was focusing on whether there was

11   evidence that the shares -- the Danish shares

12   actually existed, and whether if, in fact,

13   the shares actually existed, dividends were

14   actually paid.

15          And I said in the footnote that it

16   didn't change my opinion, looking at

17   the -- whether it was the flex futures or

18   forwards as to whether that meant anything in

19   the transaction to it.

20          So it wasn't that I didn't review

21   them.  I knew there were futures, I knew

22   there were forwards purportedly used.

23          I just didn't go into detailed

24   review on those particular parts of the

25   transaction because I didn't need to.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1        Q    Because you say they had no bearing

2    on whether the plans purchased or owned

3    shares or received dividends.

4             Right?

5        A    Correct.

6        Q    The forward contracts, those were

7    not executed on an exchange.

8             Right?

9        A    That is correct.

10       Q    But they were still real contracts,

11   weren't they?

12       A    Well, I think you're asking for a

13   legal conclusion.  I don't know whether they

14   were legitimate contracts or not.

15            There were -- there were

16   forward -- forwards that were purportedly

17   used in the transaction.  But beyond that, I

18   can't comment.

19       Q    Well, you're willing to say that

20   the futures contracts were real.

21            Right?

22       A    Yes, because I saw those.  There

23   was actual evidence from the -- J.P. Morgan

24   that those existed.

25       Q    You don't view that as a legal

```
 1    conclusion, but you view whether or not the

 2    forward contracts were real as a legal

 3    conclusion?

 4           Is that your testimony?

 5           MR. WEINSTEIN:  Objection to form.

 6      A    No, I think there's a difference.

 7    I was looking at the existence and whether

 8    there was third-party cooperating evidence

 9    for the -- for the futures, which there was.

10      Q    Okay.  Let's look at Tab 5219.

11           MR. BONGIORNO:  Mark that as 5219.

12           (Whereupon the above mentioned was

13           marked for Identification.)

14      Q    Do you have that in front of you?

15      A    I do, yes.

16      Q    Do you know whether you've seen

17    this document before?

18      A    I probably did because it deals

19    with RJM and I looked at RJM.  I think that

20    was one of the bellwethers that was selected.

21           So yes, I think I've seen this.

22      Q    Okay.  And this is -- it says it's

23    an equity forward transaction at the top of

24    the page.

25           Do you see that?
```

```
 1       A    Yes.

 2       Q    It's dated February 27, 2014?

 3       A    Yes.

 4       Q    And it's an agreement between

 5  Amalthea Enterprises Limited and the RJM

 6  Capital Pension Plan.

 7            Correct?

 8       A    Yes.

 9       Q    On the first page, you see

10  something entitled "General Terms?"

11       A    Yes.

12       Q    Okay.  And on the second page, you

13  see sections entitled "Equity Terms" and

14  "Settlement Terms."

15            Right?

16       A    Yes.

17       Q    You don't offer any opinion on the

18  terms of this contract, do you?

19       A    No, I don't.

20       Q    You don't know whether or not

21  counsel was consulted in drafting of this

22  forward contract, do you?

23       A    I don't.

24       Q    Do you know whether or not this

25  document was negotiated and accepted by the
```

```
 1   parties?

 2       A    Again, it's signed by two people,

 3   but I don't know about the negotiation

 4   between the two parties.  I think

 5   there's -- I recall there was some testimony

 6   that none of these terms, that some of the

 7   people in the pension plan didn't know what

 8   the terms were and hadn't negotiated, but

 9   that's my general recollection.

10       Q    That's not part of -- that doesn't

11   form any part of the basis for your opinion

12   in this case, what you just said, does it?

13       A    No.  No, it doesn't.  I think just

14   from the standpoint of -- it certainly -- no,

15   it goes to the facts that come out at trial,

16   it would be interesting that you had pension

17   plans that are newly formed and newly formed

18   LLCs, if, in fact, that that's the testimony

19   that comes out at trial.

20            That would be, to me, anyway, very

21   telling about the nature of these

22   transactions.

23       Q    Do you know when RJM Capital was

24   formed?

25       A    Not off the top of my head.  I'd
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1   have to go back and see if it's on one of the
2   exhibits to my report, if you give me a
3   minute.  It might be.
4           MR. WEINSTEIN:  Just to be clear,
5        are we talking about the LLC or the
6        plan?
7           MR. BONGIORNO:  RJM Capital LLC
8        Pension Plan, which is the signatory to
9        this document.
10       A    Give me one second.
11           (Witness reviewing.)
12           RJM was -- RJM Capital LLC.  Oh,
13   the pension plan.  Let me see if I've got the
14   plan.
15       Q    No, that's okay.  You can answer
16   with regard to RJM Capital LLC since it looks
17   like you found that answer.
18       A    Well, the pension plan was formed
19   on February 1, 2013, it looks like by Mr. --
20       Q    What about the -- sorry.  I didn't
21   mean to interrupt you, sir.  Go ahead.
22       A    And the related LLC appears to have
23   been formed July 17, 2007.
24       Q    Okay.  So the LLC itself had been
25   in existence for six years or so at this

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 123

```
1    point?

2         A    In this particular example.  I was

3    looking at Exhibit 1.01 in my report.

4              If you look at that, you can see

5    many of the LLCs were formed right around the

6    time the transactions and pension plans --

7    related pension plan was formed.

8              This one happens to be a little

9    bit older.

10        Q    Six years older?

11        A    Yes.  I mean, you can see, for

12   instance, on that same exhibit, Trade and

13   Investments LLC Pension Plan, formed

14   February 1, 2013, the LLC is a day before

15   that, January 30, 2013.

16             So a lot of them, when you look at

17   the -- this is just the Argre plans.  But if

18   you look at the Kaye Scholer plans, a lot of

19   those dates are very close in nature.

20             Plan formation date, LLC formation

21   date, very close.

22        Q    But the RJM Capital LLC was formed

23   in 2007, you said?

24        A    Correct.

25        Q    And this document is from 2014.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 124

1                Right?

2        A    I lost my place in the documents.

3                What was the document that we were

4    looking at?

5        Q    Sorry.  We were looking at Exhibit

6    5219, the forward contract.

7        A    Yes.  This forward was February 27,

8    2014.

9        Q    And I think we talked about,

10   before, how you reviewed over 2,500 trades.

11               Right?

12       A    Yeah, and I just want to clarify

13   the last answer before we move on.

14       Q    Sure.

15       A    Looking at 5219, it's the parties.

16   When you had asked me had the parties signed

17   this, I guess it's Amalthea Enterprises had

18   signed and someone on behalf of RJM Capital

19   LLC Pension Plan.

20               So the pension plan was formed

21   about a year -- it looks like a year prior to

22   this document.

23               What was your next question?

24       Q    It was -- we were -- I was just

25   kind of setting the table for the fact that

1    you reviewed over 2500 trades.

2              Right?

3        A    Right, yes.

4        Q    Okay.

5        A    Well, I would say 2559

6    transactions.  Each transaction --

7        Q    Sorry.

8        A    -- had different legs to it.

9        Q    And you focused primarily on what

10   the parties were referring to as "bellwether

11   plans."

12             Right?

13       A    Correct.  Well, I had looked

14   at -- in the report, I described the

15   bellwether plans, but I had looked at

16   transactions in the documents for 2,559

17   transactions.

18             But the bellwether plans, as I

19   understand it, were agreed upon between the

20   parties as sort of demonstrative of the

21   transactions I think the judge had asked the

22   parties to agree on.

23             That's my understanding.

24       Q    Okay.  In your view, is the -- all

25   2,559 of what you refer to as the Solo trades

1    were basically clones of each other.

2              Right?

3        A    Well, I would say basically.  I

4    mean, there were -- there was a simple loop

5    in the beginning, and then a complex loop

6    later on where there were different layers

7    added.

8              But when you look at the purported

9    substance of all of the transactions and the

10   way it was supposed to work, I think it's

11   fair to conclude they're all clones,

12   basically clones.

13       Q    And one of those transactions is

14   the March 2013 transaction done by the

15   Bernina plan in shares of Carlsberg.

16             Right?

17       A    Correct.

18       Q    When you reviewed this transaction,

19   you reviewed some of the underlying documents

20   and cited them in your report.

21             Right?

22       A    Correct.

23       Q    Why don't we look at Figure 10 in

24   your report, your opening report,

25   Exhibit 5200.  It's on Page 52.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1       A    Hold on, there's -- oh, it's just a
2   fire top, okay.
3            What page?
4       Q    It is Page 52, and I'm pointing you
5   to Figure 10.
6       A    5200, Figure 10, which is Page 50.
7       Q    Let me double-check that on my end.
8   Yeah, so you are correct.  Page 50,
9   Figure 10.
10           The document that is shown here,
11  you call this a "Trade Confirmation from
12  Solo Capital to the Bernina Plan."
13           Do you see that?
14      A    Yes, that's how I labeled it, yes.
15      Q    Okay.  The subject line of this
16  e-mail says "Account BER 01 Trade Approved."
17           Right?
18      A    Correct.
19      Q    This is not an actual trade
20  confirmation, is it?  It's just an e-mail.
21           Right?
22      A    That's correct, yes.
23      Q    Now, let's look at Tab 5217.
24      A    Okay.
25      Q    I think this has already been

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 128

```
 1    marked, but -- marked as Exhibit 5217 as

 2    well.

 3              Turn to the attachment at the

 4    second page, "Cash Equity Confirmation."

 5              Do you see that?

 6        A    Yes.

 7        Q    It ends in Bates 75374.

 8              Right?

 9        A    Yes.

10        Q    And this was sent by FGC Securities

11    LLC?

12        A    Yes.

13        Q    And they're located in New York.

14              Right?

15        A    That's what it says, yes.

16        Q    Okay.  And if you look at Tab 5220?

17    And we'll mark that next as Exhibit 5220.

18              MR. BONGIORNO:  Mark this

19         Exhibit 5220.

20              (Whereupon the above mentioned was

21         marked for Identification.)

22        A    Yes.

23        Q    This is a printout from a service

24    called BrokerCheck.

25              Have you ever heard of BrokerCheck?
```

```
 1        A     Yes.

 2        Q     And you see that FGC reports to

 3    FINRA.

 4              Right?

 5        A     They're -- it says they're

 6    registered with FINRA, yes.

 7        Q     And FGC is located in New York?

 8        A     I mean, I can't confirm factually.

 9    All I can tell you is it says at the

10    time -- let me see if there's a date on what

11    you're asking me, first of all.   5220.

12              I don't know when this -- is there

13    a date on this?

14        Q     It's at the end.   It says,

15    "Copyright 2022 FINRA."

16        A     Yes.

17        Q     On the very last page.

18        A     Right.

19        Q     For what that's worth.

20        A     Right.   I mean, it indicates the

21    main address is in New York.

22        Q     And it says, "SEC registration

23    approved November 26, 2012."

24              Do you see that?

25        A     Yes.
```

```
 1        Q    Let's go back to -- well, let's go
 2    actually to Tab 5221.
 3             MR. BONGIORNO:  Mark that as the
 4        next exhibit, 5221.
 5             (Whereupon the above mentioned was
 6        marked for Identification.)
 7        A    Okay.
 8        Q    This is a SEC document, "Investor
 9    Bulletin:  How to Read Confirmation
10    Statements."
11             Do you see that?  Do you have that
12    in front of you, sir?
13        A    Yes, I have it, yes.
14        Q    Okay.
15        A    Yes, it's titled, it says,
16    "Investor Bulletin:  How to Read Confirmation
17    Statements."
18        Q    Okay.  And then it says, "What is a
19    confirmation statement?"  And I'll just read
20    that.
21             "Under SEC rules, whenever you
22    purchase or sell a security, the broker
23    dealer through whom you bought or sold the
24    security is generally required to give or
25    send you a written notification or
```

```
1     confirmation with information about the

2     transaction.  The confirmation statement

3     contains basic information about the

4     transaction, such as the identity of the

5     security, the amount of the securities you

6     purchased or sold, and the price that you

7     paid or received."

8              Do you see that?

9       A    Yes, I see that.

10      Q    Okay.  Looking back at Tab 5217, it

11    says that the transaction was a buy of

12    600,000 shares of Carlsberg by Bernina at a

13    per share price of Danish kroner 586.3316.

14             Right?

15      A    Yes, I see that.

16      Q    And it does not specify the

17    identity of any counterparty to this trade.

18             Right?

19      A    That is correct.

20      Q    It does not say whether the seller

21    is a long seller or a short seller.

22             Right?

23      A    That is correct.

24      Q    And it certainly doesn't say

25    anything about the shares being fictitious.
```

```
1            Right?

2       A    That is correct.

3       Q    And underneath --

4            MR. WEINSTEIN:  Michael, can you

5       just hold on?

6            THE WITNESS:  There's a fire

7       announcement.

8            MR. BONGIORNO:  Okay.  I know we're

9       in the middle of an exhibit, but we're

10      getting close to having gone for an

11      hour.  Do you want to take a break now?

12      My hope is that the drilling that's

13      going on next door to us will expire as

14      well.

15           MR. WEINSTEIN:  Our fire

16      announcement ended, but -- so it's up to

17      you.  If you want a few more minutes on

18      this exhibit, go ahead.  If not, we can

19      take a break.

20           MR. BONGIORNO:  Yeah, sure.  Thank

21      you.  Why don't we just wrap this up and

22      then we'll take a break.

23      Q    At the top of the page, underneath

24  where it says "Cash Equity

25  Confirmation" -- are you with me?
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 133

```
 1              We're on Tab 5217.  Sorry.

 2       A    Yes.  Bates number 75374.

 3       Q    I'm sure you're right, but I just

 4  want to make sure.

 5       A    Okay.

 6       Q    Okay.  Underneath where it says

 7  "Cash Equity Confirmation," can you read that

 8  sentence?

 9       A    Yes.  It says -- do you want me to

10  read it out loud or just read it to myself?

11       Q    Please.  Yeah, read it out loud,

12  please.

13       A    Okay.

14            "Client and FGC Securities agree

15  that this confirms the terms and conditions

16  of the following cash equity transaction."

17       Q    Thank you.  I'm just getting lazy

18  here before lunch.  Normally, I would have

19  read it to you --

20       A    Okay.

21       Q    -- but here we are.

22            And we saw from the cover e-mail

23  that this confirmation was e-mailed to the

24  Bernina plan, correct?  If you go back to the

25  very first page of this exhibit?
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    A    Yeah.  Well, it was e-mailed --
2    yes, to an authorized representative, Adam
3    LaRosa.
4    Q    And again, there's nothing on the
5    face of this confirmation that would tell an
6    investor that these shares didn't exist.
7         Right?
8    A    Well, nothing -- I guess in your
9    hypothetical or in your question, are you
10   assuming that the plan has no other
11   information about anything, just like in a
12   vacuum they get this?  Because that's not
13   what this --
14   Q    I'm asking you about this document.
15   A    Well, I think just -- I don't think
16   that's -- I don't think that hypothetical or
17   that question -- it's hard for me to answer.
18   Let me put it this way.
19        If I'm a plan and I get a cash
20   equity confirmation for millions and millions
21   of dollars, knowing that I don't have money
22   in my plan, I mean, certainly bells and
23   whistles or red flags are going to go off in
24   my head as to how can I possibly do this kind
25   of transaction?  There's nothing that says

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 135

1    it's fictitious on the face.  It doesn't say,

2    "This is a fictitious transaction, this is a

3    fraud, this is a fake."

4              But, you know, certainly if I got

5    this and I'm an investor in a newly-formed

6    pension plan with very little money, I'm

7    going to scratch my head pretty hard and say,

8    "Well, how am I able to execute this?"  That

9    would be my -- my reaction.

10             I can't jump in the head of this

11   Adam LaRosa and what he might have thought or

12   what anybody else thought because I can't do

13   that.

14             All I can tell you is what -- you

15   know, if I got it, what I would have thought.

16   Q    Okay.  But I didn't ask you what

17   you would have thought if you got this, sir.

18   Okay?

19             I asked you whether or not there's

20   anything on the face of this confirmation

21   that would tell an investor that the shares

22   didn't exist?

23             MR. WEINSTEIN:  Objection to form,

24        asked and answered.

25   A    You just asked a different question

Bruce Dubinsky - March 29, 2022

1   this time, a slightly different.  But no,

2   there's nothing on the face itself that would

3   tell you the shares don't exist.

4          But it certainly would cause some

5   alarms to go off in my mind if I received it.

6      Q    Okay.  But you're not testifying as

7   to the state of mind of anybody in this case,

8   are you, sir?

9      A    No, but you asked me is there

10  anything on the face of this that would -- I

11  don't know if you said the word "indicate" or

12  "would show," I forgot the term you used, and

13  I'm putting -- I'm trying to put myself in

14  the position of somebody that would have

15  received this.

16         And I said, in my opinion, yeah, it

17  would certainly -- I would question it.  But

18  no, it doesn't say on the face of it there's

19  anything fictitious or that these are a

20  fraud.

21     Q    Let's -- what you just said is not

22  an opinion that you're offering as an expert

23  in this case, is it, sir?

24     A    Well, one, you just asked me to

25  look at a document and I answered that.  I

1    think certainly I'd have to go back through

2    the report.

3              I think I talk about the

4    transaction and the fact that the LLCs, most

5    of them, were newly formed, the pension plans

6    didn't have liquidity.  So in the context of

7    that, someone would certainly have to

8    question how could they possibly be doing

9    this type of transaction.

10             But I'm not opine -- I can't opine

11   on what people thought at that time, that

12   those are going to have to be facts that come

13   from fact witnesses at trial.

14             I can't jump into their head.

15        Q    When you say "someone would have to

16   question," is that a legal requirement that

17   they'd have to question it --

18        A    No, I think just --

19             MR. WEINSTEIN:  Objection.

20        Q    -- or is that just your opinion?

21        A    Just general common sense.  I mean,

22   if you -- you know, it's just -- as a newly

23   formed pension plan with little or no money,

24   call it 10,000, $40,000, how in the

25   world -- if I'm putting myself, and I get

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 138

1    this cash equity confirmation, somebody says,

2    "Well, Dubinsky, you have this pension plan

3    and you're going to be able to do this

4    transaction, and here's the confirm," I'm

5    like, "What?  I don't have any money, how are

6    we doing this?"

7              I mean, that would be the first

8    line of inquiry I would go to.  But again,

9    I -- you know, people, I think, have

10   testified in this case about what they did,

11   and the facts will be the facts at trial.

12        Q    This trade that we were discussing,

13   the date of the trade was March 21, 2013.

14            Right?

15        A    Correct.

16        Q    Okay.  Do you know when Carlsberg's

17   annual general meeting was in 2013?

18        A    I don't know off the top of my

19   head.  I mean, they were all pretty close

20   to -- these purported trades were all pretty

21   close to the dates of the general assembly

22   meetings, if I recall.

23        Q    Okay.  If you look at Dr. Carr's

24   reply report at Exhibit 5102, there's an

25   exhibit attached to that report, Exhibit 4.

```
 1              Hopefully, you have the exhibits to
 2    his report in your notebook?
 3        A    Yes, I do have it.
 4        Q    Do you -- were you able to find
 5    Exhibit 4 to Dr. Carr's reply report,
 6    Mr. Dubinsky?
 7        A    Yes.
 8        Q    Okay.  Do you see there where it
 9    indicates for Carlsberg the annual general
10    meeting was March 21, 2013?
11        A    Yes.
12        Q    So the ex-dividend date, per
13    Bloomberg, Dr. Carr has listed as March 22,
14    2013.
15              Right?
16        A    Yes.
17        Q    You don't have any basis to dispute
18    these dates and this exhibit, do you?
19        A    I haven't gone through and verified
20    them all, but I do recall that from the dates
21    that I found, the equity purchase trade date,
22    purported trade date, usually occurred at the
23    end of trading, at the end of the day, right
24    around -- either on or right around the AGN
25    date.
```

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

Page 140

```
 1              So these, just looking at them,
 2    look right.  But one, I guess, the TDC looks
 3    a little off.  You know, again, I didn't go
 4    back and verify these dates.
 5         Q    You say that you believe the trades
 6    occurred at the end of the trading day?
 7         A    Correct.
 8         Q    Is that your testimony?
 9         A    That's correct.
10         Q    Okay.  Let's go to -- back to your
11    Figure 10 in Exhibit 5200, which is your
12    opening report?
13         A    5200, Page 50.
14         Q    Page 50, which is not Page 52, as
15    you corrected me before.
16         A    Right.
17         Q    Do you have Figure 10 in front of
18    you?
19         A    I do.
20         Q    Do you see the time that the e-mail
21    was sent?
22         A    Yes.
23         Q    What is it?
24         A    1300 hours.  It was 1312 --
25         Q    Do you know what times -- sorry.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1       A    No, I was just saying the minutes
 2   and seconds.
 3       Q    1300 hours, 12 minutes, 20 seconds.
 4            Right?
 5       A    Correct.
 6       Q    Do you know what time zone that is?
 7       A    I don't.
 8       Q    Do you know whether or not this
 9   approval came before or after the annual
10   general meeting ended?
11       A    I don't know one way or the other.
12       Q    And that doesn't matter either way
13   for your opinions in this case, I take it?
14       A    No, that wouldn't matter.
15       Q    This trade occurred one day prior
16   to the ex dividend date, though.
17            Right?
18       A    I believe that's correct.  I'd have
19   to look -- let me just see if I say when the
20   ex-dividend date was on this.
21            (Witness reviewing.)
22            I'm sorry.  I'm looking at a big
23   binder that's on the side.
24            I don't know if I have the
25   ex-dividend date here.  I was just looking
```

```
 1    for it quickly.
 2         Q    I can point you to Dr. Carr's
 3    report if you're comfortable with that.  We
 4    just looked at what it said in his report.
 5         A    Sure.  What exhibit was that again?
 6         Q    It was Exhibit 4 to his reply
 7    report, which is 5102.
 8              MR. WEINSTEIN:  And then, maybe,
 9         Michael, once we've established what
10         that date is, we can take that break?
11              MR. BONGIORNO:  Sure.
12         A    (Witness reviewing.)
13              So Dr. Carr has listed the
14    ex-dividend date per Bloomberg as March 22,
15    2013.  So the purported trade would have
16    occurred one day before.
17         Q    Okay.
18              MR. BONGIORNO:  Why don't we go off
19         the record.
20              THE VIDEOGRAPHER:  Stand by.  The
21         time is 11:57 a.m. and we're going off
22         the record.
23              (Lunch recess taken.)
24              THE VIDEOGRAPHER:  Stand by.  The
25         time is 12:42 p.m. and we're back on
```

1           record.

2           Q    Mr. Dubinsky, I'm going to read you

3      something and you can tell me if you agree

4      with it.

5                "As long as a legal binding

6      agreement has been made on the purchase and

7      payment of shares on or before the annual

8      general meeting, the purchaser is entitled to

9      a dividend declared at that meeting."

10               Do you agree with that?

11               MR. WEINSTEIN:  Objection.

12          A    One, I think that it's calling for

13     a legal conclusion.  As I said, I'm not a

14     lawyer.

15               But I think in very general terms,

16     assuming that the stock is being delivered,

17     that you would -- that the issuer would be

18     paying a dividend to the holder of record

19     that owns the stock after that date.

20          Q    Did you review the testimony of the

21     SKAT designated corporate witness in this

22     case?

23          A    No, I did not.

24          Q    Are you aware that there was a SKAT

25     corporate witness who was designated to

1    testify in this case on behalf of SKAT?

2        A    That was my general understanding.

3    I don't know if it was under the 30(b)(6) or

4    not.

5            But that was my understanding, that

6    somebody from SKAT testified.

7        Q    You weren't interested in knowing

8    what that witness had to say?

9        A    No.  I don't think it was germane

10   to the investigation I was asked to conduct,

11   and I don't see that SKAT would have

12   information as to the custodian and where the

13   shares were, and whether the dividend was

14   actually paid in these transactions.

15       Q    So you don't know whether the SKAT

16   designee said anything about trade

17   settlement.

18           Right?

19       A    I don't know one way or the other.

20       Q    You don't know whether or not the

21   statement I just read to you was made by the

22   SKAT corporate designee.

23           Right?

24       A    That would be correct.  I don't.

25       Q    But you don't know what factual

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 145

```
 1     representations the SKAT corporate designee

 2     made during his testimony.

 3             Correct?

 4        A    That is correct.  I didn't see his

 5     testimony and didn't read it.

 6        Q    Let's go to -- back to your opening

 7     report, Exhibit 5200, Paragraph 131.

 8        A    Okay.

 9        Q    It's on Page 39, I think.

10        A    Okay.

11        Q    Can you read that paragraph to

12     yourself?  And I'll ask you some questions.

13        A    Which paragraph was it?

14        Q    131.

15        A    Okay.

16             (Witness reviewing.)

17             Okay.

18        Q    Just a question for you.

19             You can see, in the first sentence

20     of that paragraph, you reference "actual

21     dividends?"

22        A    Yes.

23        Q    When you say here that the pension

24     plans did not receive any actual dividends,

25     you're not offering any kind of opinion about
```

1    the plans' entitlement to dividends, are you?

2        A    That's correct.   The -- I'm sorry.

3    Something just beeped.

4             I think that's a legal conclusion.

5    In that regard, I was just looking for

6    evidence whether the plans actually received

7    any actual dividends in this transaction.

8        Q    Let's go back to Exhibit 5217.

9        A    Okay.

10       Q    And we'll go to the last page of

11   that document.

12       A    The one Bates --

13       Q    "Cash Equity."  Sorry.

14       A    Yeah, I was going to say, the one

15   ending in 75374 Bates number?

16       Q    Yes.

17       A    Okay.

18       Q    The price you see there, "Trade

19   Price, 586.3316," that was a market price at

20   that time.

21            Right?

22       A    I don't recall specifically on this

23   whether that was the closing price on that

24   day.  Typically, the trades were purportedly

25   executed or approved during the day and then

1    my recollection was it was the end of day

2    trading price that was used.

3            I don't know specifically on this

4    one.  I would have to go back and look.

5        Q    You're not aware of any trades that

6    were made at something other than the market

7    price.

8            Is that a fair statement?

9        A    I would agree with you, again, in

10   the context of we had the agreement earlier,

11   that I'm classifying these as purported

12   trades.

13       Q    Understood.  Understood.

14           In the course of your review for

15   your reports, you saw account statements

16   issued by Solo custodians.

17           Right?

18       A    Yes.

19       Q    And you agree that Solo Capital,

20   Old Park Lane, Telesto Markets and West Point

21   Derivatives were all registered with the FCA

22   at the time of the trading discussed in your

23   reports.

24           Right?

25       A    I believe that's true.

```
 1        Q    Okay.  Let's go to Tab 222 in your

 2   binder.

 3             MR. BONGIORNO:  I will have that

 4        marked as the next exhibit, 5222.

 5             (Whereupon the above mentioned was

 6        marked for Identification.)

 7        A    Okay.

 8        Q    Do you recognize this document?

 9        A    (Witness reviewing.)

10             Yeah.

11        Q    This is an "Open Position

12   Statement" and it's dated March 31, 2013.

13             Right?

14        A    Correct.

15        Q    And it's from Solo Capital to the

16   Bernina Pension Plan.

17             Right?

18        A    Yes.  Solo Capital Partners LLP,

19   yes.

20        Q    And if you -- if you look at the

21   call on GC-1 that starts with "Trade Date,"

22   and another, "Settlement Date?"

23        A    Which page are you on?  The first

24   page?

25        Q    Yeah.  I'm sorry.  Second page.
```

CONFIDENTIAL
Bruce Dubinsky – March 29, 2022

 1        A    Okay.  I see a column, "Trade Date"
 2    and "Settlement Date," yes.
 3        Q    And you see another column that
 4    says "Nominal?"
 5        A    Yes.
 6        Q    Okay.  And if you go down five
 7    entries from the top, you'll see an entry for
 8    Carlsberg.
 9             Do you see that under
10    "Description?"
11        A    Yes.
12        Q    And that reflects a buy of 600,000
13    shares of Carlsberg.
14             Right?
15        A    Correct.
16        Q    And the price listed there is
17    586.3316.
18             Right?
19        A    Correct.
20        Q    And if you look toward the top of
21    the page —— sorry, give me one second.  Let's
22    go to the last page of the document, the one
23    that ends in 32543.
24        A    Okay.  I see that.
25        Q    And if you look towards the top of

```
1    the page, you see an entry for "Dividend
2    CARLB."
3              Do you see that?
4       A    Yes.  I see an entry, yes.
5       Q    Okay.  And CARLB, that's the ticker
6    for Carlsberg.
7              Is that your understanding?
8       A    Correct.
9       Q    And this entry reflects that the
10   Bernina plan's account was credited with a
11   dividend amount for Carlsberg shares on
12   March 27, 2013.
13             Right?
14      A    This would indicate that someone at
15   Solo Capital made an entry on here to reflect
16   a dividend from Carlsberg.  I don't believe
17   it shows that it was received in cash, but
18   there's an entry on there.
19      Q    But you don't have any basis to
20   dispute that the Bernina plan received this
21   account statement from Solo Capital.
22             Right?
23      A    I don't know one way or the other.
24      Q    And this -- you'll agree that this
25   document shows a book entry reflecting a
```

```
 1    purchase of shares of Carlsberg stock.

 2            Right?

 3       A    You're back to Page 2?  Is that

 4    what you're asking?

 5       Q    Yeah.

 6       A    Yes, it shows a book entry.

 7       Q    A book entry reflecting a purchase

 8    of shares of Carlsberg stock.

 9            Correct?

10       A    Correct.

11       Q    And then, on the page we were

12    looking at just before that, it shows a

13    credit to Bernina's account for a dividend in

14    Carlsberg stock.

15            Right?

16       A    It shows an entry for that,

17    correct.

18       Q    And none of your opinions rely on

19    any contention that plans like Bernina did

20    not get actual statements like this.

21            Right?

22       A    Well, as I testified, I don't know

23    one way or the other whether the Bernina plan

24    received it or -- and if they did, who

25    received them, and, if they received them,
```

```
 1    whether they even looked at them.

 2            I don't know one way or the other.

 3       Q   Okay.  Let's go back to your

 4    report.  You opine that the transactions

 5    conducted through Solo Capital were circular.

 6            Right?

 7       A   Yes.

 8       Q   And let's go to Page 46 of your

 9    opening report, Exhibit 5200.

10       A   Okay.

11       Q   And here -- sorry.

12            Are you there?

13       A   Yes.

14       Q   Okay.  And here you're examining a

15    trade -- a transaction by the Bernina plan in

16    Carlsberg stock in March of 2013.  And that's

17    the same trade that we've been discussing

18    just now.

19            Right?

20       A   Correct.

21       Q   You say that FGC Securities

22    purchased 600,000 shares of Carlsberg at

23    Danish kroner 586.3316 per share from an

24    entity called DDC Cayman.

25            Correct?
```

```
1          A    Correct.

2          Q    And DDC Cayman, that's not one of

3     the U.S. pension plan investors.

4               Right?

5          A    That is correct.

6          Q    And this leg of the transaction is

7     shown in your Figure 9.

8               Right?

9          A    (Witness reviewing.)

10              Correct.

11         Q    And the documents shown in Figure 9

12    has an Elysium Bates number.

13              Right?

14         A    Correct.

15         Q    And we discussed earlier that the

16    Elysium documents are from Solo Capital's

17    files.

18              Right?

19         A    Correct.

20         Q    There's nothing on the face of this

21    document that you have shown here in Figure 9

22    that reflects that this e-mail was sent to

23    any U.S. pension plan.

24              Right?

25         A    (Witness reviewing.)
```

Bruce Dubinsky - March 29, 2022

```
 1            It doesn't appear on the face of
 2    it.
 3            That's correct.
 4       Q    And as we discussed earlier, this
 5    is not a trade confirmation.
 6            Right?
 7       A    That's correct.  This is a trade
 8    approval, an e-mail setting forth all of the
 9    terms of the purported trade.
10       Q    By the way, did you look at
11    DDC Cayman's account records for all
12    financial institutions where it held accounts
13    other than Solo?
14       A    I looked at whatever was available
15    in the record for DDC Cayman and looked at
16    that.  And I certainly looked at the
17    DDC Cayman Solo accounts.
18            I think I talk about it in the
19    report.  Maybe it's in the -- its either in
20    the rebuttal or reply report where I looked
21    at the open position statement to see if, in
22    the month prior to or the month of this
23    purported transaction, DDC Cayman had any
24    long position in Carlsberg.
25       Q    At Solo?
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 155

```
 1        A    At Solo, yes.
 2        Q    So you don't know if DDC Cayman had
 3   holdings in Danish securities outside of
 4   Solo Capital, do you?
 5        A    I haven't seen any evidence to that
 6   and I haven't seen any evidence, if they did
 7   in your hypothetical, how DDC Cayman would
 8   have gotten the shares into the closed loop
 9   at the Solo custodians.  Because those shares
10   would have needed to transfer into the loop
11   transaction to be able to then be passed
12   around in a circular nature that they
13   purportedly were.
14             So I haven't seen any evidence to
15   that.
16        Q    I'm asking you whether or not you
17   know whether DDC Cayman had holdings in
18   Danish securities outside of Solo.
19             That's my question.
20        A    Right.  And I think I answered that
21   saying I haven't seen any evidence that they
22   did, and even if they did have in your
23   hypothetical, I didn't see evidence where
24   they would have transferred that into the
25   Solo sub-custodians to effectuate the trade.
```

1              And it wouldn't make sense anyway,

2     at that point, if — well, I'll leave it at

3     that.  I didn't see any evidence that they

4     transferred them in.

5              So I haven't seen any — I haven't

6     seen any evidence they existed outside and I

7     didn't see any evidence from DDC Cayman that

8     they transferred shares from any outside

9     brokerage firm into the Solo structure.

10        Q    So is it your testimony that it

11    does not matter to you whether or not

12    DDC Cayman held Danish shares in accounts

13    outside of Solo?

14        A    No, that wasn't my testimony.  I

15    said if there's evidence to that, I haven't

16    seen it.  And certainly Dr. Carr hasn't

17    presented evidence of that.

18              And so there is no evidence in this

19    case to that.  So your hypothetical, I

20    just — it's not that it's not important to

21    me.

22              If somebody shows me that

23    DDC Cayman had these shares and how they were

24    entered into the structure, I'm happy to look

25    at it.  If you have a document to show that,

1    I'm more than happy to look at it.

2       Q    But you'd be interested to know

3    whether or not DDC Cayman had holdings in

4    Danish securities outside of Solo Capital.

5          Is that a fair statement?

6       A    No.  The fair --

7          MR. WEINSTEIN:  Objection, asked

8       and answered.

9       A    The statement was if you have a

10   document showing that DDC Cayman had these

11   Carlsberg shares outside the structure and

12   documents to show how they were put into the

13   structure, I'm happy to look at that.  I said

14   what I reviewed, I didn't see any, and

15   Dr. Carr apparently didn't have them either

16   or they'd be front and center.

17          I think that's pretty apparent.

18       Q    Bernina purchased 600,000 shares of

19   Carlsberg at a price of 586.3316 Danish

20   kroner per share through FGC Securities,

21   right?  That's on your Figure 10 on Page 50,

22   I hope?

23       A    Correct.

24       Q    And this e-mail went to the Bernina

25   Pension Plan.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 158

```
 1              Correct?

 2      A     Well, I don't know if it actually

 3   went to them or not.  It's addressed to

 4   somebody, Adam@Bernina P.com.

 5              I don't know one way or another if

 6   it actually went to them or not, and if it

 7   did, if anybody read it or what they did with

 8   it.

 9      Q     In another leg of the transaction,

10   the Bernina plan loaned shares to an entity

11   called Colbrook Limited.

12              Right?

13      A     Correct.

14      Q     That's in Figure 12 which I

15   believe, actually, is on Page 52.

16              Right?

17      A     That is correct.  And it's also

18   referenced in Figure 13.

19      Q     And this e-mail, we can agree at

20   least, it was addressed to

21   Adam@Bernina P.com.

22              Right?

23      A     Yes, we can agree on that.

24      Q     And if you turn to Page 54 of your

25   report, Paragraph 169?
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 159

```
 1        A    Yeah.

 2        Q    Your report says that in another

 3    step of the transaction, Colbrook loaned the

 4    same shares to DDC Cayman.

 5             Right?

 6        A    Yes.

 7        Q    And we discussed earlier that

 8    shares in Denmark are dematerialized.

 9             Right?

10        A    Correct.

11        Q    The shares exist electronically in

12    book entry.

13             Right?

14        A    Real shares you're talking about?

15    Yes, they would exist in dematerialized and

16    book entry form at the -- both at the issuer

17    and the central security depository.

18        Q    So you don't know that Colbrook

19    loaned the same shares to DDC Cayman, right?

20    That's something you're surmising?

21        A    Well, I think you have to look at

22    the flow, and the same amount of shares is

23    moving almost simultaneously throughout the

24    structure.  And so it doesn't really matter

25    to me whether they're the -- you know, like
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 160

1    dollars are fungible.

2                I don't really care if it was the

3    exact same shares specifically or not.   The

4    structure is moving the same shares around in

5    a circular nature and DDC Cayman ends up

6    getting back the shares that it purportedly

7    sold in the first place that it never had.

8                So that when I say "same shares,"

9    if you look at the totality of what's going

10   on, yes, I think the substance is that's

11   exactly what happened.

12       Q    But that's your surmise, right?

13   You don't know that?

14       A    Well, that's my opinion.   I mean, I

15   haven't seen evidence to -- otherwise.

16       Q    And you say you don't care if it

17   was the exact same shares or not.

18                Right?

19       A    It doesn't -- doesn't matter to me

20   in that sense.   I'm looking at the flow and

21   the fact that the 600,000, the same pricing

22   all the way through, and it moves in stepped

23   fashion.   This is almost like a step

24   transaction.

25                It's all preplanned, preapproved,

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

1    and that's what I was pointing out.  That's

2    the purpose of explaining so the judge and/or

3    jury can understand, that this is just a

4    circle.

5        Q    Let's look at Page 55, Figure 14 in

6    your report.

7        A    Okay.

8        Q    This is an e-mail discussing a

9    stock loan.

10            Right?

11       A    Correct.

12       Q    Did you review Colbrook's account

13   statements at financial institutions other

14   than Solo?

15       A    I didn't see any account statements

16   in the record for Colbrook outside of Solo,

17   so I would have -- my recollection is I would

18   have looked at what is in the record and that

19   would have been Solo account statements.

20       Q    You didn't see any Colbrook account

21   statements at financial institutions other

22   than Solo.

23            Correct?

24       A    I would have to go back and

25   double-check.  I mean, there were literally

1    millions of documents in this case.

2            And sitting here today, I can't

3    recall each specific one, but nothing is

4    coming top of mind that there would have been

5    an external account statement for Colbrook

6    showing any stock owned.

7        Q    If such documents existed, is that

8    something you would have wanted to see?

9        A    If there were documents that showed

10   Colbrook actually had a position in Carlsberg

11   at 600,000 shares and they put those into the

12   Solo transaction, yes, I would have -- that

13   would have been a document that I would like

14   to see.

15       Q    What if they had 600,000 shares but

16   didn't, as you say, put it into the Solo

17   transaction?  Is that something that you

18   would want to see?

19       A    It would -- it certainly would be

20   interesting if those shares existed

21   somewhere.  I haven't seen any evidence to

22   suggest that they existed.

23       Q    The document -- let's go back to

24   Figure 14, Page 55 of your report.

25            That document is, again, a document

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 163

1    from the Elysium documents.

2            Right?

3      A    Yes.

4      Q    And there's nothing on the face of

5    this document that you have shown here in

6    Figure 14 that reflects that it was sent to

7    any U.S. pension plan.

8            Right?

9      A    The only reason I'm hesitating to

10   answer your question, something in the back

11   of my mind, I thought Martin Smith actually

12   owned some pension plans.  But I'd have to go

13   back and check.

14           But this was sent to Martin Smith

15   at Colbrook.  I know there's crossover

16   between some of the people involved at the

17   counterparties and some of the people that

18   also had pension plans.

19           I'd need to go back and

20   cross-reference that.

21     Q    But it didn't go to -- to the

22   extent it went to somebody named Martin

23   Smith, it went to a Colbrook Limited address,

24   not a U.S. pension plan address.

25           Right?

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 164

```
 1        A    Yes, but that wasn't the question
 2   you asked.  So just to clarify, yes, this is
 3   going to a Colbrook e-mail address.
 4             You asked me, in your earlier
 5   question, do I know if this e-mail went to
 6   anybody at a U.S. pension plan, I think was
 7   your question, and that's what I wanted to
 8   clarify.
 9        Q    But these documents reflected in
10   Figures 9 and 14, neither one of them went to
11   a U.S. pension plan.
12             Right?
13        A    Well, let me just go back and look
14   at what 9 was.
15             MR. WEINSTEIN:  Objection, asked
16        and answered.
17        A    (Witness reviewing.)
18        Q    Let me ask you a different
19   question.
20             Neither of the documents reflected
21   in your Figures 9 and 14 went to Bernina, did
22   they?
23        A    I don't see anything that
24   would -- on the face of it that would
25   indicate whether they did or not.  I don't
```

```
 1    know one way or another where these documents
 2    went, so I can't say.
 3         Q    And in order to determine what you
 4    called the "closed loop," you needed to see
 5    these documents, didn't you?
 6         A    Correct.  These were the steps of
 7    the purported transaction.
 8         Q    Mr. Dubinsky, you're not an expert
 9    in trade settlement operations.
10              Right?
11         A    That is correct.  I wouldn't
12    consider myself an expert in trade
13    settlement.
14              I do have some experience with it,
15    but I'm not being proffered here and I
16    understand somebody else is dealing with
17    trades and settlement issues.
18         Q    Do you understand what "net
19    settlement" is?
20         A    As a general concept, yes.
21         Q    It's a -- two or more transactions
22    that offset each other in settlement.
23              Is that right?
24         A    Well, I think that's a very general
25    description.  You know, it's a -- very
```

1    open-ended.  I think I describe in my -- I

2    think it's in the reply report -- I'd have to

3    go look either in the rebuttal or reply

4    report what my understanding of the net

5    settlement is.

6        Q    You can't describe what your

7    understanding of net settlement is without

8    looking at your reply report, sir?

9            MR. WEINSTEIN:  Objection to form.

10       A    No, I didn't say that.  I

11   said -- you asked me is -- do I agree with

12   your definition.  I said your definition is a

13   very general definition.

14           I provided what my understanding

15   was in one of my reports.

16       Q    Okay.  Why don't you provide it to

17   us now.

18           What's your understanding of what

19   "net settlement" is?

20       A    Well, my general understanding of

21   net settlement is that a buyer and seller

22   within the same brokerage firm, same

23   custodian, if the shares exist and one is

24   selling and one is buying, that in general,

25   there can be an offsetting book entry at the

1    broker because the shares are already sitting

2    at the -- either custodian or sub-custodian

3    and don't need to move.

4            So that's my understanding, in

5    general, of what a net settlement -- how that

6    would work.

7        Q    So, in your understanding, the

8    shares have to be held at the custodian or

9    sub-custodian for a net settlement to occur?

10   Is that your testimony?

11       A    Again, that's my general

12   understanding of when a net settlement would

13   occur.  There may be nuances to that.

14           Again, I'm not an expert in net

15   settlement.

16       Q    Okay.  Let's go to your reply

17   report at Page 8.  It's Exhibit 5202.

18       A    Okay.

19       Q    At Heading B, you say, "In order

20   for a custodian to be able to internally net

21   settle offsetting trades, the shares have to

22   actually exist."

23           Do you see that?

24       A    Yes.

25       Q    What do you mean by "exist?"

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 168

```
1          A     Common -- common word, of the
2     meaning of it.   The shares have to be there.
3                So the custodian has to have the
4     shares in some sort of record format.   In the
5     days before they were dematerialized, they
6     would have been a paper share format.
7                Once they dematerialized, they'd be
8     in record format so there would be an
9     electronic record.   But they need to actually
10    have settled and be at that custodian.
11               There needs to be a record of it.
12         Q     Do you have your reply report in
13    front of you still?
14         A     I do, yeah.
15         Q     Okay.   And starting at Paragraph 26
16    going to 27, 28, and 29 on the next page, you
17    discuss net settlement.
18               Right?
19         A     Correct.
20         Q     And in all of this discussion, you
21    have one footnote there?
22         A     Correct.
23         Q     And that footnote is a citation to
24    Dr. Carr's rebuttal report.
25               Right?
```

```
 1      A    Correct.

 2      Q    And you don't cite any literature

 3  about market operations or any source

 4  whatsoever for your discussion of net

 5  settlement.

 6           Is that a fair statement?

 7      A    In the -- in this section, that's

 8  correct, yes.  I don't.

 9      Q    Okay.  Let's go back to Page 8,

10  Paragraph 27.  I'm going to point you to the

11  second sentence there where you say, "Under a

12  hypothetical scenario in which there is proof

13  that the shares did exist and were present at

14  a custodian, I agree."

15           You're referring back, obviously,

16  to the prior sentence?

17      A    Correct.

18      Q    And so you don't dispute that net

19  settlement is, of course, possible in certain

20  situations.

21           Correct?

22      A    That's correct.

23      Q    And that brokers or custodians can

24  settle trades on a net basis.

25           Right?
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1        A    As a general concept, that's

 2    correct.

 3        Q    Okay.  If you go to the bottom of

 4    Page 8, just read Paragraph 28 to yourself,

 5    please.

 6        A    (Witness reviewing.)

 7             Okay.

 8        Q    And in the last sentence of that

 9    paragraph, you say, "In other words, the

10    sub-custodian cannot net settle internally if

11    the selling party to the transaction never

12    actually possesses the shares; there would be

13    nothing to, quote, net settle, closed quote."

14             Do you see that?

15        A    Yes.

16        Q    And again, you don't cite anything

17    to support that statement in this paragraph,

18    do you?

19        A    That's correct.

20        Q    Did you -- before you filed this

21    reply report, did you read any sources about

22    net settlement?

23        A    Not that I recall.  Just my general

24    understanding of how net settlement would

25    work.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1        Q    Did you read any sources about
 2   internalized settlement?
 3        A    No.
 4        Q    Let's go to Tab 5114 of your
 5   binder.  It's toward the front of the binder.
 6        A    I've got it.
 7        Q    You've heard of the European
 8   Securities and Markets Authority, ESMA.
 9             Right?
10        A    Yes.
11        Q    And the document you have in front
12   of you is titled, "Guidelines on Internalized
13   Settlement Reporting Under Article 9 of
14   CSDR."
15             Right?
16        A    Correct.
17        Q    Have you seen this before?
18        A    Doesn't look familiar to me.
19        Q    Okay.  It was cited in Dr. Carr's
20   reply report at Page 32, Footnote 92.
21        A    All right.  Let me --
22        Q    Did you look at -- sorry.  Go
23   ahead.
24             You can look at that citation.
25        A    Sorry.  Just the reply report, you
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 172

1    said?

2        Q    Dr. Carr's reply report at Page 32,

3    at Footnote 92.

4        A    (Witness reviewing.)

5            Okay.   I see where he references

6    it.

7        Q    Okay.   Did you review sources like

8    this in Dr. Carr's reply report when you were

9    reviewing his report?

10       A    No, I did not.

11       Q    Let's turn to Page 3.   Let's go

12   back to Exhibit 5114 and go to Page 3.

13           Okay?

14       A    Okay.

15       Q    And I'm going to point you to

16   Paragraphs 10-A and 10-B.

17           10-A says, "A settlement

18   internalizer receives a settlement

19   instruction from a client regarding

20   settlement of a securities transaction and

21   the settlement instruction is not forwarded

22   in its entirety to another entity along the

23   holding chain."

24           And then, "B" says, "Such a

25   settlement instruction results or are

1    supposed to result in a transfer of

2    securities from one securities account to

3    another in the books of the settlement

4    internalizer without any external parallel

5    securities movement along the holding chain."

6            Do you see that?

7        A    Yes, I see that.

8        Q    This description of internalization

9    reflects that in some context the settlement

10   instruction may result without involving

11   external parties in a holding chain.

12           Correct?

13       A    Again, this is the first time I'm

14   seeing this document.  I haven't gone through

15   it.  I'm not a -- I'm not professing to be an

16   expert in net settlement.

17           So without going through this and

18   trying to decipher it, I don't know.  I mean,

19   it says what it says and you read it.

20       Q    You don't know whether or not it

21   reflects that in some context, settlement may

22   occur without any external parallel

23   securities movement along the holding chain?

24       A    That's what it seems to indicate,

25   under certain circumstances.  I don't know,

1    you know, all the nuances of when that would

2    occur.

3        Q    So would you agree with me that a

4    sub-custodian's records in this context of

5    settlement may not show any movement in

6    shares?

7        A    Again, I can't interpret this.  I

8    know there's another expert in the case

9    that's dealing with trading issues.

10           I do note that it says, "from one

11   securities account to another in the books of

12   the settlement internalizer," which to me

13   would mean that both of them have an account

14   at that settlement internalizer, and

15   therefore you wouldn't need an external

16   parallel security movement because they're

17   already sitting at the same custodian or

18   sub-custodian.

19           But again, I don't have an opinion

20   on this document.

21       Q    Okay.  Why don't we go to the next

22   one, then, Paragraph 52?

23           I'm sorry.  Exhibit 5223, Tab 5223.

24           MR. BONGIORNO:  Which I believe are

25        rules of the London Stock Exchange.

```
 1              (Whereupon the above mentioned was

 2         marked for Identification.)

 3         A     What was the number again?  There

 4    were several numbers.

 5         Q     Sorry.  5223.

 6         A     Okay.  I'm there.

 7         Q     Have you seen this document before,

 8    Exhibit 5223?

 9         A     No, I haven't.

10         Q     And again, this was cited in

11    Dr. Carr's reply report at Paragraph 68.

12         A     Okay.

13         Q     I don't know -- okay.  Why don't

14    you turn to Page 61 of the document?

15         A     Okay.

16         Q     The heading there says "Settlement

17    Clearing of Benefit Rules."

18               Right?

19         A     Yes.

20         Q     Okay.  And then, further in that

21    section, the heading to which I just read to

22    you -- we'll go to Page 68, please?

23         A     Okay.

24         Q     Do you see where it says -- sorry.

25               Do you see where it says "Net
```

1    Settlements Effect of Settlement?"

2        A    I see where it says that.

3        Q    Okay.  And then you see a Rule

4    G-5140?

5        A    Yes.

6        Q    "Obligations:  The obligations of

7    the central counterparty party, the clearing

8    member, and the non-clearing member in

9    respect of the trade shall be performed when

10   the net settlement is settled in accordance

11   with the terms of the central counterparty

12   netting service."

13           Then, underneath, it says "Guidance

14   to the Rule," which says, "Under the terms of

15   the central counterparty netting service, a

16   net settlement which results in a zero cash

17   and zero stock position may still be created,

18   settle on ISD, and be time-stamped at the

19   time of settlement.  In such case, the

20   relevant central counterparty contracts are

21   performed at the time indicated by the

22   relevant time stamp."

23           Do you see that?

24       A    I do see that, yeah.

25       Q    This is saying that a net

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    settlement position -- sorry.

2            This is saying that a net

3    settlement can result in zero cash and a

4    zero stock position.

5            Correct?

6            MR. WEINSTEIN:  Objection to form.

7        A    Again, this is a lengthy document.

8    This is the first time I've seen this

9    document.  I'm not an expert on the London

10   Stock Exchange rules.

11           I haven't gone through this.  I

12   think there are a lot of caveats in here.  I

13   don't know what the terms of the central

14   counterparty netting service would say.

15           So I really can't opine one way or

16   the other on this.

17       Q    Okay.  So you're not familiar with

18   this rule.

19           Is that a fair statement?

20       A    I haven't seen this before, so no,

21   I'm not familiar with it.

22       Q    And it doesn't affect your opinions

23   either way, what this rule may or may not

24   say?

25       A    No, it does not.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1        Q    Let's go back to your reply report,
 2   which is Exhibit 5202.
 3             Again, back to Paragraph 27 on Page
 4   8.
 5        A    Okay.
 6        Q    And you say here that net
 7   settlement requires an existing long position
 8   of the seller at the custodian.
 9             Right?
10        A    Where were you reading from?
11        Q    I wasn't reading from it directly.
12   But you'd agree with me that it's your
13   opinion that a net settlement requires an
14   existing long position of the seller at the
15   custodian.
16             Right?
17        A    Let me just read this for a second.
18             (Witness reviewing.)
19        Q    Sure.
20        A    (Witness reviewing.)
21             Yes, I say that.  It's in the
22   middle of Paragraph 27, that basically, the
23   concept as I understand it, the shares have
24   to already exist at the sub-custodian for the
25   sub-custodian to net settle.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1                So both -- you know, the shares

2       have to be there.  You can't net settle

3       something that doesn't already exist on their

4       platform.

5                That's my understanding.

6           Q    You don't cite anything to support

7       that in this paragraph, do you?

8           A    No, I don't.

9           Q    Okay.  Let's go to Tab 5123 again.

10      This is a document that's already been marked

11      in the Wade deposition.

12               5123.

13          A    Okay.

14          Q    Do you see this is a "Statement of

15      Policy, Pillar to Liquidity?"

16          A    I see that, yes.

17          Q    Do you see that?  And underneath

18      it, you see the date, and then you see "Bank

19      of England?"

20          A    Yes.

21          Q    Okay.  Have you seen this document

22      before?

23          A    I have not.

24          Q    And again, this is a document that

25      was cited in Dr. Carr's rebuttal report at

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 180

1   Page 49, Paragraph 117.

2           Go to Page 10 of the document and

3   look at Paragraph 4.19.

4       A   (Witness reviewing.)

5       Q   Are you there?

6       A   Yeah.

7       Q   The first sentence of this,

8   Paragraph 4.19, "Internalization:  If a PB

9   has two clients that are taking opposite

10  positions on the same asset (one long, the

11  other short) the PB may internally net these

12  amounts to avoid having to fund the positions

13  elsewhere:  Client short position is

14  therefore funding the client long position."

15          Do you see that?

16      A   Yes, I see that.

17      Q   Would you agree that this document

18  from the Bank of England says here that a

19  client's short position can fund a client

20  long position?

21          Right?

22      A   Under the scenario that 4.19 is

23  setting forth, that the "PB" -- I assume that

24  means "principal broker."  I don't know where

25  there's -- I guess it's the "prime

1    brokerage" -- has two clients taking opposite

2    positions on the same asset, then the prime

3    brokerage may internally net these amounts.

4            So that's what it says.

5        Q    And it says that the prime broker

6    can avoid having to fund the positions

7    elsewhere.

8            Right?

9        A    That's what it says, yeah, which

10   would make sense if the --

11       Q    That means --

12       A    If the position is already there at

13   the prime broker, then they don't need to go

14   external to source it somewhere else.  It's

15   already there and they can, according to

16   this, internalize and offset.

17       Q    It doesn't say if the positions's

18   already there in Paragraph 4.19, does it?

19       A    Well, I think it's certainly -- I

20   mean, you're asking me to interpret this.

21   This is the first time I have seen it.  I

22   haven't gone through this whole document.

23           I think, to me, implicit in that is

24   when it says if the prime brokerage has two

25   clients that are taking the opposite

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    positions on the same asset, to me, implicit,

2    it means that -- to me, anyway, that they

3    would be at the prime brokerage.

4            It wouldn't make sense to me

5    otherwise.  But that's just the way I'm

6    interpreting it.

7        Q    Okay.  But you're not an expert

8    on this.

9            Right?

10       A    No, but you're asking me a lot of

11   questions on it.

12       Q    Not too many.  Let's go to

13   Tab 5224.

14           MR. BONGIORNO:  Mark 5224.

15           (Whereupon the above mentioned was

16       marked for Identification.)

17       Q    And this is a page -- I can

18   represent to you this is a page from the

19   SEC's website.  We'll mark this as

20   Exhibit 5224.

21           And the heading is "Stock Purchase

22   and Sales:  Long and Short."

23           Looking at the second paragraph, it

24   says that "a short position is generally the

25   sale of a stock you did not own."

1              Do you see that?

2       A    Yes.

3       Q    And you'd agree, wouldn't you, that

4    short positions generally involve the sale of

5    shares that the seller doesn't own?

6       A    In general terms, yes.

7       Q    All right.  So we've been going for

8    about, I think, 50 minutes now, and now would

9    be a good breaking point for me where I am.

10      A    Okay.

11      Q    So if you don't mind, we'll take

12   just a short break now.

13      A    Sure.  Five, ten minutes?

14      Q    We'll say ten minutes.

15           MR. BONGIORNO:  Marc, is that all

16      right?

17           MR. WEINSTEIN:  Yeah, that's good.

18           THE VIDEOGRAPHER:  Stand by.  The

19      time is 1:28 p.m. and we're going off

20      the record.

21           (Brief recess taken.)

22           THE VIDEOGRAPHER:  Stand by.  The

23      time is 1:45 p.m. and we're back on

24      record.

25      Q    Dr. Dubinsky, we may have spoken

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

1    about it earlier today, but are you familiar

2    with the term "beneficial ownership?"

3         A    Just in a very general concept.

4         Q    So you don't offer any opinions

5    about beneficial ownership.

6              Right?

7         A    No.  I think it's a legal concept

8    and has many different meanings and different

9    situations, so I haven't issued that type of

10   opinion, no.

11        Q    Would you agree with me that

12   beneficial ownership is distinct from

13   questions of economic exposure to a given

14   security?

15             MR. WEINSTEIN:  Objection to form.

16        A    I think that's -- you're asking for

17   a legal distinction or legal conclusion, so I

18   don't have an opinion on that.

19        Q    Would you agree with me that one

20   country's laws might define "beneficial

21   ownership" one way and another country's laws

22   might define it in another way?

23        A    I would agree with you, that's

24   possible.

25        Q    And would you agree with me that a

1   country itself might define "beneficial

2   ownership" differently for different

3   purposes?

4           MR. WEINSTEIN:  Objection to form.

5       A   I would be speculating, but I would

6   assume that there could be different uses of

7   the term "beneficial owner" in different

8   context within a certain country.  I'd just

9   assume that there would be.

10      Q   Okay.  Are you familiar with -- in

11  the U.S., the concept of 13-D reports?

12          MR. WEINSTEIN:  Objection to form.

13      A   I've heard of them.

14      Q   Just a level set here, reports that

15  require a party that has more than 5 percent

16  beneficial ownership to file a report.

17  That's what I'm referring to.

18          Okay?  Does that sound familiar to

19  you?

20      A   It does, yes.

21      Q   Okay.  Will you go to Tab 5228 of

22  your binder, which is a copy of a federal

23  regulation?

24          MR. BONGIORNO:  Mark 5228.

25          (Whereupon the above mentioned was

1          marked for Identification.)

2     A    Okay.  I'm at that tab.  It's very

3    small to read.

4     Q    Okay.  If you look at A-1 and A-2

5    under this regulation, it says that

6    "beneficial ownership includes anyone who has

7    voting power or investment power."

8          Do you see that?

9     A    Under A-1?  Yeah.  Let me just read

10   the lead into this.

11    Q    Sure.

12    A    And again, you know, I'm not a

13   lawyer and you're asking me to interpret --

14   this is -- you know, from the U.S. code.

15         (Witness reviewing.)

16         Okay.  Yeah.  So Number 1 says,

17   "Voting power, which includes the power to

18   vote or to direct the voting of, such

19   security," and then it says, "and/or

20   investment power, which includes the power to

21   dispose or to direct the disposition of such

22   security."

23    Q    Okay.  And if you go down to D-1?

24    A    B-1?

25    Q    I'm sorry.  "D."

```
 1        A    As in "delta?"

 2        Q    "D" as in "delta," yeah.

 3             There it says, and you can

 4   obviously read the whole thing, that someone

 5   can be a beneficial owner "if they have the

 6   right to acquire beneficial ownership of such

 7   a security within 60 days."

 8             And I'm going to ask you if you see

 9   that, and take a chance to -- take the

10   opportunity to read it and ask if you see

11   that.

12        A    (Witness reviewing.)

13             In Delta-1?  Delta-1, little "l?"

14        Q    Yes.

15        A    I'm going to -- I'm really having

16   trouble even reading it.  I've got my glasses

17   on and I don't see where it says 60 days.

18        Q    Well, I'll read it out loud, and

19   see if you can follow along.

20             "A person shall be deemed to be the

21   beneficial owner of a security subject to the

22   provisions of Paragraph B of this rule if

23   that person has the right to acquire

24   beneficial ownership of such security as

25   defined in Rule 13-D-3-A," then there's a
```

```
 1    parenthetical, "within 60 days?"

 2        A    I see.

 3        Q    Then it goes on to say -- do you

 4    see that?

 5        A    Yes.

 6        Q    And then it goes on to say,

 7    "including but not limited to the right to

 8    acquire, through the exercise of an option,

 9    warrant, or right."  Then it goes on.

10            So you see there where it says an

11    investor, that there -- sorry -- that the

12    right to acquire might exist because the

13    party purchases or has been granted a call

14    option on the stock, right?

15            Is that a fair statement?

16        A    Where did you just jump to?  I

17    don't see that.

18        Q    Well, I just read you the part

19    about through "the exercise with any option."

20            "Any right to acquire through the

21    exercise of any option."

22            Do you see that language?

23        A    Yes, I see that.

24        Q    Okay.

25        A    Then it says "warrant or right."  I
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 189

1    see that.

2        Q    Right.  And that's a reference to a

3    call option.

4             Right?

5             MR. WEINSTEIN:  Objection to form.

6        A    Well, I don't know.  I mean, you're

7    asking me to interpret this and I'm not a

8    lawyer or an expert on beneficial ownership

9    in that regard.  And there's a lot of

10   cross-references to paragraph numbers.

11            I don't know.

12       Q    Well, someone who has an option

13   doesn't necessarily have shares at that point

14   in time, right?  They just have an option to

15   purchase at a later date.

16            Is that a fair statement?

17            MR. WEINSTEIN:  Objection to form.

18       A    My answer was, in a general

19   hypothetical, if I have a call option on an

20   equity, I don't necessarily have to own that

21   equity as well.

22       Q    So would you agree with me that

23   beneficial ownership does not require shares

24   in every case?

25            MR. WEINSTEIN:  Objection to form.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 190

```
 1        A    Again, you're asking for a legal
 2   conclusion.  I'm just not comfortable giving
 3   you one.
 4        Q    So you would agree with me that
 5   beneficial ownership is a legal question?
 6        A    My answer was, in most contexts
 7   where I've seen it, it has been a question of
 8   law and interpretation of law to apply that.
 9   I've seen it in other contexts, but that's
10   generally where I have seen the term.
11        Q    Okay.
12             MR. BONGIORNO:  I don't have any
13   more questions.
14             Thank you, Mr. Dubinsky.
15             THE WITNESS:  Thank you.
16             MR. BONGIORNO:  I don't know if
17   anybody else has questions, but I don't
18   have any more.
19             MR. LOPICCOLO:  Hey, this is Joe
20   LoPiccolo.  Can you hear me?
21             THE WITNESS:  Yes, but I can't see
22   who is talking.
23             MR. LOPICCOLO:  Oh, wait.  Sorry.
24   Let me see if this works.  Hold on.
25             (Whereupon a discussion was held
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1        off the record.)

 2
        EXAMINATION BY MR. LOPICCOLO:
 3

 4        Q    I just have -- so I rep -- I'm with

 5   Poulos LoPiccolo P.C. and I represent a

 6   number of individuals and pension plans

 7   including Roger Lehman and Doston Bradley.

 8        A    Okay.

 9        Q    I just have a couple of questions

10   and I'm going to refer to a document that you

11   cited to in your initial report.  I don't

12   know if you have -- you just cited to the

13   Bates numbers, so I don't know if you have

14   those handy.

15        A    I don't.  I have my report, but I

16   don't have any of the backup to the report

17   with me.

18             MR. LOPICCOLO:  Marc, do you want

19        me to e-mail you the specific document?

20        Would that make it easier if I'm going

21        to refer to it?

22             MR. WEINSTEIN:  Why don't we do

23        this.  How many documents do you have,

24        Joe?

25             MR. LOPICCOLO:  It's just one.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
1              MR. WEINSTEIN:  Okay.  Why don't we

2         take a five-minute break, e-mail it to

3         me, and we'll try to print out copies

4         quickly.

5              MR. LOPICCOLO:  Okay.  That makes

6         sense.

7              MR. WEINSTEIN:  Okay.

8              THE VIDEOGRAPHER:  Stand by.  The

9         time is 1:55 p.m. and we're going off

10        the record.

11             (Brief recess taken.)

12             MR. LOPICCOLO:  Mark 5229.

13             (Whereupon the above mentioned was

14        marked for Identification.)

15             THE VIDEOGRAPHER:  Stand by.  The

16        time is 2:10 p.m. and we're back on

17        record.

18        Q    Mr. Dubinsky, again this is Joseph

19   LoPiccolo with the firm Poulos LoPiccolo P.C.

20    I represent a number of defendants and

21   associated pension plans, including Roger

22   Lehman and Doston Bradley.

23             So I just have a couple of

24   questions.  And we pulled one of the exhibits

25   or one of the -- one of your cites in your
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 193

1    initial report.

2           And it's cited -- you cite it at

3    Footnote 299.  It's Bates stamped

4    Elysium 053115871.

5       A    Correct.

6           MR. WEINSTEIN:  Actually, I think

7       you said two "1s" in the middle there.

8           MR. LOPICCOLO:  Oh, did I?

9       A    05315871.

10      Q    Yeah, that's right.  And we'll mark

11   this as Exhibit 5229.

12          So at Paragraph 243 of your initial

13   report, you state, "In 2015, the flow of the

14   payments" -- and again, we're referring -- it

15   has a subheading of "Lehman Bradley Tucci and

16   Crescenzo."

17      A    Yes.

18      Q    Do you see that?  Are you there?

19      A    I am.

20      Q    Okay.  And it says, "In 2015, the

21   flow of the payments was generally as

22   follows.  The plans would pay Ganymede, which

23   would in turn, transfer funds to Elysium

24   Global Limited, a BVI entity controlled by

25   Shah."

```
 1                   And that's where you have

 2    Footnote 299 and you cite to what we've

 3    marked as 52 -- Exhibit 5229.

 4         A    Correct.

 5         Q    Okay.  Did you create this

 6    document?

 7         A    No, I did not.

 8         Q    Do you know who did?

 9         A    I do not.

10         Q    How did you get it?

11         A    It was in the Elysium documents.

12    When I was searching through the Elysium

13    database looking for flowcharts, this is one

14    that came up.

15         Q    Okay.  And with respect to

16    that -- to the statement I just read in

17    Paragraph 243, is this -- is this your main

18    support for that statement, this document

19    5229?

20         A    No.  I think this was just showing

21    the directional payments.

22              I think there are documents that I

23    cite to in the report, in this section and

24    others, where Ganymede would have an

25    agreement with the plans to provide services.
```

CONFIDENTIAL
Bruce Dubinsky – March 29, 2022

1    Ganymede would invoice for those purported

2    services, and money was taken out of the Solo

3    accounts when the reclaim payments actually

4    came back in, when cash actually was

5    received, and things were carved up in that

6    regard.

7        Q    Okay.  So with respect to your

8    reliance on this flowchart, did you analyze

9    the financial records of Ganymede?

10       A    Whatever was available.  I think

11   there were some financial records of Ganymede

12   that I've looked at that showed -- I'd have

13   to go back and look, but I recall there was

14   very little capitalization of Ganymede.  I

15   know I've looked at formation documents.

16           It would have been cited in the

17   report.

18       Q    Did you look at -- and if we just

19   stick on, let's just say the year 2015 where

20   this statement is made in Paragraph 243 of

21   your report, did you look at the account

22   statements, any and all account statements of

23   Ganymede during that year?

24       A    Let me just see if there are any in

25   the footnote.  I know we've had a lot of the

```
 1    invoices.  Let's see.
 2              (Witness reviewing.)
 3              I think this section, in going
 4    through this, was predicated on invoices that
 5    I saw.  I don't believe I had the Ganymede
 6    account records, bank account records.
 7              I'd have to go back and look at
 8    that.
 9         Q    Okay.  And so would you -- so if
10    you didn't have the account records, would
11    you be able to confirm all of the credits and
12    debits of Ganymede bank accounts during that
13    time period?
14         A    Well, if I had the bank records, I
15    would have gone through that.  And again,
16    sitting here, I just don't recall.
17              I think I had looked at the
18    invoices that were issued by Ganymede and
19    then the payments from those, other invoices,
20    because I recall there were other entities
21    that invoiced Ganymede for purported
22    services, and I talk about that in this
23    section.
24              But short of that, I don't -- let
25    me just -- let me just look one more time.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 197

```
 1              (Witness reviewing.)
 2              I'd have to go back through the
 3    report and see where I referenced any bank
 4    statements from Ganymede, which I -- sitting
 5    here today, I can't do because I don't have
 6    it electronically.
 7         Q    You don't recall if you analyzed
 8    the bank statements of Ganymede?
 9         A    There were a lot of documents in
10    this.  Let me just see.
11              (Witness reviewing.)
12              I don't recall seeing -- you know,
13    I just can't answer you right now.  I'd have
14    to go back through the report, the whole
15    report, and see.
16         Q    What about, then -- and if you're
17    looking at that flowchart, the next entity,
18    Elysium Global Limited, did you analyze any
19    bank statements -- and we can just
20    concentrate on 2015 for now -- of that
21    entity?
22         A    I don't believe so.
23         Q    All right.  What about if we now
24    cross over to the right-hand side?  We'll
25    start at the top.
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 198

1            Saheed Investments, did you analyze

2    any bank statements or financial records of

3    that entity?

4        A    Not that I recall, no.

5        Q    And what about Fire Capital One?

6    Did you analyze any bank statements or

7    financial records of that entity?

8        A    No.  Again, I don't recall those

9    existing in the data.

10       Q    Okay.  The next one is Parla

11   Global.

12            Did you analyze any financial

13   records or bank statements of that entity?

14       A    I don't recall seeing the bank

15   statements for that entity.

16       Q    Okay.  And the next one is

17   Philo Holdings.

18            Did you analyze any financial

19   records or bank statements of that entity?

20       A    No, I don't recall seeing any bank

21   statements for that entity.

22       Q    Okay.  And the next one is Elysium

23   Global Trading Limited.

24            Did you analyze any financial

25   records or bank statements of that entity?

```
 1        A    I don't recall seeing any for that
 2   entity, either.
 3        Q    And the next one is Quantmetrics
 4   Multi-Strategy Fund.   In parenthesis, it says
 5   "U.K."
 6             Did you analyze any financial
 7   records of bank statements of that entity?
 8        A    I don't recall seeing bank
 9   statements in the production for that entity.
10        Q    Okay.  And then, the last one on
11   the chart is Elysium Global (Dubai) Limited.
12             Did you analyze any financial
13   records of bank statements for that entity?
14        A    Again, I don't recall seeing any
15   bank statements for that entity.
16        Q    Okay.  Are you aware that pension
17   plans that you analyzed submitted reclaim
18   applications to jurisdictions other than
19   Denmark?
20        A    I know there was another series of
21   transactions that I wasn't involved with, if
22   that's what you're talking about, the ED&F.
23        Q    No, not ED&F.  Let's just say, if
24   we refer to -- and I think you -- in
25   Paragraph 243, you refer to the Lehman plans?
```

1     A    That's 243.

2          (Witness reviewing.)

3          I mean, I describe the Lehman

4     plans, I think, earlier on in the --

5     Q    I think --

6     A    -- in the report.  There's a whole

7     discussion in the "Factual Background"

8     section of the Lehman plans and who was

9     involved.

10    Q    Right, right.

11         So if we just talk about the Lehman

12    plans?

13    A    Okay.

14    Q    Are you aware of whether those

15    plans submitted reclaim applications to

16    jurisdictions other than Denmark?

17    A    I am not.

18    Q    Did you review Mr. Lehman's

19    deposition?

20    A    I believe that was one of the

21    depositions that I've read, yes.  Let me just

22    see if it's on the list.

23         (Witness reviewing.)

24         Yes, his August 2021 deposition.

25    Q    And in -- at Paragraph 244 of your

```
 1    initial report, you say -- you note here,

 2    "Payments to Lehman were typically made to

 3    one of two entities owned and controlled by

 4    Lehman."  And then you have "Volaris LLC or

 5    First Alton, Inc."

 6              Do you see that?

 7        A    Yes.

 8        Q    And Volaris LLC, Mr. Lehman had a

 9    pension plan that went by the same name.

10              Is that correct?

11        A    I'd have to go check, but it

12    wouldn't surprise me.

13        Q    Well, in -- are you aware that

14    Roger Lehman testified that his Volaris

15    pension plan transacted in Belgian securities

16    in addition to Danish securities?

17        A    I don't recall specifically.

18        Q    Well, at page -- and I'm just going

19    to refer to his deposition and I'll quote

20    it -- it's at Page 256 to 257 of Mr. Lehman's

21    deposition.

22              "Question:  Did the Volaris Pension

23    Plan transact in Belgian securities as well

24    as Danish securities?

25              Answer:  To the best of my
```

```
1     knowledge, they did.
2              Question:  Did the Volarius plan
3     also submit refund applications to Belgium.
4              Answer:  To the best of my
5     knowledge they did, yes.
6              Question:  Was the trading
7     instruction the same as what we've gone
8     through today, other than using Belgian
9     securities?
10              Answer:  I believe so for the most
11    part."
12        A    Okay.
13        Q    Do you recall reviewing documents
14    that reflected potential reclaim applications
15    to other jurisdictions?
16        A    I do not.
17        Q    So is it -- if there were -- if
18    Mr. Lehman is correct and there were reclaim
19    applications to jurisdictions other than
20    Denmark, is it possible that this -- however,
21    you referred -- the flow of payments could
22    include tax receipts not just from Denmark
23    but from other jurisdictions?
24              MR. WEINSTEIN:  Objection to form.
25        A    I don't recall seeing anything to
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 203

1    indicate that.  I recall seeing invoices for

2    services related to -- I'd have to go back

3    and look, but I thought they referenced

4    specifically the Danish transactions.

5            But there were a lot of documents,

6    so I'd have to go back and look.

7        Q    If we look at the next -- so if you

8    look at Paragraph 244 of your initial report?

9        A    Yeah.

10       Q    You state that -- let me make sure

11   I'm on the same -- let me make sure I'm on

12   the same -- the right paragraph here.

13           I know.  It's 245, 245.

14           I'm sorry.

15       A    Okay.

16       Q    You say, "For plans in which Lehman

17   himself was the participant, Solo's records

18   suggest that Lehman was paid 15 percent of

19   the refunds paid by SKAT."

20           Do you see that?

21       A    Yes.

22       Q    You see that there?

23           How did you -- how did you get to

24   that number, 15 percent?

25       A    If you look at the footnote, it's

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 204

1    33 million divided by 220 million is

2    15 percent.

3        Q    Okay.  So -- right.  I see that.  I

4    see the footnote.

5            So to get to 15 percent, are you

6    assuming that the 33 million paid to

7    Mr. Lehman was all reclaims -- was all for

8    reclaims paid by SKAT?

9        A    That's the assumption, yes, that

10   would be.

11       Q    And so would it affect your opinion

12   pertaining to this percentage that you came

13   up with there if part of the 33 million that

14   was paid to Mr. Lehman was for reclaims paid

15   by other foreign entities?

16       A    Yes, to the extent -- yeah, it

17   would -- it would affect the percentage.  Let

18   me just look at the lead-in to this whole

19   section.  Give me a second here.

20           (Witness reviewing.)

21           Yes, because I focused on the Solo

22   trades from the Danish securities.  So to the

23   extent some of that money was from tax

24   reclaims that weren't for the purported

25   Danish securities, it would affect that

CONFIDENTIAL
Bruce Dubinsky — March 29, 2022

Page 205

```
1    percent, yes.

2         Q    How would it affect that percent?

3         A    It would go down.  It could

4    potentially go down.

5              MR. LOPICCOLO:  I think that's all

6         I have.

7              THE WITNESS:  Okay.

8              MR. WEINSTEIN:  Yeah, just want to

9         check.  Is that it on the defense side?

10             THE WITNESS:  I will read and sign.

11             MR. WEINSTEIN:  Seems that way.

12        Mike and Jose, can you take us off the

13        record?

14             THE VIDEOGRAPHER:  Sure thing.

15        Stand by.  The time is 2:26 p.m. and

16        we're going off the record.

17             THE COURT REPORTER:  Recapping

18        orders, Wilmer Hale, original, two

19        realtime hookups, rough draft, two day

20        final.

21             Hughes Hubbard, copy sale, six

22        realtime hookups, rough draft, two day

23        final.

24             Hanamirian, regular copy sale,

25        realtime hookup.
```

1            Kostelanetz, regular copy sale.

2            K&L Gates, regular copy sale.

3            Dewey Pegno, one realtime hookup,

4       rough draft, regular copy sale.

5            Moore Tax Law Group, regular copy

6       sale.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 207

```
1                    C E R T I F I C A T E

2

3              I, MICHAEL FRIEDMAN, a Certified Court

4     Reporter and Notary Public, qualified in and for

5     the State of New Jersey do hereby certify that

6     prior to the commencement of the examination BRUCE

7     DUBINSKY was duly sworn by me to testify to the

8     truth the whole truth and nothing but the truth.

9              I DO FURTHER CERTIFY that the foregoing

10    is a true and accurate transcript of the testimony

11    as taken stenographically by and before me at the

12    time, place and on the date hereinbefore set forth.

13             I DO FURTHER certify that I am neither a

14    relative of nor employee nor attorney nor counsel

15    for any of the parties to this action, and that I

16    am neither a relative nor employee of such attorney

17    or counsel, and that I am not financially

18    interested in the action.

19

20

21    _____

22    MICHAEL FRIEDMAN, CCR of the

23    State of New Jersey

24    License No: 30XI00228600

25    Date:  March 30, 2022
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1                         LAWYER'S NOTES

 2     PAGE  LINE

 3     ____  ____       _____

 4     ____  ____       _____

 5     ____  ____       _____

 6     ____  ____       _____

 7     ____  ____       _____

 8     ____  ____       _____

 9     ____  ____       _____

10     ____  ____       _____

11     ____  ____       _____

12     ____  ____       _____

13     ____  ____       _____

14     ____  ____       _____

15     ____  ____       _____

16     ____  ____       _____

17     ____  ____       _____

18     ____  ____       _____

19     ____  ____       _____

20     ____  ____       _____

21     ____  ____       _____

22     ____  ____       _____

23     ____  ____       _____

24     ____  ____       _____

25     ____  ____       _____
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 209

```
1                    DEPOSITION ERRATA SHEET

2

3

4

5

6            DECLARATION UNDER PENALTY OF PERJURY

7                I declare under penalty of perjury

8        that I have read the entire transcript of

9        my Deposition taken in the captioned matter

10       or the same has been read to me, and

11       the same is true and accurate, save and

12       except for changes and/or corrections, if

13       any, as indicated by me on the DEPOSITION

14       ERRATA SHEET hereof, with the understanding

15       that I offer these changes as if still under

16       oath.

17

18

19

20

21            Signed on the _____ day of

22            _____, 20____

23

24       _____

25                    BRUCE DUBINSKY
```

CONFIDENTIAL
Bruce Dubinsky – March 29, 2022

Page 210

```
 1                  DEPOSITION ERRATA SHEET

 2      Page No. _____Line No. _____Change to:_____

 3      _____

 4      Reason for change:_____

 5      Page No. _____Line No. _____Change to:_____

 6      _____

 7      Reason for change:_____

 8      Page No. _____Line No. _____Change to:_____

 9      _____

10      Reason for change:_____

11      Page No. _____Line No. _____Change to:_____

12      _____

13      Reason for change:_____

14      Page No. _____Line No. _____Change to:_____

15      _____

16      Reason for change:_____

17      Page No. _____Line No. _____Change to:_____

18      _____

19      Reason for change:_____

20      Page No. _____Line No. _____Change to:_____

21      _____

22      Reason for change:_____

23

24      SIGNATURE:_____DATE:_____

25              BRUCE DUBINSKY
```

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

```
 1              DEPOSITION ERRATA SHEET

 2      Page No. _____Line No. _____Change to:_____

 3      _____

 4      Reason for change:_____

 5      Page No. _____Line No. _____Change to:_____

 6      _____

 7      Reason for change:_____

 8      Page No. _____Line No. _____Change to:_____

 9      _____

10      Reason for change:_____

11      Page No. _____Line No. _____Change to:_____

12      _____

13      Reason for change:_____

14      Page No. _____Line No. _____Change to:_____

15      _____

16      Reason for change:_____

17      Page No. _____Line No. _____Change to:_____

18      _____

19      Reason for change:_____

20      Page No. _____Line No. _____Change to:_____

21      _____

22      Reason for change:_____

23

24      SIGNATURE:_____DATE:_____

25              BRUCE DUBINSKY
```