# Exhibit 4

Statement on behalf of Defendants

Sanjay Shah

Witness statement No.1 (main trial)

Exhibit SSMT1

19 January 2024

**Claim No. CL-2018-000297, CL-2018-000404, CL-2018-000590,**

**CL-2019-000487, CL-2020-000369 (consolidated)**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

SKATTEFORVALTNINGEN (Danish Customs and Tax Authority)

**Claimant**

**-and-**

SOLO CAPITAL PARTNERS LLP (in special administration) AND MANY OTHERS

**Defendants**

_____

**FIRST WITNESS STATEMENT OF SANJAY SHAH**

**(first statement for Main Trial)**

_____

I, **SANJAY SHAH**, whose residential address is Villa C2, Palm Jumeriah, Dubai, UAE, and

1

currently held on remand at Vestre Fængsel, Vigerslev Alle, 1D, 2450 Kobenhavn, Denmark,
**DO SAY AS FOLLOWS**:

A.   I am a defendant in this claim. In addition, I am the director of the 6th, 9th, 30th, 32nd, 35th, 47th, 48th, 49th, 50th, 53rd and 70th Defendants to claim CL-2018-000297, the director of the 4th Defendant to claim CL-2018-000404 and the director of the 8th Defendant to claim CL-2018-000590. I am the director of IP Universal, which in turn is the director of the 44th, 45th, 46th, 51st, 54th, 55th, 56th and 57th Defendants to claim CL-2018-000297 and the 19th Defendant to claim CL-2018-000404. I shall refer to the above defendants as the "**Sanjay Shah Defendants**".

B.   I am duly authorised by each of the companies identified above to make this witness statement. The matters set out below are true. To the extent that I rely on information provided to me, the matters set out below are true to the best of my knowledge and belief.

C.   I make this witness statement in support of my defence and the defence of the Sanjay Shah Defendants generally against these consolidated proceedings brought by the Claimant ("**SKAT**").

D.   Where I refer to documents in this statement I shall refer to the code ascribed to the document in question when disclosed in the course of these proceedings.

E.   In making this statement, I shall refer to dialogue with my current solicitors, Meaby & Co Solicitors LLP ("**Meaby**"). In doing so, I do not intend to widen or change in any way the categories of documents already made available for inspection and those which have been withheld on grounds of privilege. All claims to privilege previously made are fully maintained in this statement.

F.   I exhibit to this statement a bundle of relevant documents marked as Exhibit **WS/SSMT1**. Where I refer to page numbers, I am referring to page numbers of the Exhibit, **WS/SSMT1** in the format [**SSMT1/page number***].

G.   The contents of this statement are set out below.

**A.  INTRODUCTION AND PRELIMINARY COMMENTS**                                      **4**

**(A)  THE IMPACT OF BEING HELD ON REMAND ON MY PREPARATION OF THIS STATEMENT**     **4**
**(B)  PRELIMINARY COMMENT ABOUT LAWFULNESS OF THE TRADING STRATEGY AND MY
       RESPONSE TO THE CLAIM**                                                      **8**
**(C)  MEDICAL DETERIORATION OVER THE COURSE OF THIS INVESTIGATION (MID 2015 TO
       PRESENT)**                                                                   **12**

**B.  PERSONAL BACKGROUND**                                                         **12**

**(A)  UNIVERSITY/EARLY CAREER**                                                    **12**
**(B)  MEETING USHA**                                                               **13**
**(C)  USHA'S INVOLVEMENT IN MY BUSINESSES**                                        16

**C.  CAREER PRE-SCP**                                                              **18**

**D.  CUM-EX TRADING**                                                              **27**

**E.  SETTING UP SOLO (FOUNDED JANUARY 2009)**                                      **28**

**(A)  KEY MEMBERS OF STAFF**                                                       **29**
**(B)  KEY COMPANIES OTHER THAN SOLO**                                              **40**
**(C)  EARLY DAYS: 2009**                                                           **46**
**(D)  2010 - 2011**                                                                **47**
**(E)  2012**                                                                       **51**
**(F)  2013**                                                                       **56**
**(G)  2014**                                                                       **57**
**(H)  2015**                                                                       **58**
**(I)  SOLO COMPETITORS**                                                           **58**

**F.  NON-GSS BUSINESS AREAS**                                                      **59**

**G.  THE DANISH GSS TRADING**                                                      **62**

**(A)  GSS SOFTWARE**                                                               **62**
**(B)  GSS CLIENTS**                                                                **64**
**(C)  GSS ACTIVITY**                                                               **65**
**(D)  WHY DANISH SHARES?**                                                         **65**
**(E)  LEGAL ADVICE RELATING TO TRADING IN DANISH EQUITIES**                        **66**
**(F)  SOLO'S RELATIONSHIP WITH EXTERNAL BANKS**                                    **69**
**(H)  WORKED TRADE EXAMPLES**                                                      73
**(I)  SHORT SELLERS**                                                              **74**
**(K)  STOCK LENDING INTERMEDIARIES**                                               **85**
**(L)  BROKERS**                                                                    **88**
**(M) RECLAIM AGENTS AND EXCLUSIVITY AGREEMENTS**                                   **91**
**(N)  PAYMENT STRUCTURE**                                                          **93**
**(O)  CONSULTANCY FEES PAID TO GANYMEDE**                                          **94**

3

**H.** **NON-DANISH GSS TRADING**                                                    **96**

**I.** **FINANCIAL TRANSACTIONS**                                                    **99**

**J.** **COMMENTS ON DEFENCE**                                                       **100**

**(B)** **CREATION AND IMPLEMENTATION OF THE SOLO MODEL**                            **102**
**(C)** **COMMENTS ON PARAGRAPHS 8B TO 8Q OF THE PARTICULARS OF CLAIM**              **105**
**(D)** **MAKING THE WHT APPLICATION REPRESENTATIONS AND CAN CUSTODIAN**
     **REPRESENTATIONS PURSUANT TO THE SOLO WHT SCHEME**                            **110**
**(E)** **SOLO WHT APPLICANTS BASED IN THE UNITED STATES OF AMERICA**                **112**
**(F)** **SOLO WHT APPLICANTS BASED IN MALAYSIA**                                    **116**
**(G)** **ACQUISITION OF SHARES IN VARENGOLD BANK AND DERO BANK**                    **119**
**(H)** **AGREEMENTS TO REWARD PARTICIPANTS IN THE SOLO WHT SCHEME**                 **124**
**(I)** **CONCEALING THE FRAUDULENT NATURE OF THE SOLO WHT SCHEME**                  **128**
**(J)** **CONCEALING AND/OR LAUNDERING AND/OR DISTRIBUTING PROCEEDS OF SOLO WHT**
     **SCHEME**                                                                     **129**

## A.   INTRODUCTION AND PRELIMINARY COMMENTS

### (A)   _The impact of being held on remand on my preparation of this statement_

1.   I was arrested in Dubai on 31 May 2022. I spent 3 nights in a police station detention room. I was then transferred to central jail and was there right up to my extradition to Denmark on 6 December 2023.

2.   The Dubai central jail has a policy of not allowing prisoners to receive any hardcopy documents, and not to receive personal visits from anyone including lawyers. The only face-to-face contact I was able to have with my legal team was a once a month Skype call with a time limit of between 20 to 30 minutes – I managed this on a handful of occasions with Meaby over the time I was there. But because of the time constraints the video calls were generally unproductive.

3.   However, I was able to call my legal team frequently as I had access to the telephone seven days a week between 6am and 9pm Dubai time, restricted only by the availability of the phone due to other prisoner wanting to use the phone and also how much credit I had on my prison account.

4.   I arrived in Denmark on 6 December 2023. Since that date I have been kept at the remand centre, Vestre Fængsel. On 13 December 2023 an offline laptop was provided to me with

4

the Danish prosecution files uploaded to it that I could access in the adjacent visitors'
centre. Access times are currently 6 days a week, Sunday to Friday from 8am to 6pm.

5.   On 22 December 2023, during a legal visit with Chris Waters from Meaby, I was
     provided with 4 lever arch files containing the key documents in the English claim. I am
     only able to access the hardcopy documents in the visitor's centre. I understand that
     Meaby were only able to provide a limited number of documents from this case and that
     the request to provide documents was initially refused. I do not have access to all of the
     documents in this case. The documents which I have been provided restricted access to
     are in the index at pages 1 to 5 of Exhibit SSMT1 [**SSMT1/1-5**]. I understand that the
     prison has given me special privileges to be allowed a laptop and access to these
     documents.

6.   On 4 January 2024 the prison agreed to have the electronic versions of the 4 lever arch
     files downloaded to the laptop in the presence of the Danish police.

7.   I was not provided access to the laptop or the hard copy documents between 23 December
     2023 and 2 January 2024 as the visitor's centre was closed due to staff shortages during
     the Christmas break.

8.   I was able to listen to part of the PTR on 12-14 December 2023 and I heard the judge say
     that he prefers witness statements that are not too lengthy. I have therefore carefully
     edited the witness statement to remove superfluous language, repetition, and any
     duplication. I also decided to remove some details which I consider to be excessive to
     shorten the witness statement.

9.   On 4 January 2024, my unsigned witness statement was uploaded to the laptop. My
     unsigned witness statement was prepared by my solicitors. I understand they used the
     SOIK interview summary as a starting point. I then dictated text over the phone during
     several phone calls from the prison in Dubai. The final document was read to me in a
     series of calls, and I made further changes. I found this process quite difficult because it
     was a long document, and I didn't have the benefit of reviewing the text myself.

10.  I understand my solicitors have been through all the transcripts of the calls with me in
     Dubai and identified the parts of the unsigned witness statement that reflect my word for

word dictation. These parts were highlighted in green when the electronic version was uploaded to my laptop in Vestre Fængsel. I have now reviewed the witness statement paragraph by paragraph on my laptop but have largely left the text highlighted in green unchanged because this was already in my own words. During legal visits with me, my solicitors downloaded my edits on the word document on 11 and 14 January 2024. On 16 January 2024, Mr Waters took me through the final amendments which I had asked to be made to my statement.

11.  My unsigned witness statement extracted information from my SOIK interview report. I now have a copy of my SOIK interview report which I have recently re-read **[SSHA00004415-001**] and I am content that it is still an accurate representation of events. It is therefore no longer necessary to quote from my SOIK interview report here and I have deleted these sections.

12.  It is necessary to explain how the SOIK interview report was prepared. I volunteered to attend an interview in Abu Dhabi with SOIK which eventually took place in September 2019. In the interview were various police officers and prosecutors from SOIK, along with my Danish criminal attorney, Kåre Pihlmann. I was asked questions in English and answered them in English. I do not speak or understand Danish. The interview was tape recorded but I was informed by Mr Pihlmann that the way the interview summary was then prepared (and is always prepared in Denmark other than the addition of the translation from English to Danish and vice versa as happened in my case) is as follows:

12.1.  After the interview had finished, the tape recording of the interview was then transcribed. The English transcription was then translated to Danish.

12.2.  The Danish prosecutor then prepared a summary of the questions asked and the answered in Danish. During this process, the Danish prosecutor summarises the answers I gave based on the Danish translation, albeit that I obviously answered the questions in the first person such that even when translated back to English, the words given are not precisely my own.

12.3.  The Danish summary was then provided to my defence attorney which was then translated to English for me. I then had the opportunity to review the English

6

summary to propose corrections but without access to the tape recordings or transcript. I recall making a few changes with Mr Pihlmann and I remember some instances where SOIK had summarised my evidence incorrectly. I was advised not to make too many changes. I also understand it is usual practice in Denmark for the suspect to sign the Danish summary and I was advised not to do so and I did not sign it.

12.4.   My Danish attorney then made a few changes to the Danish summary to reflect our discussions. A final summary was prepared in Danish which is the official document for the Danish criminal proceedings.

12.5.   I then received a version of the final summary which was again translated to English. This is the only version of the summary I have and is the one my solicitors have used to prepare this witness statement. My solicitors have informed me that the SOIK interview summary is found at **[SSHA00004415-001]**.

12.6.   The tape recording along with the English and Danish interview transcripts are then destroyed by the Danish prosecutor. I do not understand why this is done but I remember questioning it at the time and being told that it is how it is done in Denmark. As far as I am aware, the tape recording of my interview along with the English and Danish transcripts have been destroyed. Certainly, I was never provided with a copy of these.

13.   Whilst I had access to documents prior to my arrest, disclosure had not been completed by that stage and I am informed that a substantial number of documents have been disclosed since I have been in jail. I was also not in the habit of reviewing the documents which were available to me for the purpose of preparing my defence of the claim, as I did not anticipate being arrested and finding myself in prison for over the last 18 months.

14.   In addition to having restricted access to the documents referred to at paragraph 5, my legal team have shown me copies of various documents listed at Schedule 1 and which I have dealt with further below when they have visited me at Vestre Fængsel in January 2024.

7

**(B)** _**Preliminary comment about lawfulness of the trading strategy and my response to the claim**_

15.    I acknowledge and have no option but to accept the English High Court's findings as to how the Danish tax system operates following the Validity Trial Judgment, however I do not agree with it.

16.    I have always believed that all of Solo's activities were lawful, and I still do. Solo operated in a complex field that was closely regulated, executing trades that raised a large number of technical questions. I had always believed that my team had asked our legal advisers all of the relevant questions and that the positive opinions we received from Hannes Snellman and others could properly be relied upon.

17.    The findings which have now been made by the English High Court in 2023 were not known to me or anybody else during the relevant period. If they had been, Solo would have structured the trade in a way which did not conflict with the principles of the Validity Trial Judgment. It was not nor has it ever been my intention to carry out any form of unlawful trading. The solo business model was always intended to engage in legitimate dividend tax arbitrage trading. If this judgment had been available at the time, I am sure the lawyers appointed by Solo would have considered it and advised. I consider that traders are perfectly entitled to generate such profits as they are lawfully able to achieve.

18.    When I talk about my belief that the trading strategies were lawful in this statement, I am referring at all times to my belief at the relevant time. I do not repeatedly refer to the findings made at the Validity Trial which were unknown to me at the time. I believe that the legal position in the Validity Judgment was unknown to SKAT, as there was no hint of any chain of custody requirements etc in its Legal Guide at the relevant time. I would be very surprised if SKAT has ever asked any WHT Refund Applicant for proof of a chain of custody and if so, where such trades were executed through dividend arbitrage trading, it is unlikely that any applicant would have been able to provide this.

19.    SKAT's case against me seems to have been built using documents from disclosure to prove their case. This means that quite a lot of the basic factual material is not disputed

(eg the text in emails sent on given dates can be read by anyone). However, it is using these documents in an effort to paint a picture to the Court that my conduct from about 2009 to 2015 was dishonest. I strongly disagree with these efforts and deny absolutely that I was dishonest or am liable to SKAT. Some of the documents are taken out of context (in that they can be properly explained by looking at other documents created at that time) others only show a fragment of the full dialogue, much of which was in conversations in meetings or on trading floors and will not be recorded in documents.

20. SKAT alleges that I and others have conspired with each other to intentionally deceive and defraud SKAT. As I will repeat below, at no time did I ever conspire with anyone either in my personal capacity or through my businesses to defraud SKAT. I have, at all times, operated my businesses completely transparently and in a manner where, at any time, as SKAT has now been able to do, the operations of the business could be fully understood by simply looking at the documents / emails. It was always my intention that at all times:

20.1.   All email accounts across the Solo Group, including my own emails, have been archived and stored;

20.2.   The Solo server has always been securely maintained; and

20.3.   The Solo server has been backed up at the end of each day to ensure that, if there were any technical interruptions in the server, the data was always secure.

21. Had I intended to carry out an enormous fraudulent scheme I would not have preserved all of the data, documents and evidence which demonstrates exactly how the trading was operated.

22. In this statement I provide my recollection of events that are not properly captured in the documents, but this process is incomplete. Nobody can be expected to have precise recall of every event which took place in their professional life approximately 10 years ago. The Court will see from the email communications from the relevant period that, in general, I rarely write lengthy emails, far less formal letters. As the CEO of a group of fast-growing companies I wished to be kept copied into a lot of internal and external emails. I received hundreds of emails a day only some of which I read in detail and replied

9

to. I would read the subject header of the emails and I would look at any marked urgent. Any important or urgent issues would be communicated to me by telephone or in person as my staff knew that I would not read every single email which I received. This is how I conducted myself in my earlier employment from Credit Suisse (**"CS"**) onwards and therefore it was not unusual.

23. In general, my working method was to employ highly competent experienced individuals who I regarded as being at the 'top of their game', and to ensure that their incentives were aligned with mine. That structure meant that I was generally happy to follow recommendations made to me or advice I was given.

24. I recall that in the period 2012 to 2015 I cautioned staff about the amount of information they may be showing to third parties. I believed and understood that Solo was engaged in dividend tax arbitrage trades which were highly successful and profitable largely because it had few competitors. I believed that other banks and traders were keen to copy Solo's strategies and I wanted to protect what I saw as its intellectual property. My concern that Solo's trading strategies would be copied was crystallised when, for example, key personnel (such as Raj Shah and Graham Horn) left and began operating in this area themselves. This only went to increase my nervousness and desire that Solo must carefully control the amount of information it provided to third parties about its activities.

25. I was not concerned about whistleblowing because I expected that if any tax authority was not happy with a withholding tax reclaim, they would refuse to pay, ask for more information, then only pay if they were satisfied with the answers. Solo had nothing to hide from its auditors, regulators or anyone else on the basis that its conduct was unlawful.

26. I deny the claims against me in full. I did not make or conspire to make fraudulent misrepresentations to SKAT. I was not part of, let alone the mastermind of any conspiracy. The representations were not made dishonestly.

27. If the Court finds that I was responsible for making the representations (which for the reasons set out in this witness statement I dispute), I reasonably believed that the clients

10

were legitimately entitled to make the applications based upon the information set out in the Credit Advice Notes (**"CANs"**), where they would be reviewed and assessed by SKAT to determine whether refunds should be issued or not. The fact that SKAT issued and continued issuing refunds, reaffirmed my belief that the applications were legitimate in the first place and the CANs were accurate. As far as I was concerned the proof was in the pudding. SKAT had the final decision whether to issue the refunds, and it did so. It has not occurred to me that SKAT had huge internal control issues, which I would not expect at any tax authority of a country in the developed world.

28. I first became aware that there was a potential problem on or around 27 September 2015 when the directors of Varengold bank (**"VG"**) informed me that all of my bank accounts were frozen. That was alarming as I had over €200m with the bank. As I was on the supervisory board of VG, the directors shared with me the formal notice of the criminal investigation which detailed allegations of fraud. Although that was shocking, I was confident that Denmark was mistaken that there was fraud and that the trading was legitimate and the refunds had been paid out lawfully. I expected that the tax authority would soon enough discover the loophole (or defect) in the tax law that permitted a suitable trader to lead to lawful WHT reclaims.

29. I spent a lot of time during this episode speaking to my staff and searching through emails and documents to try to figure out what could possibly have been said to be fraudulent. To this day, I have not been made aware of any wrongdoing or "smoking gun". To the contrary, my resolve has strengthened that no fraud (or intention to commit any crime) had taken place and that Denmark's allegations in the criminal and civil realms would eventually fail.

30. When the trade in Danish shares was structured in 2012, in my opinion, and based on my own knowledge and experience and the information which had been provided to me by employees of Solo, there was nothing that was unusual by comparison to other trades structured within the global community of dividend tax arbitrage traders employed by, or trading with, a range of well-established financial institutions, such as Barclays SCM, CS, Deutsche Bank, Rabobank, Macquarie Bank and Santander. This structure having been "approved" by SKAT initially by issuing the refunds, the remainder of the trading

simply continued as such and the business infrastructure set up around the trading was designed only to maximise Solo's and Ganymede's profits, not to alter the original structure. The key distinction between the different Solo trades was the switch from Futures to Forwards on the derivatives hedge.

*(C)*   *Medical deterioration over the course of this investigation (mid 2015 to present)*

31.   The criminal and civil investigations and proceedings in the UK, Denmark, Dubai and Germany which have arisen out of the matters complained about by SKAT, have been ongoing in one form or another for over 8 years.

32.   These investigations have been extremely disruptive and have caused irreparable damage to my family life, my businesses and my reputation. These investigations and the very public adverse publicity which they have generated, including defamatory statements by senior Danish politicians, have had a damaging impact on both my physical and mental health, including the deterioration of my pre-existing conditions.

**B.   PERSONAL BACKGROUND**

*(A)*   *University/early career*

33.   I initially hoped to train as a doctor. In 1989 I studied for a BSc in Biomedical Sciences at King's College, London. After 3 years of study, I decided that I no longer wished to be a doctor and left university in 1993 prior to completing my final year. The deciding factor was the terrible conditions and low pay endured by junior doctors.

34.   During this time, I was living with my parents. Whilst I was at university, I would host student events and I would DJ at the student union which produced some nominal income. After I left university, I had hoped to continue doing this, but I quickly realised that it was not going to produce sufficient income for me to buy a house, get a mortgage etc so I decided I needed to get a "proper" job.

35.   I decided that I wanted to re-train as an accountant. I therefore funded myself with a bank loan to attend a chartered accountancy foundation course which I seem to remember was a three-month course.

36.   After passing the course, in 1994 I joined KPMG on the graduate training programme as

12

a trainee in the corporate tax department. My activity was a mix of classes, exams and day to day work. My principal responsibilities were corporate tax affairs for entertainment and media clients, including corporate tax return preparation and preparation of tax advice.

37. After approximately 1½ years I became tired of studying for exams and discovered that I did not need to be a qualified accountant to work in investment banking. At the time, many of my peers were leaving their accountancy jobs and joining investment banks for large salary increases.

38. I therefore left my job and started looking for work at banks.

39. After a couple of months, I got a new job at Merrill Lynch (**"ML"**). I worked in the back office of the finance department. I quickly realised that the 'back office' departments are paid far less than the 'front office' teams, in particular traders. I realised that an astronomical amount of money was made in some trading areas. This came as a complete revelation to me as I hadn't previously known anyone who worked in the sector.

40. I therefore started making efforts to transfer into a front office role so that I could earn more money. I wanted to be a trader.

*(B)*    *Meeting Usha*

41. I am married to Usha Shah (married 11 September 1999) with whom I have 3 children: Esha (DOB 21 July 2003), Aman (DOB 9 September 2007) and Nikhil (DOB 19 May 2009).

42. I met Usha in early 1998 through mutual friends whilst she was exhibiting her flower arranging business at an Indian wedding fair.

43. When I met Usha, she was working at NatWest Bank. I can't specifically remember which department she was in, but I do remember that it was to do with stationery, printing, brochures etc. I seem to remember that Usha's annual salary was around £12,000.

44. We got married in September 1999.

13

45.   It was understood that I was the breadwinner and I had ambitions to progress in my career and increase my income. Usha's role was to be the homemaker and a stay-at-home mother.

46.   Shortly after Esha was born, I suggested to Usha she should give up her job because my income was sufficient to maintain the family at that stage. From then on, my view of Usha's role in the family has always been to look after the home, the kids, cook etc.

47.   In or around March 2009, I decided to move my family permanently to Dubai. This decision was based on my wish to live and work in a tax efficient jurisdiction. I chose Dubai solely on the basis that I suffer from severe arthritis and hypertension; a dry, warmer climate results in less pain. Further, medical insurance in Dubai provides access to medication that cannot be obtained in the UK and within a month of living in Dubai, my requirement to administer pain relief medication was significantly reduced. My new rheumatologist in Dubai was surprised that in London I hadn't been prescribed anti-TNF drugs which would have prevented the severe joint damage in my hands. I was immediately prescribed these drugs and continue to take them to the present day.

48.   Prior to this, we had been considering a move to Australia as a colleague from ING had moved there and established a small trading company. But some friends who had moved from London to Dubai and suggested that I should consider Dubai because it was closer to the UK.

49.   I visited Dubai in February 2009 with my daughter for a few days. We viewed schools, apartments and looked around a number of residential communities. When I returned from this trip, I strongly suggested to Usha that we should move to Dubai and not to Australia. I then left the UK in March 2009 and moved to Dubai. Usha was expecting Nikhil at the time so the plan was for her to have Nikhil in the UK and when it was safe for her to fly, she would fly to Dubai with the three children over the summer of 2009. This would also give me enough time to find us somewhere to live in Dubai and register my daughter for school.

50.   In 2011 when my youngest son, Nikhil was 2 years old he was diagnosed with autism following concerns about his behaviour raised by staff at his nursery. Since being

14

diagnosed, he requires very specialist (and expensive) care, which is managed by my wife.

51. At the time my son was diagnosed I had very little knowledge of what autism was and after some research I decided to donate to the Autism Research Trust ("ART", a registered charity in the UK) in order to get access to the Autism Research Centre in Cambridge University, which works to understand the cause and effects of autism. The ART made me a trustee soon after I started my donations.

52. In April 2012, I decided to establish a UK Charity called Autism Rocks (www.autism.rocks: Registered Charity Number 1158121) to combine my love for my son with my passion for organising fundraising music concerts in order to raise awareness about autism and fund research.

53. Autism Rocks raised awareness through organising music concerts in London and Dubai, featuring celebrity performers such as Prince, Lenny Kravitz and Michael Bublé.

54. All funds raised by Autism Rocks went to the ART apart from a small donation to Austistica (another UK based charity). Neither I or Usha withdrew funds from the charity for personal use. To date, Autism Rocks has raised significant funds, which has enabled the ART to support 15 long term research projects that aim to find methods of identifying children (as early as possible), who will develop autism and then evaluate specific methods of intervention and support to aid them through the rest of their lives.

55. Since these proceedings have commenced, and as a direct result of the widespread negative publicity and defamatory press statements which have been made by Danish Ministers to the media, the charity has been unable to continue. I was also asked to step down as a trustee of ART for reputational reasons.

56. Separate to the Autism Rocks charity, in 2017 I encouraged my wife to set up a company in Dubai called the Autism Rocks Support Centre FZ LLC for the purpose of providing education and rehabilitation to children in Dubai (including my son) who are on the autistic spectrum.

57. I was not involved in the operation of the facility. Usha employed Claudia Sidoli as operations manager. Nikhil was able to attend the facility daily for his support needs.

15

58.  I add here that Claudia was previously an employee of Solo working in a client liaison role. She then moved to Monaco with Jessica Spoto to perform the same role through their own company. After the GSS business closed in 2015, they were effectively made redundant as they were not doing any outsourced work for Solo or me. I then suggested to Claudia that there may be a role for her as office manager at Elysium Dubai which she then accepted at some point. From around 2016 Usha started spending time with Claudia, and Usha decided to hire her for the new project.

### (C)  *Usha's involvement in my businesses*

59.  Usha did not at any time have an active role in any of my companies.

60.  However, in 2014 and 2015 I was travelling a lot. During that period Usha started to have more free time because the children were getting older, and we had more domestic support. We decided that she could spend time in the Dubai office. As she had no experience or knowledge of financial services, we decided that she should manage events to promote Autism Rocks. Around this time, I provided Usha with the authority to execute documents for me (both via a power of attorney and through her own directorship positions) when I was away from the office. All documents signed by Usha were at my ultimate direction (either directly or delegated through my staff). The appointment of Usha as a director also gave her some security over the family assets. In the event of my death, she would be able to maintain control of the companies. This was important to me because we were living in the UAE and under Sharia law, Usha would have limited rights to inherit my wealth and the companies would cease to operate if there were no other directors. I learnt that his is not an unusual set-up for wealthy families in the Gulf region.

61.  To the best of my recollection, Usha was appointed as a director of the following companies at various points since 2014:

61.1.  Ganymede Cayman Ltd;

61.2.  Elysium Global (Dubai) Ltd;

61.3.  Elysium Global Trading Ltd;

61.4.  Arche Cayman Ltd;

61.5.   Araya Holdings Ltd;

61.6.   Philo Holdings Ltd (**"Philo"**);

61.7.   Fire Capital One Ltd (**"Fire"**);

61.8.   Acai Investment Ltd (**"Acai"**); and

61.9.   Parla Global Investment Ltd (**"Parla"**).

62.   I asked her to become a director of these companies because they were the companies that I envisaged would be the most active. She was not involved in the business of these companies, and she did not have any responsibilities or assignments. The purpose of her being a director was her ability to sign documents and to provide her with some asset protection.

63.   Usha did not have any understanding of what the various companies did or how they were managed by me. Usha never asked any questions about the business; she was not particularly interested. I never explained the business to her, for no reason other than it was complicated, and Usha had no knowledge or experience in the finance or banking sector. To be blunt, she would not have understood what the business was doing so there was no point in even trying to explain it to her. I recall that, at the time and even before that in the earlier stages of our marriage, all she was concerned about was knowing that the bills could be paid and that we had a roof over our heads.

64.   In addition to her directorships, Usha had an employment contract with Elysium Dubai and her official title was events manager. The salary was around AED 100,000 per month to start with which was then increased to around AED 200,000 per month. The amount of her salary was not in reference to her role. The salary she was receiving at the time was what I knew she needed each month to meet the household's monthly outgoings. Having a high income also meant that Usha would be given access to more preferential banking services such as private banking which she would not otherwise have been able to access. This resulted in easier access to the staff when visiting the bank branch for example. The employment contract and the need for payments in the form of salary remittances were also necessary for Usha to obtain a work permit in Dubai which gave her more independence, rather than having her residency visa sponsored by me.

65. As part of the role, Usha helped to plan a few events, but I would not have contemplated employing anyone other than Usha in such a role for this salary.

66. I authorised Elysium Global (Dubai) Limited ("**Elysium Dubai**") to issue a bonus to Usha on 5 November 2015 of around AED 10 million. This was two days after some major developments in London. On 3 November 2015 the offices of Solo at the 9th and 11th Floors of 10 Exchange House, Primrose Street, London EC2A 2EN were raided by the National Crime Agency ("**NCA**"). I was informed that the search warrants were executed under a Letter of Request received in England from the authorities in Denmark and that the purpose of the search was to obtain evidence for a parallel UK money laundering investigation.

67. I expected that the bank accounts of Solo would be frozen, and I was therefore worried that my own assets and those of the companies associated with me would also be frozen.

68. The transfer to Usha was to make sure the family had money to live on for a period of time if the corporate accounts linked to me were frozen. At that time, I anticipated that the investigation would be short-lived and that the disruption to our lives would be minimal.

69. Once Usha had received the transfer, it was her money, and she had full discretion over it. Other than this sum, Usha did not have any independent private wealth (other than her interests in some UK property which by now would have been frozen) because we had not made a proper succession plan.

## C.    CAREER PRE-SCP

70. I have asked my solicitors to locate and reference copies of my CV that have been produced in the disclosure [**SKEL00161922-00001, SKEL00045829-0001, SKEL00803899-00001, SKEL01109203-00001, SKEL01126259-00001, SKEL00148844-0001**].

### *(A)    Merrill Lynch International ("ML")*

71. In 1996 I joined ML where I worked in the back office of the finance department.

72. I initially worked in the Financial Reporting team with responsibility for preparing

18

monthly, quarterly and annual consolidated income statements, and balance sheets for the European Business.

73. I worked at ML for approximately 3 years. During this time, I moved to the middle-office as part of the Precious Metals Trading Desk where I interacted with the traders and the finance department as well as other departments such as the operations and IT. As part of my role in the middle-office I was responsible for supporting six traders who traded in precious metals. During this time, I learned about derivatives and financial products, since the traders were not just buying and selling blocks of gold, but they were buying and selling forwards, futures, and options.

74. Over time I realised that in order to progress my career, which meant moving to the front office, I would need to leave ML.

### (B) *Morgan Stanley*

75. I therefore found a new job at Morgan Stanley. This was still a middle-office role, but it felt closer to the front office and I was paid much better.

76. In 1998 I started at Morgan Stanley as a Product Controller in the Equity Derivatives department. My responsibilities here included producing the daily income statement reporting and reconciliation for the Complex Equity Derivatives desk, month end income statement and balance sheet preparation and price testing of open trades.

77. This job was similar to the one at ML, but instead of supporting metals trading I was supporting equities trading, and it was here that I had my first exposure to dividend trading. I did not see any cum-ex trading at Morgan Stanley but at that point I might not have appreciated what the trade was.

78. The equity derivatives trading desk at Morgan Stanley also traded in dividend arbitrage. I needed to understand these trades to do my job. For example, I needed to check the term sheets produced/executed and compare them against the way the trade had been booked in the trading system. I also needed to liaise with the legal team to check the contracts matched the term sheet.

79. Traders would provide us with heads of terms in a termsheet and confirmation from the

broker executing the trade. At a later stage the legal department would produce a more formal contract document. I learnt key phrases and acronyms used on the desk, and how these need to be written up when booking in the trade in the IT system.

80. My spreadsheet skills greatly improved during this time. My work also required me to calculate when to trade and ascertain if a contemplated trade would be profitable. For example, I would need to check the investor relations page of the issuer to check on the upcoming dividend or previously declared dividend and check this was accurately recorded in the bank's IT system. During this period, I also learned to appreciate the difference between gross and net dividends, and the different withholding tax levels in different markets. I needed to keep up to date with changes in tax markets, so during this period I acquired some general knowledge about dividend arbitrage.

81. I also learned a lot about stock loans and standard hedging structures. Stock loans generally involved borrowing equities from other banks. We did not look or examine where stocks were being borrowed from.

82. During this period, I gained a lot of knowledge, but I was still a "small fish in a big pond". Again, I realised that I wouldn't be able to make the shift into a proper front office role. I decided that the way to try to do this was to seek employment at a small bank and try to work my way up internally. The long hours and long commutes were also affecting my health.

83. From memory I think I left Morgan Stanley in July 1999. I left without first having secured another role. Usha and I married shortly afterwards on 11 September 1999, and during this time I was looking for work.

*(C)* ***Donaldson, Lufkin and Jenrette / CS***

84. After a couple of months, I secured a new job in a small office of a US investment bank called Donaldson, Lufkin and Jenrette ("**DLJ**") located in the City. Here I learned a lot about the infrastructure of the bank, the organisation, and the employees' different roles and responsibilities.

85. I joined DLJ as a Trader Assistant in the Equity Derivatives department. It was a middle-office role. I sat on the trading desk sitting next to the traders. I was not involved in

executing the trades but the natural progression from a Trading Assistant was to become a Junior Trader. This was my plan. I had daily contract with the head of the desk.

86. The DLJ office was a branch office of a small US investment bank. It was a small (tiny) office compared to the previous offices I had worked in. We had a fraction of the staff that were employed at ML or Morgan Stanley in London (perhaps 500 employees against the 5,000 or so at the big banks). This meant that I had more exposure to senior people. I interacted with the CFO and got to know the most senior personnel in the office. It also meant that I had more exposure and time to talk with the traders.

87. My desk was in earshot of the stock lending desk, who had arrived recently due to DLJ's acquisition of a specialist stock lending company called London Global Services. I would socialise more with this group than the traders on my desk, as those traders tended not to socialise after work at all. I kept in touch with some of these stock lending traders up until the end of Solo.

88. There was no dividend arbitrage trading at DLJ.

89. DLJ was then acquired by CS in late 2000. I became an employee of CS and continued in my role. However, it turned out that CS didn't understand our trading and booking systems, and I became responsible for documenting all trades in the bank's systems.

90. At the outset CS told me (along with a lot of other people) that they were going to make us redundant. However, as they needed to transfer all the open trades onto their systems, I was asked to carry on working for around 3 months to do some handover work.

91. During this three-month period, I got to learn and understand where the trades should be most appropriately documented and booked into the CS systems. Some of these fitted better into the prime brokerage business (which incorporated stock lending and total return swaps). The equity derivatives desk dealt with more complex structures.

92. This meant that I had exposure to both the prime brokerage desk and the equity derivatives desk. My role was to explain the trades to the various teams at CS.

93. In the end, both teams offered me a permanent position. However, I had enjoyed my time with the prime brokerage team more and decided to work with them.

21

94.  Having accepted this role, I was in a more senior position doing the job I always wanted to do but as part of a larger organisation.

95.  Over time I got friendly with the people working around me, including the manager of the prime brokerage team (which oversaw the bank's relationships with hedge funds).

96.  CS had just hired David Clarkson from Deutsche Bank to start up a specialist area within prime brokerage, primarily dividend trading. I secured a job within this business area and reported to David, who was part of the first generation of persons involved in dividend tax trading. I would describe my role at this point as middle-ranking within a small group of people in a big bank.

97.  For me, this was a really important role. I sat next to David and learned how he operated.

98.  My role was as a Junior Trader. I was involved in many aspects of the business unit. I may have been dealing with stock loans one day and an IT project the next day. David had a tax background and I think he had been a chartered accountant at one of the big accountancy firms. He had a history of dividend arbitrage trading and I recall he was quite keen on implementing them at CS. I recall that these trades were conducted across Europe, particularly the Swiss and Scandinavian markets. I don't recall any Danish trading from this period. They were also involved in US and Canadian trading.

99.  At the end of the first year (circa. 2001), CS hired a tax lawyer by the name of Paul Mora in the prime brokerage business who reported to David. I did not realise initially, but Paul was a celebrity in the dividend business. I was assigned to work directly for him and he introduced me to the detail of dividend arbitrage trading. The overriding emphasis was to create trades that would reduce the amount of withholding tax they would otherwise suffer on trades.

100.  Working for Paul, I was involved in several tasks, such as drafting business plans, obtaining approvals and executing trades. When Paul joined, my role changed from being just the general junior assistant trader into a dedicated dividend arbitrage trader. There were initially two people in my team and then we were joined by a new hire to cope with the workload. Paul would bring me to meetings and introduce me to senior people (senior managers at large banks and brokerages) who were well-established in the arbitrage

22

business. This helped me when executing trades. This also helped me at Solo as I was able to easily meet with these people and be kept abreast of developments in the arbitrage industry such as tax changes.

101. The trades were structured (designed) by Paul. And I would then execute the trades on his instruction. He was often out of the office travelling so I would be required to execute the trades on my own, which I enjoyed.

102. The trades involved equities across most of Europe, Japan, Russia and Australia. Paul brought a lot more knowledge of dividend arbitrage to the business. We weren't aware of cum-ex trades at this time. We were trading as a principal and had our own profit centre and target profit set by management.

103. I also saw how lawyers within a trading team obtained external legal opinions. It would be normal for trading floors to have support from both internal and external tax and legal experts when structuring any new trades.

104. Part of my job was that once trades had been executed they would be settled by the back office. I became knowledgeable on the nuances of settling trades and key terms and jargon, such as delivery-versus-payment (DVP), free-of-payment (FOP), netting, SWIFT, Euroclear and Clearstream.

105. In July 2003, I had negotiated redundancy from my position at CS and to take a short career break. The hours I had been working at CS were incredibly long and outside of the office, I was also attending dinners and business meetings with clients, this was in addition to travelling. It was normal for me to be returning home after midnight. I felt burnt-out. I was aware that I had learnt a huge amount in a short time and as was in no doubt that I would easily land a new job when I was suitably recharged.

106. The timing of the redundancy coincided with the birth of my daughter and I wanted to spend some time at home to support Usha with our new baby.

*(D)* *ING Bank*

107. At the end of summer 2003, I began searching for a new job (conscious that I was the sole provider of the family). I was offered a number of roles and decided to choose a

23

position at ING Bank as a Senior Trader in the Equity Finance team. This covered equity derivatives, stock lending and hedge fund financing via ING's nascent CFD platform.

108. I was more senior but working with a smaller team. The business consisted of trading desks in London and New York and I reported jointly into the London and New York heads. I was now involved in introducing new trading strategies to the bank, which required a formal "new product approval" process, in which a single document contained the trade details and comments from the support areas with their eventual sign offs. The document would then be presented to the management for approval.

109. My role at ING also involved managing staff which I hadn't done in my previous jobs. This involved recruiting, interviewing, appraising and firing my subordinates.

110. I was directly involved with the support areas such as finance, operations, risk management, legal, compliance, IT and business management on usually a daily basis.

111. My time at ING gave me a very good understanding of the structure of a bank, which was invaluable when I created Solo.

112. In late 2006, I had a falling out with my managers over the direction of the business. I wanted to grow into more derivatives-based trading but this was the realm of a trading desk in the head office in Amsterdam so I was denied the resources needed due to a perceived clash. I was asked to resign without bonus and unable to negotiate, I resigned without notice in early 2007. I sued ING for constructive dismissal which resulted in a settlement later that year. ING had provided me with a "Form C" for FCA purposes, which meant that they would not vouch for my suitability for a similar regulated role in any new employment.

113. My departure from ING meant that I could not continue the discussions I was having with Raj on trade development.

*(E)* **_Rabobank_**

114. After leaving ING, I was offered a role at Rabobank International (London branch) with whom I had conducted a lot of business whilst I was at ING. I was employed as the European Head of the Equity Finance Business. At Rabobank there were a dozen traders,

24

who were spread globally in New York, London, Hong Kong and Japan, dealing with the dividend business. The attraction for me was being able to work with and learn more from these people, but at the same time to implement my own trade ideas. On joining Rabobank, I was not FCA-approved, so I could not perform regulated functions such as execute trades. Instead I focussed on documenting my new trading proposals.

115. Within Rabobank I held further responsibilities for: (a) business planning and development of the equity finance business, (b) development and implementation of a new trading IT system, (c) structuring, sourcing internal approval and executing of trading strategies, (d) origination of new clients for the business and cross-selling, and (e) managing a team of trading and support staff.

116. I was again in the centre of new trade approval documentation and having connected with the relevant support areas, this improved my knowledge of how a bank is set up, which enhanced the blueprint I would eventually use to create Solo.

117. In due course, Rabobank contacted the FCA to inform them they were satisfied with my competence, honesty and integrity such that I was once again FCA-approved.

118. At this time, trading teams were leaving employment and setting up their own "trading boutiques" supported by their former employing banks. Examples are Deutsche Bank, Macquarie Bank and Fortis Bank. I learnt that the motivation was for these individuals to profit personally from the massive profits to be made from a trading strategy called "cum-ex".

119. Rabobank wasn't in that market at all. Perhaps for this reason, I was approached by some of these individuals (many of whom I had known for years and trusted them as being involved in a perfectly legitimate business).

120. They described to me in general terms how Rabobank could participate, such as in short selling or lending ex-dividend shares, and the revenue that could be generated.

121. Rabobank had an entrepreneurial culture as I had seen other business areas get approvals for new trading ideas with little delay (due to the flatter organisation and management structure).

25

122. So I decided to seek approvals to short sell, which required Rabobank to trade in single stock futures which they had not done previously. I created a business plan and got the approvals to carry out the trades. These trades offered the bank a very good return compared to the balance sheet and risk limits employed. I had no doubt that "cum-ex" trading was a legitimate trade activity. Whilst I was aware that the effect of the trades would be to increase payments out by a state's treasury, I considered that my role was to seek to offer legally acceptable but profitable opportunities to benefit the bank's shareholders.

123. I personally didn't engage with any external advisers because this was dealt with by the tax and legal departments. Approval was soon provided.

124. The short selling structure at Rabobank was the same as the short selling structure conducted by clients at Solo. The key features I remember were:

    124.1. Rabobank sold shares to a broker, covered with a borrow and hedged by buying single stock futures. The open positions were closed out at a later date.

    124.2. No questions were asked about the source of the shares being lent to us by the buyer. I don't remember the names of the custodian banks.

    124.3. The trades were OTC but conducted on a typical settlement period for each jurisdiction.

    124.4. Belgium, Germany and France were the jurisdictions I remember trading.

    124.5. No thought was given to the '100% rule' as the quantity of shares involved was relatively small.

125. The trades were profitable. I think that over the dividend season up to October 2008 the profit was in the single digit millions of Euros.

126. I did not discuss any future bonus entitlement with my line manager but I intended to do so once the profits had been made. At the beginning of 2008, I was awarded a bonus which reflected the market norm for someone in my role.

127. Towards the end of 2008, as a result of the global credit crisis, the management of

Rabobank International decided to withdraw from the equity finance business along with most of the other business streams offered by the London office. Rabobank made a policy decision not to run a credit risk towards other banks. At the time, it was the only global bank with a triple-A credit rating which it did not want to have downgraded. My business unit across all countries was made redundant, as were hundreds of other employees.

### D.    CUM-EX TRADING

128.    I would describe the cum-ex market as an inner circle of people who did not share their knowledge with others. We all realised how profitable these trades could be and knew that others would be very keen to copy the trades if they found out about them. Spreads would get narrower by the simple logic of supply and demand (demand was constrained), and the trades would be less profitable for each participant.

129.    The cum-ex market comprised around a dozen London and Germany-based banks, with a handful of traders or less at each bank, with the exception of Barclays and Morgan Stanley who has dozens of traders dedicated to tax trading. My knowledge came from meetings directly with individuals at these banks and, I would also obtain information from potential candidates each time I interviewed them for jobs at Solo, as well as meetings with interdealer brokers.

130.    There was no discussion at that time about the ethics of cum-ex trading as it was seen as legitimate as described by legal advisors.

131.    Regarding the lawfulness, everyone regarded the trade structures as completely legal and no external party considered otherwise. No trader would want to have any involvement in something that was fraudulent and all banking institutions that were carrying out cum-ex trading were supported by all of the relevant support departments including compliance.

132.    Cum-ex trades were a subset of dividend trades. Cum-ex trading "worked" because the tax treatment in certain jurisdictions as to when a buyer of shares became the beneficial owner for tax purposes resulting in a profitable tax trade. In some countries, e.g., UK and Sweden, the buyer became the beneficial owner of shares on the date that the shares

settled in their account and they paid for them. In other countries, e.g., Germany, Denmark, and Belgium, the buyer became the beneficial owner of shares on the date of the trade. If this trade date was before the dividend ex date, and the settlement date was after the ex date, the purchased shares could be leant out to finance the purchase. The tax treatment therefore permitted "self-financing".

### E.    SETTING UP SOLO (FOUNDED JANUARY 2009)

### (A)    *Overview*

133.   My savings and property by this time was certainly less than a million pounds. I was living with Usha and our two children, Esha and Aman at 7 Snaresbrook Drive in Stanmore.

134.   The job market was not in a good shape, and I was not in a rush to get a new role while the market was so weak. I was offered "commission-only" jobs at the interdealer brokerages that I had previously been a client of, but the pay structure was not appealing. I therefore joined a friend of mine Nailesh Teraiya who had just started a brokerage business called Indigo Securities Ltd. The plan was for me to run my new business within this company but this didn't work out.

135.   On 14 January 2009, I incorporated Solo Capital Ltd so serve as the vehicle for my business ideas. I was at the time the sole owner and director. I held the position of Chief Executive Officer (**"CEO"**) from 2009 to 2014.

136.   My ideas included inter-bank brokerage (using my network of trading teams at banks to generate business) and asset management (using my knowledge of trading dividend tax arbitrage to generate profits for investors, with a profit share for Solo).

137.   The intention was for Solo to operate until the financial markets had stabilised and I would then go back into full time employment doing something similar to what I was doing in Rabobank.

138.   From around 2007 onwards, the dividend trading teams at various banks were leaving to set up their own boutiques. Each team that I was aware of, had managed to secure prime

brokerage services from the bank which they had left. This was not the case for Solo because Solo did not have any prime brokerage relationships at the time. I considered the other boutiques which had been operating for at least a couple of years before Solo to be the first generation of cum-ex traders and I considered Solo to be second generation.

139. Solo developed into a boutique financial services firm, authorised and regulated by the Financial Conduct Authority (**"FCA"**). Later the business was converted to a Limited Liability Partnership and Solo Capital Partners LLP (**"Solo"**) was incorporated. I am informed by my solicitors that the date of incorporation for Solo was 13 September 2011 [**DWF001380_0001**]. Conversion to a LLP was largely a suggestion of my legal and compliance manager Jas Bains. Employees could be better motivated and be more loyal by becoming partners of the LLP. There was now a cash saving to the business (employer's national insurance payments) which was passed to the new partners.

140. During my tenure as CEO of Solo I held a number of controlled functions including Director (CF1), CEO (CF3), Compliance Officer (CF10), Money Laundering Officer (CF11) and Customer Function (CF30). I have asked my solicitors to exhibit a printout of the FCA register showing the controlled functions I held and the dates they were held [**SSMT1/6-10**].

141. Solo was also accepted as an approved broker by some larger banks which were Solo's (then) primary customers. I had full oversight of the commercial and control aspects of the business.

*(A)    Key members of staff*

**2009**

Michael Smyth

142. Michael Smyth (**"Mike Smyth"**) was Solo's first employee when he was hired as a stock loan broker in 2009.

143. My solicitors have informed me that they have located his draft unsigned contract of employment with Solo Capital dated 2009 [**SKEL00155661-00001**]. Mike was not a key employee, and he was never involved in management.

29

Rajen Shah

144. Rajen Shah (**"Raj"**) was employed by Solo on 3 May 2010 as Senior Structurer and Capital Introduction Representative. I met Raj whilst I was working at ING between 2003-2007. He was working on different floor, in the tax department.

145. Towards the end of 2009 I became aware that Raj Shah had left ML and was looking for employment. Raj is a chartered accountant and tax structurer who I met at ING. We had stayed in touch socially through a mutual friend, and he told me that he had resigned and was working with someone called Graham Horn. Raj's professional background was in tax but in the area of fixed income, so I expected he did not know much (if anything) about dividend tax. I told Raj that I needed help to develop ideas and to "join the dots". I had the market connections and the trading experience but did not know many aspects which he could help with such as: obtaining legal opinion from tax advisors, reviewing double taxation treaties, creating overseas companies and negotiating prime brokerage agreement. It became apparent that these activities fell within his skill set and experience.

146. At the time Solo could not afford to hire Raj so we agreed an informal profit-sharing agreement. I did not want to have formal partners at Solo because I had seen partnerships that did not work out well. I wanted to remain as the sole owner of Solo.

147. In April 2013 Raj resigned from Solo. My solicitors have informed me that they have located an email from me to the London and Dubai teams confirming that it was Raj's last day on 5 April 2013 [**SKEL00957291-00001**].

Guenther Grant Klar

148. I came to know of Guenther Grant Klar through Raj, who was a former colleague of his. We went on to employ Guenther at Solo Capital and he became one of Solo's first employees. He moved to Dubai in around 2010/2011 where he worked for me for a couple of months. I am informed by my solicitors that they have located an unsigned draft copy of Guenther's employment contract, so I am unable to provide a date for this [**SSMT1/11-25**].

149. Guenther was a qualified chartered accountant with a BA in mathematics from Oxford University and was a director in the Structured Debt and Equity department of ABN

30

AMRO. Guenther has a professional background in the tax area and was very intelligent. I wanted to discuss his ideas and benefit from his knowledge. He had no dividend trading experience but had experience with fixed income. His experience, skill-set and knowledge seemed similar to Raj's. I therefore agreed to take on Guenther on an informal profit-sharing arrangement. With two tax structurers, I felt we could cover more ground quickly.

150. The informal profit-sharing agreement agreed between Raj, Guenther and me at that time was that we would each provide ideas into the business and share profits equally. Expenses of running the office would be deducted from the profits as well as specific costs such as the cost of legal advice. These profits would be retained in the business as "trading capital". There were no formalised agreements or absolute percentages agreed between us. I considered Raj and Guenther as more senior to me due to their age and experience, so asking them to formalise an agreement in writing seemed unnecessary. I felt that there was trust between the three of us which didn't require formalising. In hindsight, formal agreements would have been useful to avoid any ambiguities if we fell out with each other.

151. This arrangement only turned out to cover the profits made in the German trading which was carried out by Solo in 2010. As it transpired, Raj and Guenther were not able to generate ideas that were profitable – only dividend arbitrage was making money, which was my idea. However, the profit from that was divided equally. Although Raj and Guenther weren't providing ideas, their fixed income background was useful: I came from an equities background, so whilst I had knowledge of dividend arbitrage, I didn't know anything about double taxation treaties and lacked a good network of advisers and reclaim agents. Having "fresh eyes" look at the dividend tax arbitrage trades from the ground up was a useful control for me, as Raj and Guenther were not in a position to rely on any old assumptions they may have had, which could have been the case if I had hired from the dividend tax arbitrage industry.

152. During the course of 2011, Guenther departed Solo Capital for personal reasons but on good terms with me and we met up socially.

**2010**

31

Graham Horn

153. Raj introduced me to Graham Horn. Between 2002 and 2010 Graham had been a Director at Merrill Lynch in the New Product Development Group, the European fixed income and tax-efficient structured finance business. As such, Raj and Graham had previously worked together, and Raj alerted me to the fact that Graham might be interested in moving to Solo.

154. I met up with Graham and was impressed by him. Graham had a tax structuring background, but he had more knowledge of equities than Raj. It seemed to me that he could help Solo Capital grow further.

155. I recall that he had been employed as a tax specialist at Arthur Andersen for a number of years before moving to Morgan Stanley. The deal I struck with Graham was the same as with Raj – I offered him a profit share of the business. Graham quickly made himself useful and took over managing the London office before he later moved to Dubai in 2013/14, overseeing about 15 members of staff.

156. I am informed by my solicitors that Graham's employment contract is dated 3 May 2010 [**DWF016725_0001**].

157. Graham did not participate in the profit share from the Irish fund in 2010. Until he moved to Dubai in circa. March 2013, he was based in the London office and his role was Chief Operational Officer (**"COO"**). At Solo Graham worked together with Guenther and Raj in the tax structuring part of the business.

158. On Guenther's exit from Solo in 2011, it meant that there was additional profit share available for distribution and I negotiated terms with Graham for him to receive a profit share, effectively replacing Guenther with Graham.

159. From the time that Raj resigned in April 2013, Graham took on a more managerial role and he stopped having new trading ideas. I recall in around 2013 having a conversation with Graham saying that unless he could generate new and profitable ideas then I couldn't justify his position at the firm. I recall that he wasn't happy with what was an ultimatum, but we remained on speaking terms.

160. Graham didn't produce any new ideas, and towards the end of 2013, I asked him to leave the company because he wasn't expanding the business whilst still receiving a healthy profit share. My solicitors have informed me that they have located an email from me to Goal Taxback dated 14 June 2013 informing them that Graham was leaving Solo that day [**GOAL_00001615-0001**].

<u>Jas Bains</u>

161. In October 2010, Solo Capital hired Jas Bains who was a qualified lawyer. Jas had worked in a law firm (Freshfields Bruckhaus Deringer) but also in Barclays Bank in the unit called Barclays Structured Capital Markets (**"Barclays SCM"**), which was solely dedicated to tax trading, including dividend tax trading. Barclays SCM was the market leader in terms of knowledge of the type of trades that Solo was involved in. Thus, hiring Jas was a great opportunity because he could bring something to the table, primarily regarding the legal aspect of the trades.

162. I am informed by my solicitors that Jas's employment contract is dated 1 October 2010 [**SKEL00495847-00001**]. Raj Shah had recommended Jas to me, as the two had worked together briefly at ING and had kept in contact. Jas was brought in as head of legal and compliance.

163. When Raj and Guenther moved to Dubai in late 2010, I decided to open an office in Dubai which I had not had before. Some employees stayed at Solo in London, including Jas who then became the most senior person in London, and he became the general manager of the London office.

164. In early 2014, Jas was offered a new role in Hong Kong by me. He left his role as COO of Solo but still worked for me out of Hong Kong. I am informed that my solicitors have been unable to locate any documents setting out when this transition took place.

<u>Sanjeev Dave</u>

165. Sanjeev Dave joined us in the office I opened in the Jebel Ali Free Zone. He had moved to Dubai from London at the same time as me. We had met through mutual acquaintances in London before I moved to Dubai. The reason for meeting him was that he was also moving to Dubai as an employee of KPMG, so his employment was transferred from

33

London to Dubai. I kept in touch with him socially while he was at KPMG and at some point he decided to leave KPMG and work for me in Dubai as the office's sole accountant with oversight of the London business.

166.  I then hired him to work as an accountant / finance officer in my Dubai office. I do not recall if I made him redundant or he resigned.

**2011**

Edo Barac

167.  Edo Barac had previously worked at ING as a trader in the same business that I had been in. Edo was hired at Solo at the end of 2010 or the beginning of 2011, but he ended up becoming a senior employee.

168.  My solicitors have informed me that they have located an unsigned draft copy of Edo's initial contract of employment [**SSMT1/26-45**].

169.  Initially Edo worked on proprietary trading, but later he got involved in the investment management business.

**2012**

Anupe Dhorajiwala

170.  During the period when we were dealing with the withdrawal of Merrill Lynch, I started talking to Anupe Dhorajiwala (who I knew socially in Dubai) about Solo's requirement to obtain the clearing and custody services of JP Morgan Chase (**"JPM"**) as a sub-custodian. At that time (i.e., in 2011) Anupe was working at JP Morgan Chase in their clearing and custody department. Anupe told me that he could make an introduction for Solo with JP Morgan and arrange for an account to be opened. That was subsequently arranged. In due course, Anupe told me that he was looking for a new position and wanted to remain in Dubai. I decided to offer him a role; my intention was to ensure that Solo employed clearing/custody experts as well as experts in tax, legal and compliance so that procedures were appropriately followed.

171.  Anupe was later employed by Elysium Dubai which at that time was called Solo Capital (Dubai) Ltd.

34

172. I am informed by my solicitors that Anupe's contract of employment is dated 16 January 2012 [**DWF001946_0001**].

173. Shortly after Graham left in 2013, Anupe resigned from Elysium Dubai.

174. My solicitors have informed me that Anupe's letter of resignation is dated 24 September 2013 [**SKEL01026184-00001**].

Adam Forsyth

175. In or around January 2012 Solo employed Adam Forsyth who used to work at Rabobank in the operations department which supported my trading desk. I was aware that following our redundancy from Rabobank, Adam joined Maple Bank in London who were known in the market as a major player in dividend arbitrage.

176. Adam was initially employed as a salaried COO but later transferred to the Dubai office. I have been informed by my solicitors that they have been unable to locate a contract of employment with Solo to identify when he started work.

177. Adam became a member of the LLP and signed the LLP agreement on or around 28 March 2012 [**DWF015237_0001**].

178. In the summer of 2014 Adam resigned from Solo by mutual agreement; his role was no longer required in Dubai. I am informed by my solicitors that they have been unable to locate any documents which provide the date that Adam resigned.

Mankash Jain

179. In early 2012, Jas Bains introduced me to a foreign exchange trader called Mankash Jain. Jas and Mankash had worked together at Barclays SCM. Mankash was hired as a proprietary trader, but he did not get involved in any dividend trading during his time at Solo and I doubt he had much knowledge of the trades which are now the focus of this litigation, far less any involvement with them.

180. I have been informed by my solicitors that they have located a contract of employment with Solo dated 13 July 2011 [**SKEL00995402-00001**] and that he signed the LLP agreement dated 28 March 2012 [**DWF015237_0001**].

35

181. FX trading is only commercially viable if the trades involve very large amounts of capital, as the price movements are so small. Mankash therefore needed a lot of capital to be allocated to him, and Solo couldn't afford to lock up so much cash in his book. This meant that Mankash basically couldn't do his job and so it became clear that I needed to make him redundant.

<u>Priyan Shah, Gerard O'Callaghan and Craig Price</u>

182. In late 2011, Solo was seeking to employ additional qualified accountants, tax experts and tax structurers. We instructed two recruitment firms, Mondrian Alpha and Nebula Partners to assist with this exercise. Following the recruitment process, we were ultimately satisfied with the experience and qualifications of three individuals: Gerard O'Callaghan (**"Gerry"**), Priyan Shah (no relation) and Craig Price, who were subsequently employed by Solo.

183. I had no previous knowledge of these individuals who were identified and put forward to me by recruitment firms. My idea was to bring in new employees who could bring in new ideas that were complimentary to the existing business areas but that would not overlap.

184. At the time Gerry, Priyan and Craig joined Solo they were paid on a salaried basis to undertake trading *other than* the GSS business. At the time I did not want them involved in GSS business because that part of the business was managed by Raj and Graham.

185. My idea was that Gerry and Priyan should bring in new trade ideas and obtain legal opinions where the concept ideas justified pursuing them to the next step.

186. I informed Priyan and Gerry that if they could structure a new GSS trade then I would consider providing them with access to the GSS part of the business and negotiate a profit-sharing arrangement.

187. Priyan had previously worked in the specialist tax team at PriceWaterhouseCoopers (**"PwC"**) and then worked for many years as a director in Barclays SCM.

188. My solicitors have informed me that they have located a contract of employment for Priyan which is dated 13 February 2012 [**SKEL00192712-00001**].

36

189.  I recall that Gerry had previously worked at CS and Deutsche Bank. He was brought into Solo as a Structurer.

190.  My solicitors have informed me that they have located an unsigned contract of employment for Gerry with a commencement date of 26 March 2012 [**PSGOC0033431**].

191.  He then signed the LLP agreement dated 1 September 2012 [**DWF011347_0001**] which was to be read in conjunction with a signed side letter setting out further matters relevant to the partnership [**SKEL00192717-00001**].

192.  Gerry and Priyan left Solo in 2014 to start their own firm, Agrius Capital Partners LLP.

193.  My solicitors have informed me they have located a contract of employment for Craig which is dated 29 February 2012 [**DWF026970_0001**].

194.  Craig came into Solo with a completely different background to Priyan and Gerry as he had previously worked at HVB and PwC but not in the dividend business. Craig wanted to build an insurance funding business. It was agreed with Craig that Solo would not pay him a salary but that he should share the profits of the new (insurance funding) business.

195.  Shortly after Graham left in 2013, Craig resigned from Solo.

196.  My solicitors have informed me that there is an email from Dominique Lawrie to me dated 27 November 2013 which refers to Craig's departure and the directorships they were in the process of resigning him from [**SKEL00323488_00001**].

**2013**

Mark Patterson

197.  In early 2013 Solo hired Anthony Mark Patterson (who I shall refer to in this statement as **"Mark"** and who is also informally known as **"Pogo"**).

198.  I am informed by my solicitors that I sent an email on 5 March 2013 introducing Mark to Solo as a new joiner [**SKEL00205445-00001**].

199.  I had known Mark from the time that I was working in CS, ING, Rabobank, and Macquarie Bank. At the time Mark had worked at a UK investment bank called Cater

37

Allen, which ended up becoming part of Santander. I had wanted to hire him when he was at ING, but Mark wanted more money than Solo could afford. When I could afford him, we hired him at Solo.

200. Mark had the same background as me in trading. He had a lot of friends in the community of traders in the UK and he could obtain information about trades and strategies to pass onto me.

201. When Mark resigned from ING he came to work in Elysium Dubai. Mark spent a lot of time talking to clients to make sure that they were getting what they needed and were happy with Solo and Ganymede. Initially he had an employment contract, but he wanted more freedom, so he incorporated his own company, Five Waves, which invoiced Elysium Dubai as a consultant.

Stuart Ervine

202. Stuart was not known to me before working with Solo. He was a software developer. His role involved automating the spreadsheets and creating a database to avoid manual errors in the software which had been developed (namely TAS, Brokermesh and Octave).

Albert Latacz

203. Albert was not known to me before working with Solo. He was a software developer brought in on a consultancy basis, to carry out the same function and work with Stuart Ervine and Darren Hobbs.

Darren Hobbs

204. Darren was not known to me before working with Solo. He was also a software developer brought in as a consultant to work with Stuart and Albert.

Anne Stratford

205. Anne Stratford was appointed in November 2013 as Managing Partner and in January 2014 my replacement CEO. I do not recall how I was made aware of Anne. I recall that she had held a number of senior legal positions, including COO and director of legal at Cantor Index, and before that she was the assistant General Counsel at Cantor Fitzgerald.

206. She was invited to an interview through a recruitment firm. As Anne was a qualified lawyer, she had experience working at (i) a large and well-known law firm, and (ii) Cantor Fitzgerald which was a large stockbroker and clearer for equity trades, she was well versed in the type of business that Solo did.

207. Being a lawyer Anne had more experience than me in certain aspects which I thought was good because she could review the business, seek new opinions and so on. Anne also wanted to add value to Solo by bringing in the CFD business that she was running at Cantor Fitzgerald. With her assistance Solo ended up acquiring that business from Cantor Fitzgerald.

208. I did not know Anne beforehand. I thought that she had the right credentials to be the CEO, but I decided to first hire her as the COO in late 2013. In January 2014 I formally stepped down as CEO and Anne was appointed as the CEO.

## **2014**

Omar Arti

209. Omar Arti replaced Anupe. He had previously worked at JPM in Dubai in a custody and clearing sales role. He relocated to London and became Head of GSS. Omar Arti was in charge of the GSS business in 2014.

210. My solicitors have informed me that they have located a side letter to the LLP agreement which confirms that Omar's employment start date was 3 February 2014 [**SKEL00281437-00001**].

211. Omar left Solo in 2015, at which time the role would have been taken over by somebody else. I cannot now remember who that was.

Darren Lui

212. In around mid-2013 I interviewed Darren Lui. I think Darren was introduced to me through a recruiter, but I cannot now remember which recruitment firm that was. He was employed by Solo in early 2014.

213. Darren was previously employed by Barclays SCM. I recall that I met him in New York when he was still working for Barclays SCM. This was the first time I met him.

39

214. On a later date, I made him an offer and I then met up with him again in Hong Kong. I do not remember whether the second meeting was after he had accepted the offer or whether he was still undecided. The reason I wanted to hire Darren was to increase the size of the structurers team and to benefit from new ideas he could bring from his previous jobs.

Michael Turner

215. Michael (**"Mike Turner"**) Turner was brought into Solo as a stock lending trader to work with Mike Smyth. He was not part of the GSS business and I eventually had to make him redundant as he was not making a profit for Solo. not making a profit for Solo. I recall he was earning a pretty high salary.

**(B)    _Key companies other than Solo_**

216. In this section I have noted other key companies in my group and included details about their incorporation, jurisdiction and purpose.

217. <u>Elysium Dubai</u>: In order to expand the Dubai aspect of my business and to support the business in the UK, I incorporated a company in the DIFC which was then called Solo Capital (Dubai) Ltd. I am informed by my solicitors that the date of incorporation is 19 December 2011 [**BARAC00010450**].

218. This company is now called Elysium Global (Dubai) Ltd. I decided that this company did not need regulatory permissions from the Dubai FSA as it would not conduct any regulated business. Elysium Dubai also operated as a _quasi_-family office by which I mean, some of the staff were also there to manage my personal and corporate wealth.

219. DIFC was chosen as the location was more central and would be more attractive to future employees. The location was more prestigious.

220. <u>Ganymede Cayman Ltd (**"Ganymede"**)</u>: My solicitors have informed me that Ganymede was incorporated on 16 June 2010 [**SKEL00003133-0001**]. I don't actually recall who set Ganymede up but as far as I am concerned, I have always been the ultimate beneficial owner. I initially held all the shares personally and they were later transferred to Elysium Global which I also owned. I am informed by my solicitors that the transfer of shares to

Elysium Global took place on 20 August 2014 [**USHAH00004263-001**].

221. I was appointed as a director of Ganymede, along with Raj and Guenther. My solicitors have informed me that we were all appointed on 20 September 2011 [**USHAH00004262-001**]. My solicitors have also informed me that Guenther resigned on 5 January 2012 [**USHAH00004262-001**] and Raj resigned on 8 April 2013 [**USHAH00004262-001**] which would have been around the same time they left Solo. Over the years, other people were appointed (and resigned) as directors which I have set out in my defence.

222. I cannot remember without looking at documents to refresh my memory, but I think in 2011 Ganymede was involved in the Luxemburg trade with Macquarie bank. This was before Ganymede's clients entered into the consultancy agreement referred to below in connection with the GSS business.

223. I recall resigning as a director of Ganymede in late 2014 and my solicitors have informed me that this was on 24 October 2014 [**USHAH00004262-001**]. At that point I think I was the sole director. One of the reasons for resigning as a director of Ganymede was that my ambition at the time in 2014 was to join the managing board of Varengold and Dero bank. To join the managing board required me to make an application to the German regulator, BaFin. I understood that BaFin has a preference to approve persons who do not also have directorships of companies in non-European jurisdictions which are viewed by some people as being so-called "tax havens". I therefore wanted to terminate my directorship of Ganymede – a company registered in the Cayman Islands – along with my directorship of other companies I owned in Cayman and the BVI to placate BaFin.

224. I remember discussing this with Priyan and Gerry at the time. I also remember discussing moving my directorship of Ganymede to Usha with Priyan and Gerry.

225. When I appointed Usha to take over being the director of Ganymede, a power of attorney was signed which appointed me to make decisions. I therefore carried on being the person who made all business decisions, not Usha. This was obviously not done to somehow "hide" my connection to Ganymede – if I had wanted to do that, I would never have appointed my wife.

226. <u>AESA Sarl</u>: this company become the holding company for Solo. It had some important

functions, for example, negotiating the exclusivity agreements with the reclaim agents (see paragraph 523) and it owns Varengold shares which are currently frozen/restrained.

227. I am informed by my solicitors that the date of incorporation is 12 June 2012. It is registered in Luxemburg.

228. Westpoint Derivatives Ltd (**"WestPoint"** or **"WP"**): Towards the end of 2013 I negotiated the purchase of a small brokerage firm called WestPoint which I would describe as an inter-dealer brokerage. WestPoint was failing in terms of profit, and I acquired the business including the staff and its relationships. Fortunately, WestPoint was listed as an approved broker at key banks trading derivatives (WestPoint's niche). The intention was for WestPoint to be part of my group of companies, but not necessarily the Solo Group.

229. Originally, WestPoint revenue was just a brokerage. I was keen to ensure that WestPoint was not affiliated with Solo because this created a potential risk for the banks trading with WestPoint – the banks would assume that their trading ideas were being communicated to Solo (which was a competitor). It is for this reason – to protect WestPoint's client base - that I had the email discussion with Jim Hoogewerf in December 2013 about making sure that the market were not told that WestPoint and Solo were connected [**SKEL00329001-00001**]. This email was shown to me by my solicitors to refresh my memory.

230. However because WestPoint was not making sufficient profits, I decided to install the GSS business into WestPoint once the necessary FCA permissions had been obtained. I also thought that this would help the overall scale of the GSS business if it was being cleared through more providers.

231. I have asked my solicitors to search the FCA register to identify and exhibit the permissions WestPoint held [**SSMT1/46-53**] and the persons connected with it who were involved in regulated activities at this firm [**SSMT1/54-58**]. I did not hold any controlled functions in relation to WestPoint.

232. I have also asked my solicitors to identify the first Danish trade that was cleared by WestPoint. I have been told by my solicitors that the Full Trades List appended to the

42

June 2023 CMC Order shows the first trade that was cleared by WestPoint was for the purchase of shares in Novozymes A/S - B around the ex-date on 26 February 2015. Where I talk about Solo below in section titled *The Danish GSS Trading*, this includes WestPoint after it started operating GSS business.

233. <u>Telesto Markets LLP (**"Telesto"**)</u>: My solicitors have informed me that Telesto was incorporated on 10 October 2013 [**SKEL00278911-00001**].

234. When I decided that separate companies should operate the GSS custody model with their own separate brands, I decided to incorporate a new company and seek the relevant FCA permissions. This was done in the event that I was not able to acquire an existing FCA regulated business.

235. I have asked my solicitors to search the FCA register to identify and exhibit the permissions Telesto held [**SSMT1/59-65**] and the persons connected with it who were involved in regulated activities at this firm [**SSMT1/66-67**]. I did not hold any controlled functions in relation to Telesto. It was intended that each of the UK businesses would have an offshore holding company for tax planning purposes.

236. I have also asked my solicitors to identify the first Danish trade that was cleared by Telesto. I have been told that the Full Trades List appended to the June 2023 CMC Order shows the first trade that was cleared by Telesto was for the purchase of shares in Novozymes A/S - B around the ex-date on 26 February 2015. Where I talk about Solo in the section below titled *The Danish GSS Trading*, this includes Telesto after it started operating GSS business.

237. <u>Old Park Lane Ltd (**"Old Park Lane"**)</u>: Anne Stratford then introduced me to Old Park Lane as an M&A opportunity. As opposed to Solo, Old Park Lane could deal with retail clients who were defined by having less than €500,000 of assets and less than a certain number of years of financial experience. This was important because the other regulated entities in the group could only deal with professional and institutional clients.

238. I therefore decided to acquire Old Park Lane in the middle of 2014 with the intention of establishing a separate business from WestPoint and Solo. The shareholding (100%) was transferred to Aesa Holdings (UK) Ltd, which I am told by my solicitors took place on

15 October 2014.

239. Over time, Old Park Lane also started operating the GSS business. The GSS business did not affect the other business lines of Old Park Lane and as I have set out above, I wanted to have 3 to 5 businesses who were operating within the GSS business between them.

240. I have asked my solicitors to search the FCA register to identify and exhibit the permissions Old Park Lane held [**SSMT1/68-74**] and the persons connected with it who were involved in regulated activities at this firm [**SSMT1/75-77**]. I did not hold any controlled functions in relation to Old Park Lane.

241. I have also asked my solicitors to identify the first Danish trade that was cleared by Old Park Lane. I have been told that the Full Trades List appended to the June 2023 CMC Order shows the first trade that was cleared by Old Park Lane was for the purchase of shares in TDC A/S around the ex-date on 8 August 2014. Where I talk about Solo in the section below titled ***The Danish GSS Trading***, this includes Old Park Lane after it started operating GSS business.

242. <u>Philo, Fire, Acai, Parla</u>: I have been informed by my solicitors that these companies were acquired in July 2015 [**SKEL00142818-0001, SKEL00785237-00001, SKEL00114940-0001, SKEL00785514-00001**]. I have always been the ultimate beneficial owner of these companies through my company Elysium Global.

243. These companies were acquired after discussions with my team at Elysium Dubai. I recall speaking to Greg Nixon who was the general counsel and Ashley Richardson who was the accountant/chief financial officer, plus probably Priyan and Gerry. We decided it made sense to have five companies receiving the income from the trade (Ganymede, Parla, Acai, Philo and Fire) for the five custodians who were intended to provide clearing and custodian services (Solo, WestPoint, Old Park Lane, Telesto and Novus). It was more for a bookkeeping exercise than anything else with the intention that each income receiving company would have a relationship with the clients of one of the custodians, so, for example, Parla would issue invoices for WestPoint, Acai would issue invoices for Old Park Lane.

244. I appointed Usha as the sole director of Parla, Acia, Philo and Fire for the same reason

44

set out at paragraph 223 below. I cannot now remember whether there was formal power of attorney agreement which authorised me to make all the decisions. I have asked my solicitors to check. Irrespective of whether there was any formal document, I gave all the instructions relating to these companies.

245. <u>Novus Capital Markets Ltd ("**Novus**")</u>: In 2015, Mike Murphy who was the owner of Novus informed me that he was looking to exit the business and was looking for a buyer. I agreed to purchase 100% of the shareholding. The shares were transferred to Solo Group (Holdings) Ltd which I am informed by my solicitors took place on 20 May 2015 [**SKEL00632770-00001, SKEL00657115-00001**].

246. Novus continued its interdealer broker business and at some point, I decided that Novus would be another company suitable for the GSS business. I don't however recall if the GSS business ever was finally integrated into Novus before the investigation by SKAT commenced.

247. I have asked my solicitors to search the FCA register to identify and exhibit the permissions Novus held [**SSMT1/78-82**] and the persons connected with it who were involved in regulated activities at this firm [**SSMT1/83-88**]. I did not hold any controlled functions in relation to Novus.

248. <u>Syntax GIS Ltd ("**Syntax**")</u>: The shareholding was transferred to Arche Cayman Ltd (now called Treefrog), which was my sole established private equity vehicle. I understand from my solicitors that the dates of the transfer were 24 April 2015 and 3 July 2015 [**SKEL01090975-00001, SKEL01090976-00001, SKEL00653237-00001, SKEL01121755-00001**].

249. After I had purchased Syntax, Camilo remained as a director and manager – he retained overall/day-to-day management of the company.

250. <u>Theorem Technology Ltd ("**Theorem**"), Hydra Capital Ltd ("**Hydra**") and Typhon Hydra Holdings Ltd ("**Typhon**")</u>: Over time, as the number of software developers grew to about a dozen, I decided to employ them in a new company called Theorem. I understand from my solicitors that Theorem was incorporated on 23 October 2014 [**SKEL00525574-00001**]. They were located in a new office which was walking distance

45

to Solo. The reason for the move was that Solo was running out of office space and that the software business was not a regulated activity falling within the Solo Group.

251.  The software was initially developed by Solo but the ownership and the programming code was transferred to Hydra in 2013 or 2014 for a transfer fee of around £160,000. Solo continued to own the database. From this time onwards I think that Hydra owned the software, and Typhon held the IP in the software.

252.  I understand from my solicitors that Hydra was incorporated on 21 January 2015 [**SKEL00841844-00001**] and Typhon was incorporated on 23 June 2015 [**SKEL00144481-0001**].

253.  I remember one of the non-GSS projects was that they were working on face recognition software and a concert ticketing system. The developers also assisted GSS in reporting trades to the LSE and built an invoice system for Ganymede. My goal was to create a fintech company and sell Octave, Brokermesh and TAS as bespoke banking software to third parties.

254.  Genoa Services London Ltd (**"Genoa"**): The collection of information is not a regulated activity. I therefore incorporated a new company called Genoa which I understand from my solicitors was on 1 December 2014 [**SKEL00525573-00001**] to provide a liaison point between the Solo entities and the clients. I then moved the employment of Omar Arti, Jessica Spoto, Claudia Sidoli and Martin Ward to this new company which I (not Anne) then had direct oversight of. The activities undertaken included checking account opening forms, collecting KYC information from clients and ensuring that clients received the month end trading statements.

255.  In about mid 2014 Genoa obtained its own premises which was located across the road from the main Solo office and its employees worked from there along with the software developers employed by Theorem, and Priyan, Gerry and Mark Patterson. I beneficially owned the new companies, including Genoa.

*(C)*   *Early days: 2009*

256.  As with all start-ups, the first year was challenging. Solo didn't have many clients, and it had only established a few banking relationships by this point to do trades. The fallout

46

from the credit crunch meant that it was a pretty hostile period for new brokers. My time was also spent on office management, such as dealing with the office premises (lease, furniture, etc), new hires (interviews, contracts, etc), IT installation and so on. This first year was a steep learning curve for me.

257. I hired a couple of assistants and then negotiated terms to hire two stock lending traders to run a brokerage business on a commission-only basis. Once these hires were in place, I realised that I did not have to run the office myself and this led to my decision to move to Dubai.

258. Once Usha and the children were settled in Dubai, I did however spend several weeks at a time in London to try to grow the business.

**(D)    _2010 - 2011_**

259. Once Raj and Guenther were on board, I decided that we should focus on German cum-ex trading. At the time, this activity was prevalent in the market and I was confident we could make money from it.

260. At the beginning of 2010 I contacted a former colleague from ING who was now working in the dividend tax team at ML. I had a good relationship with him and asked him if he could introduce me to the prime brokerage team at ML. A meeting was arranged, and it was agreed Merrill Lynch would onboard Solo as a client and any funds which were under Solo's management. Solo acted as asset manager in this regard.

261. Solo needed leverage from ML to execute cum-ex trades as this was required for credit lines with brokers. For example, in order to enter into trades for €800 million through ML, the bank would need to provide the €800 million in an account in order for them to process the trades. However, the money was only needed "intraday", which meant that the money only had to be on the account on the day of the trade. ML would communicate with the seller's custodian the day before or on the day of settlement. The buyer's custodian would owe the other bank €800 million, and the seller's custodian would owe the other bank the shares. At the end of the day it would be reversed because an offsetting trade would be arranged. On the same settlement date, the trade would be unwound and therefore, the shares and the cash would move back to their original custodians. (If the

47

seller used ML as its custodian, no money would leave ML).

262. In 2010 ML agreed to provide Solo with the leverage it needed and process the trades. The leverage multiple was set by ML as 20x. Now all Solo needed to do was to find an investor and a trading vehicle to manage.

263. Through discussions with market contacts and advisors, we discovered that German funds with particular attributes were exempt from WHT on German dividends but having tried to find one (by obtaining a list of appropriate funds via public domain and cold calling), we were unsuccessful. The WHT rate in Germany was 26.375%. Incorporating a new fund would be prohibitively expensive and take too long. As an alternative, we decided to create a fund in Ireland, which due to the double taxation treaty between Germany and Ireland is liable for 10% withholding tax of German dividends.

264. Raj and Guenther obtained tax advice from Norton Rose in Frankfurt, Germany to advise on the legality of our proposed trading strategy. We were all satisfied that the structure was approved by Norton Rose. I do not recall if this legal opinion was shared with ML.

265. We now had a fund but no investor. The three of use reached out to potential investors, often cold-calling prospects. Eventually I contacted an ex-colleague from CS – Robert Klugman whose role in prime brokerage was capital introduction.

266. Robert had been working at CS when I was there and sat near me, so we developed a friendship. He was a Capital Introduction Manager which meant that he referred wealthy potential investors to well performing hedge funds who were using CS's prime brokerage services. By this time, Robert had left CS and gone back to New York.

267. I contacted Robert and explained the trades to him. Robert was already familiar with dividend arbitrage trading, and I explained to him that there was a possible opportunity in Germany.

268. Robert had an investor in mind who was also familiar with dividend arbitrage trading and who wanted to invest in this type of trading. I would describe the investor, Argre Management (**"Argre"**) as a wealth management office/private family office based in New York. Argre was managed by Richard Markowitz. They managed money for wealthy people, and they were wealthy themselves. It was a group of six people of whom

48

four were former KPMG managers or partners. I do not recall if the legal opinion from Norton Rose was shared with the investors.

269. Argre notified us that they would visit our offices and meet our staff as part of their due diligence. They also would meet the intended brokers we would use, and also the prime brokerage team. This happened shortly after our first phone call with them.

270. Argre subsequently decided to invest €40 million into the fund and were happy with our proposal to split any profits 50/50 between the investors and Solo. I informed Merrill Lynch that we had found an investor for the fund. Argre duly funded the account and the trading took place, with me executing the trades.

271. After we finished trading and the reclaims were paid, Argre were very happy. Solo and Argre proposed a right of first refusal agreement for three years, which meant that Solo were obliged to offer them any investment opportunities they had to Argre first. Only if Argre did not want to go ahead, could Solo then offer it to others. Solo agreed with this proposal.

272. I recall that the Irish regulator contacted Solo about the trading activity in the fund in connection with the auditor having been asked to resign by them. My recollection is that Raj and Guenther were dealing with the directors of the fund to iron out any issues and find a new auditor. After a series of emails, we arranged to meet with the regulator. In this one meeting, the regulator raised their concerns about the management fee of 50% being much higher than the expected 10-20% market norm, and that the profit seemed very high for the investment and timeframe. They seemed to be satisfied with our answers and the regulator subsequently approved a new auditor. The audit was then completed and as Argre did not wish to keep the investment in the fund, the fund was wound down.

273. The trades in the Irish Fund on German equities resulted in a profit to Solo in 2010 of circa. EUR 23 million, which was split equally between the three of us. Raj and Guenther were paid at a later date once they had moved to Dubai. The asked to be paid as fees under consulting agreements which I agreed to and assumed was done for their personal tax planning.

274. Having proved to myself that Solo could successfully make money, I decided to continue

49

to grow the business rather than wind it up and cash out. I therefore planned to invest some of my new wealth back into Solo by hiring more staff towards the end of 2010 and moving to a larger office.

275. Prior to opening the office in Dubai, I had worked from home. I incorporated a company in Jebel Ali Free Zone called Global Elite Trading FZE for the purpose of providing our visas and renting a small and low-cost office space.

276. In 2011, we planned to replicate the same trading as in 2010 (i.e., trading on the German equities market). However, ML were no longer able to provide leverage and Solo was required to seek alternative financing. I understand that ML had committed leverage to competitors of Solo and this was why they were not able to continue providing leverage to Solo. This is understandable as Solo no longer had an active trading vehicle.

277. In 2011 I recall speaking to Argre about a trade with a school in the US called Ezre Academy which due to its charitable status was exempt from German withholding tax.

278. Solo tried to find a new prime broker. First, Solo contacted all the banks which understood the cum-ex business. As these prime brokers were all committed, we then contacted banks whom we assumed had no knowledge about the cum-ex business. It was difficult for them to understand what Solo needed, for example that it only needed funding for a credit line three months of the year (during the dividend season) and that the funding was only required on certain dates, intraday only. These requirements were much different to an asset manager's usual requirements. Solo would not be in a position to pay for weeks or months of funding that wasn't being deployed.

279. Solo was also in discussions with BNP Paribas, but by then we missed the dividend season, and no dividend trades were made in 2011.

280. As we were unable to secure external financing in 2011, I decided to re-invent Solo as a prime brokerage so that it wasn't required to rely on banks for leverage and funding. We needed to move up the supply chain. The business model changed such that Solo would provide financing and clearing to clients rather than Solo itself being involved in the trading. This decision prompted us to make new applications to the FCA for permission to provide custody and clearing services to clients.

281. A prime broker provides the following services to clients:

    281.1.  Market access.

    281.2.  Trade execution.

    281.3.  Financing (leverage).

    281.4.  Stock lending to facilitate shorting of shares.

    281.5.  Custody and clearing.

    281.6.  Financial reporting.

282. From the above list, Solo initially wanted to provide custody and clearing to its clients. Solo required the services of a sub-custodian who would have direct links to the CDSs of the markets in which Solo's clients traded. Solo also needed a general clearer for clearing single stock futures on the Eurex an Liffe markets.

283. At the end of 2011 Solo started discussions with Macquarie Bank. Even though the bank at the time was servicing one of Solo's competitors they invited us to onboard if we were doing business that wasn't being done by their other clients. Macquarie Bank told Solo that they would get the internal approvals if Solo could come up with something that the bank had not seen before.

### (E)  *2012*

284. Solo was in discussions with CACEIS (a French bank with an office in Munich) with a view to trading in Germany, and I had one meeting with them in Munich which was a real breakthrough.

285. I recall that at one of the meetings CACEIS asked how much money Solo's investors were going to place at the bank, and I asked how much was necessary to do the business. CACEIS said €50 million because that meant that the investors had financial substance.

286. CACEIS then asked which brokers were going to be involved in the trades. We said that we had not talked to any brokers yet, which prompted CACEIS to offer us the names of two or three brokers who were clients at CACEIS. CACEIS explained that if clients

51

bought and sold through brokers who had accounts at CACEIS, the bank would not have to send money out of the bank. Therefore, there was no requirement for finance or any external money because the trades were simply debited and credited within the bank. The bank would be protected from failed settlements (which could be costly). This was a "*light bulb moment*" for me where it suddenly became clear how the trades could be scaled-up.

287. I thought that if no money was leaving CACEIS, the same must apply for the shares. At a follow-up meeting CACEIS confirmed that this was the case and that they had been doing it for years.

288. Ultimately, it turned out that CACEIS could not deal with Solo because they had committed to one of Solo's competitors. However, the idea stayed with me.

289. We decided to test this "internal settlement" idea by finding a clearer willing to perform the clearing functions.

290. Solo presented the idea to Macquarie Bank and suggested that if the bank onboarded the buyer and the seller of the shares, the broker, and the stock lending intermediary, then no shares or money would enter or leave Macquarie Bank. Macquarie Bank were unsure if this idea would work, but they were willing to give it a try. However, Macquarie suggested that shares from an external party were borrowed to enable settlement in case our proposal didn't work (ie trades remained unsettled). Solo arranged for Santander to lend the shares needed to Macquarie on settlement date.

291. Graham had presented an idea to the team about Luxembourg shares, which he knew ML traded. This kind of trade was different from cum-ex trades, but it had the same funding requirements, so it was not necessary to borrow money for a long period of time. Graham and Raj then obtained specialist legal opinions on the trade and onboarded appropriate clients. In the case of tax-related trades, the tax authority pre-approves trades (known as a "ruling"), which was the case at Solo. New Luxembourg trading companies were also incorporated.

292. Solo then started to trade Luxembourg shares in early 2012 via Macquarie Bank. After trading had completed, a debrief with Macquarie Bank was arranged. The bank said that

52

our idea had been right: the trades had settled internally. Furthermore, the stock loan from Santander had settled late (a few days later than intended) and so had not been used to effect the settlement of the Solo trades.

293. At no point did anyone at CACEIS or Macquarie Bank (or within Solo) suggest or query whether the netting out somehow invalidated the trades or that the buyers of the shares would not obtain beneficial ownership. Instead, we just saw it as a great development which solved the external funding problem we had been facing for over a year.

294. After this we started to think about how Solo, which was regulated in the UK by the Financial Services Authority (**"FCA"**), could do this business itself and without the need for an external bank at all.

295. Solo contacted Eurex and Euroclear who said that Solo needed to be a bank to clear and custody shares and futures. We then contacted one of Solo's external lawyers – I cannot now recall which ones – about applying for a bank licence. During a meeting one lawyer questioned the need for a bank license, and we explained to the lawyer that Solo wanted to operate a clearing and custody platform where clients gave Solo their money and shares for them to hold. We were told that the FCA provides permission for safeguarding of client assets and safeguarding of client money. This permission requires the company to have BIPRU 730k status, meaning having capital amount of at least £730,000. The FCA refers to this activity as CASS.

296. The license allowed Solo to market itself to the world as an investment bank. Solo could take client money and shares which were then held in segregated accounts to its own money. Solo could not make retail commercial loans under this permission, for which a bank licence is needed.

297. Solo created its Global Securities Services (**"GSS"**). This was a generic clearing platform, which (amongst other trades) enabled Solo's clients to trade in dividend arbitrage. It should be noted that once the platform was in place, it was the clients (not Solo) who undertook the trading and submitted the applications to SKAT. By comparison, during the period that Solo was trading in German equities on the Irish Fund, the trading was undertaken by Solo.

298. GSS needed to have a sub-custodian, which was a service provider who could hold shares on Solo's behalf. GSS also needed the services of a bank to hold its aggregated client money balances. Among Solo's sub-custodians were JPM and Société Générale. There were changes made as regards Solo's sub-custodians at the end of 2013. The sub-custodians held the shares of Solo's clients. Solo was also a member of Eurex.

299. Anupe worked at JPM and introduced us to the people at JPM who dealt with the clearing business. After a few discussions they onboarded Solo for the purposes of clearing shares, cash and futures. We were aware that there were Danish companies paying dividends in August 2012, so we planned to go live with the GSS platform before the Danish dividend season to capture those trades. Solo explained to JPM that Solo itself had onboarded a number of clients who wanted to trade shares and JPM suggested that they open an omnibus account for this activity. This meant JPM would not require onboarding and opening an account of each of Solo's clients.

300. At the close of business on the first day of trading at Solo, the operations team produced a trading sheet which comprised of all of the share trades and uploaded them to a system operated by JPM called Globeclear. Shortly after placing the trades into JPM's systems, the operations team had a telephone call with the JPM team to see if the trades had been accepted into the system. The response was that the trades which had been uploaded had all been netted down to zero in accordance with the Globeclear algorithm system. JPM staff explained that the system only maintains a record of the net result which in this case it was zero movement of shares and zero movement of cash between JPM and Solo.

301. JPM staff also confirmed that as far as they were concerned there was nothing further to do in order to confirm settlement. This provided me with an additional piece of evidence that netting does indeed work.

302. During the planning phase of the GSS platform, I recall a number of discussions were had between Raj, Graham, Anupe, the Solo operations team and myself as to whether shares needed to be borrowed from a source external to Solo, most likely JPM, to achieve settlement of the trades. My previous experience working at CS etc was that where parties in a transaction (i.e., sellers, buyers, brokers, stock lending intermediaries) cleared through different banks, messages were exchanged between these clearing banks using a

54

system called swift to confirm various debits and credits made in their ledgers reflecting movement of shares and cash. The company maintaining the swift system ensures that these debits and credits match to avoid errors such as double counting.

303.    Operations teams at these banks typically split large trades into smaller fractions (or chunks) in order to mitigate settlement risk and therefore credit risk. At Solo we also decided to limit each trade size to EUR 50million for these reasons. To settle a series of chunks, it is necessary for one clearer to initiate the settlement cycle by borrowing enough shares for one chunk. At Solo we considered if we needed to borrow one chunk of shares intraday from JPM each time the clients traded. "Intraday" means borrowing the shares for delivery in the morning and returning them before the close of business on the same day. It is my understanding that this is what ED&F Man did to process their settlements, having spoken to one of their Dubai employees at the time, and more recently learning this from SKAT's US proceedings. At Solo, we concluded that intraday borrows were not needed as all parties in the trade cleared at Solo.

304.    At the time Solo were not able to purchase an IT system due to cost, so we hired a couple of software developers to build our own system which is discussed further at the sections titled *GSS software* and *GSS activity* below. My idea was to create a ledger or database where changes could not be made to the automated data without creating an audit trial. Prior to developing the GSS platform Solo was using an excel spreadsheet which was time consuming and created a risk of human error. It is normal practice for financial services business to use IT systems for trade processing.

305.    In 2012 the first limited liability partnership deed was prepared by Farrer & Co LLP and my solicitors have told me that the date on the document is 28 March 2012 [**DWF015237_0001**]. Graham, Jas, Adam, Edo Barac, Mike Smyth, Mankash were admitted as members of the LLP, and I retired as a member and a designated member of the LPP on 31 March 2012. Graham, Jas and Adam were appointed as designated members. The reason for my retiring was that I did not want to receive income directly from the UK as I was no longer a tax resident in the UK.

306.    The custody department in Solo was part of GSS and was also called GSS. The infrastructure and the staff of the department were in London. As regards staff located in

Dubai and working for Elysium Dubai this was initially Raj, Guenther and myself, but later Anupe, Adam, Craig and a couple of others.

307. I recall that around the time of joining Solo (and being told about the GSS part of the business), Gerry and Priyan had a conversation with Graham which was reported to me as Gerry and Priyan saying words to the effect of "*we assume Solo are already involved in Denmark*". I believe that both Gerry and Priyan had prior experience of the Danish trade because they were trading the same strategy during their respective prior employment with CS and Barclays, which were actively trading in Denmark at that time. I knew that Barclays was trading in Denmark because I was told this by people I had employed however, I did not know that CS was trading in Danish shares as well.

308. It was therefore Gerry and Priyan that introduced Solo to the idea of the Danish trade which is now the focus of this litigation. Having introduced the trade, they managed the due diligence process to obtain legal opinions so that we could market it to clients.

309. Gerry recommended a (then) leading Danish law firm that could provide an opinion for Graham. The firm's name is Hannes Snellman. My recollection is that Gerry told Graham that he had previously dealt with this firm when he worked at CS, which was reported to me at the time. Graham subsequently obtained a legal opinion, which was signed off by two lawyers on 27 June 2012.

310. Solo sought professional advice at every juncture and as far as I am aware, no trading was conducted until all those concerned were comfortable that it was supported by legal and tax opinions.

311. Later in 2012 a second LLP agreement was prepared by Pinsent Masons LLP. I am informed by my solicitors that this is dated 1 September 2012 [**DWF011347_0001**].

*(F)* <u>*2013*</u>

312. I later became aware that Raj, Graham, Craig and Anupe joined an entity called Indigo Securities Ltd in London, which had copied Solo's GSS trades. I discuss this further at paragraph 522 below.

313. I then agreed that Gerry and Priyan could become profit sharing members of Solo and

56

that they would now assist Solo to expand its GSS trading.

314. Gerry and Priyan advised that the Danish dividend arbitrage trading could also be structured for client companies (not US pension funds) located in the Labuan Province of Malaysia – an offshore financial centre or special economic freezone. I understand that their knowledge was derived from the fact that Barclays SCM structured similar types of trades for clients holding companies based in Labuan.

315. As part of their analysis into the Labuan/Denmark trade, I recall that Gerry and Priyan obtained a tax opinion from Ernst & Young to consider this structure. I am informed by my solicitors that the advice was provided on 25 November 2013 [**SKEL00898208-00001**].

316. In December 2013 Gerry and Priyan contacted Hannes Snellman to obtain a refreshed opinion on the US/Denmark trade. I am informed by my solicitors that this advice was provided on 20 December 2013 [**SSHA00012450-001**].

*(G)* *2014*

317. In January 2014 I stepped down as CEO of Solo and from all the controlled functions that I held at the point of resignation. The reason for my resignation was that the FCA had expressed a preference (once Solo had considerably expanded its business) to have a London based CEO who had day to day conduct of its business, and I did not want to leave Dubai to move back to London.

318. In November 2013 I ceased having any day-to-day involvement in the management of Solo and its affiliate companies in January 2014 as Anne Stratford was appointed as CEO. I discuss Anne's appointment and the hand-over period in more detail at paragraphs 573 to 578 below.

319. Once Anne was in post, she largely ran the business (Solo and its affiliated companies) without my involvement (as one would expect from a CEO with her level of qualifications and experience). For example, she hired her own management team (who must have in turn undertaken their own due diligence on the GSS platform) and hired/fired employees as appropriate. I do not remember all the people she hired but for example, I remember she hired Michael Herron and Paul Kelly. I have asked my solicitor

57

to show me the FCA register for Solo [**SSMT1/89-100**] and having reviewed it, I consider the following people (not already mentioned) to be key employees: Michael Herron, Gary Pitts, Paul Kelly, David Deards, Simon Tweddle, Bernard Minsky, James Browne and Carla Aylott.

320. In early 2014 Gerry and Priyan obtained a further refreshed legal opinion from Hannes Snellman, which was subsequently provided to me. I am informed by my solicitors that this opinion is dated 25 February 2014 [**SSHA00011776-001**].

*(H)*   *2015*

321. In November 2015 Solo's offices were raided by the National Crime Agency whom I understood were acting on behalf of Denmark. Shortly after this the business was wound down, and later placed into Special Administration. I understand from my solicitors that the Companies House website shows that the first Special Administrators were appointed on 22 September 2016.

322. I have asked my solicitors to identify when the last Danish trade was executed by Solo (or its affiliated custodians). My solicitors have informed me that the Full Trades List appended to the June 2023 CMC Order shows that the last Danish stock traded by clients of Solo, WestPoint, Old Park and Telesto was Coloplast A/S-B, around the ex-date on 7 May 2015.

*(I)*   *Solo competitors*

323. Since 2011 I had realised that more people wanted to do what Solo was doing. More people left banks to set up on their own, and existing spin-offs split up to create other businesses.

324. Some examples of these spins off are Ballance Capital, Indus Ltd and GSFS.

325. Overall, the competition in this space intensified, but the different groups had different knowledge banks and were active in different areas. For example, I think that the former Macquarie Bank employees may not have known about the opportunity to carry out the Danish trade via US pension plans, whereas I think they had better knowledge than Solo about Canadian pension plans.

326.  But all the different players in the market wanted leverage, and that was the constraint.

327.  Again, because of the number of different players in this area, I did not and do not consider that Solo (or any of my other companies) were doing anything illegitimate. Nobody did, competitors included.

328.  I became increasingly concerned about the security of Solo's IP (of the GSS platform) as the number of former employees grew, some of whom were disgruntled with Solo's profit-sharing arrangements.

329.  For example, in August 2014 Jas Bains resigned from Solo because he was unhappy with the lack of profit-sharing arrangement ascribed to him. I became aware that he was subsequently marketing himself as being in possession of Solo's IP. I was informed that his "pitch" to potential investors was words to the effect that, "*Solo's IP makes EUR 80 million pa "for which he" wanted EUR 20 million pa*".

330.  Towards the end of 2014 I became aware (see paragraph 522 below) that Indigo Securities had been established or acquired by some of Solo's former employees, namely Raj, Graham, Anupe and Craig, and that it was engaged as a competitor to Solo but effectively using Solo's IP.

331.  I also learned that some of Solo's clients (Adam Larosa, Matt Stein, Jerome Lhote) were processing reclaims through Indigo Securities.

**F.    NON-GSS BUSINESS AREAS**

332.  The Danish trade was not the only structured trade that Solo undertook, and its activities were wider than dividend arbitrage trading. My aim was to widen and expand the non-GSS business areas.

333.  In addition to the GSS business, Solo ran the following businesses:

333.1.  Stock lending brokerage which arranged stock lending trades between a borrowing and a lending bank for which a commission is charged for the introduction.

333.2.  Foreign Exchange Proprietary Trading.

333.3. Investment management of an algorithmic hedge fund. Under the brand name Copella, Solo hired a team of quantitative analysts who had many years of experience at hedge funds to build a computer-based trading model for trading client capital in the equities markets. The prime broker was Morgan Stanley. This fund was not involved in dividend tax arbitrage. Trading had only commenced shortly before the SKAT investigation commenced in November 2015. At that time, we were also in discussions with acquiring a London based asset manager called Quantmetrics as a way of boosting this revenue stream which was an already established business carrying the same activities. Discussions ended after the SKAT investigation started.

333.4. Contracts-for-difference (CFDs). This followed Solo's acquisition of the Cantor Index business from Cantor Fitzgerald. This involved acquiring 20 plus staff, the clients and the computer systems to provide contracts for differences trading services to clients. This followed an introduction which was made by Anne Stratford who had previously worked there. This business was not involved in dividend tax arbitrage.

333.5. Interdealer Brokerage. Solo Group acquired WestPoint, an established interbank brokerage which was on the "approved-broker" lists of key large banks in London and Europe. The business mainly provided brokerage to these banks' trading desks in derivatives. This business was not involved in dividend tax arbitrage. WestPoint also provided brokerage services for Solo's GSS clients for a short time, and subsequently provided its own GSS services.

333.6. Stock brokerage. The Solo Group acquired Old Park Lane, an established London-based stock broker to wealthy retail clients, as well as some market-making activity.

334. In 2013 I wanted to expand Solo's brokerage business. It was easiest to do this through buying companies with existing banking relationships. Around the same time, I also negotiated the purchase of Cantor Fitzgerald's established CFD business from them, which was transferred to Solo as a further alternative revenue source.

60

335. Ultimately my intention was to build a business that could be sold or listed on the stock exchange in the future.

**(A)** *The Solo custodians (WestPoint, Old Park Lane, Telesto and Novus)*

336. The intention after acquiring/incorporating WestPoint, Old Park Lane, Telesto and Novus was that those companies, independently of Solo, would provide clearing and custodian services/act as prime brokerages. In essence, my thought was that rather than having various external competitors, these companies would compete against each other and therefore provide an opportunity for ambitious employees within the Solo group to grow without sharing the IP to other market participants.

337. WestPoint, Old Park Lane and Telesto obtained the required permission for the "safekeeping of client money and assets" (i.e., custodian services) from the FCA.

338. Although it was my intention that each company (WestPoint, Old Park Lane, Telesto and Novus) would be run independently by its own management, Anne essentially intervened and put a stop to this. She saw herself as the head of all the UK-based regulated companies. Her view was that all regulated companies with the same owner should be consolidated into one group and have one board. I believe this was prompted by legal advice that regulated companies in the EU must have an EU parent company.

339. This resulted in Solo Group Holdings Ltd being incorporated of which she was made a director alongside Simon Tweddle. I have been informed by my solicitors that Solo Group (Holdings) Ltd (previously known as AESA Holdings (UK) Limited) was incorporated on 25 June 2014 [**SSMT1/101-102**]. This new structure meant that Anne and Simon had a lot more control to manage the group without reference to me.

340. Sometime later I discovered that Anne was wrong to provide me with a regulatory reason for the group to be reorganised. Contrary to what I had been told, I then learned there was no requirement to have a "UK consolidation group" if the UBO (i.e., me) lived outside of the EU. I was unhappy that she had forced the reorganisation of the business and placed herself in charge of these other entities. This undermined my original hopes that each business would be completely independent from each other. However, I did not make this discovery however until after Solo ceased trading, so I did not make any

attempt to reverse the structure Anne had created.

## G.    THE DANISH GSS TRADING

### (A)    *GSS software*

341.    It was my intention to eventually build a prime brokerage IT system that could be marketed to hedge funds. An example of such a software system which is widely used in the sector is "SunGard".

342.    Three software programmes were created serving different functions as follows:

342.1.    **Trade Approval System ("TAS"):** an online database that held all of the trade data. This was used by the clearing entities.

342.2.    **Brokermesh:** a platform used by the brokers (only) to receive requests to trade (buy or sell shares) and find a match. Brokers subscribed to Brokermesh for which they were charged a monthly fee.

342.3.    **Octave:** an order-generation system that was developed to generate orders automatically from a set of rules such as comparison of the current date to dividend ex dates. All clients accepted a license agreement, which granted rights to use this software in exchange for a monthly fee.

343.    Solo hired three consultants whose jobs were to automate the spreadsheets and create a database to avoid manual errors. The system was built on a step-by-step basis and functions were added along the way.

344.    The first system they created was TAS. It was an internal system which meant that the clients did not have access to it. Later the cash entries from the ledgers were added to the system which meant that the client reports were completely automated. In 2012 and 2013, however, the trades still had to be entered into the system manually with the trade data from the emails sent from brokers or clients.

345.    At the end of 2013 or beginning of 2014 the brokers asked for a system which could automate the matching of trades. This was because of the increasing number of clients and therefore the increasing number of buy and sell orders, all of which at that time were

sent by email. This led to the development of Brokermesh, which was used by brokers to accept orders. The brokers received orders from buyers or sellers in Brokermesh and the system then matched the orders based on the number of shares and the price. This system was designed to generate automated confirmations, via emails, to the buyers and sellers, and to send the information to Solo where it was entered into the database.

346.    When clients asked for a way to automate orders, a third system was developed which became known as Octave. Solo's clients (i.e., the US pension plans (**"USPPs"**) and Labuan companies) knew that they had to buy shares before the ex-date. This date was known several months in advance and therefore the clients could place their orders in Octave in advance. Octave then sent the orders to Brokermesh.

347.    The Octave system generated emails to replace the emails manually generated by the clients.

348.    The TAS data is kept in the file server of Solo Group. I believe that Octave did not generate data but instead generated emails which would have been stored in the expected methods by the users. I understand that Brokermesh did also not generate data but instead it generated emails as well as "signals" - I don't have any knowledge of such "signals" being stored.

349.    Brokermesh was operating what the finance industry would refer to as a "dark pool" or "liquidity" pool". This means that it was a collection of anonymous buyers and sellers who could not see the other participants or opposing orders, and who could transact with any broker. SKAT appears to insinuate that Solo operated a "closed loop" of pre-arranged trades. I fully reject this; the Solo model of which Brokermesh (once operational) was a part of, allowed for a multi-lateral relationship between clients and brokers where any client could trade via any broker.

350.    I would describe the GSS platform as an alternative trading venue. The trades were executed over the counter (**"OTC"**) and the platform was not connected to a stock exchange. However, all trades were reported to the London Stock Exchange – not only the net result of the trades but every transaction. This meant that there was an external control and occasionally the London Stock Exchange would contact Solo and ask

questions about trading patterns or specific trades. I recall a series of questions from the LSE in the summer of 2015 about trading volumes which I shall address in further detail once I have had a chance to refresh my memory from the emails and messages I sent/received at that time.

351. To the best of my understanding, Brokermesh had the following operational features:

351.1. The orders were always executed at the closing price. This was convenient because it meant that many buyers and sellers were trading at the same price.

351.2. It was created to execute "fill or kill" trades. This meant that if a buyer asked for a certain number of shares, this exact number had to be delivered in order for the trade to go through.

**(B)**   ***GSS clients***

352. Clients were introduced to GSS by me (under Ganymede) or other staff at GSS. Introducing brokers were also used. Existing clients also introduced new clients.

353. Due to the nascent state of the GSS business, formal marketing and advertising was not employed, although there was a GSS page on Solo's website. I expected marketing would be needed once the GSS business had matured and the staff and IT systems were able to cope with additional client activity. I had many years of experience working in prime brokerage and related business, and envisioned GSS as a prime broker servicing small hedge funds and professional traders. I saw this as a niche market overlooked by the large banks.

354. I was primarily focused on clients who intended to trade because of their parallel agreements with Ganymede. It was not necessary for me to know all the other clients.

355. All clients who wanted to onboard at Solo were invited to enter into a consultancy agreement with Ganymede at the same time. Later this agreement may have been with Philo, Acai, Parla or Fire instead. Whilst this process was voluntary, I do not remember any instances of clients being approved by Solo who did not also become a client of Ganymede (or the other way around). My evidence relating to the payments made by the clients to Ganymede is set out in the sub-section below titled ***Consultancy fees paid to***

*Ganymede.*

356. Omar Arti, Jessica Spoto, Claudia Sidoli and Martin Ward were responsible for dealing with GSS clients, including assisting with completing the account opening forms, collecting client information and documents which were passed on to the compliance department for onboarding. They were initially employed by Solo and later Genoa (see paragraphs 254 to 255).

## (C) *GSS activity*

357. The USPPs and the Labuan companies sent all their trade orders to the brokers who sent out enquiries to potential counterparties to find a match. Initially the orders were sent manually by email, and later the orders were generated by Octave.

358. All traders would have been aware that if you owned 3-5% (depending on the market) of the issued capital in a company it would trigger reporting thresholds on the stock exchange. Traders would therefore ensure the holdings for the accounts they traded in would be below this reporting threshold. This is normal trading practice for traders at asset management companies and hedge funds, for example.

359. The GSS platform would have had a control to prevent the theoretical limit being reached, i.e., the number of "free float" shares so as to avoid errors. Based on this it was my understanding that it would not be possible for Solo's clients to trade more shares than a company had issued.

## (D) *Why Danish shares?*

360. Although this case is focussed on trading in Danish shares, the GSS platform was designed to support cum-ex trading in respect of any jurisdiction where we understood such trading could be effective because there was a tax treaty which discriminates between certain classes of shareholders and therefore allowed for profitable cum-ex trades.

361. As I mentioned above, I will provide further detail about trades (or trading ideas) in other jurisdictions once I have had a chance to review the underlying trading opinions / surrounding emails and to refresh my memory properly about those trades. I have also

referred to this at the section titled ***Non-Danish GSS trading*** below.

362. I was not exposed to cum-ex trading of Danish shares from my positions at ING or Rabobank. The possibility of a Danish cum-ex trade was first mentioned by Priyan and Gerry a short while after they joined Solo. Gerry had previously worked for Deutsche bank and CS. I then remember that it was Priyan, Gerry, Darren Lui and Jas Bains who began to discuss the opportunity for Solo to trade cum-ex in the Danish market. They (the former Barclays SCM employees) confirmed that Barclays SCM was involved in Danish cum-ex trading from their time at Barclays. I also recall that Darren Lui specifically mentioned the possibility of having Labuan based clients from his experience at Barclays.

363. Their recommendation prompted me to look first at the Clearstream website which at the time was 'a bible' for such matters. The website had a guide to the treatment of Danish dividends, and it said that the date of dividend entitlement was the trade date. This was the sign to me that there was a cum-ex market available in that country.

### (E) *Legal advice relating to trading in Danish Equities*

364. As I set out above, Priyan and Gerry sought several legal opinions from Hannes Snellman. In the earlier years, obtaining legal opinions for trading structures was dealt with by Raj and Graham.

365. I have been told by my solicitors that the findings in the High Court of the Validity Judgment as part of these proceedings, mean that the Hannes Snellman opinions didn't address some of the issues the Judge says were relevant to the lawfulness of the trades. I had no idea that there were questions which should have been asked that weren't. It didn't occur to me (or, I think, any members of the Solo Team such as Priyan and Gerry, Raj and Graham and later Jas Bains and Anne Stratford) that there were other questions which the lawyers at Hannes Snellman needed to address.

366. I had no prior dealings with Hannes Snellman and was not responsible for instructing them and was not asked to approve them as external advisers. I would only have been asked to approve the cost of the advice.

367. My involvement was to provide the initial fact pattern to Raj/Graham and later to

66

Priyan/Gerry who would have then added further detail. My initial fact pattern would have been in my own words, explaining how I understood the trading should be done by the USPPs in the step-by-step fashion. Raj/Graham and Priyan/Gerry would have then added to my initial fact pattern and set out the more technical detail, for example, regarding which type of futures would be traded or the fact that the broker would be independent at Solo etc. Raj/Graham and Priyan/Gerry had never been involved in executing trades, whereas I had been.

368. The updated fact patterns were then provided to the lawyers by Raj/Graham and Priyan/Gerry, and these set out the trade structure to get an answer about whether the clients might qualify for a tax refund. I was not involved. I do not recall if I was ever sent the instructions, but they would not have expected my feedback, and I would have had no reason to review them and can't remember doing so.

369. I had employed Priyan, Jas, Darren Lui and Robin Llewellyn and was made aware of Barclays SCM having developed the cum-ex trade, including in Denmark, and they were involved in developing the Danish model. They reported to Raj and Graham and that gave me comfort. I knew that Barclays would have obtained legal advice before doing those trades and that their procedures would have required external advice with extensive due diligence.

370. The issue we were most focused on when seeking the opinions at the time was to make sure that the right type of entity bought the Danish shares because not all entities were entitled to tax reclaim. The right kind of entity could for instance be a US pension plan or charity, but not other sorts of US entities. This information could be found in the relevant treaty by the staff at Solo. The next step was to contact Danish lawyers to get their opinion regarding whether specific trades might qualify for tax reclaims.

371. Most of the legal opinions were addressed to Solo, but it has to be remembered that Solo was <u>not</u> involved in buying the shares or submitting the tax reclaims.

372. I would describe the purpose of Solo obtaining opinions (assuming they reached a positive conclusion) as essentially a "marketing tool". It was:

372.1. To show them to potential investors (USPPs and Labuan companies) to let them

67

know that Solo had obtained positive legal opinions from a Danish tax expert. However, I (and I believe all staff at Solo) made it crystal clear that it was always the clients' responsibility to get their own opinion and to decide whether or not they wished to trade; and

372.2.  To show to service providers such as JPM, auditors etc.

373.  A positive opinion meant that it would be worth spending time and resources to enable trading to take place.

374.  As I believe is standard in the finance and structured products industry, any third party (e.g., Solo's clients) were not entitled to rely on the legal opinions obtained by Solo.

375.  However, the fact that I would describe the opinions as "marketing tools" did not mean that I considered them to be defective in any way. I trusted the tax structurers, Raj, Graham, Priyan and Gerry (and to some extent, Jas and Anne) to check that all relevant issues were addressed by the lawyers when they provided their opinions. Given that I expected all clients to obtain their own opinions, there was absolutely nothing to be gained by Solo obtaining a defective opinion. To the contrary, if I thought the opinion was defective and the trade did not work, it would be a waste of time and money trying to onboard clients because the clients would be unhappy and refuse to trade as soon as they took their own advice. That was not in my interest or in Solo's interest.

376.  I wish to repeat that Solo did not buy shares and did not submit tax reclaims. All Solo was required to do from a legal perspective was to ensure that it had taken appropriate advice on the clearing and custody of the trade. The clients were expected to obtain their own legal advice. Whilst I was not privy to the advice which the clients went on to obtain, I knew at the time that opinions were sought from highly respectable law firms. I was informed by Gary Hope that his Labuan Companies took advice from Clifford Chance, and I was told by Doston Bradley and Matthew Tucci that they took advice from Reed Smith on behalf of their pension plans. I also know that Argre obtained their legal advice from Bech Brunn. The fact that those clients then went on to trade indicated to me that those law firms provided positive advice. I also recall that a US client had obtained advice from Skadden.

68

377. Prior to Solo I did not have any direct experience of obtaining and dealing with legal opinions, and I relied on my team in this regard. I can't now recall whether I read all drafts of the opinions when they were sent to me. I do specifically recall reading one of the opinions (which I believe was the first opinion) because I was excited to see what had been advised after I was told by the structurers that the advice was positive.

*(F)*  *Solo's relationship with external banks*

378. As I explained above, GSS moved its sub-custodian relationships on a number of occasions during the relevant period. These changes were prompted principally by the banks realising that Solo was in competition with its own internal cum-ex operations.

379. The GSS side of the business had relationships with JPM and SEB.

380. With each of these banks, Solo held cash accounts, share accounts and futures clearing accounts. In turn, Solo's clients had custody and clearing accounts at Solo.

381. In 2013 Solo was in discussions with Skandinaviska Enskilda Banken (**"SEB"**) to open an account with them and I am told that on 5 August 2013 I wrote an email saying to Mark Patterson that he should be "very careful" in his discussions with them [**SKEL00103619-0001**, also at **SKEL00256983-00001**]. This email has now been shown to me in prison.

382. The context of this email is a question by SEB:

> *"Regarding the trade, as there you have mentioned 2 different expired will that be 400,000 lots L/S for each contract? The risk team have questioned the fact that there seems to be no volume traded or open interest on the SSF, is it possible to give a bit of background to give risk some comfort?"*

383. This appears to be a question about trading that has not yet taken place. The reference to a "contract" is to each stock which is being traded. The trade is then split up into smaller trades. I replied to SEB's question as follows:

> *"Yes the spilt will be approx 400k in each contract. Each cross will be no more than 50k lots, each of which we plan to net down before crossing the next block.*
>
> *For single stock futures, there is typically no open volume at the exchange.*

69

*Our clients will be buying and selling OTC with each other, and the exposure will be no more than 50k lots at any one time.*

*The buying and selling interest won't be shown to the open market on screen, but will be reported to the exchange as they are crossed."*

384. It then appears that Mark sent me a private email (i.e. with SEB off copy) telling me that he thought I had the approximate splits wrong:

*"The split will be closer to 670k March and 130k Dec. I've already sent the splits over to Adam. Hopefully it won't be an issue."*

385. I have no way currently of reviewing the relevant information to work out whether I was wrong or whether Mark was wrong, when he provided his estimate of the approximate splits. From having refreshed my memory of this email, I think I was concerned to ensure that Mark did not go back to SEB to correct my estimates of the splits without me knowing whether his estimate was a better estimate than mine. It was early days in the relationship with SEB and I did not want Solo or myself to come across as unprofessional. I would not have wanted to correct the figures and potentially confuse SEB if Mark's estimates turned out to be incorrect.

386. I replied to Mark's email:

*"I will check. We need to be very careful that we don't piss of SEB."*

387. This was me confirming to Mark that I wanted to check his estimates. I didn't want to "piss of SEB" by looking like we were making errors (and at that point I did not know if my original email contained one) and damaging our credibility.

388. In any event, this was not an email relating to a trade that Solo was asking SEB to clear. It was talking about the estimated size of future trading. I cannot see any basis upon which Solo saying it was going to trade more in one stock and less in another stock would have made any difference to SEB's risk analysis, in the context of this email chain. The important part of the email chain from SEB's perspective was that they wanted to know if Solo was intending to have open positions (which they would see as a risk) or if Solo was intending that everything would be netted off (which they would see as a benefit). An open position simply means that there is a mismatch between buyers and sellers – if there were more shares purchased on a given day than sold, there would be an open

70

position at the end of the trading day. If the number of shares bought and sold matched, everything would net to zero.

389. I was also aware that SEB operated a competing dividend arbitrage business, and I did not therefore want to divulge confidential information that would assist SEB in their own dividend arbitrage trading operations. My concern here was that although a clearing bank should have an information barrier where the department is responsible for clearing business for internal departments as well as clients so that those staff members should not be discussing client business with the other internal trading desks, the reality is that information would leak from the clearing desk to the competing trading desk. My experience was that the back-office groups always leaked information to the trading desks on what the external clients were up to.

390. I recall speaking to Greg Cowie during this time (the head of dividend arbitrage at SEB) who told me that SEB was going to need to decline Solo because of the extent of the competition between it and Solo.

391. Similarly, in February 2014 Solo was in discussions with ABN AMRO about the possibility of providing financing facilities to Solo and my solicitors have shown me an email chain to refresh my memory [**SKEL01052330-00001**]. This shows that in February 2014 I was asked for confirmation whether there would be "no dividend stripping" and that I replied by pulling out of the application because ABN AMRO was relying on rumours rather than facts. I have reviewed this email in prison. I believed that ABN AMRO was speaking to Solo's competitors who were trying to push us out of the market. I did not know exactly what was being said about us and I was frankly not interested in having an argument whilst Solo had other banking facility options available. I do not recall Solo having a relationship with RBS.

**(G)  Solo's role as a custodian and clearer**

392. In Solo's role as a custodian for its clients, it held securities for safekeeping to minimise the risk, and it also collected dividends and interest income for the shareholder. In relation to the USPPs and Labuan companies, Solo held the shares they owned in Danish companies, and collected the dividend and the interest income.

71

393.  A dividend could be received from VP Securities or from the short sellers. Solo collected dividends from the short sellers which were then debited from the short sellers account and credited to the purchaser's account. If a client had a short position, money was debited from his client's account – I would call this a "dividend deduction". The same amount of money was then credited to the USPPs or Labuan companies' account(s) – I would call this a "compensation payment". The short sellers did not pay any money directly to the USPP's or the Labuan Companies.

394.  The process of debiting the dividend from the short sellers account and crediting it to the purchaser's account would have taken place as a book entry in the accounts – I would refer to this as a "dividend compensation payment". There is no distinction between money credited/debited between bank accounts and money credited/debited between custodian accounts. The lack of any such distinction means that it was simply irrelevant whether the money came from 'the outside world' or whether it was all book entries within Solo.

395.  I understand that the issuer of the dividend pays the net dividend directly to VP Securities who then distributes the money to downstream custodians.

396.  Solo acted as the bank, and money would be debited from the short sellers' account following the trade. There was no credit to Solo from the dividend paying companies. I believe that this is how the banking system works overall which is very far removed from a simple linear payment from a dividend paying company to a shareholder. I never claimed and I don't think that Solo has ever asserted that it received money directly from the dividend paying companies. Rather, the trading structure was designed to generate the entitlement through an alternative route.

397.  I understand that only shareholders with accounts at VP Securities receive the dividends distributed by the issuers. Shareholders can exist that do not have an account at VP Securities and instead receive a payment equivalent to the dividend from their own custodian.

398.  It was my clear understanding and belief that these compensation payments are treated as dividend income for Danish tax purposes, and that a dividend compensation payment

72

was equivalent to a dividend. In my opinion at the time, it wasn't relevant to talk about where the dividend paid out ends up. The only relevant question was how the dividend payment was financed. Therefore, there was no distinction between receiving dividend from the dividend paying company and receiving a dividend compensation payment from another party.

399. In my interview with SOIK, I explained why a dividend payment compensation could not be distinguished from the dividend payment that could be traced back to the dividend paying company [**SSHA00004415-001**].

400. The client could not withdraw the dividend compensation payment because he had made a loss overall by selling a future at a lower price than the price of the share purchase and therefore there was an unrealised loss.

401. When the investor buys at a higher price and sells the future at a lower price, there is an unrealised loss. The investor knows that they are entitled to the net dividend and the tax refund. They can therefore allow for a receivable of the net dividend, and this will remain as a receivable until the dividend payment date and the receivable for the tax refund. Until the tax refund is paid, the account does not hold sufficient cash to be withdrawn. Once the refund is processed, the investor can then withdraw the profit which is more or less the value of the tax refund less expenses (clearing fees and brokerage fees). Until the WHT refund is paid, the investor would show this amount as an unpaid debt in their own books and records.

402. Whilst I know that at the top of the chain of custodians, VP Securities makes a payment into the market, the existence of stock lenders and short sellers essentially changes the position further down the chain. Each level of custodian must debit and credit accounts all the way down the chain on a pooled basis, for example by Danske Bank paying JPM, who was paying HSBC, etc. Short sellers were part of this chain and were debited to fund the ones who held long positions. Where a custodian has clients with both long and short positions, there is an internal part to this process as well as an external part.

### (H)  *Worked trade examples*

403. My way of explaining how the different parts of the trade work and how it fits together

as a structure is to draw diagrams and to then explain them. When I was interviewed by SOIK, and also by the Dubai CID, I was provided with a whiteboard so that I could draw diagrams and explain them. I believe SOIK took photographs of my diagrams although I have never been provided with copies of these. In the SOIK summary document, I have explained my answers to the worked example provided by SOIK relating to Carlsberg shares trades purchased by a US pension plan called India Bombay [**SSHA00004415-001**].

404. I find using a whiteboard to be a very useful way of explaining the trade concept and the individual trades – I just find it easier to draw boxes and arrows. This is how I would like to give my evidence to the Judge in these proceedings.

405. Since having access to a laptop in prison I have prepared a PowerPoint presentation for use in the Danish criminal trial which explains the trade and role of Solo. I have asked for this to be exhibited to this statement rather than repeat it. On 15 January 2024 my legal team downloaded a copy of this from my prison laptop when they visited me. I exhibit this at [**SSMT1/103-132**].

### *(I)* *Short sellers*

406. Short selling simply means selling shares and covering the delivery by borrowing shares. It is also possible to buy shares to cover the delivery but in a structured trading environment this would be an unusual way to cover delivery. There is a distinction between a "naked" short and "covered" short. To the best of my knowledge only covered short selling took place on the GSS platform. Naked short selling was illegal within the EU, and I have no doubt that all the traders knew this.

407. In terms of the paperwork, there were e-mails from the short sellers which showed that they had arranged to borrow the shares which, to my understanding, was legally sufficient to say that the short selling was covered. All stock lenders and borrowers would have been parties to a stock lending agreement. A GMSLA is the industry standard agreement. It is not possible to borrow shares without an agreement. As far as I recall, stock lending agreements were entered into by all relevant clients prior to trading.

408. The system itself was also designed to ensure that "naked" short selling did not happen.

Trades were only accepted on the GSS platform if they could settle, and trades could only settle if there was a match. This meant that for trades to settle there had to be a match between a lender and a borrower, and between a buyer and a seller. If all parties were clearing with Solo, everyone was matched at Solo. So, when a client was selling shares, Solo could see if this client had made arrangement to borrow the shares from another Solo client.

409. In terms of requirements to be onboarded by Solo as a seller, the person or company needed to be a "professional client" (the MiFID EU directive) and be based outside of the EU. The same applied to borrowers and lenders.

410. To satisfy the requirement of being a "professional client", the client had to self-certify that it has experience and knowledge of the financial industry and assets in excess of €500,000. A client who did not have the requisite experience/knowledge and/or the asset amount could also elect to be treated as a "professional client". Under the regulations, "professional clients" are given less protection than retail clients.

411. The jurisdiction of ESMA is the EU. Therefore, if any short sellers, borrowers or lenders were domiciled in the EU, then they were required to comply with the ESMA regulations. At no time did Solo/GSS/Ganymede etc ever make it a requirement that a short seller, borrower or lender had to be based outside of the EU. However, I do recall that when onboarding clients, they would have been reminded of the fact that if they domiciled their companies within the EU, they would be subject to the additional reporting and regulation of ESMA. For the avoidance of any doubt, had a client decided to domicile within and therefore fall within the ESMA regulations, this would not have been an issue for Solo/GSS/Ganymede etc, and the clients would still have been onboarded.

412. It was not necessary to on-board sellers who already owned Danish shares (or any other shares that were being traded on the GSS platform) and of course a trader who owned shares one day may not own them the next day and so on. Solo's role was to clear the trades. It was up to the investors (which, in the context of the Danish trade meant the USPPs and Labuan companies) to find a seller. It was of no consequence to me or Solo how the investors purchased the shares; Solo only cared about clearing the trades that its clients entered into.

413. To the best of my recollection, most of the short sellers on the GSS platform approached Solo although this was often because the owners of the companies already knew Solo or me. In the beginning the USPPs contacted brokers in order to buy shares. Then the brokers would have contacted potential clients and encouraged them to be Solo clients so that the brokers could buy shares which they could sell to the USPPs. Therefore, it was the short sellers who approached Solo and asked to become clients.

414. So, the process of short sellers being onboarded was an organic one. Both I and other Solo employees participated in the growth of the business, and clients were found through word of mouth. This is why connections and relationships in the banking industry (and the dividend arbitrage community in particular) were so valuable and why I placed a value on employees (or potential employees) who had good connections.

415. The reason that it was often former Solo employees who became GSS clients was a practical one – I could only introduce clients that I knew. I also wanted Solo's clients to be loyal to Solo and me, so that they did not go to our competitors and reveal Solo's business strategy or share knowledge.

416. My solicitors have read the names of persons who are said to have controlled companies that act as short sellers on the GSS platform. I understand from my solicitors that these are the persons named on a document prepared by SKAT titled 'Schedule of Trading Counterparties' and dated 12 September 2023, which was then appended to SKAT's draft Reply to my Defence provided to my solicitors on 29 September 2023 – I will refer to this as SKAT's Schedule of Trading Counterparties. I remember and recognise the following names: Mike Murphy, Dilip Shah, Jason Browne, Paul Oakley, Owen Mitchell, Rajeev Dave, Sanjeev Dave, Alex Körner, Dai Griffiths, Stuart Wilson and Richard Mills. I do not remember and did not recognise the following names: Paul Warner, Rajiv Kumar, Satyendra Kumar Singh, Bijaya Swain and Jonathon Walton.

417. In the paragraphs below, I provide my evidence on how the persons I remember acting for short-seller companies came to be known to me and how they became a client of Solo.

418. **Mike Murphy:** Mike approached me to ask if his companies could be onboarded, but this arose organically because of our relationship which I briefly set out below.

76

419. I had known Mike Murphy for a long time prior to setting up Solo. In the early days when I was employed as a trader at ING, Mike was the owner of Novus and ING used Novus as a broker. I also used Novus as a broker when I was working at Rabobank.

420. I remember using Novus as a broker on the German Trade that Solo undertook in 2010.

421. In 2012 or the beginning of 2013 I told Mike that Solo had established a trading and clearing platform. I asked if he knew anybody who would be interested in joining and that I was particularly looking for USPPs. Mike then started acting as an introducer and introduced clients, including Daniel Fletcher, for which he was paid introducers fees.

422. Later on, Mike moved to Dubai, and I ended up spending a lot of time with him socially and would describe him as a friend. He asked if he could onboard short selling companies. I didn't know anything about the companies, but I didn't need to – as far as I was concerned, Mike was a very experienced broker who understood the industry.

423. This was before I ended up buying Novus from Mike in 2015 and Mike's involvement with Varengold bank.

424. My solicitors have informed me that four of his companies are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as short-sellers: Baja Ventures Ltd, Nisus Financial Ltd, Schmet Investments Ltd and Sciron Capital Ltd (all located in the BVI). I do not recognise any of the names of these companies.

425. **Dilip Shah** (no relation)**:** Dilip is an experienced equities broker and previously worked at New Edge where he was part of a small team which Solo hired. The other people in his team that moved to Solo were Rebecca Robson, Craig Johnson, Jack Reagan, Jason Browne and a couple of others. I didn't know Dilip prior to him being hired by Solo in November 2010. He was made redundant in December 2011 because his business area was not making money.

426. I stayed in touch with Dilip through socialising in Dubai and he told me he wasn't working or earning money. He wanted to know if there were any opportunities at Solo. I told him to contact Solo directly to see if there were any opportunities for him to trade, so for example, he could have been a short seller or a stock loan intermediary or a forward

intermediate. I think it must have been his decision to trade as a short seller.

427. My solicitors have informed me that four of his companies are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as short-sellers: Black Square Ltd, DE Market View, Glendale Market Consultants and RDKS Consultants (all registered in the Cayman Islands). I don't recognise any of the company names now.

428. **Jason Browne:** Jason came to Solo as part of the New Edge team (see paragraph 425) and had previously worked with Dilip. He worked in the back-office operations area at Solo supporting the equity brokerage business. After that business closed down, I think he continued working for operations but supporting the other existing business areas. At some point, I think he either resigned or he was made redundant. Similar to Dilip he later asked me if there were any other opportunities at Solo and I referred him to the GSS team to see if he or his companies could be onboarded for trading.

429. My solicitors have informed me that four of his companies are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as short-sellers: Brazzle Ltd, Campdown Ltd, Ice Rock Ltd and Tappleton Ltd (all registered in the BVI). I do not recognise any of the names of his companies now.

430. **Paul Oakley and Owen Mitchell:** Paul was a trader who used to work with Mark Patterson at Cater Allen. I also knew him from my time at the banks when I was employed as a trader. I am pretty sure it was Mark who introduced Paul to Solo and the GSS platform. Certainly, I do not recall Solo doing any other business with him.

431. I would call Owen a senior member of the dividend arbitrage industry. I started dealing with him when he was working at MF Global. After MF Global went bankrupt, I kept in touch with him socially. I later found out he was business partners with Paul and between them they were introduced to GSS and subsequently had companies onboarded.

432. My solicitors have informed me that Paul and Owen had five companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as short-sellers: D.D.C, GreyTek Capital, Opal Capital and Procap Trading (all registered in the Cayman Islands), and Orca Investments Ltd (a company

incorporated in England & Wales). I do not recognise any of the names of the companies now, but I do recall they had companies who were trading as short sellers.

433. **Rajeev Dave:** I have known Rajeev since college. I would describe him as a close friend and our families know each other. Rajeev moved to Dubai around the same time as my family and I spent time socially with him. Rajeev had previously worked at hedge funds in London, and I was aware that he had financial services experience.

434. I remember talking to Rajeev about the GSS model and I asked him if he was interested in doing business with Solo.

435. My solicitors have informed me that three of his companies are identified as SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as short-sellers: A Squared Investments (UAE), Abra Holdings and SPL 23 (Cayman) Inc (both registered in the Cayman Islands). I do not recognise any of the names of those companies now.

436. **Sanjeev Dave:** Sanjeev is the older brother of Rajeev. I was introduced to him briefly before I moved to Dubai and he was employed by the Solo office in Dubai.

437. I do not recall if he resigned or was made redundant. We continued to socialise and as he didn't have an income, I suggested that he could talk to the GSS team to see if there was any possibility of him or his companies being onboarded.

438. My solicitors have informed me that four of his companies are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as short-sellers: SPL 23 (Cayman) Inc, Leda Cayman Ltd, Metis Cayman (all registered in the Cayman Islands), and SPK Consultants Ltd (registered in the UAE).

439. In respect of these companies, Leda Cayman Ltd and Metis Cayman were previously in my group. I am not sure how he ended up becoming an owner of these companies which as far as I know were liquidated or struck off. It could be that he was a director of those companies, but I do not recall them participating in the Danish trading. I do not recognise the other company names associated with Sanjeev now.

440. **Alex Körner:** When I started Solo, I hired a former colleague who was a stock lending

79

trader whose name is Richard Westoby. Richard introduced me to Alex who he had worked with in the stock lending business at BNP Paribas. At the time I was introduced to Alex he was working at Deka bank in Frankfurt as a senior trader in the dividend arbitrage business.

441.  I met Alex on several occasions to try to encourage him to do business with Solo in order to grow Solo's revenue. We continued socialising although my recollection is that not much business was done between Solo and Deka bank. When Alex at some point left Deka bank we discussed the possibility of him becoming a client of GSS. From that point I introduced him to the GSS team, and he would have dealt with them directly for the onboarding.

442.  After the relevant period, in around 2017 Alex became a director of Treefrog Capital Limited, a company I owned that invested in business ventures.

443.  My solicitors have informed me that one of his companies is identified on SKAT's Schedule of Trading Counterparties as a client of Solo and active on the GSS platform as a short-seller: Rock Capital Private Fund Ltd (registered in Gibraltar). I do not know recognise the name of this company.

444.  **Dai Griffiths**: When I moved to Dubai my former boss at Rabobank came to visit me. His name is Andrew Docker. Andrew introduced me to Dai. Dai had been a money market broker and had dealt with several of my former colleagues at Rabobank. I knew at that point that he had knowledge of the financial services industry. Dai and I socialised a lot in Dubai and at some point, I suggested to him that he may be able to onboard with GSS in order to make profits. He then contacted the GSS team directly to be onboarded.

445.  My solicitors have informed me that one of his companies is identified on SKAT's Schedule of Trading Counterparties as a client of Solo and active on the GSS platform as a short-seller: LDW Consultants Ltd (registered in the BVI). I do not recognise the name of this company now.

446.  **Stuart Wilson**: Stuart was a senior trader in the dividend arbitrage industry. I dealt with him when he was working at ABN AMRO bank where he had a similar position to the one I had at ING. At some point I became aware that he had left ABN AMRO and I

contacted him to see if he wanted to onboard with GSS to become a client.

447. My solicitors have informed me that two of his companies are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as short-sellers: Blumarble Capital Ltd (registered in England & Wales) and Chem Capital (registered in Cayman). I do not recognise the names of those companies now.

448. **Richard Mills**: Richard was a senior trader at Macquarie bank. I recall that his desk had in excess of 10 people who I dealt with when I was at ING and Rabobank. At some point after I had established Solo, Richard left Macquarie bank. We had a number of conversations which led to Richard being introduced to the GSS business and he then dealt directly with the GSS team to be onboarded.

449. My solicitors have informed me that one of his companies is identified on SKAT's Schedule of Trading Counterparties as a client of Solo and active on the GSS platform as a short-seller: My Gulf Management Group FZE (registered in the UAE). I do not recall the name of this company now.

450. Unless a potential client was a USPP or a Labuan company, it was up to the client how they wanted to trade on the GSS platform. The clients decided their own trading activity and in principle they could be involved in both short selling, stock loans, and futures/forwards. No clients were compelled to trade.

451. I had no involvement in deciding what trading the clients would undertake – it was of no importance to me. My aim was simply to have as many clients as possible because this was how profits were generated. I assumed the clients talked to each other.

452. It was important to me to recruit clients who had a deep understanding of dividend arbitrage and equities markets where possible. I was also comforted by the number of clients. To me, the more clients there were, the more eyes that were looking at the activity, and somebody would say if something did not make sense. It therefore acted as a further control mechanism and reinforced my view about the trade strategy.

453. This was the same idea behind having four regulated clearing companies – with four separate groups of employees there were more people to ask questions about the activity. However, this did not work out as I had hoped as I explained at paragraphs 338 to 340

81

above.

*(J)*    ***Forward traders***

454.    The process of onboarding forward-traders was the same as for onboarding short sellers; I or Solo employees recommended people to become clients, or existing clients introduced potential new clients.

455.    My solicitors have read the names of persons who are identified on SKAT's Schedule of Trading Counterparties as having controlled companies that traded as forward or future traders on the GSS platform. I remember and recognise all the names that were read to me: Dai Griffiths, Daksha Bhudia, Guenther Grant-Klar, Rebecca Robson, Steven North and Mike Murphy.

456.    In the paragraphs below, I provide my evidence on how I remember the persons controlling companies who acted as future/forward traders became to be known to me and how they became a client of Solo.

457.    **Dai Griffiths:** I have set out how I met Dai and how he came to be a GSS client at paragraph 444 above.

458.    My solicitors have informed me that Dai had five companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as forward counterparties: Al Msalli Ltd, Darliz Ltd, LDW Consultants Ltd, Rheidol Trading Ltd and Ystwyth Trading Ltd (all registered in the BVI). I do not recognise the names of these companies now.

459.    **Daksha Bhudia:** I worked with Daksha at ML in the 1990's. Daksha later moved to Dubai with her family. Daksha was one of the reasons I settled on Dubai as a warm location for my family because she persuaded me that it was a good place to live.

460.    I told Daksha about the GSS platform and offered her the opportunity to (a) introduce clients for which she would be paid an introducers fee by Ganymede, and (b) trade on the platform. I did not do any business with Daksha before this.

461.    I do not remember if Daksha ended up introducing any clients to Solo/Ganymede, but I think Ganymede paid her to look for new clients.

82

462. I do remember that Daksha owned companies which became clients and traded forwards. My solicitors have informed me that Daksha had four companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as forward counterparties: DTS Capital Ltd, Sole Capital Partners LLP, Stratina Holdings Corp (all registered in the BVI), and T&S Capital (registered in the Cayman Islands). Other than T&S Capital (see below), I do not recognise the names of these companies now.

463. I did then become familiar with T&S Capital which acquired shares in Varengold in around 2015 which is set out in more detail at the section titled *Acquisition of shares in Varengold Bank and Dero Bank*. Daksha transferred the shares to me in 2017 and this company is now owned by one of my companies.

464. **Guenther Grant-Klar:** After Guenther ceased to work for me, we remained on good terms and met up socially.

465. I remember asking if he wanted to be a client of Solo's on the GSS platform. My solicitors have informed me that Guenther had two companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as forward counterparties: Amalthea Enterprises Ltd and Cork Oak Capital Ltd (both registered in the Cayman Islands). I do not recognise the names of these companies now.

466. **Rebecca Robson:** Rebecca came to Solo as part of the New Edge team (see paragraph 425). My solicitors have informed me that they have located a draft contract of employment which states that her employment with Solo commenced on 1 March 2011 [**SKEL00955841-00001**]. She later decided to leave the London office because her partner was moving to Singapore, and she was looking for new opportunities in Singapore. Solo did not have any business activities in the region, but I referred her to Paul Preston at IP Global. I believe Paul and others eventually recruited her to work for the Labuan companies as a trader.

467. During 2014 Rebecca was appointed by some of the Labuan companies (perhaps 11 or 12 in total) to trade on their behalf which included trading in Danish shares on the GSS platform. I believe this continued through 2014 but stopped at the end of 2014 because

the Labuan companies ceased trading. As far as I remember, the owners had to be physically based in Labuan and they stopped trading because they got fed up with living in Labuan.

468. I remember in late 2014 Rebecca approached me to see if she could come to work for me again, but she wanted to do this from Singapore. I had no plans to open a business in Singapore and therefore suggested that she may want to become a Solo client, and I referred her to the GSS staff (I think to Omar Arti and/or Jessica Spoto).

469. My solicitors have informed me that Rebecca had four companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as forward counterparties: Allitsen Asset Ltd, Connaught Global Ltd, Gartside Global Ltd, and Lyall Capital Ltd. Whilst I do not recall anything about those companies, I remember that her companies became clients in 2015 after she had stopped acting as a trader for the Labuan companies.

470. **Steven North**: I was introduced to Steven by Mike Smyth. I remember Steven North asking me whether he could become a Solo client or introduce clients. As he came to me through a trusted colleague, I remember telling him to go ahead and talk to the GSS on-boarding team at Solo. I did not know Steven before this introduction.

471. My solicitors have informed me that Steven had four companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as forward counterparties: Assurity Capital Ltd, Kincavel Consultants Ltd, North Capital Group Ltd and Solarta Capital Ltd (all registered in the BVI). I do not recognise the names of these companies now.

472. **Mike Murphy:** I have set out how I met Mike and how he came to be a GSS client at paragraphs 418 to 423 above.

473. My solicitors have informed me that Mike had one company which is identified on SKAT's Schedule of Trading Counterparties as a client of Solo and active on the GSS platform as forward counterparty: Novus. This surprises me as I do not think Novus traded on the GSS platform other than as a broker. I would need to see the records of forward trades undertaken by Novus to comment further.

84

474. In addition to the above, I have been asked about my recollection of the following companies which my solicitors have informed me are listed on SKAT's Schedule of Trading Counterparties as forward counterparties:

474.1. FGC Securities Ltd (March to December 2013 only): As far as I am aware, FGC Securities is a New York based brokerage which did not act as a forward counterparty. I would need to check the trading documents to comment further on this.

474.2. London Capital Group: The name is familiar, but I do not recall this brokerage having any interaction with GSS. It was a company that Solo used for foreign currency trading on a proprietary basis which is completely unrelated to GSS. I would need to check the trading documents to comment further on this.

474.3. West Point Derivatives (December 2013 only): I think WestPoint provided brokerage services to GSS clients before it obtained custody and clearing permissions, but I do not think it acted as a forward counterparty. Again, I would need to check the trading documents to comment further on this.

## (K) *Stock lending intermediaries*

475. Stock borrowers and lenders could be described as intermediaries or stock lending traders – in this witness statement I am going to use the term stock lending intermediaries. They were necessary to the trading strategy because the USPPs and the Labuan companies needed to lend the shares to someone to finance their share purchase.

476. All stock lending intermediaries signed GMSLA agreements with whoever they dealt with on the Solo GSS platform.

477. My solicitors have read the names of persons who are identified on SKAT's Schedule of Trading Counterparties as having controlled companies who traded as stock lending intermediaries on the GSS platform. I remember and recognise all the names that were read to me: Alex Körner, Bhupendra Mistry, Martin Smith/Alexander Smith and Pratul Shah.

478. In the paragraphs below, I provide my evidence on how I remember the persons

controlling companies stock lending intermediaries became known to me and how they became a client of Solo.

479. **Alex Körner:** I have set out how I met Alex and how he came to be a GSS client at paragraphs 440 to 442 above.

480. My solicitors have informed me that Alex had four companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as stock lending intermediaries: CEKA Invest Gmbh, Relative Value Trading Gmbh and RVT Consult (registered in Germany), EQ Invest (registered in Switzerland), Rock Capital Private Fund (registered in Gibraltar), and Tehvah Global (registered in the BVI). I do not recognise the names of these companies now.

481. **Bhupendra Mistry:** Bhupendra was a friend from London who I have known for a long time. Bhupendra was living in Singapore and was married to my cousin. He approached me to ask for a job when he lost his job at CS bank. I spent time with him on family vacations in Singapore and the subject of GSS came up during one of my visits. I introduced him to Anne Stratford, and I believe he provided IT consultancy to Solo. I could not offer him a job but suggested he became of client of Solo or found new clients for Solo.

482. My solicitors have informed me that Bhupendra had four companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as stock borrower/lender: Fintech Consultancy, Gnosis Capital, Philo Capital and Techevolve (all registered in the BVI). I think Philo was one of the companies in my group, but I would need to check if it's the same one. I do not recognise any of the other names of the companies now.

483. **Martin Smith and Alexander Smith:** I first met Martin when I was a trader at CS. Martin was a broker at Cantor Fitzgerald who CS dealt with. Martin was later employed at Novus which was owned by Mike Murphy. Solo was often in contact with Novus, and I was therefore often in contact with Martin.

484. When Martin left Novus, I offered him a job at Solo, but Martin did not want to work for a friend. When the GSS business was able to take more clients, I asked him if he wanted

86

to be a client, and I believe Martin subsequently contacted the GSS team, to get his companies onboarded.

485. As well as being involved in the GSS business, one of Martin's companies was also an investor in Varengold Bank.

486. Alex Smith was Martin's son.

487. My solicitors have informed me that Martin/Alex had eight companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as stock borrower/lender: Colbrook Ltd, Neoteric Ltd (registered in the Cayman Islands), Diverse Vision Ltd, Equal Services Ltd, Prince Solutions Ltd, Principle Markets Ltd, Trance Services Ltd, and Treehurst Ltd (registered in BVI). Other than Colbrook who I refer to below, I do not now recognise any of the names of these companies.

488. The shares in Colbrook Ltd were transferred to me in 2017 or 2018.

489. Treefrog Ltd is currently owned by Elysium Global. The shares were transferred to Alex Smith in 2017 when the company was not worth anything, but they were held by him on trust for me. The shares were transferred to Elysium Global in February 2022.

490. **Pratul Shah** (no relation to me): Pratul has a daughter called Nadia Shah who worked for me in Dubai in around 2013. After that she moved back to London. When I was in London in 2013 or 2014, I visited Nadia and her family including her father, Pratul. Pratul was a retired accountant and he asked me if he could work for me. I could not offer Pratul a job, but I referred him to the GSS on-boarding team in order to find out if he could become a client.

491. When Pratul was on a visit in Dubai I introduced him to Martin Smith, so that they could look for business opportunities together or with other clients.

492. My solicitors have informed me that Pratul had four companies which are identified on SKAT's Schedule of Trading Counterparties as clients of Solo and active on the GSS platform as stock borrower/lender: Esengi Ltd (registered in the Cayman Islands), and Akishah Ltd, LADHI Ltd and NNPA Ltd (all registered in the BVI). I do not now

87

recognise any of the names of those companies.

**(L)**     **_Brokers_**

493.    The criteria regarding the onboarding of brokers for the GSS platform was that they had to be regulated by the FCA (or the equivalent regulator for the jurisdiction the brokerage was incorporated in) and that they should have employees with the experience needed to handle the business.

494.    The brokers were paid a commission per trade by the clients who bought and sold shares. As far as I am aware the commission was at the standard rate that other brokers charged banks for dividend arbitrage business.

495.    The brokers paid an account fee to Solo, which was an annual fee plus transactions fees for every trade. When Brokermesh was introduced, the brokers also paid a monthly software fee to Hydra Capital Ltd (**"Hydra"**) who owned the software. Hydra was not part of the Solo Group, but it was owned by me. The Brokermesh fee was around €5,000 a month.

496.    There was no relationship between Ganymede and the brokers. The brokers, their owners, and their employees did not receive any payments from me or my companies.

497.    The risk for a broker was that a client could not deliver or accept shares. That risk was mitigated by the buyer, the seller and the broker being cleared by Solo. This was not uncommon, and it meant that the trades were matched "in-house". In practice it meant that the broker did not have any risk. This was my understanding of how the CACEIS business model worked for dividend arbitrage.

498.    There is a specific permission granted by the FCA called "risk less principal" which meant that the broker was the principal of the trades if the broker had an "equal and opposite" purchase and sale. By definition, when a broker sells shares to a buyer, the broker is acting as a principal and, likewise, when a broker is buying shares from a seller, the broker is also acting as a principal. This meant that the seller sold the shares to the broker, who then sold the shares to the buyer. The brokers received a commission for matching trades.

88

499. The brokers on the GSS platform could only trade with clients that Solo had accepted as clients. The brokers did not receive a list of Solo's GSS clients, but they onboarded the clients they knew through their networks. Thus, each broker did not trade with all the clients on the platform. The brokers could trade with the clients that they wanted, and Solo had no influence on which brokers the different clients used. As I remember it, the brokers could trade across all four custodians.

500. My solicitors have reminded me that the Sanjay Shah Defendants' response to a request for further information from SKAT dated 4 June 2019 identifies that 9 brokers were onboarded on the GSS platform.

501. **Bastion Capital ("Bastion"):** Bastion was owned by Patrick Milne and Adrian Milne. I was introduced to this company by a Solo employee, but I cannot now remember who. I had not done business with Bastion before they were onboarded for the GSS business.

502. My understanding was that Bastion as a small brokerage with approximately 20-30 employees. I would not have been aware of the financial situation in Bastion, and I had no reason to ask about it.

503. After the on-boarding I got to know the owners of Bastion personally during 2012 and 2013, and I became good friends with Adrian Milne. I had no other business with Bastion or its owners at the same time as the GSS business.

504. At the beginning of 2017 Adrian Milne had left Bastion and moved to Dubai. He became a director of Elysium Dubai and Aesa S.à.r.l which was the holding company for Solo. In 2017 it was very difficult for me to recruit staff (which remains the position) as a result of the adverse publicity relating to this case and SKAT's investigations. I saw Adrian as someone I trusted, but also someone who had experience and somebody I thought would be able to manage my companies at that time. After a few months he resigned as he did not have enough time available to manage my group.

505. **Novus Capital Markets:** I have discussed Novus elsewhere in this statement. In relation to how I was introduced to this brokerage, see paragraphs 419 to 420.

506. **Mako Financial Markets LLP ("Mako"):** This was a well-known and well-established brokerage. It was also my impression that it was a quite large brokerage. I knew Jamie

89

Jones had been a broker in the dividend business for many years, and I had dealt with him when I was employed by the banks in my previous jobs. I was not involved in any dealings with Mako, but I was happy about Mako becoming part of the business. My assumption was that Jamie had known someone in Solo GSS team and that was the connection.

507. **Sapien Capital Ltd ("Sapien"):** Prior to Sapien being on-boarded, I had never heard of it. I had no knowledge of the company, or the persons involved.

508. **FGC Securities LLC:** I have set out my evidence on how I was introduced to this brokerage at paragraphs 596 and 597.

509. **Sunrise Brokers ("Sunrise")**: I was familiar with Sunrise before the GSS business. When I worked as a trader at banks, I had dealt with Sunrise. I knew Simon Park who was a senior broker at Sunrise. I approached him and asked him to talk to the management of Sunrise about becoming a broker for the GSS business. The GSS team at Solo had taken care of the on-boarding process. I would describe the company as well-known and well-established with a good reputation. I did not know anything about the financial situation of the company.

510. **TJM Partnership Plc ("TJM"):** My recollection is that it was a Solo employee who had introduced TJM. I had no knowledge about the company before it was on-boarded. I do however remember meeting Stanley Lock who worked there and who had come to Dubai to visit me a few times after TJM was on-boarding at Solo.

511. **Arian Financial ("Arian"):** I think someone in the GSS team or someone working at Solo made the introduction to Arian. I didn't know of Arian or anyone that worked there before they were onboarded. I did then meet Jason Lawrence who was a partner and I also remember meeting the owner a few times. Other than that, I had no knowledge of Arian, the size of the company or its financial situation. I had no other business with the company or the owner other than the GSS business.

512. **London Capital Group Ltd ("LCG")**: I do not now recall if the LCG was a broker on the GSS system, certainly I do not remember having contact with anyone there. I do however remember that Solo used it as a broker for proprietary and FX trading.

**(M)**   *Reclaim agents and Exclusivity Agreements*

513.  When clients were onboarded at Solo, they were introduced to the reclaim agents. The reclaim agents were paid by the clients. I think the clients paid between £5,000 and £10,000 per reclaim to the reclaim agents.

514.  The clients would instruct Solo to transfer money to the reclaim agents for their fees, and then the payment would be made as bank transfers from the clients' custodian accounts at Solo. I do not know if some clients had paid the reclaim agents from other sources. I also don't know if there were also instances when the reclaim agents were paid their fees first and they then just sent the balance to the clients at Solo.

515.  In 2012 and 2013 the reclaim agents transferred the tax refund money to the clients' accounts at Solo and they also sent a spreadsheet which showed how to allocate the money to the various clients. I was not involved in 2014 and 2015, but I assume that the process was similar. In this period (2014-2015) I did not get information from the reclaim agents about the money they received, so I was not informed of the tax refunds being received unless I was contacted by the clients.

516.  I did not look into and did not have knowledge of whether the tax refunds came through. In the beginning of the business in 2012 I was interested in seeing if the reclaims were successful or not. I was never made aware of any problems with the reclaims.

517.  If the tax refund was not received, it was the clients' risk. But there would not have been a huge loss because the client would not have to pay the fee to Ganymede in such cases. This was not directly stipulated in the agreement between Ganymede and the client, but it was stipulated in the agreement that the clients' payments to Ganymede was discretionary. This meant that the clients could refuse to pay Ganymede. However, they would still have to pay the fees to Solo and to the brokers.

518.  I had not previously had any interactions with reclaim agents, so before the GSS platform at Solo, I had no knowledge of what they did. It was Solo's GSS team who spoke to the reclaim agents.

519.  I was introduced to Goal Taxback (**"Goal"**) by Raj and Graham, and I remember meeting the manager or owner, Steve Everard.

520.  I was introduced to Acupay by Guenther in 2010. Guenther told me that he had previously dealt with Acupay when he was working at ABN AMARO. I did not meet the owner of Acupay who lived in New York and was not involved with the day to day running of the London office. Camilo Vargas was the head of Acupay's London office. I was introduced to Camilo in 2010 when the Broadgate Ireland Fund used Acupay for the German reclaims which Solo managed as an asset manager. Before this introduction, I had never met Camilo.

521.  Sometime in 2014 I found out that Camilo had left his job as a manager at Acupay and that he (along with two other former employees of Acupay) established a competitor company called Syntax GIS Ltd (**"Syntax"**) (which I have been informed by my solicitors was incorporated on 25 March 2014 [**SKEL00113863-0001**]).

522.  Camilo told me that he wanted to approach some of the clients he had dealt with at Acupay. I told him that I had no objections to that. He also told me that he had submitted several successful reclaims to the Danish Tax Authorities on behalf of Raj and Graham. This came as a complete surprise to me, and it was only after I had talked to Camilo further and asked him more questions, I figured out that Raj and Graham were involved in a competing business and that the competing business involved Indigo Securities in some form. It was around that time, middle of 2014, that after doing a search on the FCA register or I think, Companies House, I realised that Graham was a director at Indigo Securities in London. It was after I learned that my former team had set up a competing business that I decided that it would be a good idea to get exclusivity agreements.

523.  I discussed it with Priyan and Gerry and we decided that Aesa Sarl, my Luxemburg company, should be the entity to approach the reclaim agents. I think the reasons were that Aesa Sarl was based in Luxembourg and was not a regulated company, so it didn't therefore interfere directly with Solo's business. Also, I was a director of Aesa Sarl so I could sign in my capacity as director for Aesa Sarl rather than asking any of the directors of Solo Group companies to sign.  There was a plan for in the future to have the holdings of Dero and Varengold bank also held by Aesa Sarl, so the exclusivity agreement would have eventually covered those two banks as well (by which I mean those two banks would have eventually also been parties to the exclusivity agreements).

92

524. I therefore approached the reclaim agents Goal, Acupay and Syntax with a view to negotiating exclusivity agreements in order to reduce the effectiveness of my competitors. I did not have any ownership, directly or indirectly, in Syntax at this point. I had no involvement whatsoever in its management.

525. In respect of Acupay and Goal, an agreement was reached whereby they would receive an annual fee in exchange for providing Solo and its affiliate companies with exclusivity for specific markets. Acupay and Goal were paid around £1,500,000 each for the exclusivity agreements.

526. The concept behind these agreements was to protect my business at Solo from competitors who were former employees who had copied the business model, but also from other people who were involved in the same business at other firms. My understanding – which I got from Priyan and Gerry – was that it was normal for a beneficial owner to use a reclaim agent to process or submit a reclaim application, so I wanted to restrict my competitors' options.

527. The director of Syntax, Camilo suggested that rather than pay an annual fee the shareholders would be willing to sell the shares to me (see paragraphs 248 to 249). I understood from him that his ambition was to create a reclaim agent which became similar in size and capacity as his former employer, Acupay.

528. My only involvement with Syntax was to appoint Camilo as the manager. I do not now recall receiving any reports or data from Syntax, but it is possible Camilo or his other staff may have sent emails to me directly or indirectly via the GSS staff and I would need to refresh my memory of any relevant documents. I was not interested in the working processes of a reclaim agent.

529. I had never been in contact with the Danish tax authorities, and I had never had anyone contact the Danish tax authorities on my behalf.

*(N)*  ***Payment structure***

530. Whilst I do not have any direct knowledge, nor have I seen bank statements showing payments etc, it was my understanding that the reclaims issued by SKAT were paid to the reclaim agents.

93

531. I then understand that the clients (e.g., the USPP or Labuan company) gave instructions to the reclaim agents to pay the refund to the client's account at Solo. I am certainly aware that many refunds were made like this, and the clients refunds were credited to their custody accounts held with Solo. When the funds were received in Solo's bank account, the back-office staff allocated the payment to the relevant clients according to the analysis spreadsheet received by the reclaim agent.

532. Solo's custodian statements will show the movement of monies.

533. Solo (and its affiliated custodians) received 3-5% of the monies transferred to the custody account held by the relevant client, which is the industry/market standard rate for providing custodian and clearing services (for example, JPM and Société Générale).

534. Ganymede (and later Acai, Philo, Fire and Parla) invoiced its clients for its success/introduction fee which I discuss further in the section titled ***Consultancy fees paid to Ganymede*** below.

535. The clients retained the balance of the tax reclaim. It was up to the client whether they wanted to retain the monies in their custody account or if they instructed Solo to transfer the monies elsewhere.

### *(O)* ***Consultancy fees paid to Ganymede***

536. Payments to and from Ganymede (and later Acai, Philo, Parla and Fire) in connection with the GSS business came about in the following ways:

536.1. Ganymede paid introducers to locate potential new clients for Solo (who were also clients of Ganymede). The clients in this regard could have been USPPs, Labuan companies, short sellers, stock lending intermediaries or forward/future traders. The introducers may have been paid by Ganymede directly or to a company that they owned – that was up to the introducer.

536.2. Ganymede paid clients who were onboarded by Solo to the GSS platform. Again, the owners of these clients could have been paid by Ganymede directly or payments could have been made to the client company or to another company owned by the client's owner (for example, a US pension plan may have elected

94

to have its payment made to another LLC company controlled by the owner of the plan) – again it was up to the client where they wanted the payment to be made.

536.3.  I considered the payments mentioned at paragraphs 536.1 and 536.1 above to be a cost of business. It was in Solo's interest and in Ganymede's interest to increase the number of clients who were trading on the GSS platform.

536.4.  All of Solo's GSS clients also had consultancy agreements with Ganymede. When Solo's GSS clients received tax refunds, there was a common understanding that the clauses relating to discretionary payments in the consultancy agreements would operate in Ganymede's favour and the clients would make payments to Ganymede for the sums set out in the invoices issued by Ganymede.

536.5.  I would describe the nature of these payments as introducer fees or success fees but for the purposes of my evidence I will refer to the payments as the Advisory Services Fee (which is how I recall they are described on the invoices). There were two ways that the Advisory Services Fee was paid:

536.5.1.  The first way was that when the reclaim agent transferred the tax reclaim monies to the client's account at Solo, the client then instructed Solo to pay the Advisory Services Fee by transferring funds held in the client's custody account to Ganymede's custody account (or perhaps to a bank account nominated by Ganymede).

536.5.2.  The second way that the client paid the Advisory Services Fee to Ganymede was by transferring it from monies the client had elsewhere that were not held in its Solo custody account. This could have been because the tax refund was paid directly to the client from the reclaim agent (and not to the client's custody account at Solo) or for any other reason.

536.5.3.  From Ganymede's perspective, it did not matter how the client chose to pay the Advisory Services Fee.

95

537. Ganymede was not a partner of any description in the tax refunds claims. But if a client did not receive a tax refund the client did not have to pay the Advisory Services Fee because it was discretionary, so nobody suffered a loss. It is therefore correct that Ganymede had a financial interest in the clients receiving tax refunds and the Advisory Services Fee represented Ganymede's share of the profit from the trade.

538. There was no precise formula in calculating the value of the Advisory Services Fee – it was roughly between 60-80% of the net profit which I believed was standard in the industry. Ganymede did not always issue invoices on a refund-by-refund basis. It would often issue an Advisory Services invoice when a client had received several refunds relating to Danish shares, but the invoice could also include Advisory Services Fees for other refunds (e.g., refunds relating to Belgium shares).

539. I had a team of accountants working for me at Elysium Dubai. With the permission of the clients, they liaised with the GSS team to get the information on the tax refunds received by the clients so that they could prepare the Advisory Services invoices for Ganymede. The same team at Elysium Dubai prepared the invoices. I remember that in 2014/2015 there was some sort of mini-computer program to automate the invoices to avoid typos / human errors, and to speed the process up.

540. Only the Solo employees who dealt with the accounts could see the transfers to Ganymede. This structure also meant that the tax refunds would not appear on Solo's financial statements since the money belonged to the clients who then paid the invoices issued by Ganymede for the consultancy fees. This also reduced the risk of more Solo employees demanding a share of the profit.

541. Solo (and later Telesto, Old Park Lane and WestPoint) did not make any payments to the clients. The only payments the clients made to Solo were the standard fees for providing custody and clearing services. The more clients that were trading on the GSS platform, the greater the value of the custody and clearing fees Solo received. The idea was that as clients received refunds and the process worked smoothly, they would remain confident to continue doing business with Solo for the following dividend season.

## H.    NON-DANISH GSS TRADING

96

*(A)* **_Introductory remarks_**

542. When preparing the amended defence which was served unsigned on 23 June 2023, I asked my solicitors to waive privilege and to refer to the legal opinions that Solo had obtained which related to trading structure ideas generated by the tax structurers. I cannot say without a detailed analysis of Solo's disclosure which of these ideas went past the idea stage and which of those were actually traded by Solo's clients.

543. It has been brought to my attention that paragraph 30B of my unsigned defence states:

> *"In addition to the matters set out above, during the period 1 January 2012 to 31 December 2015 (the "Relevant Period") legal advices were obtained on a number of different trading structures. The content of these advices fortified Mr Sanjay Shah's genuine and honest understanding that a person is and is properly treated by the banking system (and for all other purposes) as a shareholder of equities (i) from the moment that it enters into a contract to purchase shares from a short-seller; and (ii) regardless without reference to the net shareholding held by that purchaser's custodian."*

544. My solicitors have also informed me that SKAT served its draft re-re-re amended reply on 28 September 2023. I have been informed that this reply is to my unsigned defence (served on 23 June 2023) and my unsigned defences to schedules 5B, 5D, 5K, 5L, 5M and 5N (served on 18 July 2023), but that it also includes new allegations against me.

545. I have been informed that SKAT's new reply is 77 pages in length and contains a large number of amendments. I have not yet read this.

546. My solicitors have however informed me that SKAT's new Reply contains a very long section setting out why they disagree with my belief at paragraph 30B of my unsigned defence and that SKAT has added the following new issue to the draft List of Issues:

> *"Did Mr Sanjay Shah reasonably, genuinely and honestly believe that a person is and is properly treated by the banking system (and for all other purposes) as a shareholder of equities (i) from the moment that it enters into a contract to purchase shares from a short-seller; and (ii) regardless without reference to the net shareholding held by that purchaser's custodian? Would a reasonable person in the Relevant Period would have drawn inferences that cum-ex trades in respect of Danish shares were legitimate based on legal advice about another jurisdiction's WHT regime, and did the Sanjay Shah Defendants do so?"*

547. I wish to therefore explain my intention behind including the advice obtained by Solo for trading other than the Danish trade. The purpose of it was to demonstrate that:

547.1. When the tax structures at Solo had a trading structure idea which they provisionally thought could work, this was reported to me, and I authorised the use of Solo funds to seek external advice. I believe this shows that Solo was always seeking to ensure that any trading structure was lawful.

547.2. I believed that any jurisdiction which transferred ownership of a share on the trade date was a jurisdiction where cum-ex trading would potentially work. This was my thinking behind the statement at paragraph 30B of my unsigned defence which was prepared by my solicitors.

547.3. I wish to make it absolutely clear that at no point did I (nor anyone else at Solo to my knowledge) believe that a positive legal opinion about a cum-ex trading structure in one country could be relied upon to say it would be valid in another country.

547.4. I believe the words "fortified my belief" are just that. It was just another reason to believe the trading was lawful. But I would never authorise a trading structure that had not been approved by lawyers in the relevant jurisdiction.

547.5. When I come to reviewing my unsigned defence I will make the changes to it that I would have made at the time it was being prepared if I had been able to read any documents or have time with my solicitors other than during short telephone calls. Paragraph 30B is one such paragraph that I will amend so as to avoid any misunderstanding.

**(B)** *Comments on non-Danish trading legal opinions*

548. It is impossible for me to provide my evidence on potential or actual non-Danish trading including my evidence on the legal opinions obtained without refreshing my memory from the documents. It has been years since I had any involvement with this.

549. I will provide this evidence when I am able to review documents. Whilst it is difficult to be precise about what evidence I would like to give on these points, I consider the

following topics should be covered:

549.1. My knowledge of cum-ex trading in Germany and why I understood banks stopped trading in Germany.

549.2. My knowledge of cum-ex trading in jurisdictions other than Germany and Denmark, including what I understood other banks to be doing and why I understood it to be lawful.

549.3. My understanding of how a jurisdiction was selected as a potential jurisdiction to trade a cum-ex strategy, including which jurisdictions (other than Denmark) were considered by Solo and why.

549.4. My understanding of which jurisdictions (other than Denmark) Solo or Solo's clients traded cum-ex strategies in, and why I believed it was lawful in those jurisdictions.

## I.    FINANCIAL TRANSACTIONS

550. I am aware that SKAT relies on a very large number of financial transactions in its pleadings which are said to have been payments made or received by me, or my companies, including a number of loan agreements which it asserts are somehow "sham" agreements.

551. Where I have admitted the receipt/payment of a particular sum in my defences this is because I am satisfied that there is a bank statement or a custody statement showing that entry. Where I have not admitted a receipt/payment it is because either (a) my solicitors have been unable to locate the receipt/payment in the bank/custody statements, or (b) I am missing the relevant bank/custody statement. I do not however agree that I or my companies received any monies that they were not entitled to it. Nor do I agree that any receipts or payments were 'laundering the proceeds of crime' as SKAT seems to allege.

552. I am not in a position to provide any commentary on why certain payments were made and/or received for this witness statement.

553. I do however wish to emphasis a point which was set out in my defence at numerous

99

points. SKAT repeatedly confuses payments to/from Solo's clients (and in this sense I mean Solo's clients in the broad sense, not limited to clients or investors who traded on the GSS platform) with payments to/from Solo. Solo operated custodian accounts for its clients, including my companies (e.g., Elysium Global, Elysium Dubai and Ganymede).

554.   Solo's custodian accounts were an internal book entry system which I refer to as the "Custody Accounts". I will refer to the internal records maintained by Solo for this system as the "Custody Statements" which were then sent to the clients who held Custody Accounts. My understanding is that Solo was required by the FCA to maintain a daily breakdown of the cash position for each client.

555.   Solo operated its own bank accounts which were held in the name of Solo. It did not open individual bank accounts for each client. The aggregated client monies held by Solo were held in a segregated client account at Barclays bank. The system used by Solo is similar to how I understand a solicitors' firm holds client monies in its client account.

556.   Therefore, any payments in/out of the bank accounts on behalf of Solo's clients will not be visible from the bank statements – you need to check the internal Custody Statements to see which client (or clients) the payments in/out were booked against. In many instances there were movements of monies between different Custody Accounts, including many movements that I asked Solo to do on behalf of my companies, which would not be visible on the bank statements at all. Any payment from a Custody Account held by me/my companies would have been initiated by an email from me or my staff that was sent to the staff at Solo who dealt with the custody accounts, so there will be an email trail for all payment instructions.

557.   So, when SKAT repeatedly says "Solo received" or "Solo paid" that is usually incorrect. Most (if not all) of the transactions SKAT appears to be concerned with are payments to/from Solo's clients.

## J.    COMMENTS ON DEFENCE

### (A)    *Introductory remarks*

558.   Given my current situation as described at the start of this statement, it is not possible for me to set out here my detailed responses to allegations against me, or to engage with the

list of issues which I have not seen for a few years and have been told were recently updated. The documents are very long, and I would need to be able to read them in full and refresh my memory of the emails, messages and documents to provide a detailed commentary.

559. However, I have attempted to understand and provide comments on paragraph 8 to 8Q of Schedule 5B to the Particulars of Claim, which I understand are some of the most important allegations against me personally in which SKAT alleges that I acted dishonestly or conspired against SKAT.

560. Before doing so I wish to comment on the allegations that I and my companies have been dishonest. As I had no contact with anyone at SKAT during the relevant time, with only a few exceptions SKAT does not seem to be alleging that I had any particular conversations or did anything in particular beyond sending emails or signing documents on any given particular date. But they are trying to use circumstantial evidence to paint a picture that is wrong. It seems to me that this case is less about what happened than about why various things happened.

561. SKAT took control of a massive number of documents from me via a search and seize order executed against Elysium Dubai in the DIFC in 2018, and it has had control of those documents for over five years. I believe that the documents demonstrate that I was not engaged in a massive conspiracy to defraud SKAT.

562. I understand from my solicitors that about 2.5 million documents have been disclosed and made available for inspection by SKAT and the defendants in this claim. Because I have been in prison since May 2022 very few of these documents have been brought to my attention. I simply have no way of reminding myself of what was said by me in the period 2012 to 2015 or to find a document which I think shows SKAT's view is wrong.

563. In reality, I was running a number of large and fast-growing businesses, of which the Danish GSS trades were one part (albeit the most profitable). I employed a wide range of people over this period and met hundreds of people who are now said by SKAT to be implicated in some way with this claim. I believe I was correct to be concerned about sharing information with external people who may be potential competitors. I wanted to

101

protect my business and I valued people who I considered could be trusted with Solo's intellectual property. I did not and do not see anything wrong with that – to me it makes perfect business sense.

564. I believe the documents show that I am (or at least, I was) a hardworking and highly successful entrepreneur who took care to employ appropriately qualified people so that the businesses were successful and that the compliance and legal issues were properly dealt with. I hired people into roles who already had several years of experience in that role, and in many cases, they were people who I considered to be at the 'top of their game'. But this did not mean that I (or the management after I left) simply left employees to get on with their jobs without supervision or oversight. Solo had proper systems in place to ensure that there was internal self-regulation in addition to all the external regulation that goes with a company operating in the highly regulated banking sector.

565. I shall now address what I have been informed are each of the subheadings within the main conspiracy section of Schedule 5B. I am aware that some of this section was added by SKAT in the amendments to the Particulars of Claim after I was imprisoned in May 2022, so it is not the case that I have had access to any documents when my solicitors prepared my unsigned amended defence or this witness statement. I have not seen many of the documents which SKAT appears to be referring to for many years.

### (B) _Creation and implementation of the Solo Model_

566. As I have described above, what has become known in this case as the Solo Model was developed as a joint effort by the structurers who were for the most part profit sharing employees at Solo, principally Raj, Graham, Priyan and Gerry. The trades were not fictitious or shams. SKAT's complaint that they netted off against each other and so involved no external movements of cash or shares misses the point. The trades only happened because they were designed to work without these external movements, and I learned that they could work in this way.

567. I didn't believe at any time that this system was in any way illegitimate. This is exactly what CACEIS had shown to us in 2011 and took place in a market where lots of other banks and hedge funds were engaged in the same activity. Solo, all of the banks and

many of our clients had compliance teams and sought legal advice.

568.  I believed the trading structures were lawful and I acted honestly. I frequently hired people who were very experienced in the structured products market or elsewhere in the banking industry (e.g., compliance, legal), and who came from very well-established banks/companies with impressive track records. One example is Anne Stratford, who had been a lawyer at Slaughter & May, and then a director of two large companies. At no time did I think that there was a risk that one of these senior employees would come in and think there was something fundamentally wrong with the Solo business model.

569.  In fact, the opposite was the case. I remember that Priyan and Gerry wanted to get updated opinions from Hannes Snellman from time to time so that we remained satisfied that Danish law hadn't changed, and the clients could still make valid tax refund applications. I also recalled that Anne instructed a law firm (or firms) to give her a legal opinion which was independent to the ones already obtained by Solo/Elysium Dubai.

570.  This also explains why all share transactions were properly reported to the London Stock Exchange and accounted for in Solo's client accounts. We had nothing to hide. Similarly, a lot of work was put into recording movements between the client accounts. If we were involved in a fraud, we wouldn't have bothered with these processes.

571.  The capital adequacy of the firm was overseen by Jas Bains. Again, he had a strong legal background, and I was satisfied he was carrying out his job properly. I believed (and still believe) that he did so.

572.  The FCA had suggested that due to the size of the company in terms of the number of employees and business areas, Solo required a CEO or general manager who was based in London on a full-time basis, and able to manage the office. Up to that point, I had been managing the business remotely from Dubai with monthly visits to London.

573.  As set out at paragraph 317, I did not want to move back to the UK to manage the London office. At that time, I had bigger plans than to just to grow Solo, including an ambition to operate a bank in the UK or somewhere else in Europe. My reasons for not moving to the UK are (i) not wanting to resettle my family, (ii) having to restart my youngest son's autism care from scratch, (iii) the cold weather in London not being good for my arthritis

103

and (iv) income tax reasons.

574. In January 2014 I formally stepped down as CEO and Anne was appointed as the CEO. I also stepped down from all the control functions I held with the FCA. My role as a shareholder was to make sure that Anne did her job properly. January 2014 was a handover period, so by February/March 2014 she ran Solo completely independently and without my involvement.

575. At the beginning I talked to Anne daily on Skype or by telephone, so I was able to bring her up to speed in understanding all aspects of the business. Those calls acted as Q&A sessions and provided an opportunity for both of us to ask and answer questions. This was an opportunity for Anne to learn more about the business areas and to raise any concerns or queries that she had. I would say that the daily calls lasted for a period of 3 or 4 months, and that afterwards the frequency reduced to maybe weekly or monthly calls. Even after this period, there was always a direct line of communication between Anne and me. If Anne had any issues, she would have no problem contacting me directly to discuss them.

576. As part of the handover Anne got a detailed introduction and explanation of the dividend business and the clients, including the USPPs and Labuan companies. She had full oversight of the GSS business.

577. Her role was to make sure that clients were on-boarded correctly and so on. As the CEO she would have been involved in meetings with the managers of the GSS business and she would have been aware of who the employees were and what their jobs were. I do not think that she would have become involved in the detail of the transactions and the IT systems (TAS, Octave and Brokermesh). Anne would however have been ultimately responsible for the production of clearing account statements, records for clients of GSS and clearing account dividend credit advice records.

578. I was pleased with Anne's work, and she stayed at Solo until the business shut down at the end of 2015. Anne dismissed more or less everybody that I had hired and replaced them with her own hires. This was a surprise to me, but I thought it was good because she showed independence. Priyan, Gerry and Mark were among the people Anne made

redundant and/or negotiated their exit.

579. Omar Arti was in charge of the GSS business in 2014 and he left in 2015.

580. After I left, I was in regular touch with Anne and other staff members to make sure there were no problems and that she did her job properly. In addition to my daily calls with Anne, I also visited the London office once or twice a month. During those visits I had informal discussions with senior members of staff to find out if they were happy with the way Anne managed the business.

581. I did not give instructions to the staff within GSS or other staff at Solo about their work, but I could contact staff directly if I wanted to, and staff occasionally contacted me. I was aware that under FCA regulations I should not be acting as a supervisor or manager of any staff, so I refrained from doing so.

**(C)** *Comments on paragraphs 8B to 8O of the Particulars of Claim*

582. I am told that paragraph 8B(b) focuses on my relationship with Mark Patterson. I had known Mark for many years and respected him. I did not ask Mark to manage or do anything unlawful. I asked him to work as a structurer, and he was given the same treatment as any other employee. I owed a duty to the FCA to ensure that employees were conducting themselves in accordance with the relevant regulation and no employee was given any special privilege or protection. I took that obligation seriously as my plan was for Solo was to grow into a much bigger business and eventually list it or merge it with a larger business.

583. During the entire life of Solo, there were regular interactions with the FCA and at no time did the FCA ever initiate any form of disciplinary or regulatory action against the Solo or any of the regulated employees within the companies or its group companies.

584. I am told that paragraph 8B(c) refers to Octave and Brokermesh. I have discussed this software at the sections titled *GSS software.* It is important to note that Octave still produced the same number of emails that were produced manually before Octave was used. Octave generated the email orders, for example, from the buyers to the brokers. Brokermesh, likewise generated email confirmations back to the buyers and sellers of shares. So, there was no reduction in the communications or therefore the audit trail.

105

585. A key purpose of automating the systems was to eliminate any manual or human errors. The introduction of software to automate processes within a bank was in line with my understanding of how trading activities at banks worked. At any bank, if there is a manual process, there is always a preference to try and find an automated solution to speed up the process, and to eliminate human error. I wasn't doing anything that I hadn't learnt banks had done before.

586. Whilst I agree that the whole purpose of the software was to automate the processes, which I recall was my idea in the first place, I left it to the developers to put this into practice. I am not a software developer and cannot explain precisely what they did, but the system worked. Its purpose was to streamline and modernise Solo's business functions, as well as to create a product that could be packaged as a fintech company and licensed to third parties.

587. I do not accept that the software is evidence of any dishonesty on my part or at all. It shows that I was looking to resolve problems with Solo's systems and where possible, to obtain new business opportunities. I did not know any of the software team beforehand, but I was perfectly happy for them to understand what Solo was doing and that it needed to do that more efficiently because I had nothing to hide.

588. I am told that paragraph 8B(d) refers to the change from futures contracts to forwards contracts in the evolution of the trades. This came about because of the decisions by JPM and SEB to exit their relationships with Solo as a client. I have explained these above, I believe the principal reasons were that JPM considered Solo to be too small, and SEB realised that their dividend arbitrage team was in competition with us (i.e., they were doing cum-ex trading themselves).

589. In the fullness of time my intention was to have the relevant exchange memberships for Solo to self-clear future trades and/or to acquire an already established clearing business, rather than being required to rely on an external clearer. The main reasons for that were that it would represent a cost saving, both for Solo and for Solo's clients. My recollection is that during the relationship with JPM, JPM earned more than £2 million in fees from the GSS business.

106

590.    In 2015, I approached Adrian Heuermann of PwC in Zurich. Adrian had assisted in the acquisition of the shares in both Dero Bank and Varengold. I asked Adrian to approach ABN AMRO to see whether they would be interested in selling their clearing business which was a separate legal entity called ABN Clearing. The idea was that, as well as, or instead of obtaining memberships for Solo, a quicker route was to acquire the existing ABN clearing business.

591.    I recall that ABN responded positively, and brief discussions took place about the cost of acquisition. At the time, ABN indicated that they would be seeking circa €400m. I do remember that we reached the stage in negotiations where we had asked to provide evidence of our financial standing. Whilst this process was underway, the SKAT investigation started which brought an abrupt end to the negotiations.

592.    The switch in the trade structure to forward came about because of an idea by Priyan and Gerry. It resolved the market access problem and was not designed to keep the trades secret. However, it is true that I was attracted to the idea partly because it struck me as a sensible development of the trade structure that would mean lower costs to Solo and to Solo's clients.

593.    I trusted Priyan and Gerry to obtain a refreshed legal opinion that the new structure would not affect the success of the trade and understood they had done so. I am told now that they had a short email exchange with Hannes Snellman who seemed to think the switch to forwards did not change Hannes Snellman's tax analysis.

594.    I am told that paragraph 8B(e)(f) relates to the acquisition of Novus Capital Markets, FGC Elysium LLC, Syntax, Varengold and Dero.

595.    When I became aware in 2015 that Mike Murphy was considering selling his shareholding in Novus Capital, I thought that it would be a useful opportunity to acquire a brokerage that could provide additional business streams and revenue for Solo. I wasn't interested in acquiring its Danish business, as this was already being run through Solo.

596.    FGC Elysium LLC was a company incorporated by my team to act as a holding company for FGC Securities if we were successful in acquiring it.  FGC Securities is a brokerage that had been founded by John Foley and Dmitri Liristis, two brokers I had previously

107

worked with at Rabobank.

597. FGC Securities was known to me because it was involved in the Danish trades, but I wasn't interested in acquiring it for that purpose. Rather, I thought that Mr Foley and Mr Liristis were interesting and promising entrepreneurs who I thought would come up with a number of profitable business ideas. I wanted to buy the company largely because I wanted to invest in them personally to give them the freedom to come up with new trades. This acquisition would also have allowed me to have an office location in New York which at the time I felt was a natural progression for Solo as an ambitious financial group. Ultimately this acquisition didn't happen because during the price negotiations this investigation started so the conversation stopped.

598. Anne Stratford was involved and oversaw both the purchase of Novus and the negotiations for the purchase of FGC.

599. As to Varengold and Dero, I bought these banks because, as I set out above, my ultimate goal from the outset had been to create a new investment bank rather than to conduct trades with pre-existing investment banks.

600. As I started to develop this idea further, I realised that it was very time consuming to apply for a banking licence for a start-up. I was informed that it takes no less than 18 months from the time of application but that a quicker route was to acquire a bank. I therefore asked the staff at Elysium Dubai to appoint PwC to review a number of potential target banks. That exercise resulted in them introducing me to Varengold and Dero.

601. Whilst SKAT has now placed a lot of focus in this claim as to how those purchases were funded and the reason behind my interest in them, the position is really quite simple. My eventual goal was to secure full control of the banks, but I was advised at the time that this required additional regulatory permissions from the European Central Bank and BaFin. Because of this, we put together a structure that was designed to satisfy the regulatory requirements rather than sidestep them. As I hope is obvious from everything I did at that time, my aim was always to employ and encourage really intelligent and talented people, and to motivate them to do well for themselves which meant bigger

108

profits for me.

602.  This was my approach with the banks also. Once it became clear that I couldn't purchase a controlling stake in the banks, I had no difficulties in granting loans to a group of people I had known for a long time who I wanted to lock into my business plans generally. We did not have the permissions to vote at shareholders meetings from BaFin by the time the investigations started. I would have also listened to the views of the other members of the consortium, in many cases they were smarter than me. The whole purpose behind having these people involved was that everyone could benefit from everyone else's experiences and ideas.

603.  I am aware that SKAT is also alleging that the purpose of buying shares in the banks and having accounts at Varengold was to 'launder the proceeds of crime'. I disagree. I was not dealing with the proceeds of crime. The reasons why I recommended clients and business partners to open accounts at Varengold was to increase its profitability. It's important to note that I was not involved in the in the workings of Varengold. I was never on the managing board and therefore I had no involvement in managing staff or running the business which is normal for a bank. The shareholders of a bank don't interfere in the running of the bank, the running of the bank is done by the managing board, and I had no influence over the staff at the banks. It is also important to note that Dero and Varengold bank are in Germany and therefore all the communication internally and externally is done in the German language. I do not speak, read, write or understand German. The reason why Dero Bank didn't take any deposits is because they were not a deposit taking bank. They didn't have the right systems or permissions to do that at the time.

604.  If I had wanted to 'launder' money, I would not do it in a highly regulated jurisdiction like Europe. Nor would I do it with a bank (or company for that matter) that I was associated with. I would not want to put these banks at risk of being shut down by regulators and therefore lose my investment. As far as I am aware, all transfers through Varengold by persons I knew were done in the name of the account holders and not nominees or other third parties. This was certainly the case for me personally and the companies I controlled.

109

605. I am told that paragraph 8B(g) alleges that additional intermediary brokers were added to create unnecessary complexity to the trading structure. I disagree. Solo made money from its clients. The more clients it had, including the more intermediary brokers, the better its revenue overall.

606. The addition of intermediary brokers came about at the suggestion of Priyan and Gerry. They wanted to comply with the relevant legal tests and told me that the trading model would be more robust if the various counterparties had a greater degree of separation from each other. I didn't have any objections to this proposal, and it seemed to me also to provide further opportunities to sign up new clients and make the trade more profitable. As such, I was happy to approve their suggestion and I didn't question them further on what relevant legal tests they were referring to.

607. Looking back, I don't recall exactly the conversations the three of us had on the issue, but I think that it would have been a fairly short conversation and that I would have simply assumed that they were trying to get the Solo trades to more closely resemble the models in use at Barclays and Deutsche banks.

### (D) _Making the WHT Application Representations and CAN Custodian Representations pursuant to the Solo WHT Scheme_

608. I am told that paragraph 8C concerns the representations which I have been informed are now at the heart of this claim. The underlying forms do not use the same words that are set out in the Particulars of Claim. Whilst I have been informed by my solicitors that the objective meaning of the words in SKAT's form 06.003 and the Credit Advice Notes (**"CANs"**) is a matter for legal submissions, I understand that it is important for me to set out my understanding of the words in the CANs and SKAT's form 06.003 at the time.

609. In order to do so with as much accuracy as possible, I would like to be able to refresh my memory by looking at the various communications between me and my team at the time the trade was set up and the first applications were submitted. I am currently unable to do so, and as such these preliminary comments are necessarily limited in their detail.

610. The CANs were produced in the GSS system. The CANs were statements to the clients showing their shareholding and the credit of the net dividend to the client's custody

110

account. The documents were templates that could be filled out. We wanted to make sure that the CAN had all the information that it was expected to have. The staff who then became the GSS team once it was formed, reached out to their contacts at custodians and tax reclaim agents and received sample credit advice notes which we used as a guide to produce our own CAN. Once GSS had started issuing CANs, I do not recall any questions being asked (whether by clients or external persons) about the level of detail in them and nobody suggested something was missing or that something needed to be removed.

611.    In the beginning the documents were created manually and hand signed by me, Jas Bains and others from Solo's management who had been authorised to sign them. As the software systems developed my signature was scanned, and the system could then produce the signature automatically. It was, however, still a valid signature. My recollection is that after Anne was appointed, I still retained authorised signatory status for the purpose of adding my signature to the CANs. The signature meant that the document was authorised by Solo.

612.    I never sought to hide the fact that the system netted out internally, and the CANs did not suggest that there was some direct payment from a particular Danish company to the client.

613.    During the relevant period, I did not know that it was necessary for the CANs to be submitted to SKAT for the tax refund or that the CANs were being submitted to SKAT, but I was aware that the information (shareholding, receipt of dividends to the client's custody account) was being used by the clients as part of the clients' applications for tax refunds. I do not recall ever having a discussion with any of the clients or the reclaim agents about what documents were actually submitted to SKAT – I wasn't involved in any of that.

614.    I would however have expected to have been made aware if there was a problem or concern at any point by any person (i.e., the tax agency, the client, GSS staff or the reclaim agents). I would regard this as 'reporting by exception'. So, I would not be told if everything was working well but I would have been told if there were problems. I do not ever recall hearing about any issues or problems with the CANs.

111

615. As to SKAT's form 06.003, I cannot recall ever having seen a copy of that document until after the trading came to an end and I looked at the form in the context of dealing with SKAT's investigation. Again, I did not address my mind to what exactly was being communicated to SKAT by the clients. But I believed that Solo was not hiding anything and that the clients were filling in the forms properly, and money was being paid out because the structurers and the external legal advisers had done their jobs properly.

616. During the period the trade was going on, I thought the system was working as it should, and that the applications were being granted because they were valid, and the clients were entitled to the reclaims.

### (E)   *Solo WHT Applicants based in the United States of America*

617. I am told that paragraph 8E refers to advice obtained from Gavin McCloskey about establishing a US Pension. I recall getting in contact with him at the start of 2012 for the purpose of obtaining some basic information. We had previously used Gavin for the purpose of creating an occupational pension scheme for the Solo team in the UK, so it was natural to approach him about this issue.

618. There was nothing wrong or dishonest about the communications. I asked him for some basic input and referred him to one of the structurers to provide more detailed information about what we were looking for and why. If I wanted to commit fraud, then I don't think I would have wasted my time contacting a pension specialist.

619. I am told that paragraph 8F relates to Richard Markowitz. I recall being introduced to Richard in 2010, and realising immediately that he was a very experienced and sophisticated investor. I am aware that Richard is now a defendant in SKAT's US proceedings, and that he has given detailed evidence in a deposition. Given that he has put forward detailed evidence on the point, I would like to be able to review that evidence and some of the underlying documents before clarifying whether or not I agree with his version of events.

620. However, on the basic point about my involvement with Richard, I wish to make it clear that it was obvious to me at the time that he was looking in detail at the proposed trade structures and investigating me/Solo. If I had thought I was putting together a bad trade,

112

I would have steered clear of Richard. But I was aware at the time that he investigated the trade and that he agreed it worked. If anything, I took comfort from securing a client such as Richard because I trusted that his independent research and due diligence had reached the same conclusion as ours.

621. I am told that paragraph 8G concerns Roger Lehman. I remember coming across Roger Lehman when he was working at a reclaim agent called GlobeTax. In our discussions about whether GlobeTax might look after the administrative side of making applications, it became obvious to me Roger knew a lot about the dividend arbitrage industry and Solo's competitors. I thought that he showed real promise and ambition too. As such, I offered him a job. But we couldn't agree terms because Roger wanted to remain in the USA and at that time, I had no interest in opening a US office which would have involved obtaining lots of new regulatory permissions.

622. I recall suggesting that he might want to join FGC Securities and assume that it was quite an effort for him to do so because he needed to study and pass various exams to become an authorised broker. My recollection is that he passed his exams and joined FGC Securities.

623. Sometime later I suggested to Roger that he might want to become a client and establish his own USPPs. I recall that he looked at the trade structures in detail, and obtained independent legal advice from Skadden, Arps, Slade, Meagher & Flom LLP, a large US law firm. I did not see the advice, but I am sure that Roger would have let me know if Skadden had spotted any issues with the trade.

624. I am told that paragraph 8G also mentions friends of Roger's brother. I don't understand this reference as I didn't meet Roger's brother until much later, and I don't know which friends SKAT is talking about.

625. I am told that paragraph 8H alleges that I conspired with Michael Murphy, Daniel Fletcher and John Devonshire. This is wrong. Solo's connections with these individuals came about for the simple reason that the Danish trade required USPPs to be clients. Because we were a small UK firm, it was obvious that we were not going to attract many large institutional pension plans, and so we needed to go about finding clients through a

113

different route. The advice we received did not mention or suggest that there was any minimum size or capitalisation needed on these plans, so we looked to sophisticated traders based in the USA who might already have plans that they wanted to trade through or might be interested in opening new plans.

626. This idea was what prompted me to get in contact with Mike Murphy. I had known him for a long time and thought that he might want to be onboarded as a client and may be able to introduce me to other traders based in the USA. This led to a series of conversations with Mike, Daniel and John about helping Solo find more clients. I am fairly confident that I would have explained that Solo was regulated by the FCA and provided them with a basic outline of the GSS trading model and the fact that Solo's clients had successfully received reclaims from the relevant tax authorities. I would then have referred them to one of the structurers in the GSS team if they had more detailed questions.

627. I am told that paragraph 8H references a specific meeting on 30 July 2013. I would need to look at the emails and documents of that time to refresh my memory and provide a detailed account of what happened at that meeting. My basic memory is that we offered a financial incentive to them which was essentially a profit-sharing agreement in a sum that was agreeable to both parties.

628. I am told that paragraph 8I contains allegations about my dealings with Jonathan Godson. Again, the basic reason why I got in touch with Jonathan was because Solo needed USPPs as clients to do the trade, and we needed to be entrepreneurial in our approach rather than focus on large institutional plans. I had met Jonathan through John Foley. John and I had worked together at Rabobank. John was now a partner with Jonathan in FGC Securities.

629. I recall that when I first met Jonathan, he was in the process of leaving FGC Securities and I think he was looking for new opportunities. I mentioned the GSS trades to him and our ongoing efforts to sign up either new or established USPPs as clients to carry out the trades. I would have explained that Solo was regulated by the FCA and has all the relevant permissions. Jonathan had some knowledge of dividend arbitrage trading generally, and understood they needed to conform to a particular structure, but I don't

114

think he had previously come across trades involving Danish companies.

630. Over the course of a few conversations with Jonathan, I explained Solo's work for other clients, the basic outline of the trade, that they were being successfully processed by the tax agency, and explained where Jonathan might be able to add value – i.e., to help Solo expand its network of clients. We agreed that he would be paid introduction fees in a sum that was agreeable to the both of us and would reflect the value of his introductions to Solo.

631. I do not have any interest, whether directly or indirectly, in the management or ownership of any of the USPPs. I assume that they took their own independent legal advice before buying Danish shares.

632. When Solo transformed from being an investment management company to be a clearer and custodian, we looked at different opportunities. One opportunity was for USPPs to become clients and trade in certain markets including Denmark.

633. I have referred to my relationship with Richard Markowitz and Argre developed at paragraphs 268 to 269 and 619 to 620 above. Argre had around a dozen pension plans, and Solo offered it the opportunity to trade in Danish shares, as well as other markets. As time went on Argre added more pension plans. Other clients also joined.

634. My understanding was that the majority of the pension plans were 401(k)'s. It was however obviously the responsibility of the USPPs to ensure that the plans complied with any US laws regarding 401(k)'s.

635. I did not have any involvement in the setting up or the incorporation of the USPPs, nor, to the best of my understanding did any of the staff at Solo or my other companies. None of the costs associated with the setting up of the USPPs was paid for by me, Solo, Ganymede or any of my other companies – this was all handled by the clients themselves.

636. I was not personally involved in the onboarding of USPPs at Solo. There was a team at Solo who I refer to as the client liaison team (see paragraph 254 above), that dealt with the due diligence and documents required from the USPPs for Solo's onboarding process. The client liaison team had the initial contact with the USPPs and was responsible for receiving the necessary documents which were then passed on to the compliance

115

department.

637. I did not instruct the USPPs on how to trade, nor, to the best of my understanding did any of the staff at Solo or my other companies. The clients were, for the most part, experienced traders. If they were not experienced traders, it was up to them to obtain the assistance they needed. The Solo staff were instructed not to educate the USPPs, but there were several others, for example brokers, who were able to give the USPPs the information and assistance they needed.

638. Cum-ex trading had to be carried out on specific dates, but this market had been around for several years, so I believe that it was easy for the clients to find the necessary information without the help of Solo. Solo did not instruct the clients about which dates to trade, or which shares to trade. As regards the shares to be traded it was just common sense – Danish companies who were paying a dividend.

639. Solo owed no liability to the USPPs if any applications for refunds were unsuccessful. The clients had not been promised risk-free trades, but the trading strategy was made so that the clients did not make any losses other than the small fees that they were obliged to pay to the brokers and to Solo.

## (F) *Solo WHT Applicants based in Malaysia*

640. In the summer of 2013 Priyan and Gerry hired Darren Lui. Darren suggested that Solo could start providing services to companies in Labuan. Darren told us (me, Priyan and Gerry) that Barclays SCM had Labuan companies as clients who were trading Danish shares over dividend dates. In Malaysia there was an exchange control but companies incorporated in Labuan were exempted from this control because it was a free trade zone. Solo staff in London asked Hannes Snellman to add Labuan companies to the legal opinion.

641. Also, in 2013 I asked some business associates working at IP Global in Hong Kong if they did any business in Labuan. After they confirmed that they did, I offered them the opportunity to trade Danish shares. I remember telling them to get their own legal opinion. I also remember being told that they had obtained an opinion from a large and reputable law firm called Clifford Chance. I did not see the legal opinion, but I was told

116

that this provided them with positive advice that the trading gave rise to valid reclaims.

642.  I am told that paragraph 8K refers to my dealings with Mankash Jain, Michael Smyth and Michael Turner. I am going to refer to Mankash, Michael Smyth and Michael Turner as the "Ex-Solo Employees Group". They were employees of Solo albeit not part of the GSS business who were made redundant because they did not make money for Solo.

643.  I think that I had conversations with each of the three of them which effectively kicked off the redundancy process, but those conversations ended up being wider discussions about new opportunities. By this time we were looking to sign up companies registered in Labuan to carry out the Danish trades using a different treaty, and it looked to be sensible to adopt a similar strategy for that country as we had carried out in the US (i.e. to develop contacts who wanted to open companies which complied with all the relevant local rules rather than go to big institutional firms already established out there).

644.  Darren, Jas and Priyan had already given me some information about Labuan companies and had explained to me what they had done when they were at Barclays SCM. I passed this onto Mankash, Michael Smyth and Michael Turner, and suggested that they speak to Priyan and Gerry to find out more about the opportunity.

645.  I only introduced them to the trade because I understood from the structurers and believed that the structure was lawful and legitimate.

646.  Paragraph 8L relates to Paul Preston, Tim Murphy and Garry Hope who I will refer to collectively as the "Hong Kong Group". When I moved to Dubai I needed to purchase medical insurance. I did so through a broker, Acuma. I do not recall how I came to know about Acuma, but I may have simply found it via the internet or a referral by word of mouth. Acuma also provided independent financial advice to its clients. I do not now exactly recall the dates, but I remember that at around the time I was liaising with Acuma to get insurance, it was acquired by Tim. I should add that both Tim and Mike Murphy told me that they were not related to each other.

647.  Tim then came and met me, and we started chatting a bit more about my business interests. I think I must have told him that I was interested in acquiring some real estate assets in various jurisdictions. Tim also told me about his wider business interests,

117

including a broking company called IP Global Limited. IP Global is (or at least it was at that time) a broker and investment manager in the property sector. Tim had founded this company. He then introduced me to his head of sales, Paul Preston.

648.    Paul then sourced a number of properties for me to consider purchasing. The ones I recall in particular and went on to purchase (either personally or via one of my companies) were (i) some flats in Covent Garden and Lovat Lane in London, (ii) an investment in a development opportunity in Battersea, London, (ii) some apartments in Japan, and (ii) some apartments in Hong Kong.

649.    At some point I recall telling Tim a bit more about Solo's expansion into Malaysia, and that we were interested in signing up either new or established Labuan companies. Given IP Global's work in Asia, I thought that his firm might have some useful contacts. Tim told me that IP Global was already an investment manager of some companies in Labuan and that his firm was familiar with the jurisdiction. Tim suggested that Paul might be willing to establish Labuan companies and move into this line of business.

650.    I then had a preliminary discussion with Paul about dividend arbitrage trading and what we were looking for. I do not recall exactly who was present at the first meeting, but I am told by my solicitors that Paul's defence suggests that Paul, Tim and Garry Hope were all part of the early discussions. They may well be right on this point.

651.    I understood that Garry had previously spent time working in the financial services sector in London at a company called ICAP. My recollection was that Paul and Tim had no real understanding of financial trading and only very superficial knowledge of equity markets because they worked in the property sector. I made it clear to them that, if they did set up a company in Labuan, they would need to hire an experienced trader, and they would need to take their own legal advice on the structures. I explained it was quite complicated and they needed to be sure that whatever companies they established met the relevant legal tests in the treaties. I do not now remember any of the names of the companies then went to onboard with Solo.

652.    The evidence I have given at paragraphs 635 to 639 above relating to my involvement in the setting up of the USPPs their onboarding with Solo and trading etc, applies equally

118

to my involvement (or rather lack of involvement) with the Labuan companies.

653. I was aware that the Ex-Solo Employees Group and Hong Kong Group had office space in the same building, along with Rebecca Robson (who I talk about below).

654. I am told that paragraph 8L also refers to Rebecca Robson and Nial O'Carroll.

655. As to Rebecca: in the beginning of 2014 she left her job at Solo in the brokerage team because she moved to Singapore. I think that what then happened was that the Hong Kong Group were recruiting a trader because they didn't have much experience, and they talked to the Ex-Solo Employees Group who introduced them to Rebecca.

656. Whilst Rebecca was at Solo, she was not involved in GSS business or dividend trading.

657. I knew that the Labuan companies set up by Hong Kong Group then employed Rebecca to trade for them. As far as I recall it was a condition that the trades were physically present in Labuan for the companies to qualify for the benefits of the treaty. I didn't encourage or instruct Rebecca to go to Labuan to assist clients. As stated at paragraph 655, it is more likely that one of Ex-Solo Employees Group, who knew Rebecca from the London office had suggested it to her.

658. I have been informed by my solicitors that Niall O'Carroll later replaced Rebecca as a trader. I do not remember having ever heard of this name.

### (G)  *Acquisition of shares in Varengold Bank and Dero Bank*

659. As I have set out above, my ultimate business goal was to own a full-service investment bank. It was my intention that Solo would apply for a banking license in the UK. A bank licence was something that I coveted because the availability of relatively large amounts of cheap financing would enable growth for the prime brokerage business and also provide financing for my property portfolio.

660. Solo had previously considered whether it would be possible to apply for a banking license (for Solo), but we decided that it was easier/cheaper/quicker to acquire a company with an existing bank licence rather than apply for a new licence from the regulators.

661. In 2014 I decided to explore this issue further and engaged PwC to do some scoping

119

research on the issue. It quickly became apparent that I could achieve this investment aim by purchasing shares in an established entity rather than create a bank from scratch.

662. PwC identified a number of targets, and I remember that I sat down with Gerry, Edo, Darren Lui, and Mark Patterson to go through potential targets that PwC had identified in Germany, Liechtenstein and Austria, one of which was Varengold.

663. I was introduced to Dero Bank (which at the time was known as VEM Bank) by David Roffey who operated through Richmond Park Partners in London. This individual was the chairman of the supervisory board of Maple Bank in Germany. He had also previously invested in the Broadgate Irish Fund briefly referred to at paragraph 520 above. I recall that PwC and I believe Norton Rose were then involved in reviewing the data room provided by Dero Bank.

664. We decided to focus in on German banks because Germany operated a deposit protection scheme that operated by a network of cross-guarantees from each bank whereby all regulated banks guaranteed all depositors' cash up to a certain amount.

665. As I understand it, Germany has (or at least it did at the time) two levels of deposit protections: (1) the Government guarantees the first EUR 100,000 of any deposit, and (2) there is a private self-regulatory association/body called GDPF, which provides a larger deposit guarantee to its members. GDPF is run by a group of banks (e.g., Goldman Sachs, Morgan Stanley and Deutsche bank), which provides banks (on an invitation only basis) with a EUR multi-million deposit guarantee.

666. I recall that the guarantee at Dero Bank was €9 million per account. This was a high level of protection which would make it easier for the bank to raise deposits.

667. We decided to target both banks: Dero due to its membership of the private deposit protection scheme, and Varengold because it was publicly listed and so shares could be acquired easily.

668. In terms of financing the acquisitions, I (and/or my companies) had the money to buy all the shares in both banks. However, I understood that my doing so would engage various regulatory rules which would be time consuming to resolve. Whilst SKAT now alleges that my solution to this issue was to engage in various artificial and sham transactions,

120

the real story is more straightforward: I wanted to work within the letter and spirit of the rules but without losing sight of the overall goal to acquire sole ownership of the banks.

669. As such, I decided to create 'investment clubs' with the participation of:

669.1. Priyan, Gerry, Edo, Darren Lui, Martin Smith, Mankash Jain, Mike Murphy, Daksha Bhudia, Mark Patterson, Paul Preston and me (the **"Varengold Investment Club"**); and

669.2. Priyan, Gerry, Edo, Darren Lui, Mankash, Mike Murphy, Mark Patterson, and me (the **"Dero Investment Club"**).

670. Each of these individuals (or their companies) would become full shareholders in their own right but would have a debt obligation to Elysium Dubai who facilitated the initial cash injection. In other words, I lent them money so that they could make the investment. I deny that there is anything unusual or suspicious about such an arrangement.

671. The investment club meant that I was also able to deepen my commercial connection with these individuals, and to minimise the risk that they would move to competitor firms or start their own spin off (i.e., competitor) hedge funds. Also, each of them brought ideas and knowledge to the bank. The loans were structured for a period of two to three years with an option to repay in shares as opposed to cash. I wanted this length of loan because I thought that, within two to three years, I would have made the necessary applications to BaFin (the German financial regulator) necessary to hold a larger ownership percentage in the banks and that I would have received the relevant permissions/licenses.

672. SKAT now argues that some of the underlying transactions funding these loans – the High/Low Trades – were illegitimate. I disagree, and I am told that SKAT has not stated how or why they were illegitimate structures beyond the use of the word "sham". In reality, I simply adopted a practice that I had seen used by other traders/banks when I was working at CS, ING and Rabobank. Trades were structured so that, at the initial transaction phase, one party would make a 'loss'. But this was counteracted by an option agreement requiring them to sell the shares at a future date. The transactions were equivalent to loans and were designed to be carried out off-exchange in a way that didn't cause any impact on the share price.

673. I remember that Priyan and myself (I cannot remember if Gerry was there) travelled to Hamburg to meet with the managing board of Varengold having informed them that the Varengold Investment Club were interested in collectively acquiring a controlling interest in the bank. I recall the Varengold board telling us that they would be willing to consider the sale of up to 10% of the bank's shares to the Varengold Investment Club. The conversation more or less ended there, and we told them we were not interested in acquiring a minority shareholding.

674. I think a few days or even a week or two later, one of the Varengold directors who lived in Dubai at the time contacted me. I met up with him in Dubai and he said that the Varengold board would be willing to sell a controlling shareholding in the bank. Varengold shares are traded on one of the stock exchanges in Germany, I think it's called the Frankfurt Stock Exchange. Therefore, being what is known as a listed company it is not possible to acquire 100% of the shares in that company unless the company is taken private because it would be virtually impossible to trace every last shareholding. I then discussed the proposal with Priyan and Gerry, and between the three of us we agreed that an offer should be made to acquire the controlling shareholding.

675. Collectively, we ended up buying 85% of the issued shares in Varengold Bank, and 100% of the shares in Dero Bank. The acquisitions happened at around the same time. I refer the court to the documents setting out the precise structuring of the transactions – I do not now recall the precise details of these.

676. The concept of owning two banks arose partly because I had the capital to do so and partly as a risk mitigation exercise. As shareholders, we would have limited formal influence on the managing board, and there was a risk that they might simply refuse to get into a business area with which they were not familiar. The idea was that if the managing board of one bank did not want to do a particular business then we would approach the other bank. We also had ambitious plans at that time and wanted to eventually invest in more banks in other jurisdictions. If we were going to own (ultimately) a multi-jurisdictional investment bank, the size of the German operations needed to be considerable.

677. There was no partnership or formal agreement for the Varengold or Dero Investment

122

Clubs to act together. Whilst we all had similar business interests there was no expectation or understanding that their involvement was merely to act as my nominee. That has never been my approach to business. I am far more comfortable engaging suitably experienced and key staff to be successful in their own right.

678. Each of the other investors in the clubs had relevant skills and experience that would add to the profitability of the banks, and I wanted them each to have a financial interest in its success.

679. Our work with Dero Bank was different, largely because Dero did not take deposits when we acquired it. It was my hope that Dero would later acquire the permissions for deposit taking but as a shareholder, I had no formal role in the management of that bank.

680. By the summer of 2015, the Varengold and Dero supervisory boards contained some members of the investment clubs. My understanding was that under German corporate law, a company (whether private or public) had a supervisory board and a managing board. The supervisory board has two roles: (i) to appoint the members of the managing board, and (ii) to set the salaries and compensations for the managing board. The managing board runs the business of the bank.

681. I think I was appointed to the supervisory board for both Varengold and Dero Bank. I also remember Mike Murphy was appointed to (at least) Varengold's supervisory board as well as Alex Körner. Alex Körner was not a member of the investment clubs but as a German speaker who has a significant amount of banking knowledge and experience, it was very helpful to have him assist with the representation of our interests on the supervisory board.

682. As far as I am aware, neither Varengold nor Dero Bank had any involvement with trading Danish shares.

683. When the investigations against me started in 2015, the other members of the supervisory board and the management board of Varengold did not want to be associated with me. To substantially dilute the value of the shareholding collectively owned by the Varengold Investment Club, Varengold issued more shares in 2017 and 2018 which were purchased by an investor from Bulgaria. I remember reading in the material disclosed period leading

123

up to the AGM in 2016 or 2017 that the Bulgarian investor funded the acquisition of the newly issued shares for two other directors using a loan mechanism. I cannot now recall much more than this without checking the material I think this was referred to in. Ultimately the result of the new investment was to massively dilute the shares held by the Varengold Investment Club to about 15%.

684. My goal was to own 100% of the shares in both banks, and I therefore wanted the participants of the investment clubs to ultimately transfer their shares to Elysium Dubai instead of paying him back the loans. I have always believed that this would then carry a 'marriage value' which would far exceed the value of the loan debt.

685. There was nothing in the process of acquiring the shares that was unusual, and it was not a secret to the authorities who had known about the purchases of the shares and about the loans.

### (H) *Agreements to reward participants in the Solo WHT Scheme*

686. I am told that paragraph 8O sets out a series of allegations that I entered into agreements to "reward" various individuals for being part of a conspiracy to defraud SKAT. This is completely wrong. As I have set out above, the Solo structure was entrepreneurial, and I wanted key employees to be financially motivated and to have an interest in its success. However, I was not interested in paying large salaries and bonuses to employees who were not bringing their own ideas to the business. The profit-sharing agreements I reached with key staff were always linked with them bringing in new ideas, not simply operating the GSS business. The Danish trading structure was principally linked to Raj (with I think some due diligence assistance from Jas Bains), and then developed further by Priyan and Gerry. When other staff ended up doing little more than managing ongoing systems and employees (such as Graham Horn) I made them redundant or otherwise encouraged them to leave.

687. Even the agreements with Raj, Priyan and Gerry were not directly linked to the Danish GSS trades. Rather, I offered them profit shares in the business as a whole. The group started off very small in 2010 and 2011 but within a couple of years became a large and growing group of companies with a wide range of operations across various business

streams. It is true that the GSS trades were the most profitable, but my focus was on diversifying the business – any and all profit-sharing arrangements were entered into on this basis.

688.  I will now comment briefly on each of the alleged profit-sharing arrangements.

689.  **Raj Shah:** I did not enter into a profit-sharing agreement with Raj relating to the Solo WHT Scheme. Along with Guenther, the three of us agreed to share the profits from all structured products trades that Solo carried out from time to time. Raj had knowledge of double taxation treaties from his work in fixed income and had connections to a good network of advisors. I wanted him to explore and investigate legitimate and potentially profitable structured dividend arbitrage trading opportunities.

690.  For example, I remember that we investigated the idea of a Malta/Spanish trading structure, whereby a Malta domiciled company would purchase and hold shares in a Spanish company and be subject to lower tax than a Spanish company. Raj investigated this idea, had informal conversations with Deloitte and Freshfields, and reviewed the double taxation treaty. He then took charge of obtaining formal legal opinions and tax opinions on the proposed structure, and incorporating companies needed to carry out the trading structure.

691.  **Graham Horn:** I did not enter into a profit-sharing agreement with Graham relating to the Solo WHT Scheme. He managed the London office before he moved to Dubai, and I essentially asked him to leave because he couldn't think up any profitable ideas of his own.

692.  **Anupe Dhorajiwala**: I did not enter into a profit-sharing agreement with Anupe relating to the Solo WHT Scheme. After Raj left Solo, I offered to give Anupe the deal that Raj had been on (i.e., profit-sharing agreement alongside me and Graham). This was linked to the group's activities as a whole. But after the relationship with JPM ended, Anupe wasn't really able to do anything that was profitable, and so he left.

693.  **Anne Stratford:** I did not enter into a profit-sharing agreement with Anne relating to the Solo WHT Scheme. She was the group CEO and I agreed to pay her salaries and bonuses linked to her performance generally.

125

694. I did personally loan her money, but this was as a general incentive for her continued loyalty and work within the group, and not linked to the Danish trades in particular. I did not want her to leave and join a competitor. I recall that the loan agreement contains a term that requires full repayment of the loan in the event that Anne left Solo and wasn't working for any of my other companies.

695. **Charles Knott:** I did not enter into a profit-sharing agreement with Charles relating to the Solo WHT Scheme. He had no involvement in the GSS business at all and I doubt I ever discussed this side of the business with him.

696. I also loaned money to Charles. The reason for this loan and the terms behind it are identical to those related to Anne at paragraph 694 above.

697. **James Hoogewerf ("Jim"):** I did not enter into a profit-sharing agreement with Jim relating to the Solo WHT Scheme. Jim was not involved in the Danish GSS trading. I initially wanted him to develop brokerage work within Solo, but after WestPoint had been purchased Jim moved into that team.

698. By 2013/14 it was clear that the brokerage work wasn't going to make much money and WestPoint was converted into a clearing business. Anne oversaw that process, which required various FCA permissions to be obtained. Jim's involvement with the Danish shares cleared by WestPoint arose really by accident.

699. I also loaned money to Jim. The reason for this loan and the terms behind it are identical to those related to Anne at paragraph 694 above.

700. **Mark Anthony Patterson:** I did not enter into a profit-sharing agreement with Mark relating to the Solo WHT Scheme. He was employed on a salary basis with discretionary bonuses. His bonuses were linked to the value I thought he was bringing to Solo (not to the Danish GSS business in isolation) and to ensure he was paid enough money to prevent him from leaving to join a competitor.

701. **Martin Smith:** I did not enter into a profit-sharing agreement with Martin relating to the Solo WHT Scheme. Like Mark Patterson, Martin was well known in the dividend arbitrage market. I had met Martin whilst I worked at CS. He was an inter-bank broker at that time. He also did stock lending work and was well-known within the community

126

of dividend arbitrage traders. When I became aware that he had fallen out with Mike Murphy I suggested that he might want to become a client of the GSS business. He was then paid consultancy fees to consider potential business opportunities. He was paid by Ganymede sums which reflected the value and knowledge he brought to the Solo group as a whole, and to retain his loyalty and therefore avoid information being divulged to competitors.

702. **Paul Oakley and Owen Mitchell:** I did not enter into profit-sharing agreements with Paul or Owen relating to the Solo WHT Scheme. I had known both of them for years and both were very familiar with dividend arbitrage trading. When GSS was operational, I invited Paul to become a client and to sell shares on the platform. Various fees were paid to them for their market insights, but there was no specific payment formula – it was based on the value that I considered they brought to the group as a whole and to retain their loyalty and therefore avoid information being divulged to competitors.

703. **Guenther Klar:** I did not enter into a profit-sharing agreement with Guenther relating to the Solo WHT Scheme. I initially employed him at Solo on a profit-sharing arrangement with Raj and me but that didn't work out. Once the GSS business was operational I reconnected with Guenther to seek his views on tax developments and business opportunities in potential markets. He was paid for this consultancy work, but there was no payment formula. As with others, he was paid based on the value I thought he brought to the group and to ensure he remain loyal to the business.

704. **Alexander Körner:** I did not enter into a profit-sharing agreement with Alexander relating to the Solo WHT Scheme. I met him when I was in the process of setting up Solo and he was working at Deka bank. Initially, I hoped that Solo could be one of Deka's brokers. Alexander subsequently approached me to see if Solo wanted to expand into Germany (we didn't) and then to become a client of the GSS business. He also provided some consultancy services, sharing information on dividend arbitrage market developments. It was also helpful that he was a German speaker and was therefore able to read a lot of the Varengold and Dero documents. As with others, he was paid based on the value I thought he brought to the group and to ensure he remain loyal to the business.

705. **Daksha Bhudia:** I did not enter into a profit-sharing agreement with Daksha relating to

127

the Solo WHT Scheme. She was a friend who had introduced me to a dividend arbitrage trader. She had a bit of knowledge about back-office banking functions but really the payments were out of friendship and loyalty. They were in no sense a reward linked to the GSS trades.

706. **Biyaja Swain:** I did not enter into a profit-sharing agreement with Biyaja Swain relating to the Solo WHT Scheme. I have no idea who this person is.

707. **Rajeev Dave:** I did not enter into a profit-sharing agreement with Rajeev relating to the Solo WHT Scheme. I met Rajeev through Anupe. I recall that Rajeev worked at a London-based hedge fund and then moved to Dubai. He had some good general knowledge of dividend arbitrage markets which he provided to me in exchange for a pretty modest payment. That dialogue was completely unrelated to the GSS business. He also helped provide knowledge and intel on investment management industry relating to hedge funds.

708. **Dai Griffiths:** I did not enter into a profit-sharing agreement with Dai relating to the Solo WHT Scheme. Dai had a good financial services background and good knowledge of dividend arbitrage trading. Once the GSS platform was up and running I approached him to see if he wanted to become a client. He subsequently provided me with some market intelligence and research for which I paid him a modest sum. There was no formula, and these payments were largely unrelated to the GSS business.

709. I am told that SKAT alleges at paragraph 8O(p) that I entered into all sorts of arrangements with other GSS clients, but it hasn't provided any details about these. I really don't know what SKAT is referring to but I deny that I rewarded anyone in any way illegitimately. The only profit-sharing agreements were with some very key staff involved in the early days at Solo. I think it is wrong for SKAT to make such a vague statement, which I can't fairly respond to.

*(I)* *Concealing the fraudulent nature of the Solo WHT Scheme*

710. I am told that paragraph 8P alleges, in essence, that the trade structures were designed and developed to conceal their fraudulent nature. This is not true. They were designed to meet the tests set out in the double tax treaties. As I have set out above, I wasn't involved

128

in the detailed development of the Danish trades, but instead discussed and explored the concepts before leaving matters to Raj/Graham (and then to Priyan/Gerry) to deal with the details and identify whether it worked. When different versions were recommended to me, I approved them.

711. From my perspective, the addition of brokers and more intermediaries came about for two reasons. First, I recall that Priyan and Gerry wanted to generate an additional degree of separation between the different market participants (not to conceal the true nature of the trades, but simply to meet the test and enable the structure to stand up to scrutiny). I was happy to follow their recommendation.

712. I agreed to do so partly because it didn't seem to have a downside, and partly because the additional intermediaries were good for Solo: each intermediary paid fees to Solo, and thus as the GSS business grew there were more clients paying more fees to Solo, enabling Solo to earn more profits.

713. As to the different custodians, it is wrong to say that they were established as clearing businesses to provide a false picture of separated companies. My intention was that they would be fully separated out from each other, both physically and in their operations (albeit with a shared back office but this did not happen as I set out at paragraphs 338 to 339. My motivation was not linked to any belief that the number of applications from any given custodian needed to be limited. I didn't think that any of them were doing anything wrong or unlawful.

714. I am told that paragraph 8P(c) contains a reference to a specific email dated 5 August 2013 [**SKEL00103619-0001**]. I addressed this at paragraph 381 above. I also addressed the email of February 2014 [**STRAT-0001251**] about which SKAT makes various allegations at paragraph 8P(d) at paragraph 391 above.

715. As to the email of October 2014 which I am told sits behind the allegation at paragraphs 8P(e), I do not recall this email and Meaby has been unable to locate it. As such, I will give my evidence on this point once I have seen the correspondence in question.

### (J)   *Concealing and/or laundering and/or distributing proceeds of Solo WHT Scheme*

716. I am told that SKAT's allegation at paragraph 8Q is simply that I made various payments.

I understand that the detail of those payments (or at least some of them) has been addressed in the defence. I do not understand how the fact of these payments are said to mean that I concealed money. It is obviously the case that, as my wealth grew, so did my expenditure including payments made to staff and consultants. I deny that the fact of these payments means that I was in any fraudulent or dishonest scheme: I was operating a number of successful and growing businesses.

717. During the years of being employed at various banks, I undertook training in money laundering detection. Based on my understanding I strongly disagree that I was doing anything which might lead to a suspicion of money laundering, for example, transferring money with no obvious purpose, I am very confident that given enough time and proper access to documents, I can explain the purpose behind the payments made by me and my companies.

718. Both Solo and Elysium Dubai employed an experienced team of accountants. Solo also had an experienced compliance department who would have monitored all payments relating to Solo. I am confident that my accountancy team in Dubai would have kept proper records to explain why payments were made by me/my companies.

719. Finally, I deny that I was part of any conspiracy intended to injure or cause financial loss to SKAT by unlawful means. There was no conspiracy. I did not make any representations to SKAT, far less the representations as alleged. I deny that I, or any other corporate entity within the Sanjay Shah Defendants is liable to SKAT as alleged or at all.

**CONFIRMATION OF COMPLIANCE AND STATEMENT OF TRUTH**

I understand that the purpose of this witness statement is to set out matters of fact of which I have personal knowledge.

I understand that it is not my function to argue the case, either generally or on particular points, or to take the court through the documents in the case.

This witness statement sets out only my personal knowledge and recollection, in my own words.

130

On points that I understand to be important in the case, I have stated honestly (a) how well I recall matters and (b) whether my memory has been refreshed by considering documents, if so how and when.

I have not been asked or encouraged by anyone to include in this statement anything that is not my own account, to the best of my ability and recollection, of events I witnessed or matters of which I have personal knowledge.

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

………………………………..

SANJAY SHAH

Dated: 19 January 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1.   I am the relevant legal representative within the meaning of Practice Direction 57AC.

2.   I am satisfied that the purpose and proper content of trial witness statements, and proper practice in relation to their preparation, including the witness confirmation required by paragraph 4.1 of Practice Direction 57AC, have been discussed with and explained to SANJAY SHAH.

131

132

3.  I believe this trial witness statement complies with Practice Direction 57AC and paragraphs 18.1 and 18.2 of Practice Direction 32, and that it has been prepared in accordance with the Statement of Best Practice contained in the Appendix to Practice Direction 57AC.

.......………………………………………….

Signed

Name: Christopher Martin Waters

Position: Partner

Date: 19 January 2024

## SCHEDULE 1

### LIST OF DOCUMENTS THE WITNESS HAS REFERRED TO OR BEEN REFERRED TO FOR THE PUPROSES OF PROVIDING THE EVIDENCE SET OUT IN THIS WITNESS STATEMENT

| No. | Document | Bates Number/Production | Exhibit Page Numbers |
|---|---|---|---|
| 1. | Index of Documents provided to Sanjay Shah | | SSMT1/1-5 |
| 2. | Interview of Sanjay Shah conducted by SOIK dated 17 December 2019 | SSHA00004415-001 | |
| 3. | Curriculum Vitae for Sanjay Shah (undated) | SKEL00161922-00001 | |
| 4. | Curriculum Vitae for Sanjay Shah (undated) | SKEL00045829-0001 | |
| 5. | Curriculum Vitae for Sanjay Shah (undated) | SKEL00803899-00001 | |
| 6. | Curriculum Vitae for Sanjay Shah dated 27 August 2015 | SKEL01109203-00001 | |
| 7. | Curriculum Vitae for Sanjay Shah (undated) | SKEL01126259-00001 | |
| 8. | Curriculum Vitae for Sanjay Shah dated 22 June 2016 | SKEL00148844-0001 | |
| 9. | Certificate of Incorporation for Solo Capital Partners LLP dated 13 September 2011 | DWF001380_0001 | |
| 10. | FCA register entry for Sanjay Shah | | SSMT1/6-10 |
| 11. | Contract of Employment for Michael Smyth (undated) (unsigned) | SKEL00155661-00001 | |
| 12. | Email from Sanjay Shah dated 5 April 2013 confirming Rajen Shah's last day of employment | SKEL00957291-00001 | |
| 13. | Contract of Employment for Guenther Grant-Klar (undated) | | SSMT1/11-25 |
| 14. | Contract of Employment for Graham Horn dated 3 May 2010 | DWF016725_0001 | |
| 15. | Email from Sanjay Shah dated 14 June 2013 confirming Graham Horn's last day at Solo Capital | GOAL_00001615-0001 | |
| 16. | Contract of Employment for Jas Bains dated 1 October 2010 | SKEL00495847-00001 | |
| 17. | Contract of Employment for Edo Barac (undated) | | SSMT1/26-45 |

133

| 18. | Contract of Employment for Anupe Dhorajiwala dated 16 January 2012 | DWF001946_0001 | |
| 19. | Letter of Resignation from Solo Capital (Dubai) Limited signed by Anupe Dhorajiwala dated 24 September 2013 | SKEL01026184-00001 | |
| 20. | Limited Liability Partnership Deed relating to Solo Capital Partners LLP dated 28 March 2012 | DWF015237_0001 | |
| 21. | Contract of Employment for Mankash Jain dated 13 July 2011 | SKEL00995402-00001 | |
| 22. | Contract of Employment for Priyan Shah dated 13 February 2012 | SKEL00192712-00001 | |
| 23. | Contract of Employment for Gerard O'Callaghan dated 26 March 2012 | PSGOC0033431 | |
| 24. | Limited Liability Partnership Deed relating to Solo Capital Partners LLP dated 1 September 2012 | DWF011347_0001 | |
| 25. | Letter dated 1 September 2012 to Gerard O'Callaghan superseding the LLP Deed dated 1 September 2012 | SKEL00192717-00001 | |
| 26. | Contract of Employment for Craig Price dated 29 February 2012 | DWF026970_0001 | |
| 27. | Email from Dominique Lawrie dated 27 November 2013 regarding resignation of Craig Price | SKEL00323488_00001 | |
| 28. | Email from Sanjay Shah dated 5 March 2013 introducing Anthony Mark Patterson | SKEL00205445-00001 | |
| 29. | Side letter to the LLP agreement confirming Omar Arti's date of employment | SKEL00281437-00001 | |
| 30. | Certification of Incorporation for Solo Capital (Dubai) Limited (Elysium Global (Dubai) Limited) | BARAC00010450 | |
| 31. | Certificate of incorporation for Ganymede Cayman Ltd dated 16 June 2010 | SKEL00003133-0001 | |
| 32. | Register of Members for Ganymede Cayman Ltd dated 23 October 2014 | USHAH00004263-001 | |
| 33. | Register of Directors for Ganymede Cayman Ltd dated 24 October 2014 | USHAH00004262-001 | |
| 34. | Emails between Jim Hoogewerf and Sanjay Shah dated 13 December 2013 | SKEL00329001-00001 | |

| 35. | FCA Summary Page for West Point Derivatives Ltd | | SSMT1/46-53 |
|---|---|---|---|
| 36. | FCA list of Individual Controlled Functions for West Point Derivatives Ltd | | SSMT1/54-58 |
| 37. | Certificate of Incorporation for Telesto Markets LLP dated 10 October 2013 | SKEL00278911-00001 | |
| 38. | FCA Summary Page for Telesto Markets LLP | | SSMT1/59-65 |
| 39. | FCA list of Individual Controlled Functions for Telesto Markets LLP | | SSMT1/66-67 |
| 40. | FCA Summary Page for Old Park Lane Capital Limited | | SSMT1/68-74 |
| 41. | FCA list of Individual Controlled Functions for Old Park Lane Capital Limited | | SSMT1/75-77 |
| 42. | Certificate of Incorporation for Parla Global Investments Limited dated 8 July 2015 | SKEL00142818-0001 | |
| 43. | Certificate of Incorporation for Acai Investments Limited dated 7 July 2015 | SKEL00785237-00001 | |
| 44. | Certificate of Incorporation for Philo Capital Ltd dated 3 October 2014 | SKEL00114940-0001 | |
| 45. | Certificate of Incorporation for Fire Capital One Limited dated 29 May 2015 | SKEL00785514-00001 | |
| 46. | Stock Transfer Form for purchase of shares in Novus Capital Markets Limited (unsigned) | SKEL00632770-00001 | |
| 47. | Solo Group (Holdings) Limited board meeting minutes dated 20 May 2015 | SKEL00657115-00001 | |
| 48. | FCA Summary Page for Novus Capital Markets Ltd | | SSMT1/78-82 |
| 49. | FCA list of Individual Controlled Functions for Novus Capital Markets Ltd | | SSMT1/83-88 |
| 50. | Stock transfer form transferring shares from Gelara Avak to Arche Cayman Limited dated 24 April 2015 | SKEL01090975-00001 | |
| 51. | Stock transfer form transferring shares from Aryeh Harry Zev Rowe | SKEL01090976-00001 | |

| | | | |
|---|---|---|---|
| | to Arche Cayman Limited dated 24 April 2015 | | |
| 52. | Companies House Annual Return for Syntax GIS Ltd dated 11 May 2015 | SKEL00653237-00001 | |
| 53. | Stock transfer form transferring shares from Camilo Enrique Vargas Manzanera to Arche Cayman Limited dated 3 July 2015 | SKEL01121755-00001 | |
| 54. | Certificate of Incorporation for Theorem Technology Limited dated 23 October 2014 | SKEL00525574-00001 | |
| 55. | Certificate of Incorporation for Hydra Capital Limited dated 21 January 2015 | SKEL00841844-00001 | |
| 56. | Certificate of Incorporation for Typhon Hydra Holdings Limited dated 23 June 2015 | SKEL00144481-0001 | |
| 57. | Certificate of Incorporation for Genoa Services London Limited dated 1 December 2014 | SKEL00525573-00001 | |
| 58. | Ernst & Young Labuan/Danish Tax Opinion dated 25 November 2013 | SKEL00898208-00001 | |
| 59. | Hannes Snellman Danish Tax Opinion dated 20 December 2013 | SSHA00012450-001 | |
| 60. | FCA Summary Page for Solo Capital Partners LLP | | SSMT1/89-96 |
| 61. | FCA list of Individual Controlled Functions for Solo Capital Partners LLP | | SSMT1/97-100 |
| 62. | Hannes Snellman Danish Tax Opinion dated 25 February 2014 (draft) | SSHA00011776-001 | |
| 63. | Certificate of Incorporation for AESA Holdings (UK) Limited dated 25 June 2014 | | SSMT1/101 |
| 64. | Certificate of Incorporation on Change of Name from AESA Holdings (UK) Limited to Solo Group (Holdings) Limited dated 10 March 2016 | | SSMT1/102 |
| 65. | Email from Sanjay Shah to Mark Patterson dated 5 August 2013 | SKEL00103619-0001 | |
| 66. | Second email from Sanjay Shah to Mark Patterson dated 5 August 2013 | SKEL00256983-00001 | |

| 67. | Emails between Solo and ABN and AMRO regarding finance facilities dated 12 February 2014 and 26 February 2014 | SKEL01052330-00001 | |
|-----|------------------------------------------------------------------------------------------------------------------|--------------------|-----------------|
| 68. | PowerPoint Presentation | | SSMT1/103-132 |
| 69. | Contract of Employment for Rebecca Robson (undated) (unsigned) | SKEL00955841-00001 | |
| 70. | Certificate of Incorporation for Syntax GIS Ltd dated 25 March 2014 | SKEL00113863-0001 | |
| 71. | Emails between between Solo and ABN and AMRO dated 12 February 2014 and 17 February 2014 | STRAT-0001251 | |

137